# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WEI GAN**                                                    )
Number 1101, Floor 10, Building 2, Yard 26                     )
Xinzhuang Yijie                                               )
Chaolang District                                            )
Beijing, China;                                              )        Civil Action No. 16-cv-711
                                                             )
**WENTAO HUANG**                                              )
Number 6-1307                                                )
Guozing Jiayuan Shouti Nanlu                                 )
Haidian District                                             )
Beijing China;                                               )
                                                             )
**JIAN WANG**                                                )
Number 101, Unit 2, Building 8                               )
Qingyouyuan Beiyuan Jiayuan                                  )
Chaoyang District                                            )
Beijing 100012                                               )
China;                                                       )
                                                             )
**XUE WANG**                                                 )
Number 2-6, Building 4, Chengshi Guoji                       )
Number 259, Jinlong Road                                     )
Yubei District                                               )
Beijing 401120                                               )
China;                                                       )
                                                             )
**XIAOMENG XU**                                              )
Number 1703, Tower D, Number 9                               )
Nanhu Nanlu                                                  )
Chaoyang District                                            )
Beijing 100102                                               )
China;                                                       )
                                                             )
                    and                                      )
                                                             )
**LIHONG YANG**                                              )
Number 1-3-1601 Wanda Dahu Apartment                         )
Qinglin East Road                                            )
Chaoyang District                                            )
Beijing 100107                                               )
China,                                                       )
                                                             )
                    Plaintiffs,                              )
                                                             )

v.                                                )
                                                  )
**U.S. DEPARTMENT OF HOMELAND**                   )
**SECURITY**                                      )
245 Murray Lane, S.W. Building 410                )
Washington, D.C. 20528;                           )
                                                  )
**JEH JOHNSON, Secretary**                        )
U.S. Department of Homeland Security, in his      )
official capacity as well as his successors and   )
assigns,                                          )
245 Murray Lane, S.W. Building 410                )
Washington, D.C. 20528-0075;                      )
                                                  )
**U.S. CITIZENSHIP AND IMMIGRATION**              )
**SERVICES**                                      )
111 Massachusetts Avenue, N.W.                    )
Washington, D.C. 20529-2000;                      )
                                                  )
**LEÓN RODRÍGUEZ, Director**                      )
U.S. Citizenship and Immigration Services,        )
in his official capacity as well as his           )
successors and assigns,                           )
20 Massachusetts Avenue, N.W.                     )
Washington, D.C. 20529-2000;                      )
                                                  )
**RON ROSENBERG, Chief**                          )
Administrative Appeals Office,                    )
in his official capacity as well as his           )
successors and assigns,                           )
20 Massachusetts Avenue, N.W. MS 2090             )
Washington, D.C. 20529-2090;                      )
                                                  )
              and                                 )
                                                  )
**NICHOLAS COLUCCI, Chief**                       )
Immigrant Investor Program,                       )
in his official capacity as well as his           )
successors and assigns,                           )
131 M Street, N.E. MS 2235                        )
Washington, D.C. 20529-2090,                      )
                                                  )
                        Defendants.               )

## COMPLAINT

Plaintiffs, prospective investors of Crenshaw Community Hospital, allege as follows:

## I.    INTRODUCTION

1.      This civil action seeks judicial review of final agency decisions that Plaintiffs have failed to establish eligibility for classification as alien entrepreneurs under § 203(b)(5)(A) of the Immigration and Nationality Act ("INA") by a preponderance of the evidence (hereinafter the "EB-5 program").

### A.    Crenshaw Community Hospital

2.      For nearly three years, each Plaintiff has been seeking to invest $500,000 into Crenshaw Community Hospital in connection with the EB-5 program (hereinafter the "Investors").

3.      Crenshaw Community Hospital is a full-service hospital in a rural community in Luverene, Alabama. Established in 1963, it provides general medical and surgical care, obstetrics and gynecology services, inpatient and outpatient surgical procedures, and laboratory, radiological, physical therapy, home health, and psychiatric services.

4.      A foundation of the community, Crenshaw Community Hospital truly serves the needs of its people. From treating rabid bob cat attacks and tragic accidents to sponsoring local fun runs, this small-town hospital alleviates the suffering of its patients and lifts up the community.  *See, e.g.,* "Alabama woman recovering from rabid bobcat attach," dtd. July 15, 2015 *available at*

*http://www.al.com/news/index.ssf/2015/07/i_wasnt_as_scared_as_i_shouldv.html;*

"Motorcyclist killed in Crenshaw County crash," dated July 15, 2015 *avialable at*

*http://www.al.com/news/montgomery/index.ssf/2015/07/motorcyclist_killed_in_crensha.html;*

Crenshaw Community Hospital Webpage, *available at*

*http://www.crenshawcommunityhospital.com/community.html* (last accessed April 11, 2016).

5.      Crenshaw Community Hospital is part of the life force of the community. It employees

nearly 100 full-time employees and many other part-time employees, and serves a county of

13,665 people. With 65 beds (45 acute care), two operating rooms, and an 24/7 emergency

care department, it serviced in 2011 alone approximately 6,230 emergency care visits and

more than 600 in-patient and out-patient surgical procedures.

6.      Unfortunately, like many of its patients, Crenshaw Community Hospital has been

suffering and needs a lift up. Operating at sustained losses, it has sought outside funding to

improve its services, increase profitability, preserve employment – and most importantly to

continue serving the people of Crenshaw County and the surrounding communities.

According to its current CEO and chief administrator:

> Although the situation right now is truly a struggle, the EB-5 funds will help
> CCH turn the corner. We expect to see bed capacities increase from 30 to
> almost 40 a night by-adding more services, more staffing and more units. . In
> short, the EB-5 funding will not just save this hospital; it will revive and lead
> us to a new chapter of healthy financial status which, in turn, will revive our
> community. …
>
> Rural health care in America is in a tough spot. Rural hospitals across Alabama
> have been closing. The most recent closure was in 2013 of Elba General
> Hospital in Elba, which is just 16 miles from Laverne (these patients are
> looking to us now - we need to be there for them and be a healthy hospital).
> Elsewhere in the state, Chilton Medical Center closed in Clanton in 2012 and
> Thomasville Hospital in nearby Thomasville closed the year prior.
>
> Crenshaw County and the surrounding community relies on CCH and the
> prospect of this funding is the hospital's only realistic way back to viability.
> Pet'r Br., Motion to Reopen, ex. 4 (filed March 2015).

7.    In 2011 Crenshaw Community Hospital entered into an agreement with the South

Central Alabama Mental Health Board "to provide crisis stabilization services to all seriously

mentally ill adult consumers of [South Central Alabama Mental Health Board] and other

consumers" who may be in need of in-patient psychiatric care for, on average, four to seven

days. *See* Form I-526 Petition, ex. 19 (filed 2013). Crenshaw intends to use part of the EB-5

investment funds to rennovate 20 beds in its South Wing to provide these crisis intervention

and stabilization services.

