# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WEI GAN, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-711-RMC |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Jason D. Wright, Esq.
DC Bar # 1029983
Wright Law Firm
40 Fulton Street, 23rd Floor
New York, New York 10038
Mobile: (202) 578-0260
Office:  (212) 285-8000
Fax:  (917) 677-8577
jwright@jasonwrightesq.com

*Attorney for Plaintiffs*

Dated:   December 2, 2016
        New York, New York

# TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................1

II.    LEGAL FRAMEWORK .....................................................................................1
    A.    Section 203(b)(5) of the INA, 8 U.S.C. § 1153(b)(5)....................................1
    B.    Regulatory Framework, 8 C.F.R. § 204.6.....................................................3
    C.    Agency Interpretations of 8 C.F.R. § 204.6 ..................................................5

III.    STATEMENT OF FACTS ..................................................................................6

IV.    PROCEDURAL HISTORY................................................................................10

V.    SUMMARY OF FINAL AGENCY DECISION................................................10
    A.    Agency Findings Regarding the Business .....................................................10
    B.    Agency Findings on Capital Placed at Risk to Generate a Return .................11
    C.    Agency Findings on Troubled Business .........................................................12
    D.    Agency Findings on Job Creation..................................................................12

VI.    STANDARD OF REVIEW ................................................................................13
    A.    Scope of Judicial Review under the APA.......................................................13
    B.    Review of Form I-526 Petitions.....................................................................15

VII.    LEGAL ARGUMENT .......................................................................................15

    POINT 1:  In reviewing whether the Investors had placed the required capital investment at risk for the purpose of generating a return under 8 C.F.R. § 204.6(j)(2), the Agency acted arbitrarily and capricious by (i) first finding that the investor had satisfied the regulation through a preponderance of the evidence, (ii) then, unprompted, reversing its decision in response to a motion to reopen on other grounds, and (iii) later rejecting reliable, credible, and substantial evidence that the investment has a chance for both gain and loss.
    ......................................................................................16

    A.    The Legal Standard for At Risk .....................................................................16
    B.    Lack of Thoroughness Evident in the Agency's Consideration .....................18
    C.    Lack of Validity in the Agency's Reasoning.................................................23

    POINT 2:  In reviewing whether Crenshaw Community Hospital qualifies as a troubled business under 8 C.F.R. § 204.6(e), the Agency erred by rejecting legitimate 2011 and 2012 tax returns and financial statements as sufficient, requiring independent audited financial statements outside of the regulatory framework, and then dismissing a filed 2015 independent auditor's report as unreliable because its figures varied with the earlier 2011 and 2012 tax returns and financial statements.
    ......................................................................................26

A.       The Legal Standard for Troubled Business Status...........................................27

B.       Lack of Thoroughness Evidence in the Agency's Consideration....................28

C.       Lack of Validity in the Agency's Reasoning...................................................34

<u>POINT 3</u>:  Because Crenshaw Community Hospital is a troubled business, the Agency erred by failing to recognize that both the 61 new and 117 saved jobs in Crenshaw Community Hospital count towards the job creation requirement of ten jobs per investor; regardless, the Limited Partnership Agreement recognizes pro rata interests among the investors such that six investors may allocate the 61 new jobs among them to establish at least 10 new jobs each.

........................................................................................................40

A.       The Legal Standard for Job Creation ..............................................................41

B.       Lack of Thoroughness Evident in the Agency's Consideration ......................42

C.       Lack of Validity in the Agency's Reasoning...................................................43

VIII.   REMEDY........................................................................................................44

IX.     CONCLUSION...............................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Fogo de Chao (Holdings) Inc. v. Dep't of Homeland Security*,
    769 F.3d 1127 (D.C. Cir. 2014) ............................................................3, 14

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ..................................................15

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ...........................................................13, 14, 35

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v.*
    *State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29 (1983) ....................14

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ................................14, 15

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ...............................14

*INS v. Orlando Ventura,* 537 U.S. 12 (2002) ........................................45

**Statutes**

5 U.S.C. § 706 ......................................................................... passim

8 U.S.C. § 1153 ...................................................................... passim

8 U.S.C. § 1186b ...........................................................................3

Dep't of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations
    Act, P.L. 102-395 § 610 (Oct. 6, 1992) ..........................................2

**Legislative History**

Senate Rep. 55, 101st Cong., 1st Sess. 5 (1989).....................................41

Senate Debate on Conf. Rep. S 358 Cong. Rec. S 17105-18 Oct. (1989) .............42

**Agency Regulations**

8 C.F.R § 1351 .............................................................................2

8 C.F.R. § 204.6 ..................................................................... passim

**Agency Precedential Decision**

*Matter of Ho*, 22 I. & N. Dec. 206 (Assoc. Comm. 1998)............................. passim

*Matter of Hsiung*, 22 I. & N. Dec. 201 (Assoc. Comm. 1998)...........................5, 18

*Matter of Chawathe*, 25 I. & N. Dec. 369 (AAO 2010) ...........................15, 36, 37

*Matter of Izummi*, 22 I. & N. Dec. 169 (Assoc. Comm. 1998)..................5, 12, 18, 25

*Matter of Soffici*, 22 I. & N. Dec. 158 (Assoc. Comm. 1998) .....................5, 18

*Kenkhuis v. INS*, 2003 U.S. Dist. LEXIS 3334 *1 (N.D. Tex. Mar. 6, 2003). ........41

**Agency Interpretive Guidance**

INS Memo, EB-5 Investor, (Oct. 20, 1997).......................................5, 17

INS Office of the General Counsel Memo, Alien Entrepreneurs under Section 203(b)(5) of the
    Immigration and Nationality Act (Sep. 10, 1993) .................................5, 17

USCIS Policy Memorandum, No. P.M.-602-0082,
    EB-5 Adjudications Policy (May 30, 2013) ..................................... passim

2011 USCIS EB-5 Training Materials..............................................28, 42

2013 USCIS EB-5 Training Materials ..................................................42

## I.     INTRODUCTION

Crenshaw Community Hospital in rural Alabama is in desperate need of a cash infusion to avoid closing its doors.  More than 100 people rely on the hospital for employment, and thousands more depend on its health services.  Seeking to benefit from an innovative, Congressional program that has generated more than $11.2 billion in investments and at least 73,000 jobs nationally,[1] Crenshaw Community Hospital has recruited foreign entrepreneurs and capital under Section 203(b)(5) of the Immigration and Nationality Act ("INA").  Six foreign investors have contributed a total $3,000,000 to save the hospital; however, Defendants have denied these investors visa eligibility – and the hospital, the jobs for its employees, and the services for the community remain on life support.

This civil action challenges the decisions of the Defendant agencies and their officers (collectively the "Agency") that denied immigrant investor visa eligibility to Plaintiffs in violation of the Section 203(b)(5) of the Immigration and Nationality Act ("INA") (Count I) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (Count II).  Plaintiffs seek a declaration of rights under the INA and APA (Count III), an order vacating the Agency decisions, a judicial finding that Plaintiffs have satisfied the eligibility requirements, and a remand to the Agency for approval.

## II.     LEGAL FRAMEWORK

### A.     Section 203(b)(5) of the INA, 8 U.S.C. § 1153(b)(5)

The Plaintiffs seek eligibility for immigrant visas under the fifth employment-based preference category ("EB-5") of the Immigration Act of 1990.  *See* Pub. L. No. 101-

---

[1] Congressional Res. Serv., EB-5 Immigrant Investor Visa, No. 544475, 15 (Apr. 22, 2016).

649, §121(a) (Nov. 29, 1990) (codified at 8 U.S.C. § 1153(b)(5)) (hereinafter the "Act").  The

purpose of the law is to expand economic opportunity by permitting alien entrepreneurs to

invest in U.S. business to create jobs for Americans.  The Act has three requirements:  (1) a

foreign national must invest a qualifying capital contribution of either $1,000,000 (or

$500,000 if in an underserved area) in a new commercial enterprise; (2) that will employ a

minimum of ten U.S. workers; and (3) for an investment made after November 29, 1990.  8

U.S.C. 1154(b)(5).

        In 1992, Congress expanded the program by introducing a regional center

concept.  *See* Dep't of Commerce, Justice, and State, the Judiciary, and Related Agencies

Appropriations Act, P.L. 102-395 § 610 (Oct. 6, 1992).  This program encourages

entrepreneurs to invest in commercial enterprises located within certain, designated "regional

centers" and permits these regional centers to pool investments from multiple investors.  *See* 8

U.S.C § 1153 note.  The program further allows the alien entrepreneur to satisfy the job

creation requirement by counting not only the jobs directly created by the investment, but also

those that are indirectly created by its effect (as determined by "reasonable methodologies"),

such as the investment's revenues from "improved regional productivity, job creation, or

increased domestic capital investment resulting from the program." *Id.*

        A foreign investor bears the burden of proof in establishing eligibility under

the Act, and applies for an EB-5 visa by submitting a Form I-526, Immigrant Petition by

Alien Entrepreneur to the U.S. Citizenship and Immigration Services.  8 C.F.R. §§ 204.6(a),

(c); § 1351.  If the Agency approves the Form I-526, conditional resident status is granted

(subject to satisfying routine consular entry requirements), and the alien entrepreneur may

petition two years later (by filing a Form I-829) to remove the conditionality of their

permanent resident status and must demonstrate full compliance with the Act's requirements – i.e. the investment and job creation requirement over the two-year conditional period of residence.  8 U.S.C. § 1186b; 8 C.F.R. § 216.6.  To evaluate the merits of a petition, the Agency generally applies the Act's implementing regulations at 8 C.F.R. § 204.6 originally published in 1991, four Agency decisions from 1998 designated as precedents, and a 2013 policy memorandum.

The Form I-526 petition is filed with the Agency's EB-5 Immigrant Investor Program Office in Washington, D.C.  There are no reported decisions within this Circuit concerning the EB-5 Immigrant Investor Program.[2]  This Circuit, has however, considered the scope of judicial review for denials of visa petitions.  *See*, *e.g., Fogo de Chao (Holdings) Inc. v. Dep't of Homeland Security*, 769 F.3d 1127 (D.C. Cir. 2014) (vacating the agency's visa denial in favor of petitioner and remanding for a visa approval).

The Act, 8 U.S.C. § 1153(b)(5) and its § 1153 note, are reproduced in full at Tab 1 of the Statutory and Regulatory Appendix to Plaintiffs' Motion for Summary Judgment.