8.    This small community, with an annual per capita income of $14,565, is in desparate

need of such services. In 2012 the State of Alabama announced the closing of in-patient

psychiatry mental health facilities in the state due to a $40 million budget shortfall, and

announced its plans to lay off 950 employees. Due to these and other closures, the people of

Crenshaw County, Luverne, and the surrounding counties have to travel more than 50 miles to

Montgomery for in-patient crisis intervention and stabilization services. Crenshaw

Community Hospital needs an immediate cash infusion to address this dire need:

> The need for these psychiatric services for adults is growing at an alarming
> pace and we must, as guardians for healthcare growth in our community, plan
> proactively for this need. By addressing this obligation in a conscientious
> manner, we can do our part to help avert potentially dire consequences for our
> families and most assuredly for our community. However to be able to service
> this segment, we must solve financial challenges. The CCHS, LP investment
> does just that. *See* Form I-526 Petition, ex. 2, Business Plan, at pt. 26 (filed
> 2013).

9.    Its motto, "Where Caring Counts," fits Crenshaw Community Hospital's community

purpose and philosophy to improve the health status of its rural communities and the

surrounding areas through primary and secondary acute health care services.

10.   Soliciting a $6,000,000 investment (from twelve investors) through the EB-5 Program,

Crenshaw intends to continue caring where it counts by expanding into this much needed, in-patient psychiatric care model, and also by hiring more qualified surgeons and physicians to increase the capacity of the operating room.

### B.     The $6,000,000 Capital Investment

11.     Crenshaw Community Hospital solicited the assistance of CCHS, L.P., an equity partnership, to secure funding to save its operation. By mutual agreement, Professional Resources Management of Crenshaw, L.L.C. d/b/a "Crenshaw Community Hospital" has agreed to give CCHS, L.P. a 24% ownership interest in exchange for a $6,000,000 capital investment. The $6,000,000 will derive from $500,000 individual capital contributions from up to twelve qualifying immigrant investor visa petitioners under § 203(b)(5) of the INA (who each would have a 5% interest in CCHS, L.P. in exchange for their individual $500,000 capital contribution).

12.     Section 203(b)(5) of the INA provides classification to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise (including a limited partnership):

> (i) in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (c), and

> (ii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent resident or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

13.     Each of the six prospective Crenshaw Hospital Investors wired their $500,000 capital contribution in 2013 for the use and benefit of Crenshaw Community Hospital, but unfortunately, Defendants have refused to acknowledge the hospital's troubled status – despite

a $120,000 independent audit, which was prepared in accordance with generally accepted auditing standards and generally accepted accounting standards.

14.     The critically important and narrow issues in dispute pertain to whether Crenshaw Community Hospital sustained serious losses (more than 20% of its net worth) in 2011 and/or 2012; whether the job creation requirement of at least 10 saved or new jobs for U.S. workers is satisfied for each Investor; and whether the Investors (who would have a 6% preferred rate of return on their investments) have demonstrated that they have placed their capital at risk for the purpose of generating a return.

15.     With all due respect to Defendants, the Crenshaw Hospital Investors assert that the agency denials are based on incorrect factual findings and unreasonable agency legal interpretations of INA § 203(b)(5), 8 C.F.R. § 204.6, its four precedent decisions, and policies regarding the EB-5 Program.

16.     As established herein, the Crenshaw Hospital Investors contend that Defendants misapplied the facts and the law as to their eligibility for immigrant investor classification by, *inter alia*:

        a.      erroneously concluding that the Crenshaw Hospital Investors had failed to establish eligibility for the benefit sought under INA § 203(b)(5), 8 C.F.R. § 204.6, and the four precedent decisions by a preponderance of the evidence;

        b.      erroneously concluding that the Crenshaw Hospital Investors had not demonstrated through reliable and credible evidence Crenshaw Community Hospital's status as a "troubled business" under 8 C.F.R. 204.6;

        c.      erroneously concluding that the Crenshaw Hospital Investors had not satisfied the job creation requirement under INA § 203(b)(5) and 8 C.F.R. § 204.6; and

c.      erroneously concluding that the Crenshaw Hospital Investors had not

demonstrated that they have placed their capital at risk for the purpose of generating a return.

17.     Plaintiffs, and by extension Crenshaw Community Hospital and the community of

Crenshaw County, have been injured by Defendants' actions. The Plaintiffs are seeking

declaratory and injunctive relief under the Administrative Procedures Act ("APA"), 5 U.S.C.

§ 701, *et seq*., and related authorities.

## II.      JURISDICTION AND VENUE

18.     The civil action arises under the Constitution and the laws of the United States. This

Court has subject-matter jurisdiction over this civil action pursuant to 5 U.S.C. § 702, 28

U.S.C. §§ 1331, 1361, and 2201–2202. Because Defendants' decision on a petition for an

EB-5 visa is not discretionary, neither the immigration laws nor the APA withdraws

jurisdiction.

19.     Defendants, agencies of the United States and their officers acting within their official

capacities, are subject to personal jurisdiction within the District of Columbia for purposes of

the Constitution's due process clause and the District of Columbia's long-arm statute.

20.     Venue lies in this judicial district under 28 U.S.C. § 1391(e) because Defendants are

agencies and officers of agencies of the United States who reside in this judicial district.

## III.      PARTIES

### A.      The Plaintiffs: Crenshaw Community Hospital Investors

21.     Ms. Wei Gan, a citizen and resident of China, transferred $540,000 to a U.S. escrow

account on May 23, 2013 for her investment (through an equity partnership) into Crenshaw

Community Hospital. She filed a Form I-526, Immigration Petition by Alien Entrepreneur on

June 17, 2013 (No. WAC-13-905-29002), a Form I-290B, Motion to Reopen on March 13,

2015 (No. WAC-15-902-12707), and a Form I-290B, Appeal to the Administrative Appeals Office (hereinafter the "AAO") on October 2, 2015 (No. WAC-16-900-12101). The Immigrant Investor Program Office (hereinafter the "IPO") denied her Form I-526 Petition on February 10, 2015 and her Motion to Reopen on September 3, 2015. As of the date of this Complaint, the AAO has not issued its decision on Ms. Gan's appeal, but it is expected imminently based on the March 25, 2016 and April 5, 2016 identical denials for the other similarly situated Plaintiffs. *See Matter of J-W-*, ID# 15937 (AAO Mar. 25, 2016); *Matter of X-X-*, ID# 15936 (AAO Mar. 25, 2016); *Matter of L-Y-*, ID# 15912 (AAO Mar. 25, 2016); and *Matter of X-W-*, ID# 16028 (AAO Apr. 5, 2016).

22.     Mr. Wentao Huang, a citizen and resident of China, transferred $540,000 to a U.S. escrow account on August 1, 2013 for his investment (through an equity partnership) into Crenshaw Community Hospital. He filed a Form I-526, Immigration Petition by Alien Entrepreneur on August 20, 2013 (No. WAC-13-905-88146), a Form I-290B, Motion to Reopen on March 13, 2015 (No. WAC-15-902-12703), and a Form I-290B, Appeal to the AAO on September 9, 2015 (WAC-15-905-78846). The IPO denied his Form I-526 Petition on February 10, 2015 and his Motion to Reopen on August 6, 2015. The AAO rejected his appeal on March 22, 2016 as untimely filed. *See Matter of W-H-*, ID# 15908 (AAO Mar. 22, 2016).