## B.    Regulatory Framework, 8 C.F.R. § 204.6

In 1991, the Agency's predecessor agency, the former Immigration and Nationalization Service ("INS") published regulations to guide the procedures and substance for alien entrepreneurs seeking eligibility under the Act and its implementing regulations.  *See* 56 Fed. Reg. 60,897; 60,910-13 (INS) (Nov. 29, 1991) (codified at 8 C.F.R. § 204.6). Consistent with the Act, an alien must demonstrate that they have invested, or are actively

---

[2] USCIS recently re-alligned and consolidated its processing of Form I-526 and Form I-829 (Petitions to Remove Conditional Residency) to Washington, D.C.

investing, lawfully obtained capital in a new commercial enterprise[3] in the United States that

will create at least ten full-time jobs for American workers.  *See* 8 C.F.R. §§ 204.6(j)(1)-(6).

The Agency interprets the Act's capital contribution requirement to require that

that an investment be placed at risk for the purpose of generating a return:

> To show that the petitioner has invested or is actively in the process of
> investing the required amount of capital, the petition must be accompanied by
> evidence that the petitioner has placed the required amount of capital at risk for
> the purpose of generating a return on the capital placed at risk. Evidence of
> mere intent to invest, or of prospective investment arrangements entailing no
> present commitment, will not suffice to show that the petitioner is actively in
> the process of investing. The alien must show actual commitment of the
> required amount of capital. Such evidence may include, but need not be limited
> to: (i) Bank statement(s) showing amount(s) deposited in United States
> business account(s) for the enterprise; . . .(iv)      Evidence     of     monies
> transferred or committed to be transferred to the new commercial enterprise in
> exchange for shares of stock (voting or nonvoting, common or preferred). Such
> stock may not include terms requiring the new commercial enterprise to
> redeem it at the holder's request; or . . .

8 C.F.R. § 204.6(j)(2).  Investor's may satisfy the Act's job creation requirement by investing

into, and sustaining, the existing jobs in a troubled business.  *See* 8 C.F.R. § 204.6(j)(4).  The

Agency defines a troubled business as:

> [A] business that has been in existence for at least two years, has incurred a net
> loss for accounting purposes (determined on the basis of generally accepted
> accounting principles) during the twelve- or twenty-four month period prior to
> the priority date on the alien entrepreneur's Form I-526, and the loss for such
> period is at least equal to twenty percent of the troubled business's net worth
> prior to such loss. For purposes of determining whether or not the troubled
> business has been in existence for two years, successors in interest to the
> troubled business will be deemed to have been in existence for the same period
> of time as the business they succeeded.

Where the capital investment is made into a "troubled business," the Form I-526 petition

"must be accompanied by evidence [such as tax records and a business plan] that the number

---

[3] The I-526 petition may be supported by an investment into a wholly new enterprise, the
expansion of an existing business, or a troubled business.  *See* 8 C.F.R. § 204.6(h).

of existing employees is being or will be maintained at no less than the pre-investment level

for a period of at least two years."  8 C.F.R. § 204.6(j)(4)(ii).  Furthermore, the job creation

requirement may be satisfied for projects with multiple investors by pooling and allocating the

jobs *pro rata* for each investors.  8 C.F.R. § 204.6(g).

      The implementing regulation is reproduced in full at Tab 2 of the Statutory and

Regulatory Appendix to Plaintiffs' Motion for Summary Judgment.

### C.     Agency Interpretations of 8 C.F.R. § 204.6

      Since the passage of the Act more than twenty-five years ago, the Agency has

issued public policy guidance, internal legal opinions, and other training materials regarding

its interpretation of the Act and 8 C.F.R. § 204.6.[4]  In 1998, to provide additional guidance on

its own implementing regulations at 8 C.F.R. § 204.6, the Agency designated four decisions

as "precedential decisions," which are "binding on all Service employees in the administration

of the Act."  *See*, *Matter of Izummi*, 22 I. & N. Dec. 169 (Assoc. Comm. 1998); *Matter of

Soffici*, 22 I. & N. Dec. 158 (Assoc. Comm. 1998); *Matter of Ho*, 22 I. & N. Dec. 206 (Assoc.

Comm. 1998); *Matter of Hsiung*, 22 I. & N. Dec. 201 (Assoc. Comm. 1998).

      On May 13, 2013, the Agency released its most recent policy guidance, an

expansive, twenty-seven page memorandum.  *See* USCIS Policy Memorandum, No. P.M.-

602-0082, EB-5 Adjudications Policy (May 30, 2013) (hereinafter "EB-5 Policy Memo")

---

[4] *See, e.g.,* INS Office of the General Counsel Memo, "Alien Entrepreneurs under Section
203(b)(5) of the Immigration and Nationality Act" (Sep. 10, 1993) (Tab 8); INS Memo, "EB-
5 Investor," (Oct. 20, 1997) (released under the Freedom of Information Act to the American
Immigration Lawyers Association ("AILA")) (Tab 9); 2011 USCIS EB-5 Training Materials
(through May 2011) (released under the Freedom of Information Act to AILA) (hereinafter
the "2011 Training Materials") (Tab 10); USCIS 2013 EB-5 Training PowerPoint
Presentation (2013) (released under the Freedom of Information Act to AILA) (hereinafter the
"2013 Training Materials") (Tab 11).

(Tab 7).[5]  This EB-5 Policy Memo affirms prior policy guidance "to the extent that it does not

conflict," [at page 1], but also cautions that "is intended solely for the training and guidance of

USCIS personnel in performing their duties relative to the adjudication of applications and

petitions [which] . . . may not be relied upon . . . in litigation with the United States, or in any

other form or manner."  *Id.* at 27.

These Agency interpretations of the Act and the implementing regulations are

reproduced either in full or in part at Tabs 3 to 11 of the Statutory and Regulatory Appendix

to Plaintiffs' Motion for Summary Judgment.

## III.    STATEMENT OF FACTS

Pursuant to an agreement between the parties, the Certified Administrative

Record in this case consist of the administrative record for one of the six Plaintiffs, Xiameng

Xu, which serves as the exemplar for all Plaintiffs' administrative records.  (ECF 15).  These

Statements of Fact derive from the exemplar administrative record, and are supplemented

below in the Argument, Section VII.

For nearly three years, each Plaintiff has been seeking to invest $500,000 into

Crenshaw Community Hospital in connection with the EB-5 program (hereinafter the

"Investors").  Crenshaw Community Hospital is a full-service hospital in a rural community in

Luverene, Alabama.  [AR 40].  Established in 1963, it provides general medical and surgical

care, obstetrics and gynecology services, inpatient and outpatient surgical procedures, and

laboratory, radiological, physical therapy, home health, and psychiatric services.  [AR 40-41].

A foundation of the community, Crenshaw Community Hospital truly serves the needs of the

---

[5] Only one plaintiff in this civil action, Lihong Yang, filed her Form I-526 petition before the
effective date of the EB-5 Policy Memo on May 30, 2013.  Ms. Yang filed her Form I-526

community.  From treating rabid bobcat attacks and tragic accidents to sponsoring local fun

runs, this small-town hospital alleviates the suffering of its patients and lifts up the

community.[6]

Crenshaw Community Hospital is part of the life force of the community.  It

employees nearly 100 full-time employees and many other part-time employees, and serves a

rural county of 13,665 people.  [2350].  With 65 beds (45 acute care), two operating rooms,

and an 24/7 emergency care department, it serviced in 2011 alone approximately 6,230

emergency care visits and more than 600 in-patient and out-patient surgical procedures.  [57-

62; 2349-54].

Unfortunately, like many of its patients, Crenshaw Community Hospital has

been suffering and needs a lift up.  Operating at sustained losses, it has sought outside funding

to improve its services, increase profitability, preserve employment – and most importantly to

continue serving the people of Crenshaw County and the surrounding communities.

According to its current CEO and chief administrator:

> Although the situation right now is truly a struggle, the EB-5 funds will help
> CCH turn the corner.  We expect to see bed capacities increase from 30 to
> almost 40 a night by-adding more services, more staffing and more units. . In
> short, the EB-5 funding will not just save this hospital; it will revive and lead
> us to a new chapter of healthy financial status which, in turn, will revive our
> community. …Rural health care in America is in a tough spot.  Rural hospitals
> across Alabama have been closing.  The most recent closure was in 2013 of
> Elba General Hospital in Elba, which is just 16 miles from Laverne (these
> patients are looking to us now - we need to be there for them and be a healthy

petition on April 2, 2013 (No. WAC-13-904-56668).
[6] *See, e.g.,* "Alabama woman recovering from rabid bobcat attach," *available at*
*http://www.al.com/news/index.ssf/2015/07/i_wasnt_as_scared_as_i_shouldv.html;*
"Motorcyclist killed in Crenshaw County crash," *available at*
*http://www.al.com/news/montgomery/index.ssf/2015/07/motorcyclist_killed_in_crensha.html;*
Crenshaw Community Hospital Webpage, *available at*
*http://www.crenshawcommunityhospital.com/community.html* (last accessed November 30,
2016).

hospital). Elsewhere in the state, Chilton Medical Center closed in Clanton in 2012 and Thomasville Hospital in nearby Thomasville closed the year prior. . . Crenshaw County and the surrounding community rely on CCH and the prospect of this funding is the hospital's only realistic way back to viability. [AR 2378-2382].

In 2011 Crenshaw Community Hospital entered into an agreement with the South Central Alabama Mental Health Board "to provide crisis stabilization services to all seriously mentally ill adult consumers of [South Central Alabama Mental Health Board] and other consumers" who may be in need of in-patient psychiatric care for, on average, four to seven days. [AR 797-814]. Crenshaw intends to use part of the EB-5 investment funds to rennovate 20 beds in its South Wing to provide these crisis intervention and stabilization services. [AR 1331].

This small community, with an annual per capita income of $14,565, is in desparate need of such services. [AR 85]. In 2012 the State of Alabama announced the closing of in-patient psychiatry mental health facilities in the state due to a $40 million budget shortfall, and announced its plans to lay off 950 employees. [AR 63]. Due to these and other closures, the people of Crenshaw County, Luverne, and the surrounding counties must travel more than 50 miles to Montgomery for in-patient crisis intervention and stabilization services. [AR 70]. Crenshaw Community Hospital needs an immediate cash infusion to address this dire need:

> The need for these psychiatric services for adults is growing at an alarming pace and we must, as guardians for healthcare growth in our community, plan proactively for this need. By addressing this obligation in a conscientious manner, we can do our part to help avert potentially dire consequences for our families and most assuredly for our community. However to be able to service this segment, we must solve financial challenges. The CCHS, LP investment does just that. [AR 63].