23.     Mr. Jian Wang, a citizen and resident of China, transferred $540,000 to a U.S. escrow account on June 26, 2013 for his investment (through an equity partnership) into Crenshaw Community Hospital. He filed a Form I-526, Immigration Petition by Alien Entrepreneur on July 15, 2013 (No. WAC-13-905-53785), a Form I-290B, Motion to Reopen on March 13, 2015 (No. WAC-15-905-12705), and a Form I-290B, Appeal to the AAO on September 1,

2015 (No. WAC-15-905-63520). The IPO denied his Form I-526 Petition on February 10,

2015 and his Motion to Reopen on July 31, 2015. The AAO denied his appeal on March 25,

2016. *See Matter of J-W-*, ID# 15937 (AAO Mar. 25, 2016).

24.     Ms. Xue Wang, a citizen and resident of China, transferred $540,000 to a U.S. escrow

account on January 22, 2013 for her investment (through an equity partnership) into Crenshaw

Community Hospital. She filed a Form I-526, Immigration Petition by Alien Entrepreneur on

July 12, 2013 (No. WAC-13-905-52404), a Form I-290B, Motion to Reopen on March 10,

2015 (No. WAC-15-902-04021), and a Form I-290B, Appeal to the AAO on September 1,

2015 (No. WAC-15-905-65095). The IPO denied her Form I-526 Petition on February 6,

2015 and her Motion to Reopen on July 31, 2015. The AAO denied her appeal on April 5,

2016. *See Matter of X-W-*, ID# 16028 (AAO Apr. 5, 2016).

25.     Ms. Xiaomeng Xu, a citizen and resident of China, transferred $540,000 to a U.S.

escrow account on August 22, 2013 for her investment (through an equity partnership) into

Crenshaw Community Hospital. She filed a Form I-526, Immigration Petition by Alien

Entrepreneur on September 13, 2013 (No. WAC-13-906-09643), a Form I-290B, Motion to

Reopen on March 13, 2015 (No. WAC-15-902-12708), and a Form I-290B, Appeal to AAO

on September 3, 2015 (No. WAC-15-905-68334). The IPO denied her Form I-526 Petition on

February 10, 2015 and her Motion to Reopen on August 6, 2015. The AAO denied her appeal

on March 25, 2016. *See Matter of X-X-,* ID# 15936 (AAO Mar. 25, 2016).

26.     Ms. Lihong Yang, a citizen and resident of China, transferred $540,000 to a U.S.

escrow account on January 29, 2013 for her investment (through an equity partnership) into

Crenshaw Community Hospital. She filed a Form I-526, Immigration Petition by Alien

Entrepreneur on April 2, 2013 (No. WAC-13-904-56668), a Form I-290B, Motion to Reopen

on March 13, 2015 (No. WAC-15-902-12704), and a Form I-290B, Appeal to the AAO on

September 3, 2015 (No. WAC-15-905-68335). The IPO denied her Form I-526 Petition on

February 23, 2015 and her Motion to Reopen on August 4, 2015. The AAO denied her appeal

on March 25, 2016. *See Matter of L-Y-*, ID# 15912 (AAO Mar. 25, 2016).

### B.    The Defendants

27.    The U.S. Department of Homeland Security ("DHS") is the federal agency bearing

responsibility  for administration and enforcement of the nation's immigration laws.

28.    Defendant Jeh Johnson is sued in his official capacity as DHS Secretary in which

he is charged with the just administration and enforcement of the immigration laws. 8

U.S.C. § 1103(a).

29.    U.S. Citizenship and Immigration Services ("USCIS"), a bureau of the U.S.

Department of Homeland Security, is  responsible for awarding visa  petitions in appropriate

circumstances  consistent with the INA. As used below, "USCIS" refers to both the U.S.

Citizenship and Immigration Services, and predecessor  agency U.S. Immigration and

Naturalization Services.

30.    Defendant León Rodríguez is sued in his official capacity as Director of USCIS.

31.    Defendant Ron Rosenberg is sued in his official capacity as USCIS Chief of the

Administrative Appeals Office.

32.    Defendant Nicholas Colucci is sued in his official capacity as USCIS Chief of the

Immigrant Investor Program Office.

### IV.    FACTS

33.    The administrative record for each Crenshaw Hospital Investor contains more than

1,500 pages of nearly-identical documentary evidence attached as Exhibits to the original

Form I-526 Petitions (filed between April to September 2013), the Responses to "Requests for

Evidence" (filed in November 2014), the Form I-290B, Motions to Reopen (filed in March

2015), and the Form I-290B, Appeals to the Administrative Appeals Office (filed in

September 2015).

### A.    <u>Troubled Business and the Job Creation Requirement</u>

*Statutory, Regulatory, and Policy Framework*

34.    INA § 203(b)(5) requires the prospective investor to invest the required capital

contribution for the purpose of engaging in a new commercial enterprise. 8 U.S.C. §

1153(b)(5)(A) (i.e. more than $1,000,000 or $500,000 if in a qualifying underserved, targeted

employment area). The investment must "benefit the United States economy and create full-

time employment for not fewer than 10 United States citizens" or other persons lawfully

authorized to be employed in the United States. *Id*. at § 1153(b)(5)(A)(ii).

35.    When the investment is into an existing, "troubled business," 8 C.F.R. § 204.6(j)(4)(ii)

identifies the evidentiary standard for satisfying the job creation requirement for both

preserving existing jobs and creating new ones:

> Troubled business. To show that a new commercial enterprise which has been
> established through a capital investment in a troubled business meets the
> statutory employment creation requirement, the petition must be accompanied
> by evidence that the number of existing employees is being or will be
> maintained at no less than the pre-investment level for a period of at least two
> years. Photocopies of tax records, Forms I-9, or other relevant documents for
> the qualifying employees and a comprehensive business plan shall be
> submitted in support of the petition.

36.    Although the term, "troubled business" is not defined in the INA, 8 C.F.R. § 204.6(e)

defines a "troubled business" based on a ratio of net worth to net loss:

> [A] business that has been in existence for at least two years, has incurred a net

loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien entrepreneur's Form I-526, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss. For purposes of determining whether or not the troubled business has been in existence for two years, successors in interest to the troubled business will be deemed to have been in existence for the same period of time as the business they succeeded.

37.     Defendant DHS and USCIS's policy memorandum governing EB-5 adjudications, entitled "Policy Memorandum, EB-5 Adjudications Policy," PM-602-0083, dated May 2013, available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/May/EB-5%20Adjudications%20PM%20%28Approved%20as%20final%205-30-13%29.pdf* (hereinafter EB-5 Policy Memo) emphasizes that the U.S. economy benefits when immigrant investors help troubled businesses, and that the preservation of jobs also counts towards satisfying the overall job creation requirement under § 203(b)(5) of the INA:

> The EB-5 Program recognizes that in the case of a troubled business, *our economy benefits* when the immigrant investor helps preserve the troubled business's existing jobs. Therefore, when the immigrant investor is investing in a new commercial enterprise that is a troubled business, or in the regional center context, is placing capital into a job-creating entity that is a troubled business, the immigrant must only show that the number of existing employees in the troubled business is being or will be maintained at no less than the pre-investment level for a period of at least two years. EB-5 Policy Memo, at pg. 17 a(citing 8 C.F.R. § 204.6(j)(4)(ii) (emphasis added).