Its motto, "Where Caring Counts," fits Crenshaw Community Hospital's community purpose and philosophy to improve the health status of its rural communities and

8

the surrounding areas through primary and secondary acute health care services.  Soliciting a

$6,000,000 investment (from twelve investors) through the EB-5 Program, Crenshaw intends

to continue caring where it counts by expanding into this much needed, in-patient psychiatric

care model, and also by hiring more qualified surgeons and physicians to increase the capacity

of the operating room.  [AR 40].

       Crenshaw Community Hospital solicited the assistance of CCHS, L.P., an

equity partnership, to secure funding to save its operation.  By mutual agreement, Professional

Resources Management of Crenshaw, L.L.C. d/b/a "Crenshaw Community Hospital" has

agreed to give CCHS, L.P. a 24% ownership interest in exchange for a $6,000,000 capital

investment.  [AR1355].  The $6,000,000 will derive from $500,000 individual capital

contributions from up to twelve qualifying immigrant investor visa petitioners under §

203(b)(5) of the INA (who each would have a 5% interest in CCHS, L.P. in exchange for their

individual $500,000 capital contribution).  [AR 6].  Each of the six prospective Crenshaw

Hospital Investors wired their $500,000 capital contribution in 2013 for the use and benefit of

Crenshaw Community Hospital.  Defendants have not yet acknowledged the hospital's

troubled status – despite a $120,000 independent audit, which was prepared in accordance with

generally accepted auditing standards and generally accepted accounting standards.  [AR 2283-

84].

       The important and narrow issues pertain to whether the hospital sustained

serious losses (more than 20% of its net worth) in 2011 and 2012; whether the job creation

requirement of at least 10 saved or new jobs for U.S. workers is satisfied for each Investor; and

whether the Investors (who would have a 6% preferred rate of return) have demonstrated that

they have placed their capital at risk for the purpose of generating a return.

## IV.     PROCEDURAL HISTORY

The exemplar Plaintiff, Ms. Xiaomeng Xu, a citizen and resident of China, transferred $540,000 to a U.S. escrow account on August 22, 2013 for her investment (through the equity partnership CCHS, L.P.) into Crenshaw Community Hospital.  She filed a Form I-526, Immigration Petition by Alien Entrepreneur on September 13, 2013 (No. WAC-13-906-09643) [AR 3-1203], a Form I-290B, Motion to Reopen on March 13, 2015 (No. WAC-15-902-12708) [AR 2241-2387], and a Form I-290B, Appeal to AAO on September 3, 2015 (No. WAC-15-905-68334) [AR 2400-2448].  The Investor Program Office denied her Form I-526 Petition on February 10, 2015 [AR 2216-2229] and her Motion to Reopen on August 6, 2015 [2388-2395].  The Administrative Appeals Office denied her appeal on March 25, 2016.  *See Matter of X-X-,* ID# 15936 (AAO Mar. 25, 2016).  [AR 2449-2457].

On April 14, 2016, Plaintiff Xiaomeng Xu, and five other Crenshaw Community Hospital investors filed a Complaint against the Department of Homeland Security and its related agencies and officers to seek judicial review of the Agency denials under Section 203(b)(5) of the INA and 5 U.S.C. § 706.  (ECF 1).  The Agency filed an Answer on July 25, 2016 (ECF 13) and served the certified index of the administrative record on August 24, 2016, and a 2,471 page administrative record for the exemplar Plaintiff in September 2016.  This Motion for Summary Judgment is timely filed  (ECF 17).

## V.     SUMMARY OF FINAL AGENCY DECISION

On March 25, 2016, USCIS' Administrative Appeals Office ("AAO") issued a final decision denying the appeal.  [AR 2449-57].

### A.     Agency Findings Regarding the Business

The AAO found that CCHS, L.P., which qualified as a new commercial

10

enterprise [AR 2453], sought to assemble $6,000,000 from 12 foreign national investors.  [AR 2451].  Each investor would invest $500,000 and become a limited partner holding a 5% interest in CCHS, L.P.  [AR 2451].  CCHS then would invest the entire amount into Professional Resources Management of Crenshaw, LLC which operates and manages the Crenshaw Community Hospital under a 20-year lease term from the Crenshaw County Hospital Board for $5,000 a month.  [AR 2451].

The AAO further determined that CCHS is located within a USCIS designated regional center, the Alabama Center for Foreign Investment Regional Center.  [AR 2451].  Per the submitted IRS Forms W-2 and Wage and Tax Statements, PRMC staffs the hospital primarily with employees from Maximum Efficiency Squared, LLC.  [AR 2451].  A 2008 Management Service Agreement shows that PRMC hired InMed Group, Inc. to provide management services for the hospital.  [AR 2451].

### B.      Agency Findings on Capital Placed at Risk to Generate a Return

With respect to Petitioner's investment, the AAO found that the Equity Investment Agreement between CCHS, L.P. and PRMC provided the investors with a 6% preferred rate of return on the capital account or an annual preferred return of $360,000 to be shared among the 12 limited partners.  [AR 2454].  The AAO, however, took issue with Crenshaw Community Hospital's expected profits.  [AR 2453-54].  Specifically, the AAO found that Petitioner had not submitted a "comprehensive analysis of the potential net profit available for distribution to PRMC and to each of the 12 CCHS limited partners" and as such, "has not sufficiently established that there is a reasonable chance for gain, especially within the foreseeable future."  [AR 2454].

The AAO determined the *pro forma* 2015 to 2019 financial statements in the

11

2015 Business Plan had not accounted for certain expenses associated with the partnership and did not reflect the "true financial status of the hospital for the relevant years." [AR 2454]. Therefore, according to the AAO, the Petitioner had not demonstrated "when or if the hospital will have the funds to distribute any return" on investment. [AR 2454].

On these factual findings, the AAO concluded that the Petitioner failed to demonstrated that she "has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk" under 8 C.F.R. § 204.6(j)(2). [AR 2454 (citing *Izummi*, 22 I&N Dec. at 184-84 n. 16, and EB-5 Policy Memo at 5].

### C.      Agency Findings on Troubled Business

The AAO asserted that the evidence submitted in support of a finding that the Crenshaw Community Hospital qualified as a troubled business under 8 C.F.R. 204.6(e) was not reliable or credible. [AR 2454-56]. The AAO determined that a substantial variance in the information presented in the February 2015 Business Plan's financial statements and the 2011 and 2012 tax returns rendered the "statistics" unreliable. [AR 2454 citing *Matter of Ho*, 19 I&N Dec. 582, 591 (BIA 1988); EB-5 Policy Memo at 16].

### D.      Agency Findings on Job Creation

The Agency compared a 2013 Business Plan submitted with the Form I-526 with the 2015 Business Plan submitted in response to a motion to reopen, and two different, Economic Reports, or job creation forecasts, from those years. [AR 2457]. The AAO found that there were unexplained inconsistencies between these Business Plans and Economic Reports that were two years apart. According to the AAO, the 2013 Business Plan provided that Crenshaw Community Hospital employed 248 personnel with 205 as full time; whereas

the 2015 Business Plan specified that Crenshaw Community Hospital employs 112, and with the investment, would create 61 new jobs.  [AR 2457].  The 2013 Economic Report forecast that 138 direct jobs would be saved at the hospital, and that a total of 204 direct and indirect (66) would be saved based on the investment; whereas the 2015 Economic Report estimated that 112 jobs would be saved, and 61 new jobs would be created, totaling approximately 167 direct jobs.  [AR 2457].

The AAO further determined that even if Crenshaw Community Hospital had not qualified as a "troubled business" the 61 new jobs to be created by the six investors would not meet the job creation requirement under the Act and 8 C.F.R. § 204.6(g)(2) of not fewer than 10 jobs for each investor because the original business plan contemplated twelve, not six investors.  [AR 2457-58].

## VI.    STANDARD OF REVIEW

### A.    Scope of Judicial Review under the APA

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), established the two-pronged approach for judicial review of administrative agency interpretations of the statutes and regulations it administers.  First, courts must ask whether congressional intent is clear, and if so, courts and agencies must defer to the unambiguous, clear expressed intent of Congress.  *Id.* at 843.  If, however, Congress has not directly addressed the exact question at issue, then a reviewing court must defer to the agency's construction of the statute so along as it is reasonable.  *Id.* at 843.

Not all agency interpretations and decisions are reasonable, and a reviewing court may, upon *de novo* review, "set aside agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  *Fogo de Chao Holdings, Inc. v.*

13

*Dep't of Homeland Security*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (citing 5 U.S.C. §

706(2)(A)).  In reviewing an agency decision the test is "whether the decision was based on

consideration of the relevant factors and whether there has been a clear error of judgment."

*Id.* (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual

Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

      In terms of deference, a reviewing court will "generally accord substantial

deference to an agency's interpretation of both a statute it administers and its own

implementing regulations."  *Id.* (citing *Chevron,* 467 U.S. at 837).  However, a reviewing

court will grant no deference to an agency's interpretation of its own regulation when "instead

of using its expertise and experience to formulate a regulation, it has elected to merely

paraphrase the statutory language."  *Id.*  (internal citations omitted).  *United States v. Mead

Corp.*, 533 U.S. 218 (2001), further clarified that agency interpretations promulgated in a non-

precedential manner are "beyond the *Chevron* pale" such as agency "interpretations contained

in policy statements, agency manuals, and enforcement guidelines."  *Id* at 234.  Thus, as the

D.C. Circuit Court has held, an appeals office interpretation of the statutory language in a

non-precedential ruling does not trigger *Chevron* deference.  *Fogo de Chao*, 769 F.3d at 1136.

      There is no question that an appeals office decision is entitled to some

deference.  The *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944), standard of review for an

appeals office decision is whether it has the power to persuade:

> The Department [of Homeland Security's] interpretation of the statute is
> entitled to respect to the extent that it has the power to persuade.  The weight
> of such a judgment in a particular case will depend on the **thoroughness
> evident in the agency's consideration, the validity of its reasoning, its
> consistency with earlier and later pronouncements,** and all those factors
> which give it power to persuade, if lacking the power to control.