38.     The EB-5 Policy Memo clarifies that this regulatory provision, 8 C.F.R. § 204.6(j)(4)(ii), does not decrease the statutory numeric requirement of at least ten jobs per investor, but highlights that the jobs saved in a troubled business count:

> This regulatory provision, while allowing job preservation in lieu of job creation, does not decrease the statutory numeric requirement; in the case of a troubled business, ten jobs must be preserved, created, or some combination of the two (e.g., an investment in a troubled business that creates four qualifying jobs and preserves all six pre-investment jobs would satisfy the statutory and regulatory requirements). EB-5 Policy Memo, at pg. 18.

**(i)      Agency Factual Findings and Legal Conclusions Regarding Crenshaw Community Hospital as a Troubled Business**

39.      Defendants considered whether Crenshaw Community Hospital, as the job creating (or job preserving) entity, was a "troubled business" for the relevant twelve and twenty-four month periods prior to the Plaintiffs' 2013 priority dates.

40.      In the Notices of Decision denying the individual Form I-526 Petitions in November 2014 (prior to the filed Motions to Reopen and later filed Appeals), Defendant Immigrant Investor Program Office rejected consideration of Crenshaw Community Hospital as a "troubled business" due to the lack of an audit conducted in accordance with "Generally Accepted Accounting Principles." *See, e.g., Form I-526, Decision of X-X-*, at pg. 8 (Feb. 10, 2015). Defendant USCIS had requested this documentation in an earlier request for evidence. ("USCIS requested that Petitioner provide audited financial statements for [Crenshaw Community Hospital] that meet the requirements of GAAP"). *Id.*

41.      Crenshaw Community Hospital thereafter financed a $120,000 independent audit of their books and records in February 2015 for the period covering January 1, 2011 through June 30, 2013, and submitted the independent audit as the most reliable and best new evidence to document their status as a troubled business for the Motions to Reopen filed in March 2015.

42.      The AAO considered this February 2015 independent audit, and only one other set of documents in determining whether Crenshaw Community Hospital was a "troubled business" for the assessed 2011 to 2012 period:

a.   <u>2015 Independent Auditor's Reports for Period 2011- June 2013</u> prepared by

Branum & Company, P.C. to audit Crenshaw Community Hospital's financial statements and

balance sheets from 2011 to June 2013; *See* Pet'r Mot. to Reopen, ex. 1, Independent

Auditor's Reports (February 19, 2015 and March 6, 2015); and[1]

      b.    <u>2011-2012 (Holt) Income Tax Filings</u> prepared by Holt, McDuffee & Ramsey,

L.L.C.; *See* Pet'r Br. in Response to Request for Evidence, ex. 5 (November 2014).

43.    The AAO stated that the <u>2015 Independent Auditor's Reports</u> provided to the IPO in

the Form I-290B Motions to Reopen (filed in mid-March 2015) "support a finding that

[Crenshaw Community Hospital] qualifies as a troubled business." *See, e.g.*, *Matter of X-X-,*

ID# 15936, at *6 (AAO Mar. 25, 2016). Per these documents, the AAO wrote that the "net

gain does not outweigh the prior net losses;" and "[t]herefore, the hospital, according to these

figures, still suffered an overall loss during the two-year period prior to the filing date." *Id.*

44.    While both sets of documents covered the period 2011-2012, the <u>2015 Independent</u>

<u>Auditor's Reports</u> and the <u>2011-2012 (Holt) Income Tax Filings</u> establish firmly that

Crenshaw Community Hospital is a troubled business, the AAO nonetheless determined that

the investors had "not sufficiently explained the very large differences" between the two sets

of documents. *Id.* (finding differences in net loss figures between the tax returns and the

independent audit conducted three years later).

45.    The AAO acknowledged that "differences in accounting methodology, for example

accrual versus cash, can result in some differences in amounts between the financial

statements and the income tax returns." Yet, the AAO expressed concern that the <u>2015</u>

<u>Independent Auditor's Reports</u> found a (greater) net loss of -$3,213,524 for 2012 as compared

---

[1] The audit consisted of three reports, 2011, 2012, and the first six months of 2013.

to a $1,812,846 net loss estimated by the <u>2011-2012 (Holt) Income Tax Filings</u> for the 2012

tax filings. *Id.* at *6 (AAO determined that the Holt prepared tax filings reflected an "Ordinary

business income (loss) of ($764,491) and Net Income (loss) per books before depreciation of

($1,048,355)").

46.     The AAO did not address Defendant USCIS's earlier request to the Investors in the

August 2014 Requests for Evidence to conduct and produce a GAAP audit of Crenshaw

County Hospital or otherwise address the earlier agency finding that the <u>2011-2012 (Holt)</u>

<u>Income Tax Filings</u> were not reliable (i.e. for lack of adherence to generally accepted

accounting principles). *See*, *supra* ¶ 40.

47.     Nevertheless, because of the "substantial variance" between the <u>2011-2012 (Holt)</u>

<u>Income Tax Forms</u> and the <u>2015 Independent Auditor's Reports,</u> the AAO now concluded that

the Crenshaw Community Investors have "not shown that the figures provided in these

[audited] documents are reliable or credible. . . [and thus have] not demonstrated that PRMC,

along with its hospital operation, constitutes a troubled business. *Matter of X-X-,* at *6-7.

### (ii)     Legal Errors and Material Evidence in the Administrative Record Not Properly Considered Regarding "Troubled Business" Status

48.     The AAO's findings regarding Crenshaw Community Hospital's status as a troubled

business under 8 C.F.R. § 204.6(j)(4)(ii) constitutes prejudicial error in violation of 5 U.S.C.

§§ 706(2)(A), (C)-(F).

49.     The AAO's findings are internally inconsistent with findings otherwise in the

administrative record.

50.     Crenshaw County Hospital, which is already struggling financially, paid for the

independent audit *because* it relied on Defendant USCIS's intimation in the August 2014

Requests for Evidence that such an audit would address any concerns about its status as a

troubled business. *See supra*. ¶ 40.

51.     The AAO also failed to reconcile the internal agency inconsistencies that Defendant

Immigrant Investor Program Office had previously found that the 2011-2012 (Holt) Income

Tax Filings were not reliable because they were not prepared in accordance with generally

accepted accounting practices. *Id.* It was specifically found in February 2015 that the financial

statements provided by Holt, McDuffee & Ramsey, L.L.C were "not credible evidence"

because they did not "follow Generally Accepted Accounting Principles." *See, e.g.,* Form I-

526 Decision of X-X-, at pg. 8 (Feb. 10, 2015) .

52.     The AAO erred by failing to afford appropriate weight to the comprehensive and

independent audit prepared by Branum & Company, P.C., certified public accounts and

members of the American Institute of Certified Public Accountants, for the covered periods

(January 1, 2011- June 30, 2013) (hereinafter the "Independent Auditor"). *See* 8 C.F.R. §

204.6(e) (requiring the "troubled business" analysis to be "determined on the basis of

generally accepted accounting principles").