*Id.* at 1137 (citing *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006); *Skidmore*, 23 U.S. at 140)).

14

## B.     Review of Form I-526 Petitions

For the EB-5 program, applicants must establish each element by a preponderance of the evidence. *Matter of Chawathe*, 25 I. & N. Dec. 369, 375-76 (AAO 2010). This requires the applicant to demonstrate the claim is "probably true, where the determination of truth is made based on the factual circumstances of each individual case." *Id.* at 376 (internal citations omitted). The Agency must "examine each piece of evidence for relevance, probative value, and credibility, but individually and within the context of the totality of the evidence, to determine whether the fact to be proven is probably true." *Id.* Some documents are "highly credible" and deserving of substantial weight where relevant, such as "audited financial statements" and other documents "reviewed by a Federal agency." *Id*. The petitioner "does not need to remove all doubt from [the Agency's] adjudication. EB-5 Policy Memo, Tab 7, at pg. 2. "Even if an adjudicator has some doubt as to its truth, if the petitioner or applicant submits relevant, probative, and credible evidence that leads to the conclusion that the claim is "more likely than not" or "probably true", then the petitioner or applicant has satisfied the standard of proof. *Id.*

## VII.   LEGAL ARGUMENT

The investors made a qualifying, all cash capital contribution into Crenshaw Community Hospital, a troubled business. Because the hospital qualifies as a troubled business, the investors are permitted to pool and allocate the 117 saved jobs and 61 estimated new jobs among them to satisfy the job creation requirement. Even if Crenshaw Community Hospital were not considered to be a troubled business, the investors still meet the capital contribution, at risk requirement, and are able to allocate the 61 new jobs among them to satisfy the Act and the implementing regulation's requirements of at least jobs per investor.

15

## POINT 1

In reviewing whether the Investors had placed the required capital investment at risk for the purpose of generating a return under 8 C.F.R. § 204.6(j)(2), the Agency acted arbitrarily and capricious by (i) first finding that the investor had satisfied the regulation through a preponderance of the evidence, (ii) then, unprompted, reversing its decision in response to a motion to reopen on other grounds, and (iii) later rejecting reliable, credible, and substantial evidence that the investment has a chance for both gain and loss.

The Court should unlawful and set aside the Agency's latest finding that the investor did not place her capital at risk for the purpose of generating a return on her investment because the Agency's actions, findings, and conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2).

The error by the Agency is evident.  It determined that the investor had satisfied the at risk requirement on February 10, 2015 through a preponderance of the evidence, only to, unprompted and without explanation, reverse itself a year later.  This subsequent decision thereafter failed to consider properly the substantial evidence in the record.  The Agency further erred by exceeding its regulatory authority by engaging in profit estimation and by inventing an additional requirement that the investor must demonstrate when the business will become profitable, and how much profit will occur.

### A.      The Legal Standard for At Risk

Section 203(b)(5) of the INA requires an investment of a qualifying amount of capital into a new commercial enterprise.  Under the Act's implementing regulation at 8 C.F.R. § 204.6(j)(2), an alien entrepreneur must demonstrate that he or she "has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk."  *Id.*  The petitioner is required to "show the actual commitment of the required amount of capital" because a "mere intent to invest" or a "prospective investment

16

arrangement" fails to show a present commitment that the "petitioner is actively in the

processing of investing." *Id.* "Capital" means, among other things, cash, and "investment"

means to contribute capital. 8 C.F.R. § 204.6(e). To document a cash investment of the

required amount of capital, the petitioner may submit evidence of bank statements showing

the amount deposited into the U.S. business and wire transfer transmittals. 8 C.F.R. §

204.6(j)(2)(i), (iv).

The Agency has interpreted its regulation in both precedential decisions and

policy statements. In 1993, the Agency General Counsel reviewed the legislative history for

the Act, and wrote that Congress "intended that an alien seeking to immigrate to this country

pursuant to section 203(b)(5) of the Act place his or her capital "at risk" for the two-year

period following admission as a lawful permanent resident." Tab 8, at pg. 5. Relying on

State Department guidance at that time, the General Counsel emphasized that profitability

need not be guaranteed, but "the concept of investment connotes the placing of funds or other

capital assets at risk in the hope of generating a return on the funds risked." *Id.* Importantly,

the 1993 General Counsel opinion stresses that "[n]either the statute nor the regulations

require, however, that the risk be an absolute one." *Id.* at 9. The Agency believes that "aliens

investing the relatively large amount of capital required for immigrant investor classification

under section 203(b)(5) of the Act should be able to expect a relatively risk-free, minimum

return on their investment." *Id.* For these reasons, the General Counsel opined that "in

general, as long as an investor places his or her capital at commercial risk, the "at risk"

requirement of 8 C.F.R. § 204.6(j)(2) will me met." *Id.*

In 1998 a policy statement, the Agency furthered its understanding of the at

risk rule by alerting adjudicators that even investments into failing businesses would still meet

17

the requirements of 8 C.F.R. 204.6(j)(2): "The Service is aware that not all investments

enterprises will generate a return and that, despite every effort, some will continue to operate

at a loss for a period of time. However, the essence of an investment is the entrepreneurial

use of capital to create more capital." Tab 9, at pg. 2. In 1998, the Agency also issued a

series of precedential decisions, all of which clarified the "at risk" criteria in some detail.

*Matter of Izummi*, 22 I. & N. Dec. 169 (Assoc. Comm. 1998) (a redemption agreement

protecting against a risk of loss is not an at risk investment); *Matter of Ho*, 22 I. & N. Dec.

206 (Assoc. Comm. 1998) (a capital investment into a corporate money-market account to

which the investor had sole control does not qualify as an active, at risk investment); *Matter

of Hsiung*, 22 I. & N. Dec. 201 (Assoc. Comm. 1998) (an unsecured promissory note does not

qualify as the at-risk, present commitment of capital); *Matter of Soffici*, 22 I. & N. Dec. 158

(Assoc. Comm. 1998) (indebtedness secured by assets of the enterprise, and not the petitioner

personally, does not meet the definition of capital under § 204.6(e)).

       In 2013, the Agency re-affirmed its policy position that the "at risk"

requirement means that that the capital should be placed at risk "with the hope of a return on

their investment, to help create U.S. jobs." Tab 7, at pg. 5. For this reason, according to the

Agency, "[t]he law does not specify what the degree of risk must be; the entire amount of

capital need only be at risk to some degree. . . . [f]or the capital to be at risk there must be a

risk of loss and a chance for gain." *Id.*

## B.     Lack of Thoroughness Evident in the Agency's Consideration

       The administrative record reveals arbitrary and capricious decision-making on

the question of whether the investor made a qualifying, present investment of at risk capital.

On February 13, 2014, the Agency rendered a final decision finding that the investor had met

the capital contribution requirement through a preponderance of the evidence [AR 2221, 2235]; only to reverse itself, without explanation in a later decision in response to a motion to reopen on other grounds. [AR 2388-2395].

### 1.    The Evidence in the Form I-526 Petition

The Form I-526 Petition included evidence that the investor made an all-cash, $500,000 capital contribution from her personal account to Crenshaw Community Hospital's escrow account at Washington First Bank.  [AR873-74, 1304-07].  The petition also included a limited partnership agreement [248-303], escrow agreement [304-308], subscription agreement [866-867], offering memorandum [AR 232-47], and other documents to demonstrate that she committed the funds to a for-profit enterprise for the purpose of a generating a return on her investment.

For example, the June 19, 2012 confidential offering memorandum for the limited partnership [AR 232-47] required that "[a] prospective investor's investment in the Units must be derived wholly from his or her personal assets and are entirely at risk."  [AR 233, 238].  For the limitations on losses, the confidential offering memorandum advised that "[i]f the Limited Partnership incurs losses, Limited Partners will not be able to deduct such losses if they exceed such limited partners' tax basis in their Units" because the Internal Revenue Code imposes various limitations relating to losses and deductions for at risk investments in limited partnerships.  [AR 244-47].  The memorandum further advised that the investment is "highly speculative" and noted certain inherent risks, such as real estate risk, construction costs overruns, illiquidity, and the possible loss of the entire investment.  [AR 242-43].  With regard to the Limited Partnership Agreement, Article V, Allocations of Profits and Losses, and Article VI, Distributions, outlined the treatment of profits and losses in the

business.  [AR 268-272].

### 2.    The Agency's Request for Evidence

On August 30, 2016, the Agency issued a request for evidence seeking more evidence that the capital invested has been placed at risk.  [AR 1311].  The Agency wrote that the Business Plan and the Confidential Offering Memorandum stated that the EB-5 Funds would be placed in Reserve Accounts and into the Accounts Receivables. [AR 1311].  The Agency requested further documentation concerning what the reserve accounts and accounts receivables would be used for, and any other evidence deemed appropriate by the investor to overcome the Agency's contention that there were deficiencies.

### 3.    The Investor's Response to the RFE

On March 13, 2015, the investor provided additional documentation, to include a letter form the General Partner of CCHS, L.P. [1351], a letter from the hospital administrator [1353], a March 1, 2013 Equity Investment Agreement between CCHS, L.P. and Crenshaw Community Hospital [1355], and a November 2014 Updated Business Plan [AR 1360-1382].  Notably, the investor clarified that the funds would not be used for reserves, but would be used by the business to pay for ongoing liabilities, equipment, renovations, and to fund its business needs.  [AR 1330].  Based on the documentation submitted, the investor established that the investment would be used to clear debts for back wages, fund technological upgrades, fund capital upgrades (i.e. expansion projects), and recruit, hire, and train new physicians.  [AR 1330-31, 1351].  The hospital administrator also attested that the funds would be used to clear back debt, and fund $855,000 in technological upgrades, $550,000 in physical upgrades, and $800,000 towards talent acquisition.  [AR 1353].  The Equity Investment Agreement provided additional evidence of the Limited Partnership's hope

for gain, in that Crenshaw Community Hospital would advance a 2% interest to the Limited

Partnership for every approved, immigrant visa petitioner:

> CCHS, LP will invest up to $6,000,000 in exchange for a 24% interest in CCH,
> plus a 6% preferred rate of return on the capital account.  In the event that less
> than $6,000,000 is invested, the CCHS, LP interest shall be reduced on a pro
> rata basis  For example, if $3,000,000 is vested, the membership interest shall
> be 12%.  The parties fully agree that the only reason less than $6,00,000 could
> be invested is if any I-526 petition is denied.  If an I-526 petition is denied,
> then that $500,000 must be returned to the applicant and will not be available
> to CCH.