53.     The Independent Auditor prepared the 2015 Independent Auditor's Reports in

accordance with both generally accepted auditing standards ("GAAS") and generally accepted

accounting principles ("GAAP"):

> Our responsibility is to express an opinion on these financial statements based
> on our audit. We conducted our audit in accordance with *auditing standards*
> *generally accepted* in the United States of America. Those standards require
> that we plan and perform the audit to obtain reasonable assurance about
> *whether the financial statements are free from material misstatement.*

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion. *See* Pet'r Motion to Reopen, ex. 1, Independent Auditor's Report (February 19, 2015).

54.     The Independent Auditor plainly explained in the <u>2015 Independent Auditor's Reports</u>

that their actual results could differ depending on the estimates and assumptions affecting

reported amounts of assets and liabilities for the period covered in the audit:

In preparing financial statements in accordance with generally accepted accounting principles, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements and revenues and expenses during the reporting period. Actual results could differ from those estimates. *See* Pet'r Mot. to Reopen, ex. 1, Independent Auditor's Report, Note to the Financial Statement, (February 19, 2015).

55.     The Independent Auditor also established that their assessment did not take into

account or otherwise seek to reconcile any accounting discrepancies associated with any

previously filed tax returns:

The Company is treated as a partnership for federal and state income·tax purposes. Members are taxed individually on their proportionate share of the Company's net income. Accordingly, federal and state income taxes *have not been recorded in the financial statements*.

The Company's income tax returns are subject to review by the Internal Revenue Service and the state taxing authority generally for three years after

they were filed. As of [June 30, 2013, December 31, 2012 and 2011], the Company had no uncertain tax positions, or interest and penalties that qualify for either recognition or disclosure in the financial statements. *See* Pet'r Mot. to Reopen, ex. 1, Independent Auditor's Report, Note to the Financial Statement, (February 19, 2015).

56.     The AAO further failed to address the February 23, 2015 letter in the administrative record from Holt, McDuffee & Ramsey, L.L.C. certified public accounts and Crenshaw Community's income tax preparers, disclaiming *reliability* to the members of Crenshaw Community Hospital based on their inability to conduct an independent, GAAP audit:

> We have compiled the accompanying balance sheet of Professional Resources Management of Crenshaw, LLC as of March 31, 2013, and related statements of income for the year then ended. <u>We have not audited</u> or reviewed the accompanying financial statements and, accordingly, <u>do not express an opinion</u> or provide any assurance about whether the financial statements are in accordance with accounting principles generally accepted in the United States of America . . . <u>We are not independent</u>. *Cf.* 8 C.F.R. § 204.6(e) (requiring the "troubled business" analysis to be "determined on the basis of generally accepted accounting principles") (emphasis added).

57.     Any variations can be further reconciled – Holt has impliedly endorsed the reliability and credibility of the <u>2015 Independent Auditor's Reports</u> as the best evidence. On February 23, 2015 by letter to the Crenshaw Hospital Investor's equity partnership (CCHS, L.P.), Holt, McDuffee & Ramsey, L.L.C., as Crenshaw Community Hospital's regular accountants (and income tax form preparers) endorsed the generally accepted accounting principles used by the Independent Auditors in preparing the comparative audit of the balance sheets as of December 31, 2012 and 2011. *See* Pet'r Br., Mot. to Reopen, ex. 1, Ltr. from Holt, dated Feb. 23, 2015 (filed March 2015).

58.     Based on Holt's review and affirmation of the superseding <u>2015 Independent Auditor's Reports</u>, Holt affirmed their earlier position that it "is very apparent that [Crenshaw Community Hospital] meets the definition of a "Troubled Business" based on their net

operating losses which exceed twenty percent of the net worth. *Id.* at pg. 2. *See also,* Pet'r Br. to Request for Evidence, ex. 5, Ltr. from Holt dtd. Nov. 4, 2014 (filed Nov. 2014).

59.     Despite the superseding reliability of the comprehensive <u>Independent Auditor's</u> <u>Reports</u> over the earlier work performed by Holt, McDuffee & Ramsey, L.L.C. some three years before (which nonetheless also concluded that the business is troubled), there are strong consistencies regarding the troubled status that heightens the reliability of the <u>Independent</u> <u>Auditor's Reports</u>.

60.     For instance, to the benefit of the Crenshaw Hospital Investors, the Independent Auditor actually found a *greater amount* of net loss than what was reflected in the 2011 and 2012 tax filings prepared by Holt for the 2012 tax year: $3,213,524 of loss versus $1,812,846 of loss. *See, e.g., Matter of X-X-,* at *6. The three-year general statute of limitations for amending a tax return has passed for the 2011 and 2012 tax years, but Crenshaw Community Hospital's variations likely resulted in a greater tax burden.

61.     Credibility and reliability problems usually result from over-reporting losses and deductions – as opposed to underreporting which Crenshaw Community Hospital (as revealed through the <u>Independent Auditor's Report</u>) seems to have inadvertently done through the Holt prepared tax forms in 2011 and 2012.

62.     Any conflict between the 2011 and 2012 filed tax returned by Holt and the <u>2015</u> <u>Independent Auditor's Reports</u> are fully reconcilable; and regardless, any such variations are immaterial for the actual determination of whether Crenshaw Community Hospital qualifies as a "troubled business" as "determined on the basis of generally accepted accounting principles." 8 C.F.R. § 204.6(e).

63.     The AAO also failed to consider significant factual evidence in the administrative

record establishing the superior reliability of the <u>2015 Independent Auditor's Reports,</u> and

other relevant documentation to explain the harmless variations between the two sets.

64.     Like Holt, Crenshaw Community Hospital also concurs with the reliability and

credibility of the <u>2015 Independent Auditor's Reports</u> to such an extent that it forms the basis

of its revised business plan. At the request of USCIS, Crenshaw Community Hospital

provided to USCIS (through the Investors) a revised business plan that substantially relied on

<u>2015 Independent Auditor's Reports</u>. *See* Pet'r Mot. to Reopen, ex. 3, USCIS-requested

Revisions to EB-5 Business Plan, dated Feb. 20, 2015 (filed March 6, 2015) (hereinafter the

"<u>2015 Revised Business Plan</u>").

65.     Crenshaw Community Hospital's <u>2015 Revised Business Plan</u> was "made after the

results of the GAAP-compliant audit became availably, which in turn form the basis for a

revised economic impact analysis." *Id.* at pg. 1. *See also*, *id.* at pgs. 5-6 ("[b]elow you will

find a pro forma case flow based upon actual 2011 and 2012 <u>audited</u> year-end income

statements . . . CCH's actual information for 2011-13 is below (with 2011 and 2012 being

derived from audited financial statements) along with the expected figures for 2014")

(emphasis in original).

66.     Michael K. Evans, Ph.D., chairman of Evans, Carroll, and Associates, Inc., an

economic consulting firm, submitted into the administrative record, an expert report entitled

the "Economic Impact of Expanding the Crenshaw Community Hospital, A Troubled

Business Located in Crenshaw County, AL, as Part of an Existing EB-5 Regional Center,"

dated September 2012 (hereinafter the "<u>2012 Economic Impact Expert Report</u>"). *See* Form I-

526, Pet'r Br., ex. 4 (filed 2013).