[AR 1355].  The Equity Investment Agreement also confirmed the agreement between the

Limited Partnership and Crenshaw Community Hospital that "profits above what is needed

for operations shall be distributed to equally to the capital accounts of CCHS, LP and other

members of CCH.  All disbursements shall be calculated based on the value of the amounts in

their capital accounts at the date of the disbursement."  [AR 1355].

### 4.    The First Agency Denial – But Approval of At-Risk Issue

On February 10, 2015, the Agency issued a decision denying the Form I-526

Petition on the grounds that the investor failed to satisfy the job creation requirement and

establish that the hospital qualified as a troubled business.  [AR 2216-2229].  However, the

Agency determined that for the purposes of the Act and 8 C.F.R. § 204.6(j)(2) the additional

evidence submitted by the investor "in the record adequately resolved the Capital at Risk

issue."  [AR 2221].  The Agency's internal February 10, 2015 Form I-526 Adjudication's

Worksheet provided in the administrative record, further recognized the Agency's

determination that the "Preponderance of the Evidence Established [X] Capital at Risk."  [AR

2235].

### 5.    The Investor's Motion to Reopen

On March 13, 2015, the investor filed a motion to reopen challenging the

Agency's decision regarding the hospital's status as a troubled business and the job creation requirement. [2241-2387]. The investor did not address the capital contribution, at risk requirement because the Agency determined on February 10, 2015 that the "record adequately resolved the Capital at Risk issue" through a preponderance of the evidence. [AR 2221; 2235].

6.      **The Second Agency Denial – Reverses Earlier Decision on At Risk**

On August 6, 2015, the Agency issued its second denial. [AR 2388-2395]. Inexplicably, the Agency determined, despite its prior finding, that the capital contribution no longer satisfied the Act or 8 C.F.R. § 204.6(j)(2)'s at risk requirement because "[i]t does not appear that the introduction of the EB-5 investors' funds will have any positive effect on the net worth of the business" . . . because "the hospital will still be burdened by massive liabilities related to a [$3,081,141] advance from related parties." [AR 2394]. Addressing the Limited Partnership's prospective 24% equity interest in the hospital, the Agency also wrote that the partners "would only be entitled to a small share of any distributed profits;" thus, the Agency reversed its earlier finding and concluded that it is not reasonable that the Petitioner "has a chance of generating a return on her investment." [AR 2395].

7.      **The Investor's Appeal to the AAO**

On September 3, 2015, the investor appealed the second denial to the Administrative Appeals Office [AR 2400-2488]. The investor wrote that the at-risk matter was settled by the Agency's earlier finding [AR 2414], and further took issue with the Agency's calculation on an expected rate of return, which, as argued on brief went beyond the scope of the Agency's responsibilities. [AR 2419]. Based on the 6% preferred annual rate of return, recoupment of a $500,000 initial investment would happened within 16 years because

22

of the preferred nature of the return – it guarantees that investors will be attributed that amount out of profits first, before they are otherwise distributed.  [AR 2419].

To further emphasize the understanding between the Limited Partnership and Crenshaw Community Hospital on the design and hope for profitability, the hospital administrator affirmed to the Agency that the EB-5 investors would be repaid by annual cash flow.  [AR 2422].  The 2016-19 *pro forma* projections predicted a net income in excess of $500,000 after stabilization, and the "agreement does direct all net cash from the Hospital be used to re-pay the EB-5 funding."  [AR 2422].  Nevertheless, the investor believed, in reliance on the earlier agency finding on the Form I-526 petition, that the capital contribution requirement under the Act and 8 C.F.R. § 204.6(j)(2) had been established through a preponderance of the evidence.

## 8.    The Third (and Final) Agency Denial

The AAO failed to address the discrepancy that the Agency had previously determined that the at risk requirement had been met through the preponderance of the evidence.  [AR 2221; 2235].  The AAO challenged Crenshaw Community Hospital's expected profit projections, and asserted that the investor, "has not sufficiently established that there is a reasonable chance for gain, especially within the foreseeable future."  [AR 2454].  According to the AAO, the Petitioner had not demonstrated "when or if the hospital will have the funds to distribute any return" on investment.  [AR 2454].

## C.    Lack of Validity in the Agency's Reasoning

The AAO's findings regarding whether the investor's $500,000 cash investment is fully at risk under the Agency's implementing regulation, 8 C.F.R. 204.6(j)(2), violates 5 U.S.C. §§ 706, is unreasonable, and lacks the power to persuade.

23

1.       **Arbitrary and Capricious Agency Action – Internal Inconsistency**

The Agency approved the at-risk nature of the $500,000 capital contribution on February 10, 2015.  [AR 2221; 2235].  The Agency offered no rationale in any subsequent decision why it reversed its earlier decision, or why its earlier decision was incorrect.

2.       **Abuse of Discretion – Attempting to Calculate Profits**

The implementing regulations do not empower the Agency, and the Agency personnel are not equipped to, conduct venture capital valuations for the purpose of estimating returns.  The Business Plans in the record, the pro forma calculations, and the letters submitted by the hospital administrator established convincingly that each investor's capital contribution into Crenshaw Community Hospital has a chance for gain.  The Agency's own policy statements clarify that the "law does not specify what the degree of risk must be," [Tab 7, at pg. 5] and that the Agency "is aware that not all investments enterprises will generate a return and that, despite every effort, some will continue to operate at a loss for a period of time."  [Tab 9, at pg. 2].

Moreover, there is no statutory, regulatory, or policy requirement for a petitioner to demonstrate when the investment will have the funds to distribute returns.  [AR 2455].  Any such policy, as intimated by the AAO, would dangerously approximate a "guaranteed rate of return" which is expressly prohibited by EB-5 Policy Memo and precedential authority.  Tab 7 at pg. 5 ("If the immigrant investor is guaranteed the return of a portion of his or her investment, or is guaranteed a rate of return on a portion of his or her investment, then that portion of the capital is not at risk" (citing *Izummi*, 22 I & N Dec. at 180-188)).

24

### 3.      Abuse of Discretion – Ignoring the Evidence of Profitability

The Agency ignored the substantial evidence of profitability.  The Limited

Partnership agreement made clear that the risk of loss was real, and the Confidential Offering

Memorandum established that the "availability and timing of cash distributions is uncertain."

[AR 242].  The hope and chance for gain is present.  The 2015 Independent Auditor's Report

determined that the net income increased in the first six months of 2013 by $555,925 [AR

2323] and the pro forma projections from the 2015 Business Plan anticipates that the hospital

will be cash flow positive "with the help of the EB-5 investment."  [AR 2353].

The AAO further failed to address the letter from Mr. Eisenmann, dated

August 31, 2015, submitted in response to the Forms I-290B, Notice of Appeal (filed

September 2015).  In this submission Crenshaw Community Hospital's CEO and

administrator clarifies that the 2019 projection of a net income of $500,000 is subject to the

$6 million investment stabilization – which if all goes well, to include discounting any

depreciation, could exceed $700,000.  [AR 2422].  Expressing confidence in the projections,

he emphasizes that with access to the $6,000,000 in investment funding, Crenshaw

Community Hospital will be able to meet its obligations to the investors on the preferred rate

of return (i.e. the windfall provisions).  [AR 2422].

The six percent preferred rate of return (subject to the expected profitability)

evidenced in the administrative record fully establishes the design of the profit generating

activity.  Based on the past performance, pro forma, and business plan projections, the

Investors have established that the capital has been placed at risk for the purpose (i.e. chance

and/or hope) of generating a return on the investment.

On February 10, 2014, the Agency concurred, and determined that the at risk

25

requirement had been met – and then a year later, inexplicably, the Agency reversed itself. The Agency exceeded its regulatory authority by requiring an investor to demonstrate when an investment would be profitable and by how much, and also failed to heed its own policy guidance that the hope and chance for a gain are the animating principles.

## POINT 2

> In reviewing whether Crenshaw Community Hospital qualifies as a troubled business under 8 C.F.R. § 204.6(e), the Agency erred by rejecting legitimate 2011 and 2012 tax returns and financial statements as sufficient, requiring independent audited financial statements outside of the regulatory framework, and then dismissing a filed 2015 independent auditor's report as unreliable because its figures varied with the earlier 2011 and 2012 tax returns and financial statements.

The Court should unlawful and set aside the Agency finding that Crenshaw Community Hospital does not qualify as a troubled business because the Agency's actions, findings, and conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2). The administrative record contains balance sheets, tax returns, economic reports, and other evidence to establish that Crenshaw Community Hospital had been operating a loss for the two-year period prior to September 2013 (the filing date of the petition). Notwithstanding this evidence, the Agency exceeded the bounds of its own implementing regulation by imposing a requirement on Crenshaw Community Hospital (through the investor) to submit *audited* financial statements.

In February 2015, Crenshaw Community Hospital conceded and paid for an Independent Auditor to evaluate their books and records for the Agency, at a cost of approximately $120,000. The Agency then determined that the Independent Auditor's Reports were unreliable because they conflicted with the information from the tax returns that had been previously filed in 2011 and 2012 (which were based on tax basis accounting).

26

There is overwhelming evidence in the administrative record that Crenshaw Community Hospital qualifies as a troubled business, and the Agency's findings on the unreliability of the 2011 to 2013 Tax Returns and the Independent Auditor's Report (procured at their request) are meritless.

### A.     The Legal Standard for Troubled Business Status

INA § 203(b)(5) requires the alien entrepreneur to invest the required capital contribution into a new commercial enterprise for the purpose of job creation.  When the investment is into an existing, "troubled business" as the new commercial enterprise, 8 C.F.R. § 204.6(j)(4)(ii) permits the applicant to not only create jobs, but also to save existing jobs. As the Agency correctly noted in its final decision, "[i]f it is a troubled business, then the Petitioner may meet the job creation requirements by showing preservation, as well as creation, of jobs."  [AR 2455].  The I-Form 526 petition "must be accompanied by evidence that the number of existing employees is being or will be maintained at no less than the pre-investment level for a period of at least two years."  *Id.*  This evidence should consist of "[p]hotocopies of tax records, Forms I-9, or other relevant documents for the qualifying employees and a comprehensive business plan."