67.     Dr. Evans, whose resume is appended to his expert economic report, holds a Ph.D. in

economics from Brown University, has taught economics at the Wharton School and

Northwestern University, and has published dozen of peer-reviewed journal articles and

books. *Id.* at app. He has been a regular contributor to the *Los Angeles Times'* Board of

Economists, has consulted for the Senate Finance Committee, the Environmental Protection

Agency, the National Aeronautics and Space Administration, the U.S. Treasury, the U.S.

Department of Agriculture, the Organization of Economic Cooperation and Development, and

has developed econometric models for the State of New York, the State of Pennsylvania, and

Washington, D.C. among others. *Id.*

68.     Dr. Evans' expert assessment on the status of Crenshaw Community Hospital as a

"troubled business" is in the administrative record. Dr. Evans did not conduct his own

calculations on whether Crenshaw Community Hospital had incurred a net loss for accounting

purposes (determined on the basis of generally accepted accounting principles)." 8 C.F.R. §

204.6(e).   Dr. Evans did, however, review "payroll records, income statements, and balance

sheets for 2010-2011 operations at the hospital" under  8 C.F.R. 204.6(j)(4)(ii) to determine

whether the job creation requirement was satisfied for Crenshaw Community Hospital as a

troubled business. Form I-526, Pet'r Br., ex. 4, at pg. 31. Dr. Evans offered the following:

> Crenshaw community Hospital (CCH) operates a 65 bed hospital in a rural
> county in Alabama. The Hospital was originally constructed in 1963 and was
> partially renovated in 2005-2007. Over the past two years, however, the
> hospital has operated at a loss and its assets have declined, *so it is a troubled
> business as defined by the USCIS. Id.* at pg. 3.
>
> Section (8) shows the payroll records of the hospital for 2010 and 2011, and
> calculates the number of full-time and FTE jobs that are being saved. It also

includes *the income statements and balance sheets for those years, attesting to the status of this hospital as a troubled business. Id.* at pg. 7 (emphasis added).

*This business qualifies as a troubled business*, which is defined, according to 8 CFR 204.6(e), as a business that has been in existence for at least two years, has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the 12 or 24-month period prior to the priority date on the alien entrepreneur's Form I-526, and the loss for such period is at least equal to twenty per cent of the troubled business's net work prior to such loss. *Id* at pg. 88.

69.    To the absolute detriment of the rural community, Defendants have incorrectly

determined that the hospital does not constitute a troubled business.

### (iii)    Agency Factual Findings and Legal Conclusions Regarding the Job Creation Requirement

70.    The AAO's findings regarding the job creation requirement under INA § 203(b)(5)

and 8 C.F.R. §§ 204.6(j) and (g) constitute prejudicial error in violation of 5 U.S.C. §§

706(2)(A), (C)-(F).

71.    Based on the determination that Crenshaw Community Hospital is not a "troubled

business," the AAO concluded that each of the twelve investors must create at least ten *new*

jobs individually (and thus not benefit from any provisions allowing for the preservation of

existing jobs in a troubled business). *See Matter of X-X-,* at pgs. 7-8.

72.    The AAO also identified some variations within the documents submitted in the

administrative record during this nearly three year proceeding:

a.    Dr. Evan's 2012 Economic Impact Report projected 204 saved jobs, 137 direct

and 67 indirect and induced;

b.    The 2013 Business Plan referenced the preservation of 205 full-time employees

with a total staff of 248 employees;

    c.      The <u>2015 Revised Business Plan</u> the preservation of 112 jobs and the creation of 61 new jobs; and

    d.      The <u>2015 Economic Impact Report</u> estimated the preservation of 112 jobs saved and the creation of 61 new jobs. *Id.* at 7.

73.    The AAO finds that there has been no explanation or offered materials to resolve the inconsistencies.

74.    The AAO also considered, *in dicta*, whether the Crenshaw Community Hospital Investors could satisfy the job creation requirement based only on the estimated 61 new jobs to be created. (The AAO premised this analysis on a finding that the business was not troubled, and thus, the 112 saved jobs would not count towards the job creation requirement). *Id.* at 7.

75.    The AAO found that the Crenshaw Community Hospital Investors had not shown, "assuming the additional [61] job creation estimate is credible and reliable . . . any reasonable agreement made among the [immigrant] entrepreneurs" regarding the allocation of the 61 new jobs to be created. *Id.* (citing 8 C.F.R. § 204.6(g)(2) ("The Service shall recognize any reasonable agreement made among the alien entrepreneurs in regard to the identification and allocution of such qualifying positions.").

76.    On the basis of Crenshaw Community Hospital's original intention to offer twelve subscriptions to qualifying immigrant investors through the equity partnership CCHS, L.P., the AAO determined that a minimum of 120 new full-time jobs would have to be created (based upon their determination that it did not qualify as a troubled business where saved American jobs counted). *Id.* at 8.

**(iv)    Legal Errors and Material Evidence in the Administrative Record Not Properly Considered Regarding the Job Creation Requirement**

77.    The AAO erred in its factual and legal finding that Crenshaw Community Hospital was not a troubled business under 8 C.F.R. § 204.6.

78.    By and through this error, AAO has failed properly to consider the 112 preserved jobs and projected 61 newly created jobs under the 2015 Economic Impact Report and/or the 204 saved jobs under the 2012 Economic Impact Report.

79.    The variations between the 2012 Economic Report, and its associated 2013 Business Plan, and the 2015 Economic Impact Report, and its associated 2015 Revised Business Plan are self-evident:

a.    The 2015 Economic Impact Report and 2015 Business Report are based on the revised data provided in the 2015 Independent Auditor's Reports;

b.    Crenshaw Community Hospital is an on-going (albeit troubled) concern with regular personnel and market changes such that differences between 2012 and 2015 should be expected;

c.    The differences are marginal in any event. The 2012 Economic Report and the 2015 Economic Impact Report, reflect a jobs variance of only ~15% due to the latter's reliance on variables after September 2012, to include the actual 2012 revenues and projected 2017 revenues. Pet'r Br., Mot. to Reopen, ex. 2, Economic Report of Robert Kulick, dated Feb. 23, 2015, at ¶ 2 (filed Mar. 2015); and

d.    The reasons for these variations are fully supported in the administrative

record. For instance, the 2015 Updated Business Plan provides that "[t]he actual job creation history of [Crenshaw Community Hospital] is in line with the economist's report, which supports it reasonability." *Id.* at ex. 4, pg. 2; *see id.* at pg. 3 ("83 people were employed in a full-time capacity as the start of the year . . . [n]aturally, there are more full time positions, though some of those positions experienced turnover; approximately 20 employees either left of started during 2012. At any given time, [Crenshaw Community Hospital] has about 100 individuals employed in what the USCIS would consider a full-time capacity").