Although the term, "troubled business" is not defined in the Act, the Agency defines a "troubled business" based on a 20% or more loss ratio of net worth to net loss:

> [A] business that has been in existence for at least two years, has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien entrepreneur's Form I-526, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss.  8 C.F.R. § 204.6(e).

The Agency's 2013 Training Materials capture the regulatory requirement quite simply, a troubled business is one that "has been in existence for at least two years, that

27

has incurred a net loss for accounting purposes during the 12 or 24 months period prior to the

filing date of the Form I-526 petition."  2013 Training Materials, Tab 11, at pg. 111.  "Net

loss for such period is at least equal to 20% of the troubled business's net worth prior to such

loss" and the determination is made on the basis of generally accepted accounting principles.

2013 Training Materials, Tab 11, at pg. 111.  Neither the regulation, the four precedential

decisions, nor the EB-5 Policy Memo require audited financial statements to establish that the

a business has incurred a 20% loss during the twelve or twenty-four months period prior to the

petition.   This is because, as the Agency's 2011 Training Materials further note, audited

financial statements are not always required in the regular course of most business, as they

are: "[a] Required by SEC for most publicly traded corporations; [b] Required by many banks

for commercial loans; [c] Not required by IRS; [and] [d] Seldom used by small businesses if

not required."  (Tab 10, at pg. 284).

### B.      Lack of Thoroughness Evidence in the Agency's Consideration

The Agency failed to consider properly whether Crenshaw Community

Hospital, as the job creating (or job preserving) entity, was a "troubled business" for the

relevant twelve and twenty-four month periods prior to the Plaintiffs' 2013 priority dates.

### 1.      The Evidence in the Form I-526 Petition

On September 13, 2013, the Form I-526 petition included initial evidence that

Crenshaw Community Hospital qualified as a troubled business.  This evidence included

Crenshaw Community Hospital's 2010 federal tax return [AR 331-60], operating statements

from 2010 through June 2013 [AR 362-64], a 2013 Business Plan [AR 38-116], and 2012

Economic Impact Report [125-230].  This initial evidence established that the hospital had

been in existence since 1963, and had begun to suffer steep losses that exceeded 20% of its net

equity for the prior two years. [AR 14]. For instance, the 2010 Form 65, Partnership/Limited Liability Company Return of Income, reported net losses of $207,228 with $492,734 in assets as shown on the Form 1065, reflecting a proof of a loss that was "at least equal to twenty percent of the troubled business's net worth prior to such loss" under 8 C.F.R. § 204.6(e). [AR 348].

## 2.     The Agency's Request for Evidence

On August 30, 2014, the Agency submitted a Request for Evidence [AR 1318-1326] requesting additional information about the job creation requirement. The evidence requested "may include, but is not limited to" six different types of documentation, such as tax records, an updated copy of a business plan, an updated economic analysis, "documents to provide evidence to show that the entity is a troubled business, to include but is not limited to *audited* financial statements of the Hospital which use generally approved [sic] accounting principles,"[7] or "[a]ny other evidence deemed appropriate by the petitioner." [AR 1324-25] (emphasis added).

## 3.     The Investor's Response to the RFE

On November 11, 2014, the investor responded to the Request for Evidence, and provided additional documentation to demonstrate that Crenshaw Community Hospital qualified as a troubled business. [AR 1327-1349]. On brief, the investor objected to the invitation to submit GAAP audited financial statements on several grounds. [AR 1337]. The investor argued that GAAP audited financial statements are not feasible for "nearly any small-to mid-sized businesses; due to the burdensome cost of complying with all of GAAP." [AR 1337]. The investor also alerted the Agency that deviations do exists between Tax Basis

---

[7] The Agency seems to have miswrote "approved" instead of "accepted." The industry

Accounting (i.e. which is generally used for tax returns) and GAAP accounting.  [AR 1337].

There are major differences in revenue recognition rules (i.e. cash, accrual, or modified basis

accounting) and the treatment of depreciation.  [AR 1337].  To provide further documentation

to the Agency, the investor provided: (a) an analysis from a certified public accountant, Barry

Holt, CPA to verify Crenshaw Community Hospital's status as a troubled business for the

two-years prior to September 2013 [AR 1401]; (b) Balance Sheets from 2011 through mid-

2013 [AR 1403-1412]; (c) and Tax Returns for 2010 through 2012 [AR 1413-1525].

   The tax returns were prepared by two separate certified public accountants on

cash, tax basis accounting.  Warren Averett, LLC prepared the 2010 Tax Returns, and Holt,

McDuffee & Ramsey LLC prepared the 2011-2013 Tax Returns.  [AR 1414, 1142, 1456,

1501].[8]   The separate CPA letter provided by Holt expressly provided that the accountant's

compliance of the Balance Sheets was made "in accordance with Statement on Standards for

Accounting and Review Services issued by the American Institute of Certified Public

Accountants."  [AR 1405].  Like the initial evidence provided, these documents provided

further confirmation that the loss for the relevant period was at least equal to twenty percent of

the troubled business's net worth prior to such loss.

### 4.      The First Agency Denial

   On February 10, 2015, the Agency's issued is first decision rejecting Crenshaw

Community Hospital as a troubled business.  [AR 2216-2229].  The Agency determined that

the CPA letter and the Balance Sheets were not reliable because they did not "appear[] to

---

standard to which they referred is Generally Accepted Accounting Standards (GAAP).
[8] Warren Averett, L.L.C. has more than 800 employees and is the 2nd largest CPA firm
among Gulf Coast states, and the 27th largest in the U.S.  *See http://warrenaverett.com/firm-
profile/.*  Holt, McDuffee & Ramsey, LLC is a full-service accounting firm in Montgomery,
Alabama.  *See http://www.holtmcduffeeramsey.com/home.*

follow Generally Accepted Accounting Principles (GAAP), as required by the regulation."

[AR 2224-25].  The Agency's decision did not address the reliability of the 2011 to 2013 Tax

Returns, prepared by two separate accounting firms, and based its denial on the investor's

failure to provide audited financial statements.

### 5.      The Investor's Motion to Reopen with New Evidence

On March 13, 2015, the investor filed a motion to reopen.  [AR 2400-2407].

The investor noted on brief that she believed that the Tax Returns and Balance Sheets

previously submitted would have satisfied the regulatory standard.  [AR 2245].  This is

because 8 C.F.R. § 204.6(e) does not require audited financial statements or an independent

auditors report, but only that net loss must be shown by "accounting purposes (determined on

the basis of generally accepted accounting principles)."  In the motion to reopen, without

waiving the objection that the regulation does not require audited financial statements,

Crenshaw Community Hospital financed an independent audit (costing approximately

$120,000) from Branum and Company, P.C., another accounting firm, to demonstrate to the

Agency (through the investor) its status as a troubled business.  [2281-2328].  The motion to

reopen included another letter from CPA Holt that summarizes the independent auditor's

report.  [AR 2329-30].  The motion also included an updated Economist Report [AR 2334-45]

and an updated Business Plan [AR 2347-2376] that were based on the independent audit.

Each one of these documents addressed Crenshaw Community Hospital's status as a troubled

business.

### 6.      The Second Agency Denial

On August 6, 2015, the Agency denied the motion to reopen on new grounds

[AR2388-2395], and its opinion is devoid of any analysis or discussion of whether Crenshaw

Community Hospital qualified as a troubled business based on the February 2015 Independent Auditor's Report.  [AR2388-2395 (denying on other grounds)].  The Agency ignored the primary basis for the motion to reopen.

The Agency did, however, consider the independent auditor's reports on the question of whether the funds were at risk, which was one of the new bases for this second denial.  [AR 2428].  The Agency concluded that the "auditor's reports show that the hospital did have decreased revenue and increased expenses between 2011 and 2011, leading to a net operating loss of $3,213,524."  [AR 2428].  This corresponding decrease in assets by 9% and an increase in liabilities by approximately 70% "was due almost exclusively to an increase of $3,081,141 in the balance sheet line for an advance from related parties." . . which appears [to be] a cash infusion into the hospital for the purpose of alleviating the cash flow problems that arose in 2011 and 2012."  [AR 2428].

### 7.     The Investor's Appeal to the AAO

On September 3, 2015, the investor filed an appeal to the Administrative Appeals Office and argued that the Agency had abused its discretion by ignoring that this Form I-526 petition had been filed on the basis of the hospital's status as a troubled business. [AR 2400-2447].  The Appeal also challenged the Agency's failure to consider the additional evidence, failure to address the merits of the appeal on the troubled business question, and denial of due process by raising new matters in a denial without providing the investor notice and an opportunity to be heard. [AR 2400-2447; 2418].

### 8.     The Third (and Final) Agency Denial

As briefly described above, the AAO determined that the records submitted in support of the question of whether Crenshaw Community Hospital qualified as a troubled

business were not reliable or credible.  [AR 2454-56].  The AAO determined that a substantial

variance in the information presented in the February 2015 Business Plan's financial

statements and the 2011 and 2012 Tax Returns rendered the "statistics" unreliable.  [AR 2455

citing *Matter of Ho*, 19 I&N Dec. 582, 591 (BIA 1988)].[9]  Both sets of documents covered the

period 2011-2012.  While the 2015 Independent Auditor's Report and the 2011-2012 Income

Tax Filings supported the finding that Crenshaw Community Hospital is a troubled business,

the AAO nonetheless determined that the investors had "not sufficiently explained the very

large differences" between the two sets of documents.  [AR 2455].

      The AAO acknowledged that "differences in accounting methodology, for

example accrual versus cash, can result in some differences in amounts between the financial

statements and the income tax returns."  [AR 2455].  Yet, the AAO expressed concern that the

2015 Independent Auditor's Report found a (greater) net loss of -$3,213,524 for 2012 as

compared to a net loss estimated by 2012 Tax Filings.  [AR 2455 (determining that the tax

filings reflected an "Ordinary business income (loss) of ($764,491) and Net Income (loss) per

books before depreciation of ($1,048,355)")].  There are several problems with this analysis.