80.     The AAO further committed legal error in its finding that, even if Crenshaw Community Hospital were not a troubled business (where the 112 saved American jobs do not count), the job creation requirement of 10 jobs per individual investor had not been met:

    a.      At the Form I-526 filing stage, there is no statutory, regulatory, or policy requirement for immigrant investors to submit an agreement on job allocation among multiple investors. If multiple immigrant investors do enter into, and submit such an agreement, the only requirement is for USCIS - they *must* consider any reasonable job allocation agreement. In other words, "the [USCIS] *shall* recognize any "reasonable agreement made among the alien entrepreneurs in regard to the identification and allocation of such qualifying positions." 8 C.F.R. § 204.6(g)(2) (emphasis added);

    b.      The purpose of the two-year conditional period of residence (after Form I-526 approval), is to ensure that the conditions under INA § 203(b)(5) have been met – i.e. the qualifying investment and the creation of at least 10 jobs per the individual investor;

    c.      Overlooked by USCIS in the administrative record is a March 1, 2013 agreement between Crenshaw Community Hospital Investor's limited partnership (CCHS,

L.P.) and Crenshaw Community Hospital. *See* Pet'r Br. in Response to Request for Evidence, ex. 1, (November 2014). This agreement, which applies to the multiple immigrant investors as limited partners, specifies that the Investors' shares and interests into the Hospital "*shall be reduced on a pro rata basis*" contingent on the number of approved EB-5 investors. *Id.* (emphasis added); and

      d.     For the six Crenshaw Hospital Investors here, no such prior *pro rata* agreement is required by statute, regulation, or policy; however, 61 new jobs pro rated as to six investors satisfies a minimum of ten jobs per investor.

81.     To the absolute detriment of the current and prospective employees in rural Crenshaw County, Defendants have incorrectly construed the job creation requirement.

    **C.**     **Capital Placed at Risk to Generate a Return**

*Statutory, Regulatory, and Policy Framework*

82.     Section 203(b)(5) of the INA requires an investment of a qualifying amount of capital into a new commercial enterprise.

83.     Under 8 C.F.R. § 204.6(j)(2), an immigrant visa petitioner must demonstrate that he or she "has placed the required amount of capital at risk for the *purpose of generating* a return on the capital placed at risk." (emphasis added).

84.     <u>The EB-5 Policy Memo</u> clarifies that "commercial enterprise must be one that is *designed* to make a profit." *Id.* at pg. 9 (citing 8 C.F.R. 204.6(e)) (emphasis added). For capital to be 'at-risk' there must be a risk of loss and a *chance* for gain." *Id. at* pg. 5 (emphasis added). USCIS's policy rational is simple: "The EB-5 Program is seeking to attract

individuals from other countries who are willing to put their capital at risk in the United

States, *with the hope of a return on their investment*, to help create U.S. jobs." *Id.*

> **(i)    Agency Factual Findings and Legal Conclusions Regarding Purpose and Chance for Gain**

85.    The AAO found that the Crenshaw Hospital Investors have not shown the present

commitment of capital for the purpose of generating a return. *Matter of X-X-*, at pg. 4.

86.    The AAO considered the <u>2015 Revised Business Plan</u>'s anticipation of being cash

flow positive in 2015 and an estimated net gain of approximately $500,000 in 2019. *Id.*

87.    The AAO also considered a March 1, 2013 document entitled "<u>Equity Investment

Agreement</u>" between CCHS, L.P. and Crenshaw Community Hospital specifying that CCHS

will invest up to $6,000,000 in exchange for a 24 percent interest, plus a six percent preferred

rate of return on the capital account, or an annual preferred return rate of $360,000 to be

shared among the 12 limited partners within CCHS, L.P.. *Id.* at pg. 5.

88.    The AAO disregarded both the <u>2015 Revised Business Plan</u> and the <u>Equity Investment

Agreement</u> because the business plan did not in its *pro forma* project any anticipated

distributions to the Crenshaw Hospital Investors per the Equity Investment Agreement. *Id.*

> **(ii)    Legal Errors and Material Evidence in the Administrative Record Not Properly Considered Regarding Purpose and Chance for Gain**

89.    The AAO neglected to consider that the design of the new commercial enterprise,

CCHS, L.P., the equity partnership, expressly offers and provides a meaningful *chance* and

*hope* of a return on the $500,000 capital investment.

90.    The AAO failed to review the <u>Confidential Offering Memorandum</u>, dated June 19,

2012, wherein the investors are informed that distributions of profits in the troubled business

are – subject to profitability:

> The availability and timing of cash distributions is uncertain. (emphasis in
> original) The Limited Partnership does not expect to make significant
> distributions to its Limited Partners until the Project *has consistent income* . . .
> Form I-526, Pet'r Br., ex. 5, Confidential Offering Memorandum, dtd. June 19,
> 2012, at pg. 9 (filed in 2013) (emphasis added); *see also*, *id.* at ex. 7, Limited
> Partnership Agreement at pgs. 16-18 (referencing allocations of profits, losses,
> and distributions).

91.     The 2015 Revised Business Plan directly addressed the *chance* and *hope* for a return

on the investment for the partners based on the design of the plan.

> Significant progress on getting the inpatient rehabilitation and drug detox units
> has already been made. In fact, the drug detox unit was actually not a CCH
> idea, but rather CCH was approached by the county and asked whether this
> would be possible, as there is a significant need for this concern in Crenshaw
> County and the neighboring areas - and there is no facility capable of providing
> it. The inpatient rehabilitation is also a service that is demanded by the
> community. *CCH anticipates both to be successful and profitable, aiding its
> bottom line - but desperately needs the investment of the EB-5 funds to allow
> these two departments to begin their operations.* 2015 Revised Business Plan,
> at pg. 5.

92.     The administrative record also includes a letter from Chief Executive Officer and

Hospital Administrator for Crenshaw Community Hospital addressing the chance and hope

for a return on an investment based on the design and application of EB-5 Program to

Crenshaw Community Hospital:

> In addition to saving the positions described above, the EB-5 investment will
> allow us to "open" two new departments and hire more than 20 new full-time
> employees . . . Specifically, we plan to begin offering drug detox and inpatient
> rehabilitation services once we have access to the EB-5 funds, which will
> allow us to make some necessary minor facility upgrades and most importantly
> begin hiring and paying new staff members . . The inpatient rehabilitation is
> also a service that is demanded by the community. We expect both to be
> successful and profitable, aiding our bottom line -- but we really need the
> investment of the EB-5 funds to allow these two departments to begin their
> operations. Pet'r Br., Mot. to Reopen, ex. 4, Ltr from Brad Eisemann,
> Administrator, Crenshaw Community Hospital, dtd. Feb. 20, 2015, at pg. 4
> (filed March 2015).

93.     To further evidence the hope and chance for a return (based on the design of the equity partnership), the Crenshaw Community Investors actually made their qualifying ($500,000) capital contributions into the escrow accounts in 2013 at a time when Crenshaw Community Hospital began experiencing improved profitability. Specifically, the 2015 Independent Auditor's Reports determined that the net income increased in the first six months of 2013 by $555,925, improving the equity balance from -$3,047,573 on January 1, to $-2,491,649 on June 30, 2013. *See* Pet'r Mot. to Reopen, ex. 1, Independent Auditor's Reports, Note 8 (March 6, 2015).

94.     There is no statutory, regulatory, or policy requirement for immigrant investor visa petitioners to demonstrate "when or if [the new commercial enterprise] will have funds to distribute any [investment] returns . . . to establish a reasonable chance for gain, especially within the foreseeable future." *Cf. Matter of X-X-,* at pg. 5.