      First, the AAO ignored its earlier finding that actually explained the

discrepancy.  In its second denial (in response to the motion to reopen that was denied on new

grounds), the Agency determined that the differences between the 2015 Independent Auditor's

---

[9] In *Matter of Ho*, the Agency determined that the uncorroborated business plan and the self-serving statements submitted by the petitioner were unreliable.  *See, e.g.,* EB-5 Policy Memo, Tab 7, at 19-20.  Here, the Agency failed to provide its interpretation of *Ho* in that "the more details the business plan contains, as described in *Matter of Ho*, the more likely it is that the plan will be considered comprehensive and credible."  *Id.*  And, as the Agency acknoweldges, "[t]he petitioner or applicant does not need to remove all doubt from our adjudication . . . if the petitioner or applicant submits relevant, probative, and credible evidence that leads to the conclusion that the claim is "more likely than not" or "probably true", then the petitioner or applicant has statisfied the standard of proof."  *Id.* at 2.

Report and the tax filings related to a cash infusion into the hospital for "the purpose of alleviating cash flow problems that arose in 2011 and 2012."  [2428].  Second, the AAO also ignored that the GAAP audited financial statements (as distinct from federal tax forms submitted on tax basis accounting), were filed to address precisely the Agency's earlier invitation to submit "audited financial statements of the Hospital which use generally approved [sic] accounting principles."  [AR 1315].  Third, as the Agency conceded, differences in accounting methods, such as tax basis accounting and accrual basis accounting, can results in differences.  [AR 2455].

Nevertheless, because of what the Agency construed as "substantial variances" between the 2011-2012 Tax Forms and the 2015 Independent Auditor's Report, the AAO concluded the Crenshaw Community Hospital Investors had "not shown that the figures provided in these [audited] documents are reliable or credible. . . [and thus have] not demonstrated that PRMC, along with its hospital operation, constitutes a troubled business. [AR 2456].

### C.      Lack of Validity in the Agency's Reasoning

The AAO's findings regarding Crenshaw Community Hospital's status as a troubled business under 8 C.F.R. § 204.6(j)(4)(ii) constitutes prejudicial error in violation of 5 U.S.C. §§ 706, and the interpretation of the § 204.6(e) to require (and then reject) audited financial statements is beyond the *Chevron* pale.

### 1.            Requiring Audit Statements – Beyond *Chevron*

Audited financial statements are not required under the Act or the implementing regulation.  A petitioner is required, however, to submit sufficient documentation of the concern's status as a troubled business based on documentation that

relies on generally accepted accounting principles.  8 C.F.R. § 204.6(e).  Crenshaw County

Hospital, which is already struggling financially, paid for the independent audit *because* it

relied on the Agency's suggestion in the August 30, 2014 Request for Evidence that such an

audit would address any concerns about its status as a troubled business.

### 2.    Abuse of Discretion in Rejecting Tax Forms & the Requested Audit

The AAO further erred by failing to afford appropriate weight to the

comprehensive and independent audit prepared by Branum & Company, P.C., certified public

accounts and members of the American Institute of Certified Public Accountants, for the

covered periods (January 1, 2011- June 30, 2013).  More, the AAO's findings throughout the

three denials are internally inconsistent, and at odds with the other overwhelming evidence in

the administrative record – such as the Balance Sheets (accrual basis), and the 2011-2013 Tax

Returns (cash basis) substantiating a net loss ratio of more than 20%.  For instance, just one

document, the 2013 Tax Return History Report for 2013, prepared by the CPA on a cash

basis, reflects the following qualifying ratios [AR 1525]:

| Year | Total Assets | Net Income | Ratio of Loss to Assets |
|------|--------------|------------|--------------------------|
| 2010 | $492,734 | -$207,228 | >20% (42%) |
| 2011 | $2,148,790 | -$1,703,799 | >20% (79%) |
| 2012 | $1,568,659 | -764,491 | >20% (48.7%) |
| 2013 | $1,212,685 | -1,937,765 | >20%  (159.8%) |

The Tax Returns, as officially filed documents subject to both civil and

criminal penalties, are "highly credible" and inherently reliable as a matter of law as they have

been reviewed by another Federal agency.  *Chawathe*, 25 I. & N. at 376 ("a document that is

based on audited financial statements and reviewed by a Federal agency . . . is highly credible

and warrants substantial weight in immigration proceedings.").  Turning to the reliability of

the Independent Auditor's Report, it was prepared in accordance with both generally accepted

auditing standards ("GAAS") and generally accepted accounting principles ("GAAP"):

> Our responsibility is to express an opinion on these financial statements based on our audit.  We conducted our audit in accordance with *auditing standards generally accepted* in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about *whether the financial statements are free from material misstatement*. . .  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. . . We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.  [AR 2283] (emphasis added).

The auditor plainly explained in the 2015 Independent Auditor's Report that their actual results could differ depending on the estimates and assumptions affecting reported amounts of assets and liabilities for the period covered in the audit:

> In preparing financial statements in accordance with generally accepted accounting principles, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements and revenues and expenses during the reporting period. . . Actual results could differ from those estimates.  [AR 2318]

The auditor also established that their assessment did not take into account or otherwise seek to reconcile any accounting discrepancies associated with any previously filed tax returns:

> The Company is treated as a partnership for federal and state income tax purposes.  Members are taxed individually on their proportionate share of the Company's net income.  Accordingly, federal and state income taxes *have not been recorded in the financial statements*.

> The Company's income tax returns are subject to review by the Internal Revenue Service and the state taxing authority generally for three years after they were filed. As of [June 30, 2013, December 31, 2012 and 2011], the Company had no uncertain tax positions, or interest and penalties that qualify for either recognition or disclosure in the financial statements.  [AR 2320].

### 3.    Abuse of Discretion in Rejecting CPA's Evidence

The AAO further failed to address the February 23, 2015 letters in the

36

administrative record from Holt, McDuffee & Ramsey, L.L.C.  First, the CPAs have made it

clear throughout the record that their role is to assist management with accounting and tax

matters "in accordance with Statements on Standards for Accounting and Review Services

issued by the American Institute of Certified Public Accountants."  [AR 1405 (Oct. 31, 2016),

2326 (Feb. 23, 2016)].  Second the CPAs also clarified that they did not performed an audit

when they complied the balance sheets (which is not require by 8 C.F.R. § 204.6(e)):

> We have compiled the accompanying balance sheet of Professional Resources
> Management of Crenshaw, LLC as of March 31, 2013, and related statements
> of income for the year then ended.  We have not audited or reviewed the
> accompanying financial statements and, accordingly, do not express an opinion
> or provide any assurance about whether the financial statements are in
> accordance with accounting principles generally accepted in the United States
> of America.  [AR 2326].

There is no question, consistent with the Agency's holding in *Chawathe*, that

tax returns, as distinct from balance sheets, have inherent reliability.   Moreover, any

differences between the tax returns, the complied balance sheets, and the 2015 Independent

Auditor's Report are reconcilable.  The tax returns were sufficient, but the 2015 Independent

Auditor's Report is the best evidence of the hospital's status.   Additionally, on February 23,

2015 by letter to the Crenshaw Hospital Investor's equity partnership (CCHS, L.P.), Holt,

McDuffee & Ramsey, L.L.C., as Crenshaw Community Hospital's regular accountants (and

income tax form preparers) endorsed the generally accepted accounting principles used by the

Independent Auditors in their preparation of the audited balance sheets as of December 31,

2012 and 2011.  [AR 2329-30].  Based on this review, the CPAs affirmed their earlier position

that it "is very apparent that [Crenshaw Community Hospital] meets the definition of a

"Troubled Business" based on their net operating losses which exceed twenty percent of the

net worth.  [AR 2330].

### 4.    Abuse of Discretion in Rejecting other Corroborative Evidence

37

There are further consistencies in the administrative record that support the independent reliability of both the 2011 to 2013 Tax Forms and the comprehensive Independent Auditor's Report.  First, the Independent Auditor actually found a *greater amount* of net loss than what was reflected in the 2011 and 2012 tax filings prepared by Holt for the 2012 tax year: $3,213,524 of loss versus $1,812,846 of loss. [AR 2332].  The three-year general statute of limitations for amending a tax return has passed for the 2011 and 2012 tax years, but Crenshaw Community Hospital's variations likely resulted in a greater tax burden.  *See* 26 U.S.C. § 6511.  Second, credibility and reliability problems usually result from over-reporting losses and deductions – as opposed to underreporting which Crenshaw Community Hospital (as revealed through the Independent Auditor's Report) seems to have inadvertently done through the Holt prepared tax forms in 2011 and 2012.  Finally, any conflict between the 2011 and 2012 filed tax returned by Holt and the 2015 Independent Auditor's Report is fully reconcilable based on differences in revenue recognition method (cash v. accrual) and the differences between an accountant's compilation and an audit.  Any such differences are immaterial because both sets of documents are independently credible and reliable, and are not uncorroborated, self-serving statements of the applicant.  *See, e.g., Matter of Ho*, n. 9, *supra.*  Regardless, any variations attendant to accounting methodology are immaterial for the actual determination of whether Crenshaw Community Hospital qualifies as a "troubled business" as "determined on the basis of generally accepted accounting principles."  8 C.F.R. § 204.6(e).

The AAO also failed to consider other factual evidence in the administrative record that bolsters the credibility of the Independent Auditor's Report.  Like the CPA, Crenshaw Community Hospital concurred with the reliability and credibility of the 2015

Independent Auditor's Report to such an extent that it forms the basis of its revised, 2015

Revised Business Plan.  [AR 2347-2376].  Crenshaw Community Hospital's 2015 Revised

Business Plan was "made after the results of the GAAP-compliant audit became available,

which in turn formed the basis for a revised economic impact analysis." [AR 2349].  Michael

K. Evans, Ph.D., chairman of Evans, Carroll, and Associates, Inc., an economic consulting

firm, also submitted into the administrative record, an expert report entitled the "Economic

Impact of Expanding the Crenshaw Community Hospital, A Troubled Business Located in

Crenshaw County, AL, as Part of an Existing EB-5 Regional Center," dated September 2012

(hereinafter the "2012 Economic Impact Expert Report").  [AR 125-230].  Dr. Evans, whose

resume is appended to his expert economic report holds a Ph.D. in economics from Brown

University, has taught economics at the Wharton School and Northwestern University, and

has published dozen of peer-reviewed journal articles and books.  [AR 215-230].  He has been

a regular contributor to the *Los Angeles Times'* Board of Economists, has consulted for the

Senate Finance Committee, the Environmental Protection Agency, the National Aeronautics

and Space Administration, the U.S. Treasury, the U.S. Department of Agriculture, the

Organization of Economic Cooperation and Development, and has developed econometric

models for the State of New York, the State of Pennsylvania, and Washington, D.C. among

others.  [AR 215-230].