95.     Any such policy, as intimated in the AAO's denials at page 6, would dangerously approximate a "guaranteed rate of return" which is expressly prohibited by EB-5 Program policy and precedential authority. EB-5 Policy Memo, at pg. 5 ("If the immigrant investor is guaranteed the return of a portion of his or her investment, or is guaranteed a rate of return on a portion of his or her investment, then that portion of the capital is not at risk" (citing *Matter of Izummi*, 22 I & N Dec. at 169, 180-188 (Assoc. Comm'r 1998).

96.     The AAO further failed to address the letter from Mr. Eisenmann, dated August 31, 2015, submitted in response to the Forms I-290B, Notice of Appeal (filed September 2015). In this submission Crenshaw Community Hospital's CEO and administrator clarifies that the 2019 projection of a net income of $500,000 is subject to the $6 million investment

stabilization – which if all goes well, to include discounting any depreciation, could exceed $700,000. Expressing confidence in the projections, he emphasizes that with access to the $6,000,000 in investment funding, Crenshaw Community Hospital will be able to meet its obligations to the investors on the preferred rate of return (i.e. the windfall provisions).

97.     The six percent preferred rate of return (subject to the expected profitability) evidenced in the administrative record fully establishes the design of the profit generating activity, and based on the past performance, *pro forma*, and business plan projections, establishes the capital has been placed at risk for the purpose (i.e. chance and/or hope) of generating a return on the investment.

## V.     EXHAUSTION & INJURY

98.     The Crenshaw Hospital Investors have final agency decisions denying their eligibility for classification under INA § 203(b)(5), and as such, have exhausted their administrative remedies.

99.     Defendants' wrongful denials of Plaintiffs' Form I-526 petitions have caused and will continue to cause personal harm to the Crenshaw Hospital Investors.

100.    Defendants' wrongful denials of Plaintiffs' Form I-526 petitions have caused and will continue to cause an actual disruption of the economic relationship between Plaintiffs and their investments (through an equity partnership) into Crenshaw Community Hospital.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

*DEPRIVATION AND VIOLATION OF RIGHTS UNDER THE INA*

101.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs

above, inclusive.

102.    In denying Plaintiffs' eligibility for immigrant investor classifications, Defendants

have unlawfully interpreted and applied INA § 203(b)(5), 8 C.F.R. § 204.6, its four EB-5

precedent decisions, and the <u>EB-5 Policy Memo</u>.

103.    As a result, Defendants deprived Plaintiffs' of their rights under the INA to benefit

from the statute's immigrant investor provisions, and thereby violated those rights.

<div align="center"><b><u>SECOND CAUSE OF ACTION</u></b></div>

<div align="center"><i>DEPRIVATION AND VIOLATION OF RIGHTS UNDER THE APA</i></div>

104.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs

above, inclusive.

105.    Defendants' denial of Plaintiffs' Form I-526 petitions are improper and reviewable

under 5 U.S.C. § 702.

106.    As a result of these improper decisions by Defendants, Plaintiffs are "suffering a legal

wrong of agency action," are "adversely affected or aggrieved by agency action," and

therefore "[are] entitled to judicial review thereof" under 5 U.S.C. § 702.

107.    Defendants' decisions to deny Plaintiffs' visa petitions are based upon legal

interpretations and factual findings contrary to, and inconsistent with, INA § 203(b)(5), 8

C.F.R. § 204.6, the four EB-5 precedent decisions, and the applicable <u>EB-5 Policy Memo</u>.

108.    The APA directs that the "reviewing court shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.    Defendants' actions, findings, and conclusions are arbitrary, capricious, an abuse of

discretion, and not otherwise in accordance with law as follows:

a.       In violating 5 U.S.C. §§ 706(A) and (C)-(F), Defendants erroneously conclude that Plaintiffs had failed to establish eligibility for the benefit sought under INA § 203(b)(5), 8 C.F.R. § 204.6, and the four EB-5 precedent decisions "at the time of filing the benefit request and continu[ing] . . . through adjudication." 8 C.F.R. 103.2(b)(1);

b.       In violating 5 U.S.C. §§ 706(A) and (C)-(F), Defendants erroneously conclude that Plaintiffs have failed to demonstrate that Crenshaw Community Hospital was a "troubled business" during the twelve-or twenty-four month period before their priority dates under 8 C.F.R. 204.6;

c.       In violating 5 U.S.C. §§ 706(A) and (C)-(F), Defendants erroneously conclude that Plaintiffs failed to demonstrate the job creation requirement under INA 203(b)(5) and 8 C.F.R. § 204.6;

d.       In violating 5 U.S.C. §§ 706(A) and (C)-(F), Defendants erroneously conclude that Plaintiffs have not placed their capital at risk for the purpose of generating a return on the capital placed at risk under 8 C.F.R. § 204.6; and

h.       In sum, Defendants' actions, findings, and conclusions that Plaintiffs insufficiently demonstrated whether (i) Crenshaw Community Hospital was a "troubled business" under 8 C.F.R. § 204.6; (ii) whether Plaintiffs satisfied the job creation requirement under INA § 203(b)(5) and 8 C.F.R § 204.6; and (iii) whether capital has been placed at risk for the purpose of generating a return on the investment under INA § 203(b)(5) and 8 C.F.R § 204.6 is "arbitrary, capricious, and abuse of discretion, [and not] otherwise in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; [and] unsupported by substantial evidence" contrary to INA § 203(b)(5) and 8 C.F.R. § 204.6. *See* 5 U.S.C. § 706(A) and (C)-(F).

## THIRD CAUSE OF ACTION

### *DECLARATORY JUDGMENT ACT*

110.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs

above, inclusive.

111.    Plaintiffs are entitled to a declaration of their rights, namely, eligibility to classification

under INA § 203(b)(5) and 8 C.F.R. 204.6 as conditional permanent residents, which shall

have the force and effect of a final judgment, in accordance with 28 U.S.C. § 2201(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby pray for relief as follows:

a.    That the Court hold unlawful and set aside Defendants' findings that Plaintiffs

failed to establish eligibility under § 203(b)(5) of the INA as not in accordance with the INA

and APA;

b.    That the Court declare that Plaintiffs, under INA § 203(b)(5), 8 C.F.R. § 204.6,

and related authorities, fully established that (i) Crenshaw Community Hospital was a

"troubled business" for the twelve-or twenty-four month before their priority dates; (ii) the job

creation requirement has been satisfied through consideration of either the preserved and/or

individually allocated new jobs; and (iii) the capital has been placed at risk for the purpose

(i.e. hope and/or chance) of generating a return on their investment.

c.    That the Court either grant independently or direct Defendants to grant

Plaintiffs' eligibility to alien entrepreneur classification under INA § 203(b)(5);

d.    That the Court provide further relief as it deems appropriate, just, and

equitable; and

e.    That the Court grant reasonable attorney's fees, expenses and costs of court to

Plaintiff, pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, or any other applicable

provision, to include 28 U.S.C. 2412(d).

DATED: April 14, 2016

<div style="margin-left:40%">

Respectfully submitted,

//s//

_____
Jason D. Wright, Esq.
Wright Law Firm
DC Bar #1029983
40 Fulton Street - 23rd Floor
New York, New York 10038
O: 212-285-8000
M: 202-578-0260
jwright@jasonwrightesq.com

*Attorney for Plaintiff*

</div>