       Dr. Evans' expert assessment on the status of Crenshaw Community Hospital

as a "troubled business" is in the administrative record.  [AR 131].  Dr. Evans reviewed

"payroll records, income statements, and balance sheets for 2010-2011 operations at the

hospital" under  8 C.F.R. 204.6(j)(4)(ii) to determine whether the job creation requirement

was satisfied for Crenshaw Community Hospital as a troubled business.  [AR 131].  Dr.

Evans offered the following:

> Over the past two years, however, the hospital has operated at a loss and its
> assets have declined, so it is a troubled business as defined by the USCIS. [AR
> 127]. . . . Section (8) shows the payroll records of the hospital for 2010 and
> 2011, and calculates the number of full-time and FTE jobs that are being
> saved. It also includes the income statements and balance sheets for those
> years, attesting to the status of this hospital as a troubled business. [AR 131].

The Agency's exceeded its bounds, and abused its discretion in denying

recognition of Crenshaw Community Hospital as a troubled business under its regulation at 8

C.F.R. 204.6(e). The independently prepared tax returns, prepared on a cash basis in

accordance with generally accepted accounting principles, clearly established the qualifying

net loss to assets ratio. Notwithstanding this substantial evidence, the Agency further erred by

creating a requirement, outside of its regulation, for the investor to submit audited financial

statements; and then, abused its discretion further by rejecting this independent audit as

unreliable because its comprehensive analysis conflicted with the earlier tax returns and

balance sheets prepared by the outside accountant.

## POINT 3

> Because Crenshaw Community Hospital is a troubled business, the Agency
> erred by failing to recognize that both the 61 new and 117 saved jobs in
> Crenshaw Community Hospital count towards the job creation requirement of
> ten jobs per investor; regardless, the Limited Partnership Agreement
> recognizes pro rata interests among the investors such that six investors may
> allocate the 61 new jobs among them to establish at least 10 new jobs each.

Crenshaw Community Hospital is a troubled business, and for that reason, both

the new jobs and the preserved jobs count towards the job creation requirement. However,

the investors satisfy the job creation requirement even if Crenshaw Community Hospital is

not considered to be a troubled business. The most recent Economic Report, which is based

on the Independent Auditor's Report, identifies that at least 61 new jobs will be created

40

through the investment.  Because the Limited Partnership Agreement recognizes *pro rata* interests, there exists an agreement among the remaining, six investors to pool and allocate the 61 new jobs among them for the purposes of the job creation requirement.

## A.     The Legal Standard for Job Creation

The purpose of the EB-5 program is to encourage infusions of new capital in order to create jobs.  *Kenkhuis v. INS*, 2003 U.S. Dist. LEXIS 3334 *8 (N.D. Tex. Mar. 6, 2003).  The Senate Report on the legislation twice refers to investments of "new capital" that will promote job growth. S. Rep. 55, 101st Cong., 1st Sess. 5, 21 (1989).  Both the Act and the implementing regulation require that the investment create no fewer than ten (10) full-tome positions for U.S. workers.  *See* 8 C.F.R. § 204.6(j)(4)(i).

Because the U.S. economy benefits when immigrant investors help troubled businesses, the preservation of jobs also counts towards satisfying the overall job creation requirement under § 203(b)(5) of the INA.  8 C.F.R. § 204.6(j)(4)(ii); EB-5 Policy Memo, Tab 7, at pg. 17.  For investments into troubled businesses, the investor "must only show that the number of existing employees in the troubled business is being or will be maintained at no less than the pre-investment level for a period of at least two years."  EB-5 Policy Memo, Tab 7, at pg. 17 (citing 8 C.F.R. § 204.6(j)(4)(ii)).  There is no decrease in the statutory numeric requirement of at least ten jobs per investor, but "ten jobs must be preserved, created, or some combination of the two (e.g., an investment in a troubled business that creates four qualifying jobs and preserves all six pre-investment jobs would satisfy the statutory and regulatory requirements)."  EB-5 Policy Memo, Tab 7, at pg. 18.  Maintaining jobs in a troubled business "was not a statutory device . . . "but the Service determined that job retention comports with Congressional intent."  2011 EB-5 Training Materials, Tab 10, at pg. 303 (citing S. Debate on

41

Conf. Rep. S 358 Cong. Rec. S 17105-18 Oct. 1989)).  As the Agency's 2011 Training

Materials assert, "it was Congress' intent that the EB-5 investment should be directed to

investments that create permanent year-round employment."  For this reason, "[p]ooled

investments should have an impact on the economy commensurate with the required

aggregate level of investment by the group of EB-5 investors . . . [t]herefore each investor

must prospectively demonstrate that at least 10 jobs will be created (or maintained in the case

of a "troubled business").   2011 EB-5 Training Materials, Tab 10, at pg. 304.

### B.      Lack of Thoroughness Evident in the Agency's Consideration

         In two separate denials, the Agency ruled that because the investor had not

established that she invested in a troubled business, she must prove that her investment will

create at least ten new, full-time jobs.  [AR 2226 (Feb. 10, 2015); 2456 (Mar. 25, 2016)].

Based on this analysis, the Agency further determined that even if the job estimations in the

Business Plans and the Economic Reports are reliable, the investor must establish at least 10

jobs per each of the 12 investors originally intended for the Limited Partnerships.  [AR 2456].

Because the latest estimates project 61 new jobs created and 112 jobs saved, only the 61 jobs

could be allocated among the twelve intended investors, and the "Petitioner has not submitted

any "reasonable agreement made among the entrepreneurs . . . allocating job creation among

them in the project."  [AR 2456].  Such an allocation would not satisfy, in the Agency's

estimation, ten new jobs for each intended investor for the new commercial enterprise.

         As discussed *supra*, Crenshaw Community Hospital qualifies as a troubled

business, therefore both indirect and indirect jobs should count towards the jobs creation

requirement.  Regardless, the data and expert reports provided to the Agency are reliable and

credible even if minor variations exist.  These are the projections and minor variations in the

record:  (a) Dr. Evan's 2012 Economic Impact Report projected 204 saved jobs, 137 direct

and 67 indirect and induced [AR125-230]; (b) the 2013 Business Plan referenced the

preservation of 205 full-time employees with a total staff of 248 employees [AR 38-124]; (c)

the 2015 Revised Business Plan projected the preservation of 112 jobs and the creation of 61

new jobs [2347-2376]; and (d) the 2015 Economic Impact Report of Robert Kulick estimated

the preservation of 112 jobs saved and the creation of 61 new jobs [AR 2334-2345].

The variations were explained plainly in the brief on appeal.  The 2012

Economic Impact Report and the 2013 Business Plan were based on earlier financial

projections before the 2015 Independent Auditor's Report.  [2251-2252].  The job estimates in

the 2015 Revised Business Plan and the 2015 Economic Impact Report "derive from the audit

results, which are GAAP compliant . . . the audit report provides the basis for the financial

projections, which provide the inputs for the economic impact analysis."  [AR 2252].

### C.      Lack of Validity in the Agency's Reasoning

Crenshaw Community Hospital qualifies as a troubled business, and therefore,

the 112 jobs saved and the creation of 61 new jobs (totaling 179) may be allocated among the

individual investors for the job creation requirement under the Act and implementing

regulation.  Even if the Crenshaw Community Hospital is not considered to be a troubled

business, the 61 new jobs may still be attributed to the six investors in this civil action.

The AAO committed further legal error in its finding that, even if Crenshaw

Community Hospital were not a troubled business (where the 112 saved American jobs do not

count), the job creation requirement of 10 jobs per individual investor had not been met.

First, at the Form I-526 filing stage, there is no statutory, regulatory, or policy requirement for

immigrant investors to submit an agreement on job allocation among multiple investors.  If

multiple immigrant investors do enter into, and submit such an agreement, the only requirement is that the Agency *shall* recognize any "reasonable agreement made among the alien entrepreneurs in regard to the identification and allocation of such qualifying positions." 8 C.F.R. § 204.6(g)(2) (emphasis added).  Second, the Agency ignores the March 1, 2013 Equity Agreement between Crenshaw Community Hospital and the Limited Partnership. [1355].  This agreement, which applies to the multiple immigrant investors as limited partners, specifies that the Investors' shares and interests into the Hospital "*shall* be reduced on a pro rata basis" contingent on the number of approved EB-5 investors.  [AR 1355].  There is an agreement that if investors are denied, then they lose their partnership interest.  [232 ("In the event that a prospective investor's I-526 Petition . . . is denied, the prospective investor shall be provided a full refund".]

        For the six Crenshaw Hospital Investors remaining from the prospective pool of twelve, no such prior *pro rata* agreement is required, but the corporate documents establish such an agreement that the Agency shall recognize.  *See* 8 C.F.R. § 204.6(g)(2).  Even if the hospital were not considered to be a troubled business, 61 new jobs pro rated as to the six remaining investors satisfies a minimum of ten jobs per investor.

## VIII.   REMEDY

        Plaintiffs respectfully request that the Court vacate the Agency's decision denying the investor's eligibility to Section 203(b)(5) of the Act and remand for further proceedings consistent with an opinion and order that Plaintiffs have established through a preponderance of the evidence their entitlement to immigrant investor visa classification under Section 203(b)(5) of the INA and the implementing regulations.  *See INS v. Orlando Ventura,* 537 U.S. 12, 16-17 (2002) (applying the ordinary remand rule).

## IX.      CONCLUSION

Crenshaw Community Hospital, its employees, its community and the U.S. economy would benefit from a remand and an Agency reconsideration and approval.  With both reason and overwhelming documentation, the investors have shown through a preponderance of the evidence their at risk, cash investment into a troubled hospital – as determined by independent accountants, auditors, economists, and even federally filed tax returns.  This hospital and the jobs can be saved.

For the reasons expressed above, the Plaintiffs respectfully request that the Court grant summary judgment in their favor.


Respectfully submitted,

*//s// Jason D. Wright*
Jason D. Wright, Esq. (DC Bar # 1029983)
Wright Law Firm
40 Fulton Street, 23rd Floor
New York, New York 10038
Mobile: (202) 578-0260
Office:  (212) 285-8000
Fax:  (917) 677-8577
jwright@jasonwrightesq.com

*Attorney for Plaintiffs*

DATED:  December 2, 2016
         New York, New York