**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WEI GAN, *et al.,*                )
                                  )
     Plaintiffs,                  )
                                  )
     v.                           )          Civil Action No. 16-711-RMC
                                  )
UNITED STATES DEPARTMENT          )
OF HOMELAND SECURITY, *et al.,*   )
                                  )
     Defendants.                  )

---

**STATUTORY AND REGULATORY APPENDIX**
**TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Jason D. Wright (DC Bar # 1029983)
Wright Law Firm
40 Fulton Street, 23rd Floor
New York, New York 10038
Mobile: (202) 578-0260
Office:  (212) 285-8000
Fax:  (917) 677-8577
jwright@jasonwrightesq.com

*Attorney for Plaintiffs*

December 2, 2016

INDEX TO STATUTORY AND REGULATORY APPENDIX

<u>Statutes</u>

<u>TAB</u>

1.     Immigration Act of 1990, § 203(b)(5), as amended (codified at 8 U.S.C. § 1153(b)(5)]

<u>Code of Federal Regulations</u>

2.     8 C.F.R. § 204.6

<u>Agency Precedential Decisions & Policy Memorandum</u>

3.     *Matter of Izzumi*, 22 I. & N. Dec. 169 (Assoc. Comm. 1998)

4.     *Matter of Soffici*, 22 I. & N. Dec. 158 (Assoc. Comm. 1998)

5.     *Matter of Ho*, 22 I. & N. Dec. 206 (Assoc. Comm. 1998)

6.     *Matter of Hsiung*, 22 I. & N. Dec. 201 (Assoc. Comm. 1998)

7.     USCIS Policy Memorandum, No. P.M.-602-0082, EB-5 Adjudications Policy (May 30, 2013)

8.     INS Office of the General Counsel Memo, "Alien Entrepreneurs under Section 203(b)(5) of the Immigration and Nationality Act" (Sep. 10, 1993)

9.     INS Memo, "EB-5 Investor," (Oct. 20, 1997) (released under the Freedom of Information Act to the American Immigration Lawyers Association ("AILA")

10.    Excerpt of USCIS 2011 EB-5 Training Materials (through May 2011) (released under the Freedom of Information Act to AILA)

11.    Excerpt of USCIS 2013 EB-5 Training PowerPoint Presentation (released under the Freedom of Information Act to AILA)

<u>Other U.S. Government Reports</u>

12.    U.S. Congressional Research Service, EB-5 Immigrant Investor Visa, Report No. R44475 (Apr. 22, 2016), by Carla N. Arguenta and Alison Siskin.

# TAB 1

**The Immigration Act of 1990, § 203(b)(5)**
[8 U.S.C.  1153(b)(5), as amended]

**8 U.S.C. § 1153(b)(5)  Employment creation.**

(A)  <u>In general</u>. Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise (including a limited partnership)—

(i)  in which such alien has invested (after the date of the enactment of the Immigration Act of 1990 [enacted Nov. 29, 1990]) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and

(ii)  which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

(B)  <u>Set-aside for targeted employment areas</u>.

(i)  In general. Not less than 3,000 of the visas made available under this paragraph in each fiscal year shall be reserved for qualified immigrants who invest in a new commercial enterprise described in subparagraph (A) which will create employment in a targeted employment area.

(ii)  Targeted employment area defined. In this paragraph, the term "targeted employment area" means, at the time of the investment, a rural area or an area which has experienced high unemployment (of at least 150 percent of the national average rate).

(iii)  Rural area defined. In this paragraph, the term "rural area" means any area other than an area within a metropolitan statistical area or within the outer boundary of any city or town having a population of 20,000 or more (based on the most recent decennial census of the United States).

(C)  <u>Amount of capital required</u>.

(i)  In general. Except as otherwise provided in this subparagraph, the amount of capital required under subparagraph (A) shall be $ 1,000,000. The Attorney General, in consultation with the Secretary of Labor and the Secretary of State, may from time to time prescribe regulations increasing the dollar amount specified under the previous sentence.

(ii)  Adjustment for targeted employment areas. The Attorney General may, in the case of investment made in a targeted employment area, specify an amount of capital required under subparagraph (A) that is less than (but not less than 1/2 of) the amount specified in clause (i).

(iii) Adjustment for high employment areas. In the case of an investment made in a part of a metropolitan statistical area that at the time of the investment—

(I)      is not a targeted employment area, and

(II)      is an area with an unemployment rate significantly below the national average unemployment rate, the Attorney General may specify an amount of capital required under subparagraph (A) that is greater than (but not greater than 3 times) the amount specified in clause (i).

(D) <u>Full-time employment defined</u>. In this paragraph, the term "full-time employment" means employment in a position that requires at least 35 hours of service per week at any time, regardless of who fills the position.

<u>Source</u>:  Pub. L. No. 101-649, § 121, 104 Stat. 4978 (Nov. 29, 1990)

**8 U.S.C. § 1153 note:  Immigrant Investor Program**

(a)  Of the visas otherwise available under section 203(b)(5) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(5)), the Secretary of State, together with the Secretary of Homeland Security, shall set aside visas for a program to implement the provisions of such section. Such program shall involve a regional center in the United States, designated by the Secretary of Homeland Security on the basis of a general proposal, for the promotion of economic growth, including increased export sales, improved regional productivity, job creation, or increased domestic capital investment. A regional center shall have jurisdiction over a limited geographic area, which shall be described in the proposal and consistent with the purpose of concentrating pooled investment in defined economic zones. The establishment of a regional center may be based on general predictions, contained in the proposal, concerning the kinds of commercial enterprises that will receive capital from aliens, the jobs that will be created directly or indirectly as a result of such capital investments, and the other positive economic effects such capital investments will have.

(b)  For purposes of the program established in subsection (a), beginning on October 1, 1992, but no later than October 1, 1993, the Secretary of State, together with the Secretary of Homeland Security, shall set aside 3,000 visas annually until September 30, 2015 to include such aliens as are eligible for admission under section 203(b)(5) of the Immigration and Nationality Act [8 USCS § 1153(b)(5)] and this section, as well as spouses or children which are eligible, under the terms of the Immigration and Nationality Act [8 USCS §§ 1101 et seq. generally; for full classification, consult USCS Tables volumes], to accompany or follow to join such aliens.

(c)  In determining compliance with section 203(b)(5)(A)(iii) of the Immigration and Nationality Act [8 USCS § 1153(b)(5)(A)(iii)], and notwithstanding the requirements of 8 CFR 204.6, the Secretary of Homeland Security shall permit aliens admitted under the program described in this section to establish reasonable methodologies for determining the number of

2

jobs created by the program, including such jobs which are estimated to have been created indirectly through revenues generated from increased exports, improved regional productivity, job creation, or increased domestic capital investment resulting from the program.

(d)  In processing petitions under section 204(a)(1)(H) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(H)) for classification under section 203(b)(5) of such Act (8 U.S.C. 1153(b)(5)), the Secretary of Homeland Security may give priority to petitions filed by aliens seeking admission under the program described in this section. Notwithstanding section 203(e) of such Act (8 U.S.C. 1153(e)), immigrant visas made available under such section 203(b)(5) [subsec. (b)(5) of this section] may be issued to such aliens in an order that takes into account any priority accorded under the preceding sentence.

Source:   Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Oct. 6, 1992, P.L. 102-395, Title VI, § 610, 106 Stat. 1874; Nov. 26, 1997, P.L. 105-119, Title I, § 116(a), 111 Stat. 2467 (effective as provided by § 116(b) of such Act, which appears as a note to this section); Oct. 30, 2000, P.L. 106-396, Title IV, § 402, 114 Stat. 1647; Nov. 2, 2002, P.L. 107-273, Div C, Title I, Subtitle B, Ch. 2, § 11037(a), 116 Stat. 1847 (effective and applicable as provided by § 11037(b) of such Act, which appears as a note to this section); Dec. 3, 2003, P.L. 108-156, § 4, 117 Stat. 1945; Oct. 28, 2009, P.L. 111-83, Title V, § 548, 123 Stat. 2177; Sept. 28, 2012, P.L. 112-176, § 1, 126 Stat. 1325, provides:

# TAB 2

**8 C.F.R. § 204.6**
[as amended]

§204.6   Petitions for employment creation aliens.

(a) <u>General</u>. A petition to classify an alien under section 203(b)(5) of the Act must be filed on Form I-526, Immigrant Petition by Alien Entrepreneur. The petition must be accompanied by the appropriate fee. Before a petition is considered properly filed, the petition must be signed by the petitioner, and the initial supporting documentation required by this section must be attached. Legible photocopies of supporting documents will ordinarily be acceptable for initial filing and approval. However, at the discretion of the director, original documents may be required.

(b) [Reserved]

(c) <u>Eligibility to file</u>. A petition for classification as an alien entrepreneur may only be filed by any alien on his or her own behalf.

(d) Priority date. The priority date of a petition for classification as an alien entrepreneur is the date the petition is properly filed with the Service or, if filed prior to the effective date of these regulations, the date the Form I-526 was received at the appropriate Service Center.

(e) <u>Definitions</u>. As used in this section:

> **Capital** means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided that the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness. All capital shall be valued at fair market value in United States dollars. Assets acquired, directly or indirectly, by unlawful means (such as criminal activities) shall not be considered capital for the purposes of section 203(b)(5) of the Act.

> **Commercial enterprise** means any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business. This definition shall not include a noncommercial activity such as owning and operating a personal residence.

1

**Employee** means an individual who provides services or labor for the new commercial enterprise and who receives wages or other remuneration directly from the new commercial enterprise. In the case of the Immigrant Investor Pilot Program, "employee" also means an individual who provides services or labor in a job which has been created indirectly through investment in the new commercial enterprise. This definition shall not include independent contractors.

**Full-time employment** means employment of a qualifying employee by the new commercial enterprise in a position that requires a minimum of 35 working hours per week. In the case of the Immigrant Investor Pilot Program, "full-time employment" also means employment of a qualifying employee in a position that has been created indirectly through revenues generated from increased exports resulting from the Pilot Program that requires a minimum of 35 working hours per week. A job-sharing arrangement whereby two or more qualifying employees share a full-time position shall count as full-time employment provided the hourly requirement per week is met. This definition shall not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

**High employment area** means a part of a metropolitan statistical area that at the time of investment:

(I)     Is not a targeted employment area; and

(ii)     Is an area with an unemployment rate significantly below the national average unemployment rates.

**Invest** means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part.

**New** means established after November 29, 1990.

**Qualifying employee** means a United States citizen, a lawfully admitted permanent resident, or other immigrant lawfully authorized to be employed in the United States including, but not limited to, a conditional resident, a temporary resident, an asylee, a refugee, or an alien remaining in the United States under suspension of deportation. This definition does not include the alien entrepreneur, the alien entrepreneur's spouse, sons, or daughters, or any nonimmigrant alien.

2

**Regional center** means any economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

**Rural area** means any area not within either a metropolitan statistical area (as designated by the Office of Management and Budget) or the outer boundary of any city or town having a population of 20,000 or more.

**Targeted employment** area means an area which, at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate.

**Troubled business** means a business that has been in existence for at least two years, has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien entrepreneur's Form I-526, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss. For purposes of determining whether or not the troubled business has been in existence for two years, successors in interest to the troubled business will be deemed to have been in existence for the same period of time as the business they succeeded.

(f) Required amounts of capital—

(1) General. Unless otherwise specified, the amount of capital necessary to make a qualifying investment in the United States is one million United States dollars ($1,000,000).

(2) Targeted employment area. The amount of capital necessary to make a qualifying investment in a targeted employment area within the United States is five hundred thousand United States dollars ($500,000).

(3) High employment area. The amount of capital necessary to make a qualifying investment in a high employment area within the United States, as defined in section 203(b)(5)(C)(iii) of the Act, is one million United States dollars ($1,000,000).

(g) Multiple investors—

(1) General. The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien entrepreneur by more than one investor, provided each petitioning investor has invested or is actively in the process of investing the required amount for the area in which the new commercial enterprise is principally doing business, and provided each individual investment results in the

creation of at least ten full-time positions for qualifying employees. The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien entrepreneur even though there are several owners of the enterprise, including persons who are not seeking classification under section 203(b)(5) of the Act and non-natural persons, both foreign and domestic, provided that the source(s) of all capital invested is identified and all invested capital has been derived by lawful means.

(2) Employment creation allocation. The total number of full-time positions created for qualifying employees shall be allocated solely to those alien entrepreneurs who have used the establishment of the new commercial enterprise as the basis of a petition on Form I-526. No allocation need be made among persons not seeking classification under section 203(b)(5) of the Act or among non-natural persons, either foreign or domestic. The Service shall recognize any reasonable agreement made among the alien entrepreneurs in regard to the identification and allocation of such qualifying positions.

(h) Establishment of a new commercial enterprise. The establishment of a new commercial enterprise may consist of:

(1) The creation of an original business;

(2) The purchase of an existing business and simultaneous or subsequent restructuring or reorganization such that a new commercial enterprise results; or

(3) The expansion of an existing business through the investment of the required amount, so that a substantial change in the net worth or number of employees results from the investment of capital. Substantial change means a 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees. Establishment of a new commercial enterprise in this manner does not exempt the petitioner from the requirements of 8 CFR 204.6(j) (2) and (3) relating to the required amount of capital investment and the creation of full-time employment for ten qualifying employees. In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 CFR 204.6(j)(4)(ii).

(i) State designation of a high unemployment area. The state government of any state of the United States may designate a particular geographic or political subdivision located within a metropolitan statistical area or within a city or town having a population of 20,000 or more within such state as an area of high unemployment (at least 150 percent of the national average rate). Evidence of such designation, including a description of the boundaries of the geographic or political subdivision and the method or methods by which the unemployment statistics were obtained, may be provided to a prospective alien entrepreneur for submission with Form I-526. Before any such designation is made, an official of the state must notify the Associate Commissioner for Examinations of the agency, board, or other appropriate governmental body of the state

4

which shall be delegated the authority to certify that the geographic or political subdivision is a high unemployment area.

(j) <u>Initial evidence to accompany petition</u>. A petition submitted for classification as an alien entrepreneur must be accompanied by evidence that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than 10 qualifying employees. In the case of petitions submitted under the Immigrant Investor Pilot Program, a petition must be accompanied by evidence that the alien has invested, or is actively in the process of investing, capital obtained through lawful means within a regional center designated by the Service in accordance with paragraph (m)(4) of this section. The petitioner may be required to submit information or documentation that the Service deems appropriate in addition to that listed below.

(1) To show that a new commercial enterprise has been established by the petitioner in the United States, the petition must be accompanied by:

(i) As applicable, articles of incorporation, certificate of merger or consolidation, partnership agreement, certificate of limited partnership, joint venture agreement, business trust agreement, or other similar organizational document for the new commercial enterprise;

(ii) A certificate evidencing authority to do business in a state or municipality or, if the form of the business does not require any such certificate or the State or municipality does not issue such a certificate, a statement to that effect; or

(iii) Evidence that, as of a date certain after November 29, 1990, the required amount of capital for the area in which an enterprise is located has been transferred to an existing business, and that the investment has resulted in a substantial increase in the net worth or number of employees of the business to which the capital was transferred. This evidence must be in the form of stock purchase agreements, investment agreements, certified financial reports, payroll records, or any similar instruments, agreements, or documents evidencing the investment in the commercial enterprise and the resulting substantial change in the net worth, number of employees.

(2) To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence **that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk**. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital. Such evidence may include, but need not be limited to:

(i) Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

(ii) Evidence of assets which have been purchased for use in the United States enterprise, including invoices, sales receipts, and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(iii) Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading, and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

(iv) Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred). Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

(v) Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

(3) To show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means, the petition must be accompanied, as applicable, by:

(i) Foreign business registration records;

(ii) Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the petitioner;

(iii) Evidence identifying any other source(s) of capital; or

(iv) Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years.

(4) Job creation—

(i) General. To show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:

6

(A) Documentation consisting of photocopies of relevant tax records, Form I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or

(B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

(ii) Troubled business. To show that a new commercial enterprise which has been established through a capital investment in a troubled business meets the statutory employment creation requirement, the petition must be accompanied by evidence that the number of existing employees is being or will be maintained at no less than the pre-investment level for a period of at least two years. Photocopies of tax records, Forms I-9, or other relevant documents for the qualifying employees and a comprehensive business plan shall be submitted in support of the petition.

(iii) Immigrant Investor Pilot Program. To show that the new commercial enterprise located within a regional center approved for participation in the Immigrant Investor Pilot Program meets the statutory employment creation requirement, the petition must be accompanied by evidence that the investment will create full-time positions for not fewer than 10 persons either directly or indirectly through revenues generated from increased exports resulting from the Pilot Program. Such evidence may be demonstrated by reasonable methodologies including those set forth in paragraph (m)(3) of this section.

(5) To show that the petitioner is or will be engaged in the management of the new commercial enterprise, either through the exercise of day-to-day managerial control or through policy formulation, as opposed to maintaining a purely passive role in regard to the investment, the petition must be accompanied by:

(i) A statement of the position title that the petitioner has or will have in the new enterprise and a complete description of the position's duties;

(ii) Evidence that the petitioner is a corporate officer or a member of the corporate board of directors; or

(iii) If the new enterprise is a partnership, either limited or general, evidence that the petitioner is engaged in either direct management or policy making activities. For purposes of this section, if the petitioner is a limited partner and the limited partnership agreement provides the petitioner with certain rights, powers, and duties normally granted to limited partners under the Uniform Limited Partnership Act, the petitioner will be considered sufficiently engaged in the management of the new commercial enterprise.

(6) If applicable, to show that the new commercial enterprise has created or will create employment in a targeted employment area, the petition must be accompanied by:

(i) In the case of a rural area, evidence that the new commercial enterprise is principally doing business within a civil jurisdiction not located within any standard metropolitan statistical area as designated by the Office of Management and Budget, or within any city or town having a population of 20,000 or more as based on the most recent decennial census of the United States; or

(ii) In the case of a high unemployment area:

(A) Evidence that the metropolitan statistical area, the specific county within a metropolitan statistical area, or the county in which a city or town with a population of 20,000 or more is located, in which the new commercial enterprise is principally doing business has experienced an average unemployment rate of 150 percent of the national average rate; or

(B) A letter from an authorized body of the government of the state in which the new commercial enterprise is located which certifies that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area. The letter must meet the requirements of 8 CFR 204.6(i).

(k) Decision. The petitioner will be notified of the decision, and, if the petition is denied, of the reasons for the denial and of the petitioner's right of appeal to the Associate Commissioner for Examinations in accordance with the provisions of part 103 of this chapter. The decision must specify whether or not the new commercial enterprise is principally doing business within a targeted employment area.

(l) [Reserved]

(m) Immigrant Investor Pilot Program—

(1) Scope. The Immigrant Investor Pilot Program is established solely pursuant to the provisions of section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, and subject to all conditions and restrictions stipulated in that section. Except as provided herein, aliens seeking to obtain immigration benefits under this paragraph continue to be subject to all conditions and restrictions set forth in section 203(b)(5) of the Act and this section.

(2) Number of immigrant visas allocated. The annual allocation of the visas available under the Immigrant Investor Pilot Program is set at 300 for each of the five fiscal years commencing on October 1, 1993.

(3) Requirements for regional centers. Each regional center wishing to participate in the Immigrant Investor Pilot Program shall submit a proposal to the Assistant Commissioner for Adjudications, which:

(i) Clearly describes how the regional center focuses on a geographical region of the United States, and how it will promote economic growth through increased export sales, improved regional productivity, job creation, and increased domestic capital investment;

(ii) Provides in verifiable detail how jobs will be created indirectly through increased exports;

(iii) Provides a detailed statement regarding the amount and source of capital which has been committed to the regional center, as well as a description of the promotional efforts taken and planned by the sponsors of the regional center;

(iv) Contains a detailed prediction regarding the manner in which the regional center will have a positive impact on the regional or national economy in general as reflected by such factors as increased household earnings, greater demand for business services, utilities, maintenance and repair, and construction both within and without the regional center; and

(v) Is supported by economically or statistically valid forecasting tools, including, but not limited to, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and/or multiplier tables.

(4) Submission of proposals to participate in the Immigrant Investor Pilot Program. On August 24, 1993, the Service will accept proposals from regional centers seeking approval to participate in the Immigrant Investor Pilot Program. Regional centers that have been approved by the Assistant Commissioner for Adjudications will be eligible to participate in the Immigrant Investor Pilot Program.

(5) Decision to participate in the Immigrant Investor Pilot Program. The Assistant Commissioner for Adjudications shall notify the regional center of his or her decision on the request for approval to participate in the Immigrant Investor Pilot Program, and, if the petition is denied, of the reasons for the denial and of the regional center's right of appeal to the Associate Commissioner for Examinations. Notification of denial and appeal rights, and the procedure for appeal shall be the same as those contained in 8 CFR 103.3.

(6) Termination of participation of regional centers. To ensure that regional centers continue to meet the requirements of section 610(a) of the Appropriations Act, a regional center must provide USCIS with updated information to demonstrate the regional center is continuing to promote economic growth, improved regional productivity, job creation, or increased domestic capital investment in the approved geographic area. Such information must be submitted to USCIS on an annual

basis, on a cumulative basis, and/or as otherwise requested by USCIS, using a form designated for this purpose. USCIS will issue a notice of intent to terminate the participation of a regional center in the pilot program if a regional center fails to submit the required information or upon a determination that the regional center no longer serves the purpose of promoting economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment. The notice of intent to terminate shall be made upon notice to the regional center and shall set forth the reasons for termination. The regional center must be provided 30 days from receipt of the notice of intent to terminate to offer evidence in opposition to the ground or grounds alleged in the notice of intent to terminate. If USCIS determines that the regional center's participation in the Pilot Program should be terminated, USCIS shall notify the regional center of the decision and of the reasons for termination. As provided in 8 CFR 103.3, the regional center may appeal the decision to USCIS within 30 days after the service of notice.

(7) Requirements for alien entrepreneurs. An alien seeking an immigrant visa as an alien entrepreneur under the Immigrant Investor Pilot Program must demonstrate that his or her qualifying investment is within a regional center approved pursuant to paragraph (m)(4) of this section and that such investment will create jobs indirectly through revenues generated from increased exports resulting from the new commercial enterprise.

(i) Exports. For purposes of paragraph (m) of this section, the term "exports" means services or goods which are produced directly or indirectly through revenues generated from a new commercial enterprise and which are transported out of the United States;

(ii) Indirect job creation. To show that 10 or more jobs are actually created indirectly by the business, reasonable methodologies may be used. Such methodologies may include multiplier tables, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and other economically or statistically valid forecasting devices which indicate the likelihood that the business will result in increased employment.

(8) Time for submission of petitions for classification as an alien entrepreneur under the Immigrant Investor Pilot Program. Commencing on October 1, 1993, petitions will be accepted for filing and adjudicated in accordance with the provisions of this section if the alien entrepreneur has invested or is actively in the process of investing within a regional center which has been approved by the Service for participation in the Pilot Program.

(9) Effect of termination of approval of regional center to participate in the Immigrant Investor Pilot Program. Upon termination of approval of a regional center to participate in the Immigrant Investor Pilot Program, the director shall send a formal written notice to any alien within the regional center who has been granted lawful permanent residence on a conditional basis under the Pilot Program, and who has not yet

removed the conditional basis of such lawful permanent residence, of the termination of the alien's permanent resident status, unless the alien can establish continued eligibility for alien entrepreneur classification under section 203(b)(5) of the Act.

[56 FR 60910, Nov. 29, 1991, as amended at 57 FR 1860, Jan. 16, 1992; 58 FR 44608, 44609, Aug. 24, 1993; 74 FR 26937, June 5, 2009; 75 FR 58990, Sept. 24, 2010; 76 FR 53782, Aug. 29, 2011]

# TAB 3

Interim Decision #3360

# In re IZUMMI, Petitioner

*In Visa Petition Proceedings*

A76 426 873

Decided by the Associate Commissioner, Examinations, July 13, 1998.

(1) Regardless of its location, a new commercial enterprise that is engaged directly or indirectly in lending money to job-creating businesses may only lend money to businesses located within targeted areas in order for a petitioner to be eligible for the reduced minimum capital requirement.

(2) Under the Immigrant Investor Pilot Program, if a new commercial enterprise is engaged directly or indirectly in lending money to job-creating businesses, such job-creating businesses must all be located within the geographic limits of the regional center. The location of the new commercial enterprise is not controlling.

(3) A petitioner may not make material changes to his petition in an effort to make a deficient petition conform to Service requirements.

(4) If the new commercial enterprise is a holding company, the full requisite amount of capital must be made available to the business(es) most closely responsible for creating the employment on which the petition is based.

(5) An alien may not receive guaranteed payments from a new commercial enterprise while he owes money to the new commercial enterprise.

(6) An alien may not enter into a redemption agreement with the new commercial enterprise at any time prior to completing all of his cash payments under a promissory note. In no event may the alien enter into a redemption agreement prior to the end of the two-year period of conditional residence.

(7) A redemption agreement between an alien investor and the new commercial enterprise constitutes a debt arrangement and is prohibited under 8 C.F.R. § 204.6(e).

(8) Reserve funds that are not made available for purposes of job creation cannot be considered capital placed at risk for the purpose of generating a return on the capital being placed at risk.

(9) The Service does not pre-adjudicate immigrant-investor petitions; each petition must be adjudicated on its own merits.

(10) Under 8 C.F.R. § 204.6(e), all capital must be valued at fair market value in United States dollars, including promissory notes used as capital. In determining the fair market value of a

Interim Decision #3360

promissory note, it is necessary to consider, among other things, present value.

(11)  Under certain circumstances, a promissory note that does not itself constitute capital may constitute evidence that the alien is "in the process of investing" other capital, such as cash. In   such a case, the petitioner must substantially complete payments on the promissory note prior to the end of the two-year conditional period.

(12)  Whether the promissory note constitutes capital or is simply evidence that the alien is in the process of investing other capital, nearly all of the money due under the promissory note must be payable within two years, without provisions for extensions.

(13)  In order for a petitioner to be considered to have established an original business, he must have had a hand in its actual creation.

ON BEHALF OF PETITIONER:   MAURICE INMAN/FREDRICK W. VOIGTMANN
          1925 CENTURY PARK EAST, 16TH FLOOR
          LOS ANGELES, CA  90067

## DISCUSSION

The preference visa petition was denied by the Director, Texas Service Center, who certified the decision to the Associate Commissioner for Examinations for review. The decision of the director will be affirmed.

The petitioner seeks classification as an alien entrepreneur pursuant to section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), and section 610 of the Appropriations Act of 1993. The director determined that the petitioner had failed to establish that he had placed the requisite capital at risk. The director made the following findings: $30,000 of the claimed contribution would be used for the expenses of the Partnership rather than being infused into the subsidiary commercial enterprise for the purpose of employment creation; the majority of the remaining capital would not be available for job creation because the Partnership was required to maintain it in reserves; part of the petitioner's capital contribution was not an investment because it was made in exchange for a debt arrangement; and another part of the petitioner's contribution would derive from guaranteed annual interest payments received from the Partnership.

In response, the petitioner submits two separate briefs, two supplemental briefs, and numerous exhibits. He contends that the director's decision misstates existing facts and mischaracterizes the provisions of the American Export Limited Partnership ("AELP") investor program. The petitioner also complains that the director's decision fails to mention, distinguish, or "explain away" approvals of other AELP petitions by both the Texas Service Center and Vermont Service Center; furthermore, the director's decision fails to mention, distinguish, or "explain away" prior Service opin-

ions and communications that directly supported and authorized the use of various features of the AELP program. The petitioner states that, even if the director had been correct in denying the petition, certain new amendments to the partnership plan should cause the Administrative Appeals Unit (AAU) to approve his petition.

Oral argument was granted in this case, and during his presentation counsel reiterated the points made in the brief. Counsel emphasized that the petitioner had made an investment by executing and delivering the promissory note for $500,000; the schedule of future payments under the note was irrelevant.

Section 203(b)(5)(A) of the Act provides classification to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise:

> (i)  which the alien has established,

> (ii)  in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and

> (iii)  which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

The petitioner indicates that the petition is based on an investment in a new business in a targeted employment area for which the required amount of capital invested has been adjusted downward. In addition, the business is located in an area designated as a "regional center" authorized to participate in the Immigrant Investor Pilot Program.

## THE PETITIONER HAS NOT DEMONSTRATED THAT AELP IS ENGAGING IN APPROVED REGIONAL-CENTER ACTIVITIES IN TARGETED EMPLOYMENT AREAS

8 C.F.R. § 204.6(e) states, in pertinent part, that:

> *Targeted employment area* means an area which, at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate.

8 C.F.R. § 204.6(j)(6) states that:

> If applicable, to show that the new commercial enterprise has created or will create employment in a targeted employment area, the petition must be accompanied by:

Interim Decision #3360

(i) In the case of a rural area, evidence that the new commercial enterprise is principally doing business within a civil jurisdiction not located within any standard metropolitan statistical area as designated by the Office of Management and Budget, or within any city or town having a population of 20,000 or more as based on the most recent decennial census of the United States; or

(ii) In the case of a high unemployment area:

(A) Evidence that the metropolitan statistical area, the specific county within a metropolitan statistical area, or the county in which a city or town with a population of 20,000 or more is located, in which the new commercial enterprise is principally doing business has experienced an average unemployment rate of 150 percent of the national average rate; or

(B) A letter from an authorized body of the government of the state in which the new commercial enterprise is located which certifies that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area. The letter must meet the requirements of 8 C.F.R. § 204.6(i).

On October 19, 1995, American Export Partners, LLC ("AEP") filed its articles of organization with the State of South Carolina. On March 25, 1996, AELP filed its certificate of limited partnership with the State of South Carolina, and AEP was designated as AELP's general partner. Both AEP and AELP are located in Charleston, South Carolina.

In a letter dated February 8, 1995, the Assistant Commissioner for Adjudications designated AEP a regional center and specified that individuals could file petitions with the Service "for new commercial enterprises located within the eight-county coastal areas, or Lowcountry, of South Carolina." On June 14, 1995, the Acting Assistant Commissioner for Adjudications expanded the geographical area covered by the AEP regional center to include 22 other counties in South Carolina.

The petitioner has presented evidence that many, but not all, of the counties within this regional center were considered rural in 1995 and qualified at that time as targeted employment areas.[1]

In his brief, the petitioner explains that AELP has established a commercial credit corporation subsidiary, American Commercial and Export Credit Company, Inc., with its co-venturer, Resurgens Capital & Investment. This credit company makes asset-based loans and engages in receivables financing for small export companies "located throughout South Carolina and the southeastern United States." The capital provided by the alien investors to AELP is used to purchase stock in the credit com-

---

[1]Of the 22 new counties added to the regional-center area, Aiken, Edgefield, Lexington, Richland, and Sumter counties were not targeted employment areas in 1995.

pany, and the credit company uses this money to secure loans from an institutional bank lender. This other lender will increase the capital by a factor of three or four. The petitioner claims that the credit company has succeeded in placing "several" loans already.

According to the materials submitted, the credit company has extended or purchased four loans to date. The credit company has purchased a $780,000 loan that had been extended to Pillow Perfect, Inc. by First Capital Bank; Pillow Perfect is located in Woodstock, Georgia. The credit company has purchased a $380,000 loan that had been extended to Pointe Services, Inc. by First Capital Bank; Pointe Services is located in Atlanta, Georgia. The credit company has extended a $200,000 loan to Advanced Technology Services, Inc. located in Atlanta, Georgia. Finally, the credit company has extended a $1,000 loan to Bitz America, Inc., in Martinez, Georgia.

It is not known how much the credit company paid to purchase the loans involving Pillow Perfect and Pointe Services. The above loans evidence at most the use of only $1,361,000 of the funds obtained from the first 95 investors who were granted under this program.[2]  The petitioner has provided loan-prospect reports from October 1997 and February 1998; these reports show that the credit company has proposed (but not succeeded in) lending money to various companies in Norcross, Oakwood, Atlanta, and Marietta, Georgia as well as Miami and Orlando, Florida.

Pillow Perfect is located in Cherokee County, Georgia; according to the employment information submitted by counsel, Cherokee County did not have any census tracts that qualified as areas of high unemployment in 1995. Pointe Services and Advanced Technology Services, Inc., are located in Fulton County. The petitioner has not demonstrated that these companies are located in the particular census tracts that qualified as areas of high unemployment in 1995 or in any other year. Nor has the petitioner shown that Bitz America is located in a targeted employment area.

The few transactions in which the credit company has engaged have not been shown to benefit companies located in targeted employment areas.[3] Even the businesses considered "loan prospects" are not located in targeted employment areas. Neither the credit company, headquartered in Atlanta, nor AELP, headquartered in Charleston, has been shown to be located in a targeted employment area. Therefore, the amount of capital necessary to make a qualifying investment in this matter is $1,000,000.

---

[2]This computes to approximately $14,327 per investor, far short of the requisite $500,000 per investor.

[3]It is noted that the employment information provided by counsel is out of date, in any event. A petitioner must establish that certain areas are targeted employment areas as of the date he files his petition; just because a particular area used to be rural many years ago, for example, does not mean that it still is.

Interim Decision #3360

Also, the regional-center designation in this case was granted for most of the counties in South Carolina. It did not extend to Georgia or Florida. While AELP is located in South Carolina, neither the credit company extending the actual loans nor the companies receiving the loans are located within the regional center. Therefore, the petitioner must establish direct employment creation.

The petitioner states in his brief that the Service had expressly permitted the use of the subsidiary credit corporation as a vehicle for making loans to export-related businesses not related to the regional center. He refers to a letter dated September 27, 1995, from the Chief of the Immigrant Branch, Adjudications, who was asked whether the customers of an export credit corporation needed to be located within the region covered by the regional-center designation. The Chief's response did not directly address this question; instead, he stated, "Although the regional center should focus on a geographical area, there is no requirement in either the statute or the regulations that the exports generated under the Pilot Program be **produced or manufactured** within the area designated by the regional center," (emphasis added).[4]   The petitioner concludes that the credit company may extend loans to any export-related company located anywhere.

Such an interpretation renders the geographical limitation of a regional center meaningless. The definition of "regional center" in 8 C.F.R. § 204.6(e) requires that the economic unit be involved in "improved regional productivity."   8 C.F.R. § 204.6(m)(3)(i) states that, in order to gain approval as a regional center, an entity must describe clearly how it will promote economic growth through "improved regional productivity."   If neither the credit company nor the export-related businesses are located in the regional center, it is difficult to see how the productivity within the regional center is being improved.[5]

As the subsidiary credit corporation's actual and proposed loan activities benefit companies outside the geographical area covered by the regional-center designation granted in this case, the petitioner must estab-

---

[4]Not all export-related businesses produce or manufacture their own goods. For example, if a bank located within the regional center were to lend money to a company that exported chicken parts to Russia, the chickens would not have to have been raised within the specific geographical area; the export company would have to be located within the area, however. Similarly, the bank could permissibly lend money to a company located in the geographical area that exported cosmetics, jeans, and American rice to Japan; these products would likely not have been produced or manufactured within the area. It is not sufficient for just the bank, or the bank's primary shareholder, to be located in the regional center

[5]Even if the credit company here were located within the regional center rather than in Atlanta, the arrangement would still not qualify. The only improved regional productivity would concern the salaries of a few loan officers; this is not what was intended by the regional-center provisions.

174

lish direct employment creation; he cannot rely on indirect employment creation. For the sake of argument, however, the AAU will analyze the investment portion of this case using his claim of indirect employment creation.

## CERTAIN REVISIONS TO THE PARTNERSHIP
## AGREEMENT CANNOT BE ACCEPTED

Subsequent to the issuance of the director's decision, counsel has submitted numerous revisions to AELP's limited partnership agreement. He explains that the revisions are in the form of Stage I and Stage II amendments.

The original partnership agreement had been prepared and executed in March of 1996, prior to the creation of an initial payment option of $120,000. When the $120,000 option was added to AELP's program in the fall of 1996, AELP neglected to amend the partnership agreement. As a result, many provisions within the documents signed by this petitioner contradict provisions within the official partnership agreement. The Stage I amendments are intended to correct these inconsistencies.

In addition, after the attorneys for AELP obtained a copy of a memorandum issued in December of 1997 by the Service's Office of General Counsel ("OGC"), "the Limited Partnership Agreement of AELP was further amended to restructure, amend or eliminate some or all of [the] 'objected-to' provisions."  These Stage II amendments, counsel continues, should render the instant petition approvable.

A petitioner must establish eligibility at the time of filing; a petition cannot be approved at a future date after the petitioner becomes eligible under a new set of facts. *See Matter of Katigbak*, 14 I&N Dec. 45, 49 (Comm. 1971), Therefore, a petitioner may not make material changes to a petition that has already been filed in an effort to make an apparently deficient petition conform to Service requirements.

Counsel states that petitions have previously been amended to reflect program changes and to cure defects in the original documents. He refers to a 1995 case in which the center director had correctly found that the business at issue did not constitute a troubled business. At oral argument in that case, counsel presented a completely different business plan that abandoned the troubled-business claim and substituted a plan to create a new business instead. This new business plan formed the basis of an approval. The case referenced by counsel, however, resulted in an unpublished decision that did not have any precedential value, procedural or otherwise. Furthermore, the AAU acknowledges that acceptance of the new business plan at such a late date was improper and erroneous.

In the case at hand, the AAU will recognize the Stage I amendments to the extent that they cause the partnership agreement to conform to the other

Interim Decision #3360

agreements that this petitioner had originally executed and submitted with his Form I-526. The AAU will make no determination as to the adequacy or inadequacy of the Stage II amendments, as they are irrelevant in this proceeding; the Service cannot consider facts that come into being only subsequent to the filing of a petition. *See Matter of Bardouille*, 18 I&N Dec. 114 (BIA 1981). If counsel had wished to test the validity of the newest plan, which is materially different from the original plan, he should have withdrawn the instant petition and advised the petitioner to file a new Form I-526. The case shall be analyzed only on the basis of the original documents and the revisions that correct the original inconsistencies.

## THE PETITIONER HAS NOT MADE A QUALIFYING "INVESTMENT"

8 C.F.R. § 204.6(e) states, in pertinent part, that

*Capital* means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness. All capital shall be valued at fair market value in United States dollars, ...

*Commercial enterprise* means any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business. This definition shall not include a non-commercial activity such as owning and operating a personal residence.

*Invest* means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part.

8 C.F.R. § 204.6(j) states, in pertinent part, that:

(2)  To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital. Such evidence may include, but need not be limited to:

(i)  Bank statement(s) showing amount(s) deposited in United States business

account(s) for the enterprise;

   (ii)  Evidence of assets which have been purchased for use in the United States enterprise, including invoices; sales receipts; and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

   (iii)  Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

   (iv)  Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred), Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

   (v)  Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

   Counsel states that the petitioner has made an investment of $500,000 in the form of a $500,000 promissory note. This note provides for an initial deposit of $120,000 into an escrow account, to be released to the partnership upon approval of the immigrant visa, five annual payments of $18,000, and a final balloon payment of $290,000.

### Initial Partnership expenses

   On October 14, 1997, Wells Fargo Bank notified the petitioner that his funds in the amount of $120,000 had been received and deposited into a custody account for the Partnership. According to section 2.A(3) of the investment agreement, the petitioner agreed to instruct counsel, as trustee of his escrow account, "immediately to release US$30,000 as a refundable advance for initial expenses of the Partnership"; the remaining $90,000 would be released upon approval of the visa application. As pointed out by the director on page 4 of his decision, the use of the $30,000 for Partnership costs and expenses meant that the full $500,000 would not be "infused into the commercial enterprise for the purpose of employment creation."

   In response, the petitioner states that it is possible that the director objected to the expenses being released from the escrow account and that the director might not have objected if the expenses had been paid after the funds were released from escrow. Regardless of the timing of the payment, the ultimate payee is the Partnership, the petitioner maintains. The timing

Interim Decision #3360

of the payment, however, was not the director's objection. The director cited 8 C.F.R. § 204.6(j)(2) in stating that the required amount of capital must be placed at risk "for the purpose of generating a return on the capital placed at risk." As the payment of initial Partnership expenses and costs was not the type of profit-generating activity contemplated by the regulations, no more than $470,000 could be considered to have been "invested."

The petitioner argues that fees and expenses incurred in the process of raising capital are customary and reasonable. For example, when businesses go to banks for money, the banks charge processing fees, points, appraisal fees, and other expenses that are included in the debt. The petitioner continues:

> It is absurd to suggest that there is no cost to creating an immigrant investor program (attorneys fees, accountant fees, and administrative fees), there is no cost to raising money in the market place (finders fees, immigration consultant fees, forwarding fees, and so forth); and that there are no ongoing administrative and operating expenses during the initial start up phase of the business (rent, utilities, telephones, fax machines, office furniture, personnel costs, executive salaries, etc.), We live in a world of reality, not "make believe."

The petitioner refers to AELP's subsidiary credit company having retained an expert in asset-based loans for an annual salary "in excess of $200,000." What is important, the petitioner emphasizes, is that the money spent by AELP on initial expenses is in furtherance of the Partnership business.[6]

While points and processing fees are often financed, they are considered an amount over and above the original loan amount. To illustrate, when a person intends to obtain a mortgage for $200,000, he can choose to pay the points and fees separately or he can choose to finance them. If he chooses to finance the fees, the principal on his mortgage is no longer just $200,000 but something more. In the investor context, the Service is not prohibiting the payment of Partnership expenses; rather, the Service is finding that if AELP wishes to have the limited partners pay these expenses, these expenses must be paid in addition to the $500,000.

The petitioner explains that AELP deducts its operating expenses of $30,000, and the remaining funds go to the subsidiary credit corporation. The credit corporation then deducts its own expenses and the leftover money is contributed to a lending fund from which the loans to export companies are made. The petitioner contends that the new commercial enter-

---

[6]Nevertheless, counsel appears to be prepared to abandon these numerous arguments. In his brief on behalf of the petitioner, counsel states that if the AAU finds that providing for the payment of initial expenses from and out of capital contributed by the investor is improper, then AELP will immediately amend its partnership agreement to eliminate the provision from its program.

Interim Decision #3360

prise here is the Partnership, AELP, and an investment of $500,000 in AELP constitutes an investment of $500,000 in the new commercial enterprise, "It was never AELP's intent...that 100% of the funds contributed by the foreign national investors would flow through the partnership and into the credit corporation for lending to U.S. export businesses." After AELP and the credit corporation deduct tens of thousands of dollars for their "expenses," however, it is not clear how much of the original money is made available for loans.

It could perhaps be argued that, when the owner of a corporation pays a million dollars for shares in his business and earmarks the money for equipment, inventory, and working capital, some of the working capital will in fact be spent on initial salaries and expenses. In the partnership scenario, the new commercial enterprise is the partnership, and it too will need to spend money on initial salaries and expenses. The Service distinguishes these two situations in that, in the former example, the employment-creating entity is spending the money. In the latter example, the employment-creating entity never receives the money spent on the partnership's expenses. Especially where indirect employment creation is being claimed, and the nexus between the money and the jobs is already tenuous, the Service has an interest in examining, to a degree, the manner in which funds are being applied. **The full amount of money must be made available to the business(es) most closely responsible for creating the employment upon which the petition is based.**[7] The Service does not wish to encourage the creation of layer upon layer of "holding companies" or "parent companies," with each business taking its cut and the ultimate employer seeing very little of the aliens' money.

In his brief on behalf of the petitioner, counsel claims that the deduction of AELP's and the credit company's expenses had previously been disclosed to, and approved by, the Service when the Service approved the general partner's designation as a regional center. The focus of an inquiry into the designation of a regional center, however, has to do with whether proposed activities will improve regional productivity through increased exports; it has nothing to do with the propriety of various business expenses and how they are funded. Counsel also claims that the same facts were disclosed within the past few months, both in writing and during a conference attended by AELP representatives and Service attorneys. Disclosure, though, does not mandate approval.

---

[7]Whether or not $500,000 must be made available for the loans to export companies or whether $500,000 must merely be made available to the credit corporation extending the loans, it is clear that making $500,000 available to **AELP** is not sufficient. AELP's primary purpose is apparently to locate potential alien investors. AELP does not extend the loans to the export companies and is not the entity most closely engaged in employment creation, indirect or otherwise.

179

Interim Decision #3360

In his brief on behalf of the petitioner, counsel cites a 1995 case in which the Vermont Service Center had questioned whether $80,000 or $90,000 set aside for fees could be considered an investment of capital. On May 25, 1995, the Administrative Appeals Unit approved the case. Counsel further states, "During oral argument an AAU official stated that it was proper to deduct such fees from the amount of the capital contributed by the investor without thereby reducing the investor's contribution of capital."

The decision rendered by the AAU in that case did not specifically address the issue of fees. In addition, the decision in that case was unpublished and has no precedential value.

## Annual payments

According to section 2B of the investment agreement executed by the petitioner, the petitioner must make five annual cash payments of $18,000 each, totalling $90,000, commencing one year from the date he is admitted to the Partnership.

Section 3 of the investment agreement, however, states, "I shall receive a return on the cash I have contributed to the Partnership in the amount of 12% per annum, payable annually, commencing one year from the date I am admitted to the Partnership as a Limited Partner and ending five years thereafter."[8]  The petitioner would also receive a share of any profits exceeding this 12-percent return. The partnership agreement explains that the percentage return is computed on the basis of the total cash contributed at the time the distribution is made. In other words, the petitioner's first annual distribution would be at least $14,400 (12 percent of $120,000, plus any additional profits), his second annual distribution at least $16,560 (12 percent of $138,000), his third at least $18,720, his fourth at least $20,880, and his fifth at least $23,040.

In effect, the $90,000 that the petitioner's annual payment obligation represents would require very little in new, personal funds. To make his first annual payment of $18,000, the petitioner would have to contribute no more than $3,600 of his own funds to the $14,400 (or more) he would receive from the Partnership. To make his second payment, the petitioner would have to contribute no more than $1,440 of his own funds to the $16,560 he would receive from the Partnership. The petitioner's third, fourth, and fifth payments, however, would be entirely covered by his guaranteed distributions from the Partnership; in fact, the petitioner would be at least $8,640 ahead for these last three years.

---

[8]The original partnership agreement, however, provides that this return is **10** percent per year, payable for **four** years. Counsel does not submit a Stage I amendment for this inconsistency.

180

The petitioner's obligation to make his annual payments is conditioned upon the Partnership making the guaranteed annual distributions to the petitioner.[9]  As such, these annual payments do not constitute a contribution of capital.[10]

The petitioner refers to the OGC memorandum of December 19, 1997, which had criticized the use of profits generated by a business to meet obligations under a promissory note. The petitioner contends that he is entitled to use his guaranteed return for whatever purpose he desires, and it would be absurd to segregate dividends or profits in a special account to guarantee that they would not be used to make payments on the note.

The AAU does not at this time reach the issue of whether it is ever appropriate for a business to distribute profits to an alien who still owes money to the business. The problem addressed here is that the annual returns are **guaranteed**. The fact that title to that money changes hands does not change the essence of the transaction; as the director pointed out in his decision, the Partnership receives no infusion of new funds from the petitioner.

Another problem with guaranteed annual distributions is the source of the distributions. As the petitioner concedes on page 70 of his brief, "[i]t is unlikely that the business will be immediately profitable from the lending activities contemplated by AELP and its credit corporation subsidiary." Since there is never a guarantee that the Partnership will generate sufficient profits during any given year to pay each investor his 12-percent guaranteed distribution, the possibility exists that the distributions may be drawn from the contributions of future limited partners (thereby necessitating the acquisition of more and more limited partners) or from the contributions already made (thereby depleting the initial contributions).

At pages 70 and 71 of his brief on behalf of the petitioner, counsel counters, "The payment of this guaranteed return is an obligation of the partnership which may or may not be met. If the partnership does not have the ability to make such annual payments, they will not be made." As mentioned earlier, this is directly contradicted by section 2.C of the investment agreement, which provides that the failure of the Partnership to make the

---

[9]Section 2.C of the investment agreement states, "In the event of the bankruptcy, the insolvency, or the failure of the partnership to pay the annual return on capital, to pay the sell option price, or to pay any judgment, the Partnership shall be deemed to be in breach of its obligations to the Limited Partners under the American Export Limited Partnership Agreement, and I, as a Limited Partner, shall have no further obligations to the Partnership, and furthermore, I shall not be obligated to make any further cash payments under the Limited Partnership Agreement, this Investment Agreement or the Promissory Note."

[10]At most, one could argue that the petitioner must make an initial outlay of $5,040 for the first two payments; but because this amount would be more than offset by the last three guaranteed distributions from the Partnership, this initial outlay is, in effect, a loan. 8 C.F.R. § 204.6(e) specifies that contributions of money in exchange for debt arrangements do not qualify as "investments."

181

Interim Decision #3360

annual distributions is considered a breach of the Partnership's obligations and will cause the petitioner not to have to make any further cash payments.

The petitioner states that Service administrative case law exists supporting a petitioner's application of guaranteed annual returns paid by a partnership toward meeting the petitioner's obligation to make annual payments to the partnership. The petitioner cites an unpublished AAU decision from 1995 involving the "C&W Hotel Management program." While the center director's decision in that case had referred to a provision in the business plan stating that four annual payments might come from the profits of the business, the center director did not note whether these so-called "profits" were in the form of *guaranteed* returns (which would then have no direct connection to profit, as discussed above), and he did not make any finding as to the propriety of this provision. Review of the AAU decision reveals no reference whatsoever to annual returns or annual payments. Therefore, it cannot be said that the AAU has specifically sanctioned the use of guaranteed annual returns toward meeting obligations to make annual payments. More significantly, the AAU decision in question was unpublished and has no binding precedential authority.[11]

The petitioner points to an internal Service memorandum issued on October 20, 1997, by the Office of Adjudications. This memorandum stated that in some cases, guaranteed interest payments were made through outside loans or from capital contributed by other investors; as not all businesses could be profitable immediately, a contractual provision for guaranteed payments may, in certain cases, be consistent with a genuine investment.[12] This memorandum was a general statement of policy and did not analyze any particular fact patterns. Indeed, the statements in the memorandum were qualified with the words "may" and "in certain cases." Given the confusing statements contained in the memorandum, and the lack of guidelines provided, this memorandum provides no assistance in resolving the present case.

In short, because the petitioner is guaranteed annual distributions from the Partnership of at least 12-percent for five years, which would yield him $93,600, the petitioner's five annual payments totalling $90,000 under the promissory note cannot be considered a qualifying contribution of capital.[13]

---

[11]The AAU recognizes that the Service has approved plans that may have contained guaranteed annual returns. If so, such approvals were in error for the reasons stated in this decision.

[12]This recent memorandum was superseded by a subsequent memorandum dated March 11, 1998, however.

[13]In apparent recognition of the fact that the petitioner is not contributing capital through the five annual payments, the investment agreement provides, at section 6, that if the conditions of the petitioner's permanent resident status are not removed, the Partnership will refund the petitioner $120,000. Presumably, by the time the petitioner applied for removal of his conditions, he would have made at least one of the annual payments and contributed $138,000.

The petitioner has effectively shifted the risk of loss of the $90,000 from himself to the Partnership.

### Redemption agreement

Section 4 of the investment agreement provides, "after the sixth anniversary of my admission to the Partnership, I, as a limited partner, may exercise a sell option under which I have the **right to require** the Partnership to purchase from me my limited partnership interest," (emphasis added).[14]   The sell-option price is equal to the petitioner's total contributed capital, less the first six payments, plus a pro rata share of profits. In other words, the sell-option price is $290,000 plus profits. Or, to look at it from the petitioner's perspective, the price of permanent resident status is $116,400 minus profits; as discussed above, the five annual payments are more than fully covered by the annual distributions and do not require any expenditure on the part of the petitioner. At the same time, the Partnership may exercise a buy option for the same price.[15]

Section 4 of the investment agreement specifies that the sell-option price is "payable as soon as the sell option is exercised." Section 8.05C of the original partnership agreement, however, states that the price is payable 180 days after the exercise of the sell option. The revised partnership agreement, instead of conforming to the investment agreement, reiterates the 180-day deadline. While the Stage I amendments were intended to reflect the actual intent of the parties, the petitioner has not executed a new investment agreement or otherwise indicated that he agrees with the new partnership agreement and is willing to wait 180 days.

It is not clear whether the petitioner is obligated actually to make the last payment of $290,000 if he exercises his sell option; both his responsibility to pay and his right to sell ripen at the same time. Section 8.05C of the partnership agreement provides that once the Partnership pays the sell-option price, "all amounts owed under such Selling Limited Partner's Investor Note shall be deemed satisfied by the Partnership..."   Similarly, under section 8.06C, after the Partnership pays the buy-option price, "all

---

[14]The original partnership agreement states that the sell option is exercisable after five years; the revised agreement, pursuant to a Stage I amendment, states that the sell option is exercisable after six years in the case of a limited partner who makes an initial cash payment of $120,000.

[15]Section 8.06 of the original partnership agreement states that this "buy option" is exercisable after **three** years. Pursuant to Stage II amendments, the partnership agreement now states that the buy option is exercisable one year after the petitioner completes his payments under the note, or **seven** years. The revised partnership agreement also mentions sell-option prices of "$410,000? $290,000?" [sic],

Interim Decision #3360

amounts due and owing under the Investor Note shall be discharged by the Partnership..." It is not known what amount would still be owed if the petitioner is obligated to pay the $290,000 prior to the exercise of the buy or sell option. If the petitioner can avoid making this last payment by exercising his sell option, this amount of $290,000 cannot be considered to have been placed at risk.

Even if the petitioner is obligated to make this balloon payment prior to exercising his sell option, the $290,000 still cannot be said to be at risk because it is guaranteed to be returned, regardless of the success or failure of the business. If the investment agreement executed by the petitioner is controlling, then the moment he made this last payment, the petitioner could exercise his sell option, and the money would be immediately returned; the amount of $290,000 would never be at risk. If the partnership agreement is controlling, then the petitioner's agreement to make this payment of $290,000 is, in essence, a debt arrangement in which he provides funds in exchange for an unconditional, contractual promise that it will be repaid later at a fixed maturity date (six months later). Such an arrangement is specifically prohibited by the regulations. *See* 8 C.F.R. § 204.6(e).

In its opinion dated December 19, 1997, OGC engaged in a lengthy discussion of the factors evidencing debt and equity in the context of tax law; the opinion cited various tax cases and concluded that the debt characteristics of a plan such as AELP's outweighed any equity characteristics. The AAU finds such a discussion unnecessary and not particularly helpful with respect to this matter. The considerations at issue here are not the same as those of a court attempting to ascertain whether a business is attempting to evade taxes. Furthermore, the businesses examined in those tax cases were standard businesses not created for the purpose of enabling aliens to obtain immigration benefits. As counsel conceded at oral argument, potential alien investors are

> not going to make this investment, under *any* circumstances, unless they get a green card. If anybody ever suggests that this is a wonderful investment and they're going to make it without getting lawful permanent residence, they're lying and they're crazy; they're brain-damaged, all right? Nobody is gonna do this without getting a green card. That was the intent of the law. That's the carrot; that's the quid pro quo.

In other words, AELP has created a program to which most people would be unwilling to subscribe.[16] A discussion of the numerous debt and equity factors set forth in the tax cases unnecessarily complicates the

---

[16]This, by itself, raises the question of whether the AELP plan is a genuine investment. If normal investors would be unwilling to participate in this program because the chance for a net monetary gain does not exist, then it is logical to conclude that the hoped-for "profit" inherent in this program is the green card itself.

attempt to ascertain the true substance of the transaction. Very simply, the payment of the $290,000 constitutes a straight loan; the petitioner would be making this money available to AELP with the contractual expectation that it would be returned to him six months later. The risk that the petitioner might not receive payment if the Partnership fails is no different from the risk any business creditor incurs.

Counsel states on page 30 of his brief on behalf of the petitioner, "The payment of the sell-option price was dependent upon the Partnership's ability and willingness to pay. Thus, substantial risk existed in that the Partnership might be unable or unwilling to pay the investor." At oral argument, counsel claimed that the redemption provisions were entirely unenforceable; no partner could bring a lawsuit to enforce them. Aside from the question of why not, counsel's statements raise questions of good faith. For AELP to entice aliens to invest in AELP by promising them redemption rights, but then for counsel (who is counsel for both AELP and the petitioner) to suggest in his brief that AELP might not be "willing" to honor the redemption rights, and to add at oral argument that the redemption provisions are not enforceable anyway, is disturbing. While most normal investors in the business world realize that they risk losses due to business downturns, the aliens participating in AELP may not realize that their attorney believes that their risk instead involves the refusal of their attorney's other client to comply with the written contract it executed with them. The Service cannot endorse illusory promises and does not recognize this type of "risk" as the kind of risk contemplated by 8 C.F.R. § 204.6(j)(2).

More importantly, the AAU must look to the plain language of the documents executed by the petitioner and not to subsequent statements of counsel; these documents provide the petitioner with the right to redemption and a certain price. As mentioned earlier, section 2.C of the investment agreement specifies that the failure of AELP to pay the sell-option price constitutes a breach of AELP's obligations to its limited partners.

In its memorandum of September 10, 1993, OGC stated its opinion at page 8 that it was "entirely appropriate for an alien to enter into an agreement with the investment fund whereby the seller agrees to repurchase the investor's shares upon, but not before, removal of the conditional basis of the alien's permanent residence." OGC qualified this statement by adding that such a redemption agreement "may not be used as a vehicle to avoid or reduce the risk of capital loss to the alien investor during the two-year period of conditional residency." To ensure that the capital remained at risk during the two-year period, OGC believed that the repurchase agreement should expressly provide that the price of the shares to be resold could not exceed the fair market value of the shares at the time of repurchase; "[a]ny other repurchase arrangement would impermissibly shift the risk of loss from the investment from the alien to the party promising to buy back the alien's interest in the investment." In a subsequent memorandum dated

Interim Decision #3360

June 27, 1995, OGC explained at page 10 that such a redemption agreement was permissible "since the alien risks losing all or part of his own capital in the event the fair market value of the investment has fallen at the time of the repurchase."

The AAU does not entirely agree with the opinions of OGC. To enter into a redemption agreement at the time of making an "investment" evidences a preconceived intent to unburden oneself of the investment as soon as possible after unconditional permanent resident status is attained. This is conceptually no different from a situation in which an alien marries a U.S. citizen and states, in writing, that he will divorce her in two years. The focus here is on the green card and not on the business. Despite counsel's repeated claims that the Service's current position is hurting U.S. workers and U.S. businesses, and despite counsel's accusations regarding the Service's allegedly cavalier attitude toward them, one could argue that an alien who enters into a redemption agreement considers the continued success of the U.S. workers and U.S. businesses secondary. His primary concern is obtaining permanent resident status for as little money as possible.

For the alien's money truly to be at risk, the alien cannot enter into a partnership knowing that he already has a willing buyer in a certain number of years, nor can he be assured that he will receive a certain price. Otherwise, the arrangement is nothing more than a loan, albeit an unsecured one.

The fair-market-value limitation on the sale price referenced by OGC, while well-intended, is not workable. It is not clear how this fair market value would be determined. For example, at page 31 of his brief on behalf of the petitioner, counsel discusses the two five-year payment options offered by AELP prior to the offering of the $120,000 option subscribed to by this petitioner. "Since the AELP sell-option prices were either $150,000 or $140,000 less than the $500,000 cash contribution recently completed, it seemed obvious that the sell-option prices would be substantially below fair market value." The only reason this would be "obvious" would be if counsel already knew what the fair market value would be in five years. True fair market value cannot be known five years in advance. Fair market value assumes the existence of a market. In this case, no public market exists for the AELP partnership interest. The sale of the partnership interest would not be an arms-length transaction, and the valuation of the parties would not reflect a true fair market value.

The AAU does not find that an alien investor may never sell back his partnership interest. Rather, the AAU finds that, prior to completing all his cash payments under a promissory note (whether to the partnership or to some third-party lender), an alien investor may not enter into any agreement granting him the right to sell his interest back to the partnership. In no event may he enter into such an agreement prior to the end of the two-year period of conditional residence. An investment assumes that a risk exists. The

186

alien must go into the investment not knowing for sure if he will be able to sell his interest at all after he obtains his unconditional permanent resident status; and if he is successful in selling his interest, the sale price may be disappointingly low (or surprising high and more than what he paid), This way, the alien risks both gain and loss. To allow otherwise transforms the arrangement into a loan.[17]

The petitioner contends that the AAU, in the unpublished C&W decision from 1995, had previously considered the issue of whether a structure identical to AELP's constituted a debt arrangement. According to the petitioner, the Vermont Service Center had found that the plan in question appeared to represent a good-faith commitment on a debt agreement, and representatives of the AAU "advised that they had analyzed the investment agreements and had concluded that the C&W program did not constitute a debt arrangement."   "The C&W decision reversing the Vermont Service Center and ordering that the petitions be approved rejects the argument that this structure constitutes a debt arrangement," the petitioner continues.

The petitioner misreads the decisions. The Vermont Service Center's statement regarding a "good faith commitment on a debt agreement" was a reference to a comment in the Federal Register from someone suggesting that the Service "should state in the regulations that a good faith commitment on a debt agreement, *which is secured by the alien entrepreneur's assets*, should suffice to meet the requirement that the alien entrepreneur has, in good faith, substantially met the capital investment requirement..." (emphasis added). In other words, the "debt agreement" referred to by the Vermont Service Center was the promissory note executed by the *petitioner*, who had agreed to make cash payments to the partnership; as such, the "debt" at issue was the petitioner's debt to the partnership, not the partnership's subsequent debt to the petitioner. Neither the center decision nor the AAU decision specifically considered whether the investment structure at issue involved a prohibited debt arrangement (i.e., loan) as is at issue here. Neither decision made reference to a sell option.

The petitioner points to another program, which he calls the "Pardini/Tony Roma program." According to the petitioner's counsel, the California Service Center stated, in a notice of intent to deny, that the effect of the partnership arrangement appeared to be "a series of loans called investments made by the Limited Partners, the foreign investors, to the General Partner who is to be repaid by the General Partners at 10% interest." Brief at 54. Counsel claims that, in his response, he set forth the AAU decision in C&W; "[t]he AAU's rejection of the debt arrangement argument proved persuasive to the California Service Center, which in turn rejected

---

[17]More precisely, the AAU finds that the AELP plan contains, as one of its many features, a loan of $290,000. This amount of $290,000 cannot be considered an "investment."

Interim Decision #3360

the 'debt' argument and approved the Pardini/Tony Roma investor petitions."

As noted above, the AAU's C&W decision did not address the issue of loans extended by the limited partners to the partnership. Therefore, the California Service Center would have been in error if it had relied on the C&W decision to conclude that the Tony Roma plan did not involve an impermissible debt arrangement. Moreover, the C&W decision was unpublished and, even if it were relevant to Tony Roma or to this case, would not have any binding precedential value. Furthermore, even if the Service has, in the past, approved petitions that contained redemption agreements, these approvals were in error because the Service now recognizes that such agreements are in fact debt arrangements.

> The petitioner also refers to an internal Service memorandum from October 20, 1997, in which appears the following statement:
> On the other hand, absent evidence to the contrary, where the agreement does not specifically grant the investor the option to sell or the new commercial enterprise to buy out the investment before the balloon payment is due, an adjudicator may not deny the petition based on a finding that the investor will not exercise a sell (or the new commercial enterprise a buy-out) option before the due date on the balloon payment.

This statement makes no sense and certainly does not support the petitioner's contentions. The petitioner characterizes this memorandum as "all-important"; far from being "all-important," this memorandum was meant only to provide general policy statements, not to analyze specific fact patterns.[18]

As far as the petitioner's criticism that the Texas Service Center's decision in this case failed to mention, distinguish, or explain away the above prior decisions and OGC opinions, it is not clear why the center director would reference them at all. Neither of the above decisions had any precedential value, and neither case originated from the Texas Service Center. OGC memoranda, as counsel himself stated after oral argument, are merely opinions. OGC is not an adjudicative body and is in the position only of being an advisor; as such, adjudicators are not bound by OGC recommendations. *See* 8 C.F.R. § 103.1(b)(1).

Because the petitioner here has entered into an agreement to pay $290,000 in exchange for a promise that he can receive the $290,000 back six months later, he has in effect entered into a debt arrangement as prohibited by 8 C.F.R. § 204.6(e).[19] The $290,000 cannot be considered to have been properly "invested" and is not at risk.

---

[18]Furthermore, as mentioned earlier, this memorandum was superseded by another memorandum less than five months later.

[19]Again, this is assuming that the partnership agreement is the controlling document. If the investment document executed by this petitioner is controlling, then the money must be returned immediately and not after six months.

### Cash reserves

The definitions section and section 4.04 of the original partnership agreement state that the general partner may deposit portions of the limited partners' capital contributions, designated as "reserve funds," in escrow or sub-escrow accounts. According to section 4.04.A(i) of the agreement, the banks holding these accounts shall invest the funds "in securities or other financial instruments and obligations in amounts sufficient to satisfy the requirements of **Section 8.05**," (emphasis in original). Section 4.04.B adds that the general partner "shall deposit with the Banks from the Initial Cash Payments sufficient Reserve Funds to satisfy the Partnership obligations under **Section 8.05** and to defray such costs and expenses of the Partnership as determined by the General Partner," (emphasis in original), Section 8.05 of the partnership agreement is entitled "Limited Partner Sell Option" and sets forth the timing and price of the sell option.

Section 4.03.B explains that after all the requirements of section 4.04.B are satisfied, any funds remaining from the initial cash payments and all subsequent capital contributions may be used to meet the obligations of the Partnership, as determined by the general partner in its sole discretion, with any excess to be used in the business of the Partnership.

In other words, pursuant to the above sections of the original partnership agreement, the general partner would be obligated to deposit sufficient portions of the initial $120,000 and/or the remaining $380,000 into the reserve funds such that the deposits and their earnings (from securities or other financial instruments) would enable the Partnership to fulfill its own obligations to buy back Partnership interests. The creation and maintenance of these reserve funds take priority over any other use of the capital contributions. Under these terms, any leftover money would be used for other Partnership obligations, and whatever was left thereafter would then be used for business activities. As the director stated in his decision, these reserve funds are, by agreement, not available for purposes of job creation and therefore cannot be considered capital placed at risk for the purpose of generating a return on the capital being placed at risk.

In his brief, the petitioner claims, "It is estimated in the business plans of AEP [the general partner] that no more than 10% of the total amount invested will ever be placed in bank accounts as reserves." The petitioner argues that since the sell-option price is $290,000, the initial payment of $120,000 and the installment payments totalling $90,000 would never become the subject of reserve accounts because they would yield an insufficient amount ($210,000) to cover the sell-option price. As such, these payments would be able to be used fully by the Partnership. Furthermore, the petitioner points out that if all of the limited partners' initial contributions and annual payments had been withheld as cash reserves, the subsidiary credit corporation could not have extended the

Interim Decision #3360

loans that it has.[20]

First, the partnership agreement states that the reserve funds are supposed to be invested in securities and other financial instruments, so the amount withheld from the capital contributions would not necessarily have to be $290,000. Second, the reserve provisions do not say that the reserves deducted from the contributions of a limited partner must be used to pay the sell-option price to that same limited partner; reserves drawn from later partners could conceivably be used to help pay the sell-option price to earlier partners.

Third, the reserve provisions probably have more significance as far as the final balloon payment of $290,000 than with respect to the initial payments. This final payment might have to be returned to the limited partner within six months, and the Partnership has a contractual obligation under sections 4.04.A(i) and 4.04.B to reserve sufficient funds to meet its redemption obligation of $290,000.[21]  This is assuming, of course, that the partnership agreement is controlling; if the investment agreement executed by the petitioner is controlling, the money would be returned immediately instead of six months later.

In his brief, the petitioner states that in 1992 a Service official had delivered to counsel a model EB-5 investor petition that had been approved; at oral argument, counsel added that he was assured that if he followed this model petition, his petitions would also be approved. According to the petitioner, the one million dollars in capital invested in that case "would create reserves for inventory, working capital, expansion, and other partnership expenses, in the sum of *$450,000*. Thus, the model petition established that $450,000 of the $1,000,000 to be invested, or 45%, would be set aside as bank reserves."

The record does not contain a copy of this "model petition," and the AAU cannot ascertain whether the cash reserves in that case were mandatory or inadvertent, temporary or long-term. The opinions of one Service official, moreover, cannot work to remove from the AAU's jurisdiction the authority to review individual cases. *See* 8 C.F.R. § 103.1(f)(3)(iii), The Service does not pre-adjudicate investor petitions;[22] each petition must be adjudicated on its own merits. The fact that a particular petition (which did not result in a precedent decision) was considered qualifying in 1992, when the Service was less experienced with these types of cases, has no bearing

---

[20]The credit company has only extended four loans to date, totalling $1,361,000. Capital contributions of $500,000 from the 95 previously-approved petitioners would yield $47.5 million available for loans.

[21]Even if, after six years, the petitioner elected to remain in the Partnership instead of exercising his redemption option, the reserve provisions would still preclude the capital from being placed at risk during the two-year conditional period, as required by the regulations.

[22]Cf. 8 C.F.R. § 214.2(l)(2)(ii) regarding non-immigrant L-1 blanket petitions.

on whether the reserve provisions in question here should also be considered qualifying.

> Counsel explains in his brief on behalf of the petitioner:
>
> It was discovered by AELP that the Limited Partnership Agreement may be interpreted to require the creation of reserves in order to enable the Partnership to perform its obligation to pay the sell-option price to investors who exercised the sell-option obligations. It was never the intention of the Partnership to require the maintenance of reserves for this purpose.

Therefore, he states, pursuant to Stage I amendments the reserve provisions have since been eliminated.

The plain language of section 4.04.B of the original partnership agreement, however, clearly states that the general partner "shall" deposit sufficient reserves for the purpose of enabling the Partnership to meet its obligations under the sell-option agreement; the reference to the section pertaining to the sell option is even in bold face. It is difficult to imagine what the intent of this provision could be other than to require the creation and maintenance of reserves for such purpose. The assertion that the deletion of the reserve provisions is a Stage I amendment is not well taken; this revision does not conform the partnership agreement to the investment agreement executed by the petitioner and is a material change in position from the original partnership agreement. It is more in the nature of an unacceptable Stage II amendment.[23]  (See earlier discussion of revisions to the partnership agreement.)  Even if the issue of cash reserves were the sole ground for denial, the elimination of the cash-reserve requirement could not form the basis of an approval of *this* petition.

### Fair market value of promissory note, schedule of payments

As stated in 8 C.F.R. § 204.6(e), **all** capital must be valued at fair market value in United States dollars. Counsel claims that the petitioner has made a capital contribution of $500,000 because he has executed a promissory note for $500,000. One issue to be examined when determining the fair market value of a promissory note is whether it is adequately secured.

According to the Secured Promissory Note executed by the petitioner on October 14, 1997, the obligation of the petitioner to make payments is secured by the petitioner's personal assets, "which are identified in the Attachment hereto."  The promissory note does not include any document entitled "Attachment," although the record does contain a Summary of Bank Account Balances. This summary does not specify that the bank

---

[23]The investment agreement is silent as to cash reserves.

Interim Decision #3360

accounts listed are securing the note.

The summary and accompanying bank statements verify that the petitioner's accounts at Sumitomo Bank in Japan contained a total of $42,376.70 as of October 3, 1997; the petitioner's savings accounts at Sanwa Bank in Japan contained a total of $500,558.60 as of October 6, 1997; the petitioner's checking account at Sanwa Bank in California contained $70,985.80 as of October 10, 1997; and the petitioner's account at South Bay Bank in California contained $51,500 as of October 14, 1997. The Summary states that these accounts represent a total of $665,421.10 in funds.[24]

Assuming, arguendo, that the bank accounts do constitute the security for the promissory note, the petitioner has not demonstrated how AELP could reach the funds in the overseas accounts if the petitioner were to default, and it is not clear what expenses and effort would be involved. In the absence of such information, and in the absence of any details regarding the laws of Japan and the enforceability, by U.S. entities, of security interests taken in Japanese bank accounts, the petitioner has failed to establish that the security interest in the foreign accounts has any value.

More importantly, funds in bank accounts can easily be dissipated. As none of the above accounts is, for example, an escrow account or trust account in favor of AELP, no guarantee exists that the money contained in the accounts would remain there for the entire six years over which the petitioner would be obligated to make payments on the promissory note. For this reason, too, the petitioner has failed to show that his promissory note is adequately secured.

The fair market value of a promissory note also depends on the terms of the note itself. The petitioner contends that the promissory note at issue here is for $500,000, not $380,000; he urges the Service not to view his contribution as an initial payment of $120,000, plus annual payments totalling $90,000, plus a balloon of $290,000. The petitioner states that the regulations allow him either to have already invested or to be in the process of investing the requisite amount of capital. Therefore, the petitioner could either pay all $500,000 now or pay it over time. The regulations do not require that a petitioner pay extra to compensate for the fact that money paid now is worth more than money paid later, he argues. The petitioner points out that, at the time an alien investor seeks to remove the conditions of his permanent resident status, he need only demonstrate that he has "substantially" complied with the investment requirement. The petitioner main-

---

[24]It should be noted that the bank balances are for completely different dates, and it is not known if money was transferred among the various accounts and some of the funds double-counted. The petitioner did not provide transactions histories, and only one bank statement specifies the date on which the account was opened.

tains that by delivering the executed promissory note for the full $500,000, he has already made the full investment, and the schedule of payments is irrelevant.

The petitioner has failed to demonstrate that his promissory note, if it is to be considered capital, has a fair market value equal to its face value of $500,000. The question to be asked is what a third party would pay for the petitioner's note. In the real business world, promissory notes, such as mortgages, are regularly sold and are regularly discounted; present value is always relevant. The petitioner has submitted no evidence whatsoever as to the fair market value of his promise to finish paying $500,000 over six years.[25] In fact, applying standard formulae for computing the fair market value of annuities and future payments, the present value of five annual payments of $18,000 plus a payment due in six years of $290,000 plus a completed payment of $120,000 would be approximately $375,000 instead of $500,000.[26]

Under certain circumstances, a promissory note that does not itself constitute capital could instead constitute evidence that the petitioner is "in the process of investing" other capital, such as cash. In that situation, 8 C.F.R. § 216.6(c)(1)(ii) requires that a petitioner substantially complete his payments on the note prior to the end of the two-year conditional period. In the present case, however, the promissory note is not evidence that the petitioner is in the process of investing $500,000 of cash. As discussed earlier, the five $18,000 annual payments are covered by the guaranteed annual distributions. The $290,000 balloon payment is not due until well after the two-year period.

In administering this program, the Service has a responsibility to ensure that the requisite amount of money is actually paid by the petitioners. Over the years, the Service has observed that the terms of promissory notes have grown progressively longer; AELP, for example, started with due dates of four and five years, while the petitioner's payment plan, a more recent AELP development, involves six years. The schedule of payments under a promissory note, whether the note is used as capital or as evidence of a

---

[25]As noted earlier, it is not actually clear that the petitioner is in fact obligated to complete all of his payments prior to exercising his sell option. If the petitioner can avoid making the last payment of $290,000 by simply exercising his sell option at the time the payment is due, any purchaser of the note could not count on receiving this last payment and would further discount the value of the note. In addition, as discussed earlier, section 2.C of the investment agreement provides that the petitioner is not obligated to make any further payments on the note in the event of the Partnership's bankruptcy (voluntary or involuntary) or failure to make any of its own payments; this further reduces the value of the promissory note to a third-party purchaser.

[26]As discussed above, the note in this case would be further discounted for other reasons, such as the lack of adequate security.

Interim Decision #3360

commitment to invest, is relevant to the issue of whether a petitioner has, in good faith, committed the requisite amount of his personal funds. It is also relevant to the issue of the amount of funds at risk and available to the job-creating enterprise(s). Therefore, at a minimum, nearly all of the money due under a promissory note must be payable within two years, without provisions for extensions.[27]  To allow otherwise would permit the admission of aliens who, by the terms of their investment plans, would be ineligible for removal of the conditions of their permanent resident status. *See* 8 C.F.R. § 216.6(c)(1)(iii).

If the instant petition were to be approved, the petitioner would have paid at most $123,600 of his own funds at the time he sought removal of the conditions of his permanent resident status.[28]  This is far short of the requisite $500,000 and hardly evidences a good-faith commitment of funds. As noted above, the petitioner has also failed to show that the promissory note is adequately secured and that it otherwise has an adequate fair market value.

## Source of funds

8 C.F.R. § 204.6(j) states, in pertinent part, that:

(3)  To show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means, the petition must be accompanied, as applicable, by:

(i)  Foreign business registration records;

(ii)  Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the petitioner;

(iii)  Evidence identifying any other source(s) of capital; or

(iv)  Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years.

---

[27]The petitioner must still show that the promissory note is adequately secured and that the promissory note has an adequate fair market value.

[28]§§ 216A(c)(1) and (d)(2) of the Act provide that such a petition must be filed within the 90-day period preceding the second anniversary of a petitioner's admission as a conditional permanent resident.

While the record contains a letter from Wells Fargo Bank dated October 14, 1997, acknowledging the receipt of $120,000 and advising the petitioner that the funds had been deposited into a custody account, the record does not reveal from where these funds originated. It is not known if the money came from the petitioner's overseas accounts, from his U.S. accounts, or from some other source. As the petitioner has not documented the path of the funds, such as by wire-transfer records, the petitioner has failed to meet his burden of establishing that the initial $120,000 were his own funds. *See Matter of Soffici*, 22 I&N Dec. 158 (Comm. 1998).

The petitioner has also failed to document the source of the hundreds of thousands of dollars in his bank accounts. The petitioner is 30 years old and, according to counsel, began his "entrepreneurial activities" in May 1993. The petitioner is said to be the president of a company that imports and sells vintage Levis jeans in Japan.

The only evidence of earnings contained in the record consists of two documents from the Director of Nerima Higasi Taxation Office. These documents indicate that, for the taxable year of June 3, 1996, to May 31, 1997, South Bay Trading Japan, Inc., declared Y12,674,887 in corporate income and paid Y3,992,100 in taxes. Counsel states that, applying an exchange rate of 122 Japanese yen to one U.S. dollar, the company's taxable income was $103,892.52 for this period. After subtracting taxes paid, however, the net income of South Bay Trading was approximately $71,170.

Furthermore, this figure says nothing about the *petitioner's* level of income that year, and the petitioner has not submitted any documentation about his level of income during other years. Assuming that the petitioner had taken all of South Bay's net income for himself, and assuming that the petitioner's business activities had been just as successful in the previous three years, and assuming that the petitioner had had no living expenses, he could have saved no more than $300,000; counsel claims that the petitioner's bank accounts contain over $650,000. Therefore, the petitioner has failed to meet the requirements of 8 C.F.R. § 204.6(j)(3).

### Estoppel and reliance considerations

In his brief on behalf of the petitioner, counsel refers to instances in which he was supposedly guaranteed that his clients' petitions would be approved. Counsel states that in 1992 he was given a model petition and advised that if he patterned his investment structures in the same way, his clients' petitions would be approved.

In the fall of 1996, counsel met with "the Senior INS representative in charge of immigrant investor programs" and this person

expressly approved the $120,000 initial payment option, the six year schedule of payments in the sell-option or redemption agreement available after all of the payments

195

Interim Decision #3360

> have been made. The only limitation placed upon any of these provisions was that the
> redemption agreement could not be exercised until all of the payments had been made
> by the investor.

Brief at 46. Counsel states, at page 14, "Thereafter, INS kept its word.
Approximately 95 petitions of AELP were approved by INS including over
50 petitions involving the initial payment option of $120,000." The opin-
ions of a single Service official, however, are not binding, and as stated ear-
lier, no Service officer has the authority to pre-adjudicate an immigrant-
investor petition.

Counsel states that he has submitted 11 different partnership plans to
the Service and that they are all identical; since the first petitions were
approved, the Service is bound to approve the petition at issue here. Counsel
further claims that on more than 30 occasions, he had been promised that
no "changes" would be made except by formal rulemaking. Counsel is say-
ing, in effect, that the approval of his programs is nonreviewable except
upon a writing of formal regulations. Opinions purportedly expressed by a
few Service officials cannot remove the AAU's regulatory authority to
review these cases. To say that an agency's knowledge cannot grow, and that
an agency is prohibited from benefiting from its experience, is unreason-
able.

The petitioner argues that the OGC opinion of December 19, 1997,
constitutes a rule change that the Service is now retroactively applying in
violation of the Administrative Procedure Act ("APA"). Brief at 4-7, 114-
43; Second Supplemental Brief at 5-12. This OGC opinion, however, is not
a "rule." Under the APA, a rule is a binding legal principle "designed to
implement, interpret or prescribe law or policy." 5 U.S.C. § 551. As noted
in the OGC opinion itself, the opinion in no way modifies existing law, but
is intended merely to provide guidance to the Service in understanding
many factual issues that have arisen over the years with respect to immi-
grant-investor petitions. Providing this type of guidance is the very mission
of OGC, as specifically provided at 8 C.F.R. § 100.2(a)(1) and 103.1(b)(1).
These regulations do not delegate any authority to OGC to establish bind-
ing legal principles or to exercise any other rulemaking power. Neither the
AAU nor other Service adjudicators, therefore, are bound to follow the
OGC opinion of December 19, 1997. The AAU's decision in this case is
based entirely on the application of longstanding statutory and regulatory
law to the facts presented in this petition.

The petitioner incorrectly argues that the Service should be estopped
from finding that his investment plan is inconsistent with § 203(b)(5) of the
Act and the relevant regulations. The Supreme Court has never upheld a
claim that a Government agency may be estopped from deciding a case
before it, such as this case, in accordance with the law. *See Office of
Personnel Management v. Richmond*, 496 U.S. 414, 422 (1990).

196

Furthermore, even if estoppel were applicable to the Service under these circumstances, the petitioner has completely failed to establish the requisite elements therefor. For example, the petitioner has shown no affirmative misconduct on the part of the Service.

Moreover, the petitioner has not shown that he has detrimentally relied on any prior representation by a Service official. First, no basis exists for a claim that the petitioner or his counsel "reasonably" or "justifiably" believed that informal discussions between counsel and any Service officer were an acceptable substitute for following the normal rules applicable to the filing and adjudication of investor-visa petitions. It is basic immigration law that the only way to obtain a determination on eligibility for immigrant-investor classification is to file a petition with the Service. *See* section 204(a)(1)(F); 8 C.F.R. § 2.1 and 204.6(a), Furthermore, the Service may approve a petition only if the Service makes a formal adjudication "[a]fter an investigation of the facts in each case," that the alien is eligible for the classification sought, § 204(b) of the Act.

In addition, even if the petitioner were able to establish reasonable reliance, he has not shown that he has done so to his detriment. For example, according to the investment plan, the petitioner is only obligated to pay the required investment upon the approval of his visa petition. Brief at 29.

### THE PETITIONER HAS NOT ESTABLISHED A NEW COMMERCIAL ENTERPRISE

8 C.F.R. § 204.6(h) states that the establishment of a new commercial enterprise may consist of:

   (1) The creation of an original business;

   (2) The purchase of an existing business and simultaneous or subsequent restructuring or reorganization such that a new commercial enterprise results; or

   (3) The expansion of an existing business through the investment of the required amount, so that a substantial change in the net worth or number of employees results from the investment of capital. Substantial change means a 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees. Establishment of a new commercial enterprise in this manner does not exempt the petitioner from the requirements of 8 C.F.R. § 204.6(j)(2) and (3) relating to the required amount of capital investment and the creation of full-time employment for ten qualifying employees. In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 C.F.R. § 204.6(j)(4)(ii).

8 C.F.R. § 204.6(e) states that:

   *Troubled business* means a business that has been in existence for at least two years,

197

Interim Decision #3360

> has incurred a net loss for accounting purposes (determined on the basis of generally
> accepted accounting principles) during the twelve- or twenty-four month period prior
> to the priority date on the alien entrepreneur's Form I-526, and the loss for such peri-
> od is at least equal to twenty percent of the troubled business's net worth prior to such
> loss. For purposes of determining whether or not the troubled business has been in
> existence for two years, successors in interest to the troubled business will be deemed
> to have been in existence for the same period of time as the business they succeeded.

According to the plain language of § 203(b)(5)(A)(i) of the Act, a peti-
tioner must show that he is seeking to enter the U.S. for the purpose of
engaging in a new commercial enterprise that **he** has established. As coun-
sel maintains, the new commercial enterprise at issue here is AELP. AELP,
however, was established on March 25, 1996. The petitioner executed the
various partnership documents on October 14, 1997. The petitioner did not
indicate, at Part 4 of the Form I-526, in what way he was creating a new
enterprise.

While AELP is a new commercial enterprise, in that it was formed after
November 29, 1990, the petitioner had no hand in its creation and was not
present at its inception.[29]  Therefore, the petitioner must demonstrate that he
will restructure or reorganize AELP to the degree that a new business will
result, or he must demonstrate that he will expand AELP's net worth or
number of employees by 40 percent, or he must demonstrate that AELP is
a troubled business as defined above.

AELP was an ongoing business prior to the petitioner executing the
investment agreement, and it intends to continue in its current form; there-
fore, the petitioner has not established the requisite restructuring or reor-
ganization. As the petitioner has noted on numerous occasions, 95 investors
have previously been approved with respect to AELP. Taking his claims at
face value, and assuming that all 95 investors have made capital investments
of $500,000, it is not possible for this petitioner to expand AELP by 40 per-
cent with a single "investment" of $500,000. Finally, the petitioner has not
submitted evidence to show that AELP has suffered the degree of loss in net
worth specified by 8 C.F.R. § 204.6(e) to qualify as a troubled business; in
addition, AELP was not in existence for at least two years prior to the time
the petitioner signed the investment agreement.

The AAU recognizes that the Service has previously approved petitions
involving plans in which limited partners joined partnerships over varying
periods of time. Experience has shown, however, that some of these pool-

---

[29]It could perhaps be argued that the date of filing of the Certificate of Limited
Partnership was not the date of AELP's creation, that AELP is still in the process of being cre-
ated, and that therefore the petitioner is part of the original creation of AELP. If so, the peti-
tion has been filed prematurely; the Act requires that the petitioner "has established" the com-
mercial enterprise already. Accomplishment of a business's purposes would be too specula-
tive if it was based on successfully attracting unidentified future investors.

ing arrangements are being used to circumvent the establishment require-
ment set forth by Congress.

The petitioner has failed to show that **he** has established a new com-
mercial enterprise, as required by § 203(b)(5)(A)(i) of the Act.


### THE PLAN DOES NOT MEET THE
### EMPLOYMENT-CREATION REQUIREMENT

8 C.F.R. § 204.6(j)(4)(i) states:

> To show that a new commercial enterprise will create not fewer than ten (10) full-
> time positions for qualifying employees, the petition must be accompanied by:
>
> (A) Documentation consisting of photocopies of relevant tax records, Form I-9, or
> other similar documents for ten (10) qualifying employees, if such employees have
> already been hired following the establishment of the new commercial enterprise; or
>
> (B) A copy of a comprehensive business plan showing that, due to the nature and
> projected size of the new commercial enterprise, the need for not fewer than ten (10)
> qualifying employees will result, including approximate dates, within the next two
> years, and when such employees will be hired.

8 C.F.R. § 204.6(g) deals with multiple investors and states, in pertinent
part:

> (1) The establishment of a new commercial enterprise may be used as the basis of a
> petition for classification as an alien entrepreneur by more than one investor, provid-
> ed each petitioning investor has invested or is actively in the process of investing the
> required amount for the area in which the new commercial enterprise is principally
> doing business, and provided each individual investment results in the creation of at
> least ten full-time employees.
>
> (2) The total number of full-time positions created for qualifying employees shall be
> allocated solely to those alien entrepreneurs who have used the establishment of the
> new commercial enterprise as the basis of a petition on Form I-526. No allocation need
> be made among persons not seeking classification under section 203(b)(5) of the Act
> or among non-natural persons, either foreign or domestic. The Service shall recognize
> any reasonable agreement made among the alien entrepreneurs in regard to the identi-
> fication and allocation of such qualifying positions.

As discussed earlier, the petitioner has failed to demonstrate that the
subsidiary credit corporation has extended loans in the past to export-relat-
ed businesses located within the geographical limitation of the regional cen-
ter. Similarly, the credit corporation's loan prospects do not appear to
involve businesses within the geographical limitation. No reason exists to
believe that this petitioner's money will be lent to businesses within the geo-
graphical area. Therefore, he must establish direct employment creation.

199

Interim Decision #3360

The petitioner has failed to show that AELP has hired or will hire a sufficient number of employees to allocate 10 full-time positions to each of the 95 previously-approved petitioners as well as to this petitioner and the remaining 64 petitioners whose cases have not been decided.

CONCLUSION

In his brief, counsel states, "INS is supposed to *grant* immigrant investor petitions, not to *deny* them. INS is to interpret the laws and regulations liberally and generously so as to achieve [this] Congressional purpose." He presents statistics showing that, of the total number of visas made available, only six percent has been used. The fact that counsel considers this category to be under-utilized is irrelevant. The alien-entrepreneur classification is for a special kind of person, and it is not surprising that, notwithstanding the random number fixed by Congress, few people have both the financial means and the entrepreneurial spirit to apply. The Service will not eviscerate the meaning of the regulations or the essence of the law simply to "fill up" the numbers. The measure of success or failure of the EB-5 program is not the number of petitions granted; rather, it is the extent to which proper compliance is achieved and genuine investments are made.

Counsel continues, "Failing to comply reflects adversely upon INS as having failed to properly communicate to those attempting to comply, that which is necessary to comply." The foregoing decision should offer some guidance as to what is necessary to comply.

The burden of proof in these proceedings rests solely with the petitioner. Section 291 of the Act, 8 U.S.C. § 1361. The petitioner has not met that burden. Accordingly, the petition is denied.

**ORDER:** The decision of the director is affirmed. The petition is denied.

# TAB 4

Interim Decision #3359

# In re SOFFICI, Petitioner

*In Visa Petition Proceedings*

A76 472 614

Designated as a precedent by the Commissioner, June 30, 1998.
(Decided by the Associate Commissioner, Examinations, June 25, 1998.)

(1) A petitioner under § 203(b)(5) of the Immigration and Nationality Act cannot establish the requisite investment of capital if he lends the money to his new commercial enterprise.

(2) Loans obtained by a corporation, secured by assets of the corporation, do not constitute capital invested by a petitioner. Not only is such a loan prohibited by 8 C.F.R. § 204.6(e), but the   petitioner and the corporation are not the same legal entity.

(3) A petitioner's personal guarantee on a business's debt does not transform the business's debt into the petitioner's personal debt.

(4) A petitioner must present clear documentary evidence of the source of the funds that he invests. He must show that the funds are his own and that they were obtained through lawful means.

(5) A petitioner who acquires a pre-existing business must show that the investment has created, or at least has a reasonable prospect of creating, 10 full-time positions, in addition to those existing before acquisition. The petitioner must, therefore, present evidence concerning the pre-acquisition level of employment. Simply maintaining the pre-acquisition level of employment is not sufficient, unless the petitioner shows that the pre-existing business qualifies as a "troubled business."

ON BEHALF OF PETITIONER:        LARRY J. BEHA
                                888    SE    3RD
AVENUE
                                SUITE 400
                                FORT    LAUD-
ERDALE FL  33316

The preference visa petition was approved by the Director, Texas Service Center, who certified the decision to the Associate Commissioner for Examinations for review. The decision of the director will be reversed.

The petitioner seeks classification as an alien entrepreneur pursuant to section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5). The director determined that the petitioner had adequately

158

established that he was actively in the process of investing the requisite amount of capital. The director further found that the investment would result in full-time positions for not fewer than 10 qualifying employees.

In response, counsel urges the Administrative Appeals Office to affirm the director's decision. He asserts that the petitioner's investment exceeds one million dollars and points out that the hotel is commercially active. He states that the petitioner's investment has already created at least 10 full-time jobs.

Section 203(b)(5)(A) of the Act provides classification to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise:

> (i)   which the alien has established,
>
> (ii)   in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and
>
> (iii)   which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

## MINIMUM INVESTMENT AMOUNT.

The petitioner indicates that the petition is based on an investment in an existing business located in a targeted employment area, for which the required amount of capital invested has been adjusted downward.

8 C.F.R. § 204.6(e) states, in pertinent part, that:

> *Targeted employment area* means an area which, at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate.

The petitioner's company, Ames Management, Inc., does business as a Howard Johnson Hotel located at 950 South Federal Highway in Stuart, Florida. The City of Stuart is in Martin County. The petitioner has submitted a March 1996 letter from the Florida Department of Labor and Employment Security indicating that Martin County qualified as a rural area in 1995. In addition, the Ft. Pierce metropolitan statistical area, which encompassed Martin County, experienced a sufficiently high unemployment rate to qualify as a targeted employment area in 1995.

A petitioner has the burden to establish that his enterprise does business in an area that is considered "targeted" as of the date he files his petition.

159

Interim Decision #3359

The fact that a business may be located in an area that was once rural, for example, does not mean that that area is still rural. The letter from the Florida Department of Labor and Employment Security contains the following statement: "This listing will only remain in effect until 1996 annual averages are available in early 1997." The petitioner here filed his Form I-526 in January 1998, and his data are at least a year, if not two years, out of date.

The Service has nevertheless independently obtained current employment information from the Florida Department of Labor and Employment Security. While Martin County is no longer a rural area, the "Ft. Pierce-Port St. Lucie" metropolitan statistical area does constitute an area of high unemployment; all of Martin County is contained in this new metropolitan statistical area. Therefore, the amount of capital necessary to make a qualifying investment in this matter is $500,000.


THE PETITIONER HAS NOT MADE, AND IS NOT IN THE PROCESS OF MAKING, A QUALIFYING INVESTMENT OF CAPITAL.


8 C.F.R. § 204.6(e) states, in pertinent part, that:

> *Capital* means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness.

> *Commercial enterprise* means any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business. This definition shall not include a non-commercial activity such as owning and operating a personal residence.

> *Invest* means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part.

8 C.F.R. § 204.6(j) states, in pertinent part, that:

> (2) To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suf-

160

fice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital. Such evidence may include, but need not be limited to:

(i)  Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

(ii)  Evidence of assets which have been purchased for use in the United States enterprise, including invoices; sales receipts; and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(iii)  Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

(iv)  Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred), Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

(v)  Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

(3)  To show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means, the petition must be accompanied, as applicable, by:

(i)  Foreign business registration records;

(ii)  Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the petitioner;

(iii)  Evidence identifying any other source(s) of capital; or

(iv)  Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years.


Purchase of the hotel.


Ames Management, Inc. filed its articles of incorporation with the State

Interim Decision #3359

of Florida on June 27, 1997. All 1000 authorized shares were issued to the petitioner in July 1997. On October 31, 1997, Ames Management purchased a Howard Johnson's Motor Lodge for the sale price of $2.4 million, paid as follows:  $25,000 in earnest money, consisting of a $10,000 initial deposit and a subsequent $15,000 deposit; $705,298.79 brought to settlement; and $1.7 million borrowed from 1st United Bank.

In a document entitled Sources of Investment Funds, the petitioner stated that the money used to purchase the hotel came from two sources. Approximately $450,000 were transferred to Barnett Bank from Argentina over the period 1994 to 1997; these funds "originated from personal savings and a sale of a house."  An additional $500,000 were transferred from Argentina in December of 1996; these funds originated from the sale of "our business."  The petitioner explained that, for both sources, "[t]hese monies were loaned to me by my father and I loaned them back to my company Ames Management, Inc. It has not been stipulated when I should return the funds."[1]

The balance sheet for the petitioner's hotel, dated November 30, 1997, confirms that the business's liabilities include long-term loans, totaling $922,136.09, payable to the shareholder (the petitioner), *See also* the Continuing and Unconditional Subordination of Debt discussed below. The accompanying "Transactions by Account" breaks down the amount, date, and destination of each loan. It is clear from this document that the $25,000 in earnest money and the $705,298.79 brought to the settlement table are mere loans from the petitioner to Ames Management. As specified in the definition of "invest" set forth in 8 C.F.R. § 204.6(e), debt arrangements between a petitioner and his business do not constitute qualifying contributions of capital. Therefore, the $730,298.79 paid toward the purchase of the hotel cannot be considered to be an "investment" by the petitioner.

Ames Management financed the balance of the purchase price, or $1.7 million, through 1st United Bank. According to the Mortgage and Security Agreement, the loan is secured by the hotel and all of its contents, including inventory, accounts, leases, the franchise agreement, furniture, patio umbrellas, landscaping, etc. First, it should be noted that a loan obtained by a corporation is not the same as a loan obtained by an individual, and it cannot be said that this loan through 1st United Bank is an investment of the *petitioner's* personal capital. Second, even if it were assumed, arguendo, that the petitioner and Ames Management were the same legal entity for purposes of this proceeding, indebtedness that is secured by assets of the enterprise is specifically precluded from the definition of "capital." *See* 8 C.F.R. § 204.6(e).

---

[1]The petitioner has not disclosed the terms of the loan from his father, and it is not known if, for example, it is secured by assets of Ames Management.

162

Counsel points out that the petitioner has personally guaranteed the payment of the loan. In a Continuing and Unconditional Subordination of Debt dated October 31, 1997, Ames Management and the petitioner agreed that all debts owed by Ames to 1st United would receive priority; all obligations owed by Ames to the petitioner would be subordinated to those owed to 1st United. In case of default by Ames with regard to its loan from 1st United, the petitioner would not seek or accept payment from Ames with regard to Ames's debts to the petitioner. In an Unconditional and Irrevocable Guaranty of Payment, also dated October 31, 1997, the petitioner agreed to make the mortgage payments if Ames Management did not. 1st United would have the right to proceed against the petitioner without first proceeding against Ames Management or against any property securing the note.

As the guarantee does not **obligate** 1st United to proceed against the petitioner, it does not prohibit 1st United from first seeking payment from the business.[2] The petitioner's personal guarantee of payment does not change the character of the mortgage; the assets of Ames Management are still primarily securing the mortgage. As such, the $1.7 million that the mortgage represents cannot properly be considered an investment of the petitioner's capital.

**Purchase of the van, pre-opening expenses, and corporate accounts**.

On November 1, 1997, Ames Management purchased a van to be used as the hotel shuttle. The petitioner made a down payment of $8,000 and Ames Management financed the balance of $17,477.06 through Primus. Counsel and the petitioner count this van as part of the petitioner's investment. The loan through Primus does not constitute a qualifying investment of capital because it is secured by the van itself, which is an asset of Ames Management; moreover, it is not an investment of the *petitioner's* capital because it is a loan obtained by Ames and not by the petitioner.

The $8,000 down payment also does not qualify as an "investment" of the petitioner's funds; according to the Transactions by Account referenced above, it is part of the $922,136.09 in long-term loans payable to the petitioner. In other words, the $8,000 must be repaid to the petitioner.

Counsel and the petitioner include bank accounts and pre-opening expenses as investments in Ames Management. The pre-opening expenses of $44,836.09, however, appear on the Transactions by Account and are part of the long-term loans payable to the petitioner. The amounts transferred to the bank accounts also appear on the Transactions by Account as long-term loans and therefore cannot constitute qualifying investments.

---

[2] It is not clear why, in the event of default, 1st United would prefer to research and pursue the petitioner's personal assets, which are not specified in the guarantee and which do not total $1.7 million, in lieu of seizing the easily accessible hotel itself.

Interim Decision #3359

## Resources to invest.

As discussed above, the petitioner has not made a qualifying invest-
ment in Ames because the amounts he has paid on behalf of Ames are mere
loans to Ames, prohibited by the regulations. It should be noted that the
petitioner has not documented that he has the means to begin the process of
investing, either. He submits a personal net worth report as of November 30,
1997, purporting to show that his net worth is $761,747.02. It is not clear
who prepared this report, and the report contains certain irregularities. For
example, the hotel, which belongs to Ames Management, is counted among
the petitioner's personal assets. Also, the mortgage held by Ames
Management is included among the petitioner's personal liabilities. On the
other hand, the hotel van owned by Ames Management is correctly omitted
from the report. In effect, with this personal net worth report the petitioner
is attempting to show that he has sufficient wealth to invest in the hotel
because he has invested in the hotel. Subtracting the hotel entries leaves the
petitioner's alleged net worth at $61,747.02.

The petitioner counts the funds in various personal bank accounts as
part of his personal assets. A letter and bank statements from Barnett Bank
reveal that the petitioner has held *joint* accounts with his father since
October 1994. It is not possible to determine what portions of these
accounts belong to the petitioner's father and what portions to the petition-
er. Unlike the situation of a husband and wife, funds in a pooled joint
account cannot be attributed to only one person.

A letter from Bank Boston states that, since April 1997, "Ames
Resources Limited maintains an International Private Banking
Relationship" with BankBoston. The petitioner is the secretary of Ames
Resources Limited, and the account has always had balances in the mid
seven figures. These funds belong to Ames Resources Limited, a corpora-
tion, and do not belong to the petitioner, an individual. Furthermore, "Ames
Resources Limited" is not the same thing as "Ames Management, Inc.," and
at most, this letter indicates that the petitioner serves as an officer at a sep-
arate corporation in addition to his own corporation, and that this separate
corporation has a bank account with BankBoston.

## Source of funds.

The source of the funds lent to the petitioner (and in turn lent to Ames
Management) has also not been adequately documented. The petitioner
claims that the first $450,000 came from personal savings and the sale of "a
house." The second $500,000 came from the sale of "our business." No

documentation, such as a sales contract or deed establishing ownership and price, has been submitted regarding the house or the business. Such documentation is relevant to the question of whether the funds have been lawfully obtained, which is a requirement under 8 C.F.R. § 204.6(j)(3).[3] Simply going on record without supporting documentary evidence is not sufficient for purposes of meeting the burden of proof in these proceedings. *See Matter of Treasure Craft of California*, 14 I&N Dec. 190 (Reg. Comm. 1972).

In summary, the petitioner has failed to demonstrate that he has invested, or is actively in the process of investing, the requisite amount of capital obtained by lawful means. The amounts referenced by the petitioner either do not constitute qualifying "capital," because they are not his, or have not been properly "invested," because they are debt arrangements between the petitioner and his business. Even if the petitioner and Ames were to be considered one and the same entity, the loans obtained by Ames from other banks would not be considered qualifying capital because they are secured by assets of the business. The petitioner has also failed to document the source of his funds other than to say that the funds are a loan from his father.

## THE PETITIONER HAS FAILED TO ESTABLISH A NEW COMMERCIAL ENTERPRISE.

8 C.F.R. § 204.6(h) states that the establishment of a new commercial enterprise may consist of:

(1) The creation of an original business;

(2) The purchase of an existing business and simultaneous or subsequent restructuring or reorganization such that a new commercial enterprise results; or

(3) The expansion of an existing business through the investment of the required amount, so that a substantial change in the net worth or number of employees results from the investment of capital. Substantial change means a 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees. Establishment of a new commercial enterprise in this manner does not exempt the petitioner from the requirements of 8 C.F.R. § 204.6(j)(2) and (3) relating to the required amount of capital investment and the creation of full-time employment for ten qualifying employees. In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 C.F.R. § 204.6(j)(4)(ii).

---

[5] A petitioner must also establish, pursuant to 8 C.F.R. § 204.6(e), that funds invested are his own. The petitioner has already conceded that the funds lent to Ames are not his; the funds belong to his father and must be repaid.

Interim Decision #3359

8 C.F.R. § 204.6(e) states that:

> *Troubled business* means a business that has been in existence for at least two years, has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien entrepreneur's Form I-526, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss. For purposes of determining whether or not the troubled business has been in existence for two years, successors in interest to the troubled business will be deemed to have been in existence for the same period of time as the business they succeeded.

Although Ames Management was incorporated in 1997, it is the job-creating business that must be examined in determining whether a new commercial enterprise has been created. The Howard Johnson's Motor Lodge purchased by Ames Management had been in operation for approximately 24 years and was an ongoing business at the time of purchase; Ames Management, doing business as Howard Johnson Hotel, has merely replaced the former owner.

The petitioner has provided no documentation whatsoever to establish that the Howard Johnson's was a "troubled business," as defined above, prior to his purchase. He also does not claim that he will expand the hotel by 40 percent as provided in 8 C.F.R. § 204.6(h)(3). The petitioner has not shown the degree of restructuring and reorganization required by 8 C.F.R. § 204.6(h)(2); the hotel has always been a Howard Johnson and is still a Howard Johnson today. A few cosmetic changes to the decor and a new marketing strategy for success do not constitute the kind of restructuring contemplated by the regulations, nor does a simple change in ownership. Therefore, it cannot be concluded that the petitioner has created a new commercial enterprise.

## THE PETITIONER HAS NOT ESTABLISHED THE REQUISITE EMPLOYMENT CREATION.

8 C.F.R. § 204.6(j)(4) discusses job creation, and states:

> (i) *General.* To show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:

> (A) Documentation consisting of photocopies of relevant tax records, Form I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or

> (B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

(ii) *Troubled business*. To show that a new commercial enterprise which has been established through a capital investment in a troubled business meets the statutory employment creation requirement, the petition must be accompanied by evidence that the number of existing employees is being or will be maintained at no less than the pre-investment level for a period of at least two years. Photocopies of tax records, Forms I-9, or other relevant documents for the qualifying employees and a comprehensive business plan shall be submitted in support of the petition.

8 C.F.R. § 204.6(e) states, in pertinent part:

*Employee* means an individual who provides services or labor for the new commercial enterprise and who receives wages or other remuneration directly from the new commercial enterprise...This definition shall not include independent contractors.

*Full-time employment* means employment of a qualifying employee by the new commercial enterprise in a position that requires a minimum of 35 working hours per week.

In a letter dated January 15, 1998, the petitioner states that Ames Management employs 23 full-time United State citizens or lawful permanent residents. It also employs part-time employees on an as-needed basis, as well as multiple subcontractors.

Section 5.1.19 of the Agreement for Sale and Purchase refers to an Exhibit H containing the payroll of the Howard Johnson's Motor Lodge as of the date of the petitioner's purchase. The petitioner has furnished copies of the neatly-labeled exhibits, but the only document between Exhibit G and Exhibit I is an unlabeled, one-page worksheet. This worksheet, for the 1997 quarter to date, merely provides the amount of taxes withheld, wages paid, etc. It does not name any of the employees or specify the positions held or hours worked, although it does mention the number of employees as 29.

To show the current level of employment at the hotel, the petitioner has supplied the payroll journal for the period ending November 28, 1997. Assuming that this journal reflects one week of work and not two, only 16 individuals clearly worked at least the minimum 35 hours to be considered full-time employees.[4] Another three were paid salaries and not by the hour, while the last three worked fewer than 35 hours and must be considered part-time employees. The petitioner has submitted a Form I-9 for one other person who was hired after the date of the payroll journal. At most, the hotel employs 20 full-time workers. The petitioner has not established that this figure constitutes either the maintenance of the previous level of full-time

---

[4]If the payroll journal reflects *two* weeks of work instead of one, then only two individuals worked at least the minimum 70 hours to be considered full-time employees.

Interim Decision #3359

employment or the addition of 10 new, full-time positions. As noted above, the hotel previously had 29 employees of unknown designation.

If a petitioner has not already created the requisite number of positions, he must submit a comprehensive business plan clearly demonstrating that the business will need the applicable level of employment. 8 C.F.R. § 204.6(j)(4)(i)(B), The plan must contain a timetable for hiring and must be credible. The petitioner has provided a Marketing Plan 1998 for the hotel. The plan discusses, in detail, the petitioner's marketing strategies and employee-incentive programs, among other things. It does not address the issue of hiring, however. While the plan states that a new position will be created in sales, the person named to occupy this position, Janet Mills, has been working at the hotel since 1994.

CONCLUSION.

In conclusion, the petitioner is ineligible for classification as an alien entrepreneur because he has failed to show that he has invested, or is actively in the process of investing, the requisite amount of money. In every transaction, he has attempted to distance himself from making an actual investment in Ames Management by instead becoming Ames Management's creditor. The petitioner has not shown that Ames Management has been established with anything but loans; in essence, the petitioner has attempted to create something from nothing. The petitioner has further failed to demonstrate that he has established a "new" commercial enterprise, and he has failed to show that his business has or will engage in either employment maintenance or employment creation.

The burden of proof in these proceedings rests solely with the petitioner. Section 291 of the Act, 8 U.S.C. § 1361. The petitioner has not met that burden. Accordingly, the petition is denied.

**ORDER:** The decision of the director is reversed. The petition is denied.

# TAB 5

Interim Decision #3362

# **In re HO**, Petitioner

## *In Visa Petition Proceedings*

### WAC 98 072 50493

Decided by the Associate Commissioner, Examinations, July 31, 1998.

(1) Merely establishing and capitalizing a new commercial enterprise and signing a commercial lease are not sufficient to show that an immigrant-investor petitioner has placed his capital at risk. The petitioner must present, instead, evidence that he has actually undertaken meaningful concrete business activity.

(2) The petitioner must establish that he has placed his own capital at risk, that is to say, he must show that he was the legal owner of the invested capital. Bank statements and other financial documents do not meet this requirement if the documents show someone else as the legal owner of the capital.

(3) The petitioner must also establish that he acquired the legal ownership of the invested capital through lawful means. Mere assertions about the petitioner's financial situation or work history, without supporting documentary evidence, are not sufficient to meet this requirement.

(4) To establish that qualifying employment positions have been created, INS Forms I-9 presented by a petitioner must be accompanied by other evidence to show that these employees have commenced work activities and have been hired in permanent, full-time positions.

(5) In order to demonstrate that the new commercial enterprise will create not fewer than 10 full-time positions, the petitioner must either provide evidence that the new commercial enterprise has created such positions or furnish a comprehensive, detailed, and credible business plan demonstrating the need for the positions and the schedule for hiring the employees.

ON BEHALF OF PETITIONER:   JOHN L. SUN
                                     3550 WILSHIRE BOULEVARD,  SUITE 1250
                                     LOS ANGELES, CA  90010-2413

## DISCUSSION

The preference visa petition was approved by the Director, California Service Center, who certified the decision to the Associate Commissioner for Examinations for review. The decision of the director will be reversed.

The petitioner seeks classification as an alien entrepreneur pursuant to section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), The director determined that the petitioner had already invest-

ed the requisite amount of capital, apparently obtained through lawful means. The director further found that, while the business had only two employees at the time of her decision, the business plan called for at least eight more employees within the next 12 months.

The petitioner has chosen not to respond.

Section 203(b)(5)(A) of the Act provides classification to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise:

> (i)   which the alien has established,
>
> (ii)   in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and
>
> (iii)   which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

The petitioner indicates that the petition is based on the creation of a new business located in a targeted employment area, for which the required amount of capital invested has been adjusted downward.

## MINIMUM INVESTMENT AMOUNT

8 C.F.R. § 204.6(e) states, in pertinent part, that:

> *Targeted employment area* means an area which, at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate.

On December 18, 1997, King's Wheel Corp. filed its articles of incorporation with the State of California. According to the petitioner, who is the president, director, and chief executive officer of the corporation, King's Wheel will import steel and aluminum automobile wheels from Taiwan and market them in the United States as a wholesaler. On December 20, 1997, the petitioner signed a lease on behalf of King's Wheel for an "office and warehouse" located at 350 W. Artesia Boulevard in Compton, California.

Compton is in Los Angeles County, and the most current information available from the California Employment Development Department indicates that all of Los Angeles County is an area of sufficiently high unemployment to qualify as a targeted area. Therefore, the amount of capital necessary to make a qualifying investment in this matter is $500,000.

Interim Decision #3362

## INVESTMENT OF QUALIFYING CAPITAL

8 C.F.R. § 204.6(e) states, in pertinent part, that:

*Capital* means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness, ...

*Commercial enterprise* means any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business. This definition shall not include a non-commercial activity such as owning and operating a personal residence.

*Invest* means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part.

8 C.F.R. § 204.6(j) states, in pertinent part, that:

(2) To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital. Such evidence may include, but need not be limited to:

(i) Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

(ii) Evidence of assets which have been purchased for use in the United States enterprise, including invoices; sales receipts; and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(iii) Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

(iv) Evidence of monies transferred or committed to be transferred to the new com-

208

mercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred), Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

(v)  Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

On December 30, 1997, the sum of $515,000 was transferred from an unidentified bank account to one of King's Wheel's business accounts at Cathay Bank, and the business account was credited $514,995. On January 5, 1998, the petitioner obtained 500,000 of the one million authorized shares of King's Wheel; the petitioner indicates that these shares were in exchange for $500,000.

### Capital at risk

Even though the petitioner owns only half of the authorized shares in King's Wheel, he is the sole shareholder thus far. He is also the only officer of the corporation. As such, the petitioner exercises sole control over the corporation's activities; whether the business proceeds according to plan or whether, for example, the business returns the petitioner's money is the petitioner's decision alone. Therefore, the petitioner cannot meet his at-risk requirement by merely depositing funds into a corporate account.

The business plan indicates that sales would commence in three to six months from the date of submission of the petition (January 12, 1998), yet the petitioner has not undertaken the necessary preparations to meet this deadline. The petitioner has not submitted evidence that King's Wheel has purchased inventory or office equipment. The petitioner has not shown that he has entered into negotiations with potential suppliers of wheels abroad, nor has he even identified who his potential suppliers are. The petitioner has not provided evidence that he has identified or entered into negotiations with potential buyers within the United States. The petitioner has not even furnished evidence that he has contracted with the suppliers of local utilities, such as the telephone or electric companies. The petitioner has not adequately explained how the business will go about spending the $500,000 that have been placed into its account. Although the petitioner has signed a lease for King's Wheel's showroom, the lease contains an escape clause at section 14, allowing King's Wheel to assign the lease or sublet the property with consent from the landlord.

The regulations provide that a petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. A mere

Interim Decision #3362

deposit into a corporate money-market account, such that the petitioner himself still exercises sole control over the funds, hardly qualifies as an active, at-risk investment.[1]  Simply formulating an idea for future business activity, without taking meaningful concrete action, is similarly insufficient for a petitioner to meet the at-risk requirement. Before it can be said that capital made available to a commercial enterprise has been placed at risk, a petitioner must present some evidence of the actual undertaking of business activity; otherwise, no assurance exists that the funds will in fact be used to carry out the business of the commercial enterprise. This petitioner's de minimis action of signing a lease agreement, without more, is not enough.

### Source of funds

8 C.F.R. § 204.6(j) states, in pertinent part, that:

> (3)  To show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means, the petitioner must be accompanied, as applicable, by:

> (i)  Foreign business registration records;

> (ii)  Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the petitioner;

> (iii)  Evidence identifying any other source(s) of capital; or

> (iv)  Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years.

To show that he has invested his own capital obtained through lawful means, the petitioner has furnished copies of bank statements showing that as of December 12, 1997, he had NT$1,339,447 (less than US$41,000[2]) on deposit at the Bank of Taiwan, and as of December 23, 1997, an individual named "Ho Wang Chung-Chia, Theresa Wang" had NT$6,255,844.52

---

[1]King's Wheel has two accounts at Cathay Bank:  the money-market account into which the $514,995 were deposited and a commercial checking account containing $3,100. The petitioner has not shown any activity in either account.

[2]This figure assumes an exchange rate of NT$32.68 = US$1, which appears in the materials submitted by the petitioner. The current exchange rate is closer to NT$34.27 = US$1. WASHINGTON POST, July 21, 1998, at C10.

(US$191,427.31) on deposit at the First Commercial Bank. The petitioner has also submitted a letter from the United World Chinese Commercial Bank indicating that he holds 506,000 shares of capital stock in the bank, and as of December 22, 1997, those shares were worth NT$30,866,000. A letter from United Orthopedic Corporation states, "Mrs. Ho Wang Chung-Chia, also known as Theresa Wang has invested N.T.$1,000,000 in United Orthopedic Corp."  On December 19, 1997, Ms. Chung-Chia Ho Wang's single unit on the 11th floor of an 18-story, 147-unit condominium in Taiwan was appraised at NT$6,502,348 (less than US$199,000).

The petitioner asserts that Chung-Chia Ho Wang is his wife; however, he has submitted no documentation, such as a marriage certificate, to sub-stantiate this claim.[3]  Even if Ms. Wang is the petitioner's wife, and even if her assets can be considered joint property, the petitioner has failed to estab-lish the source of the funds transferred to the King's Wheel money-market account, totalling $515,000. Prior to the date of transfer, neither Taiwanese bank account contained sufficient funds; in fact, the two accounts together contained less than $250,000. Neither the petitioner nor Ms. Wang has sold any shares of stock in the Taiwanese corporations, and Ms. Wang appears still to own the condominium unit. As stated earlier, the wire-transfer receipt does not reveal from what bank account(s) the funds originated.

Furthermore, while the petitioner claims to have been a medical doctor in Taiwan, he has not presented any evidence of his having engaged in this occupation, nor has he provided any documentation regarding his level of income. The petitioner explains that, through his medical practice and invest-ments, he has accumulated "liquid assets" of approximately US$1.4 million, and therefore the source of his $500,000 is lawful. The above documentation does not reflect $1.4 million in liquid assets; moreover, simply going on record without supporting documentary evidence is not sufficient for pur-poses of meeting the burden of proof in these proceedings. *See Matter of Treasure Craft of California*, 14 I&N Dec. 190 (Reg. Comm. 1972).

## EMPLOYMENT CREATION

8 C.F.R. § 204.6(j)(4)(i) states:

To show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:

(A) Documentation consisting of photocopies of relevant tax records, Form I-9, or

---

[3]The real-estate appraisal indicates that Ms. Wang's name changed to "Ho" after mar-riage, but "Ho" is a common Chinese name.

Interim Decision #3362

> other similar documents for ten (10) qualifying employees, if such employees have
> already been hired following the establishment of the new commercial enterprise; or
>
> (B) A copy of a comprehensive business plan showing that, due to the nature and pro-
> jected size of the new commercial enterprise, the need for not fewer than ten (10) qual-
> ifying employees will result, including approximate dates, within the next two years,
> and when such employees will be hired.

8 C.F.R. § 204.6(e) states, in pertinent part:

> *Employee* means an individual who provides services or labor for the new commercial
> enterprise and who receive wages or other remuneration directly from the new com-
> mercial enterprise...This definition shall not include independent contractors.
>
> *Full-time employment* means employment of a qualifying employee by the new com-
> mercial enterprise in a position that requires a minimum of 35 working hours per
> week.
>
> *Qualifying employee* means a United States citizen, a lawfully admitted permanent
> resident, or other immigrant lawfully authorized to be employed in the United States
> including, but not limited to, a conditional resident, a temporary resident, an asylee, a
> refugee, or an alien remaining in the United States under suspension of deportation.
> This definition does not include the alien entrepreneur, the alien entrepreneur's spouse,
> sons, or daughters, or any nonimmigrant alien.

As evidence that two positions have already been created, the petition-
er has submitted two Forms I-9 completed just three days prior to the date
he signed the Form I-526 petition. The business plan calls for the hiring of
eight employees within the next 12 months:  a secretary, an accounting
clerk, a truck driver, two warehouse people, and three salespersons.

With respect to the two persons identified in the Forms I-9, the peti-
tioner has not explained what positions they occupy, and it is not known
whether they work full- or part-time or whether they work at all. Forms I-9
verify, at best, that a business has made an effort to ascertain whether par-
ticular individuals are authorized to work; they do not verify that those indi-
viduals have actually begun working. In the absence of such evidence as
paystubs and payroll records showing the number of hours worked, the peti-
tioner has not met his burden of establishing that he has created full-time
employment within the United States.

In addition, as the business plan fails to reveal what these two indi-
viduals do, it is not altogether clear that they would still be needed once
sales commenced and the business progressed beyond its "planning
stage."  The petitioner has not demonstrated that he has created permanent
employment.

According to 8 C.F.R. § 204.6(j)(4)(i)(B), if a petitioner has not already
met the employment-creation requirement, he must submit a comprehen-
sive business plan from which it is clear that the business will in fact require

212

10 qualifying employees within the next two years. To be "comprehensive," a business plan must be sufficiently detailed to permit the Service to draw reasonable inferences about the job-creation potential. Mere conclusory assertions do not enable the Service to determine whether the job-creation projections are any more reliable than hopeful speculation.

A **comprehensive** business plan as contemplated by the regulations should contain, at a minimum, a description of the business, its products and/or services, and its objectives. The plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise. The plan should list the required permits and licenses obtained. If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. The plan should detail any contracts executed for the supply of materials and/or the distribution of products. It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. The plan should set forth the business's organizational structure and its personnel's experience. It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. It should contain sales, cost, and income projections and detail the bases therefor.[4] Most importantly, the business plan must be credible.

Certainly no astute investor would place half a million or a million dollars into a business that he had not thoroughly researched. Creating a comprehensive business plan as described above is normal practice for any businessman seeking to operate a viable business. Without knowing whether a business is feasible and has the potential for long-term survival, neither the petitioner nor the Service can reasonably conclude that it will create permanent, full-time employment. It is not too onerous to ask a petitioner who has not yet met the employment-creation requirement to submit to the Service a real business plan. Other administrative agencies, such as the Small Business Administration, and private financial institutions routinely require the submission of detailed business plans before extending loans to businesses. Permanent resident status is no less significant a matter than a loan.

The petitioner's four-page "business plan" is wholly inadequate and fails to meet the petitioner's burden of showing that he will create 10 permanent, full-time positions within the next two years.

---

[4]The Service recognizes that each business is different and will require different information in its business plan. These guidelines, therefore, are not all-inclusive.

Interim Decision #3362

## CONCLUSION

The petitioner is ineligible for classification as an alien entrepreneur because he has failed to establish that he has made an active, at-risk investment and has failed to clarify the source of his funds. The petitioner has further failed to demonstrate clearly that his proposed business will result in the requisite employment creation.

The burden of proof in these proceedings rests solely with the petitioner. Section 291 of the Act, 8 U.S.C. § 1361. The petitioner has not met that burden. Accordingly, the petition is denied.

**ORDER:** The decision of the director is reversed. The petition is denied.

214

Interim Decision #3363

# In re NEW YORK STATE
## DEPT OF TRANSPORTATION, Petitioner

*In Visa Petition Proceedings*

EAC 96 063 51031

Designated by the Acting Associate Commissioner, Programs,
August 7, 1998

(1) An alien seeking immigrant classification as an alien of exceptional ability or as a member of the professions holding an advanced degree cannot meet the threshold for a national interest waiver of the job offer requirement simply by establishing a certain level of training or education which could be articulated on an application for a labor certification.

(2) General arguments regarding the importance of a given field of endeavor, or the urgency of an issue facing the United States, cannot by themselves establish that an individual alien benefits the national interest by virtue of engaging in the field or seeking an as yet undiscovered solution to the problematic issue.

(3) A shortage of qualified workers in a given field, regardless of the nature of the occupation, does not constitute grounds for a national interest waiver. Given that the labor certification process was designed to address the issue of worker shortages, a shortage of qualified workers is an argument for obtaining rather than waiving a labor certification.

ON BEHALF OF PETITIONER:  Jill Nagy
Lee and LeForestier, P.C.
Box 1054
Second Street
Troy, NY  12180

## DISCUSSION

The employment-based immigrant visa petition was denied by the Director, Vermont Service Center, and is now before the Associate Commissioner for Examinations on appeal. The appeal will be dismissed.[1]

The petitioner seeks to classify the beneficiary pursuant to section 203(b)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(2), as

_____

[1]This decision was originally entered on April 27, 1998. The matter has been reopened on Service motion for the limited purpose of incorporating revisions for publication.

215

# TAB 11

Interim Decision #3361

# In re HSIUNG, Petitioner

## *In Visa Petition Proceedings*

## A76 854 232

Decided by the Associate Commissioner, Examinations, July 31, 1998.

(1) A promissory note secured by assets owned by a petitioner can constitute capital under 8 C.F.R. § 204.6(e) if:  the assets are specifically identified as securing the note; the security interests in the note are perfected in the jurisdiction in which the assets are located; and the assets are fully amenable to seizure by a U.S. note holder.

(2) When determining the fair market value of a promissory note being used as capital under 8 C.F.R. § 204.6(e), factors such as the fair market value of the assets securing the note, the extent to which the assets are amenable to seizure, and the present value of the note should be considered.

(3) Whether a petitioner uses a promissory note as capital under 8 C.F.R. § 204.6(e) or as evidence of a commitment to invest cash, he must show that he has placed his assets at risk. In establishing that a sufficient amount of his assets are at risk, a petitioner must demonstrate, among other things, that the assets securing the note are his, that the security interests are perfected, that the assets are amenable to seizure, and that the assets have an adequate fair market value.

(4) A petitioner engaging in the reorganization or restructuring of a pre-existing business may not cause a net loss of employment.

ON BEHALF OF PETITIONER:    ROBERT LUBIN
                            8229 BOONE BOULEVARD
                            SUITE 610
                            VIENNA, VA  22182

## DISCUSSION

The preference visa petition was denied by the Director, Nebraska Service Center, who certified the decision to the Associate Commissioner for Examinations for review. The petitioner has chosen not to respond. The decision of the director is affirmed.

The petitioner seeks classification as an alien entrepreneur pursuant to section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), The petitioner is one of 14 "investors" in Imedix, Inc. Imedix was established on June 16, 1997, for the purpose of structuring, purchas-

Interim Decision #3361

ing, reorganizing, and upgrading health-care facilities in targeted areas of the United States. No clinics have yet been acquired, but the petitioner estimates that 27 clinics will employ approximately 194 employees.

The director determined that the petitioner had failed to make an active, at-risk investment in that the project was not even in the start-up phase; Imedix had not conducted any sort of business or financial analysis and had not engaged in any discussions with health-care facilities, state health officials, or real-estate agents, for example. The director also found that the required amount of capital had not been placed at risk and that the petitioner had failed to show that he was investing his own funds, obtained through lawful means. The director was further unable to ascertain a reasonable basis for Imedix's determination that it would create 194 positions, as this estimate was given without reference to medical needs of specific communities to be served.

After review of the evidence contained in the record, the decision of the director is found to be correct. Beyond the director's decision, other issues must be addressed. The affirmance of the director's decision is based not only on the director's findings but also on the findings discussed below.

The first issues concern the petitioner's payment agreement and his claimed assets abroad. As stated by the director, the petitioner agreed, pursuant to this payment agreement, to make an initial payment of $50,000, another payment within 30 days after the petition was approved, a payment of $200,000 one year after entry into the United States, and a final payment of $200,000 prior to the removal of the conditions of permanent resident status. The petitioner agreed to secure the principal sum of $500,000 by an assignment of his property having a net fair market value of $500,000.

The petitioner's claimed investment is in the form of a promissory note. A promissory note can constitute "capital" under 8 C.F.R. § 204.6(e) if the note is secured by assets owned by the petitioner. These assets must be specifically identified as securing the note. Furthermore, any security interest must be perfected to the extent provided for by the jurisdiction in which the asset is located,[1] and the asset must be fully amenable to seizure by a U.S. note holder.[2]

--------

[1] This office notes that the Office of General Counsel ("OGC") has previously stated its opinion that the regulations do not require that indebtedness meet the requirements for secured transactions under Article 9 of the Uniform Commercial Code ("UCC"); similarly, OGC has stated that the regulations do not require that the lender perfect his security interest. Memorandum from Paul W. Virtue to Louis D. Crocetti, Jr. (June 27, 1995), *reprinted in* 72 INTERP. REL. 1209 (September 1, 1995). While the regulations do not specifically require that a promissory note be secured under the UCC, merely "identifying" assets as securing a loan, without perfecting the security interest, is not meaningful since the note holder cannot be assured that the identified assets will remain available for seizure in the event of default.

[2] See below for a discussion concerning the seizure of assets.

The petitioner has submitted no evidence that a security interest has been recorded in any particular property, and the promissory note does not even identify what assets are securing it. In addition, as the director stated in her decision, the petitioner has not established that the assets he claims to own in Taiwan are in fact his. The bank accounts at the Bank of Taiwan, containing NT$5,736,012 (US$199,613 as of September 3, 1997, according to counsel), belong to Dustin Hsiung; the petitioner has not demonstrated that he and Dustin Hsiung are the same person. The real estate in Taiwan, appraised at NT$11,167,843 (US$388,640 as of September 3, 1997), belongs to Ping-Hsiu Liu; the petitioner has not demonstrated that he and Ping-Hsiu Liu are the same person. Therefore, even if these assets were properly securing the note, the note does not meet the definition of "capital" because the petitioner has not shown that it is secured by his assets.

Assuming arguendo that the note at issue here did constitute "capital," the regulations at 8 C.F.R. § 204.6(e) further provide that all capital must be valued at fair market value in United States dollars. Whether a promissory note has a fair market value equivalent to its face value depends on many factors, including the value of the assets securing the note. The Taiwanese real estate, appraised at $388,640, is subject to a mortgage of NT$7,000,000 (approximately US$201,180). The net value of this real estate, then, is approximately $187,460. Assuming that the petitioner has made his initial payment of $50,000, assuming that the real estate and the money in the bank accounts (which contain $199,613) are his, and assuming that these assets do secure the promissory note, the net result is that a $450,000 obligation is being secured by only $387,073 in assets.[3]  This is not sufficient to meet the fair-market-value requirement of the regulations.

The fair market value of a promissory note also depends on the amenability of the assets securing the note to seizure. Both the bank account and real estate are located abroad. In order for foreign assets, including real estate, to be considered as acceptable security, a petitioner must establish that the laws of the foreign country in which the assets are located would recognize, and permit execution of, a judgment of a court of the United States or of any State with respect to the foreign assets.[4]  In the alternative, the petitioner must establish that the courts of that foreign country would themselves recognize and enforce the promissory note absent the judgment of an American court. Otherwise, the promissory note would clearly not have the value attributed to it by the petitioner. The petitioner here has not

---

[3]The current exchange rate is closer to NT$34.27 = US$1. WASHINGTON POST, July 21, 1998, at C10. At this exchange rate, the net value of the assets is only US$288,994.89.

[4]This, for example, could take the form of a transfer of ownership of the property to the creditor or it could take the form of a court-ordered liquidation and transfer of assets to the creditor.

Interim Decision #3361

presented any evidence as to Taiwanese law regarding the seizure of assets.

Even if assets can be reached under the laws of the applicable foreign country, considerable expense and effort would be involved in pursuing them. These factors would reduce the fair market value of a promissory note secured by foreign assets. It is not clear to what extent the value of the petitioner's promissory note should be reduced since the petitioner has not submitted any evidence as to the cost of enforcing a judgment against his purported property.

The fair market value of a promissory note further depends on its *present* value. *Matter of Izumii,* 22 I&N Dec. 169 (July 13, 1998), Money received today is worth more than money received tomorrow, and promissory notes are routinely discounted in recognition of this principle. A petitioner who bases his claim of investment on a promissory note must demonstrate that the promissory note has a fair market value equal to the amount of the investment. A petitioner cannot merely claim that his promissory note for $500,000 is worth $500,000, even if the note is properly secured with personal assets, amenable to seizure, of sufficient fair market value. This petitioner has not furnished evidence of the present value of his promissory note and has therefore failed to meet his burden.

To establish that the petitioner has invested, or is actively in the process of investing, he must show that he has placed the required amount of capital at risk.[5] 8 C.F.R. § 204.6(j)(2), The petitioner here has not shown that his assets are at risk. As discussed above, the petitioner has failed to demonstrate the following:  that the bank accounts and real estate in Taiwan allegedly securing the note belong to him; that these assets are in fact securing the note; that any security interest in these assets has been perfected to the extent provided for under Taiwanese law; and that these assets are amenable to seizure. In addition, even if the petitioner had established ownership of these assets, he still has not shown that the requisite amount of money is at risk; he has failed to demonstrate that the assets in Taiwan have a total net fair market value of $500,000 (or $450,000 if he has already made his first payment of $50,000), and he has failed to allow for the estimated costs of seizing the assets should the need arise.

A further issue to be addressed concerns the petitioner's statement that Imedix plans to engage in "structuring, purchasing, reorganizing and upgrading health care facilities." Although the petitioner could argue that Imedix is the new commercial enterprise at issue here, the clinics Imedix claims it will purchase are pre-existing, ongoing businesses. Through his

---

[5]This applies regardless of whether the petitioner is claiming that his promissory note is itself capital or whether he claims that it is merely evidence that he is in the process of investing cash. An actual commitment does not exist if the petitioner's assets are not at risk. *See* 8 C.F.R. § 204.6(j)(2).

Interim Decision #3361

company's business activities, a petitioner cannot directly cause a net loss of employment. It is not known if the projected figure of "194" employees represents the maintenance of the former levels of employment at the unidentified clinics (in the case of troubled businesses), the addition of 10 new positions per investor, or an actual loss of employment.

**ORDER:** The decision of the director is affirmed. The petition is denied.

# TAB 7



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship and Immigration Services**

May 30, 2013                                          PM-602-0083

# Policy Memorandum

SUBJECT:   EB-5 Adjudications Policy

PURPOSE:  The purpose of this policy memorandum (PM) is to build upon prior policy guidance for adjudicating EB-5 applications and petitions.  Prior policy guidance, to the extent it does not conflict with this PM, remains valid unless and until rescinded.

SCOPE:  This PM is applicable to, and is binding on, all USCIS employees.

AUTHORITY:

- Immigration and Nationality Act (INA) sections 203(b)(5) and 216A
- Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, Pub. L. No. 102-395, § 610, 106 Stat 1828, 1874 (1992)
- 8 C.F.R. §§ 204.6 and 216.6

## I.      Introduction

**The purpose of the EB-5 Program is to promote the immigration of people who can help create jobs for U.S. workers through their investment of capital into the U.S. economy.**

Congress established the EB-5 Program in 1990 to bring new investment capital into the country and to create new jobs for U.S. workers.  The EB-5 Program is based on our nation's interest in promoting the immigration of people who invest their capital in new, restructured, or expanded businesses and projects in the United States and help create or preserve needed jobs for U.S. workers by doing so.

In the EB-5 Program, immigrants who invest their capital in job-creating businesses and projects in the United States receive conditional permanent resident status in the United States for a two-year period.  After two years, if the immigrants have satisfied the conditions of the EB-5 Program and other criteria of eligibility, the conditions are removed and the immigrants become unconditional lawful permanent residents of the United States.  Congress created the two-year conditional status period to help ensure compliance with the statutory and regulatory

PM-602-0083:  EB-5 Adjudications Policy
Page 2

requirements and to ensure that the infusion of investment capital is sustained and the U.S. jobs are created.

The 1990 legislation that created the EB-5 Program envisioned lawful permanent resident status for immigrant investors who invest in and engage in the management of job-creating commercial enterprises.  In 1993, the legislature enacted the "Immigrant Investor Pilot Program" that was designed to encourage immigrant investment in a range of business and economic development opportunities within designated regional centers.  In 2012 Congress reaffirmed its commitment to the regional center model of investment and job creation by removing the word "Pilot" from the now twenty-year old program, and by providing a three-year reauthorization of the regional center model through September 2015.

Our goal at U.S. Citizenship and Immigration Services (USCIS) is to make sure that the potential of the EB-5 Program, including the Immigrant Investor Program, is fully realized, and that the integrity of the EB-5 Program is protected.  Through our thoughtful and careful adjudication of applications and petitions in the EB-5 Program, we can realize the intent of Congress to promote the immigration of people who invest capital into our nation's economy and help create jobs for U.S. workers.

## II.        The Preponderance of the Evidence Standard

As a preliminary matter, it is critical that our adjudication of EB-5 petitions and applications adhere to the correct standard of proof.  In the EB-5 program, the petitioner or applicant must establish each element by a preponderance of the evidence.  *See Matter of Chawathe*, 25 I&N Dec. 369, 375-376 (AAO 2010).  That means that the petitioner or applicant must show that what he or she claims is more likely so than not so.  This is a lower standard of proof than both the standard of "clear and convincing," and the standard "beyond a reasonable doubt" that typically applies to criminal cases.  The petitioner or applicant does not need to remove all doubt from our adjudication.  Even if an adjudicator has some doubt as to the truth, if the petitioner or applicant submits relevant, probative, and credible evidence that leads to the conclusion that the claim is "more likely than not" or "probably true", the petitioner or applicant has satisfied the standard of proof.

## III.       Ensuring Program Integrity

It is critical to our mission to ensure that we administer the EB-5 program with utmost vigilance to program integrity.  Our operational teams work in collaboration with the Fraud Detection and National Security directorate and cases presenting issues relating to fraud, national security, or public safety should be referred as appropriate to law enforcement and regulatory authorities.

## IV.       The Three Elements of the EB-5 Program

The EB-5 Program is based on three main elements:  (1) the immigrant's investment of capital, (2) in a new commercial enterprise, (3) that creates jobs.  Each of these elements is explained below in the context of both the original EB-5 Program and the Immigrant Investor Program.

### A.      The Investment of Capital

The EB-5 Program is based in part on the fact that the United States economy will benefit from an immigrant's contribution of capital.  It is also based on the view that the benefit to the U.S. economy is greatest when capital is placed at risk and invested into a new commercial enterprise that, as a result of the investment, creates at least ten jobs for U.S. workers.  The regulations that govern the EB-5 Program define the terms "capital" and "investment" with this in mind.

### 1.      "Capital" Defined

The word "capital" in the EB-5 Program does not mean only cash.  Instead, the word "capital" is defined broadly in the regulations to take into account the many different ways in which an individual can make a contribution of financial value to a business.  The regulation defines "capital" as follows:

> Capital means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur [immigrant investor], provided that the alien entrepreneur [immigrant investor] is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness.  All capital shall be valued at fair market value in United States dollars.  Assets acquired, directly or indirectly, by unlawful means (such as criminal activities) shall not be considered capital for the purposes of section 203(b)(5) of the Act.

8 C.F.R. § 204.6(e).

The definition of "capital" has been clarified in regulations and in precedent decisions that our Administrative Appeals Office (AAO) has issued:

- First, the definition of "capital" is sufficiently broad that it includes not only such things of value as cash, equipment, and other tangible property, but it can also include the immigrant investor's promise to pay (a promissory note), as long as the promise is secured by assets the immigrant investor owns, the immigrant investor is liable for the debt, and the assets of the immigrant investor do not for this purpose include assets of the company in which the immigrant is investing.

  In our AAO's precedent decision *Matter of Hsiung*, 22 I&N Dec. 201, 204 (Assoc. Comm'r 1998), we reflected the fact that the immigrant investor's promissory note can constitute "capital" under the regulations if the note is secured by assets the petitioner owns.  We also determined that:

  (1) The assets must be specifically identified as securing the promissory note;

  (2) Any security interest must be perfected to the extent provided for by the jurisdiction in which the asset is located; and,

(3) The asset must be fully amenable to seizure by a U.S. note holder.

- Second, all of the capital must be valued at fair market value in United States dollars. 8 C.F.R. § 204.6(e) (definition of "capital"). The fair market value of a promissory note depends on its present value, not the value at any different time.  *Matter of Izummi,* 22 I&N Dec. 169, 186 (Assoc. Comm'r 1998).  Moreover, to qualify as capital for EB-5 purposes, "nearly all of the money due under a promissory note must be payable within two years, without provisions for extensions."  *Id.* at 194.

- Third, the immigrant investor must establish that he or she is the legal owner of the capital invested.  *Matter of Ho,* 22 I&N Dec. 206 (Assoc. Comm'r 1998).

- Fourth, any assets acquired directly or indirectly by unlawful means, such as criminal activity, will not be considered capital.  The immigrant investor must demonstrate by a preponderance of the evidence that the capital was obtained through lawful means. According to the regulation, to make this showing the immigrant investor's petition must be accompanied, as applicable, by:

  (1) Foreign business registration records; or,

  (2) Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this list), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the immigrant investor; or,

  (3) Evidence identifying any other source(s) of capital; or,

  (4) Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the immigrant investor from any court in or outside the United States within the past fifteen years.

8 C.F.R. § 204.6(j)(3)(i)-(iv).

## 2.    "Invest" Defined

The immigrant investor in the EB-5 Program is required to invest his or her capital.  The petitioner must document the path of the funds in order to establish that the investment was his or her own funds.  *Matter of Izummi*, 22 I&N Dec. at 195.  The regulation defines "invest" as follows:

Invest means to contribute capital.  A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur [immigrant investor] and the new commercial enterprise

does not constitute a contribution of capital  . . . .

8 C.F.R. § 204.6(e).

The regulation also provides that, in order to qualify as an investment in the EB-5 Program, the immigrant investor must actually place his or her capital "at risk" for the purpose of generating a return, and that the mere intent to invest is not sufficient.  The regulation provides as follows:

> To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.  Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petition is actively in the process of investing.  The alien must show actual commitment of the required amount of capital.

8 C.F.R. § 204.6(j)(2).

The EB-5 Program is seeking to attract individuals from other countries who are willing to put their capital at risk in the United States, with the hope of a return on their investment, to help create U.S. jobs.  The law does not specify what the degree of risk must be; the entire amount of capital need only be at risk to some degree.

If the immigrant investor is guaranteed the return of a portion of his or her investment, or is guaranteed a rate of return on a portion of his or her investment, then that portion of the capital is not at risk.  *Matter of Izummi,* 22 I&N Dec. at 180-188.  For the capital to be "at risk" there must be a risk of loss and a chance for gain.  In our precedent decision *Matter of Izummi,* 22 I&N Dec. at 183-188, the AAO found that the capital was not at risk because the investment was governed by a redemption agreement that protected against the risk of loss of the capital and, therefore, constituted an impermissible debt arrangement under 8 C.F.R. § 204.6(e) as it was no different from the risk any business creditor incurs.  *Id.* at 185.  Furthermore, a promise to return any portion of the immigrant investor's minimum required capital negates the required element of risk.  Thus, if the agreement between the new commercial enterprise and immigrant investor, such as a limited partnership agreement or operating agreement, provides that the investor may demand return of or redeem some portion of capital after obtaining conditional lawful permanent resident status (*i.e.*, following approval of the investor's Form I-526 and subsequent visa issuance or, in the case of adjustment, approval of the investor's Form I-485), that portion of capital is not at risk.  Similarly, if the investor is individually guaranteed the right to eventual ownership or use of a particular asset in consideration of the investor's contribution of capital into the new commercial enterprise, such as a home (or other real estate interest) or item of personal property, the expected present value of the guaranteed ownership or use of such asset does not count toward the total amount of the investor's capital contribution in determining how much money was truly placed at risk.  *Cf. Izummi* at 184 (concluding that an investment cannot be considered a qualifying contribution of capital at risk to the extent of a guaranteed return).  Nothing, however, precludes an investor from receiving a return on his or her capital (*i.e.,* a

distribution of profits) during or after the conditional residency period, so long as prior to or during the two-year conditional residency period, and before the requisite jobs have been created, the return is not a portion of the investor's principal investment and was not guaranteed to the investor.

An investor's money may be held in escrow until the investor has obtained conditional lawful permanent resident status if the immediate and irrevocable release of the escrowed funds is contingent only upon approval of the investor's Form I-526 and subsequent visa issuance and admission to the United States as a conditional permanent resident or, in the case of adjustment of status, approval of the investor's Form I-485.  An investor's funds may be held in escrow within the United States to avoid any evidentiary issues that may arise with respect to issues such as significant currency fluctuations[1] and foreign capital export restrictions. Use of foreign escrow accounts however is not prohibited as long as the petition establishes that it is more likely than not that the minimum qualifying capital investment will be transferred to the new commercial enterprise in the United States upon the investor obtaining conditional lawful permanent resident status.  At the Form I-829 stage, USCIS will require evidence verifying that the escrowed funds were released and that the investment was sustained in the new commercial enterprise.

### 3.    The Amount of Capital That Must be Invested

The statute governing the EB-5 Program provides that the immigrant investor must invest at least $1,000,000 in capital in a new commercial enterprise that creates not fewer than ten jobs.  As discussed above, this means that the present fair market value, in United States dollars, of the immigrant investor's lawfully-derived capital must be at least $1,000,000.  8 U.S.C. § 1153(b)(5)(C)(i).

An exception exists if the immigrant investor invests his or her capital in a new commercial enterprise that is principally doing business in, and creates jobs in, a "targeted employment area."  In such a case, the immigrant investor must invest a minimum of $500,000 in capital.  8 U.S.C. § 1153(b)(5)(C)(ii); 8 C.F.R. § 204.6(f)(2).  *See* Section 3.a below for the definition of where the new commercial enterprise is "principally doing business."

An immigrant investor may diversify his or her total EB-5 investment across a portfolio of businesses or projects, so long as the minimum investment amount is placed in a single commercial enterprise.  For immigrant investors who are not associated with a regional center, the capital may be deployed into a portfolio of wholly-owned businesses, so long as all capital is deployed through a single commercial enterprise and all jobs are created directly within that commercial enterprise or through the portfolio of businesses that received the EB-5 capital through that commercial enterprise.  For example, in an area in which the minimum investment

---

[1] It should be noted that when funds are held in escrow outside the United States, USCIS will review currency exchange rates at the time of adjudicating the I-526 petition to determine if it is more likely than not that the minimum qualifying capital investment will be made.  At the I-829 stage, USCIS will review the evidence in the record, including currency exhange rates at the time of transfer, to determine that when the funds were actually transferred to the United States, the minimum qualifying capital investment was actually made.

amount is $1,000,000, the investor can satisfy the statute if the investor invests in a commercial enterprise that deploys $600,000 of the investment toward one business that it wholly owns, and $400,000 of the investment toward another business that it wholly owns.  *See* 8 C.F.R. § 204.6(e).  (In this instance, the two wholly-owned businesses would have to create an aggregate of ten new jobs between them.)  An investor cannot qualify, on the other hand, by investing $600,000 in one commercial enterprise and $400,000 in a separate commercial enterprise.

In the regional center context, where indirect jobs may be counted, the commercial enterprise may create jobs indirectly through multiple investments in corporate affiliates or in unrelated entities, but the investor cannot qualify by investing directly in those multiple entities.  Rather, the investor's capital must still be invested in a single commercial enterprise, which can then deploy that capital in multiple ways as long as one or more of the portfolio of businesses or projects can create the required number of jobs.

### a.      "Targeted Employment Area" Defined

The statute and regulations governing the EB-5 Program defines a "targeted employment area" as, at the time of investment, a rural area or an area that has experienced unemployment of at least 150 percent of the national average rate.  A "rural area" is defined as any area not within either a metropolitan statistical area (as designated by the Office of Management and Budget) or the outer boundary of any city or town having a population of 20,000 or more (based on the most recent decennial census of the United States).  8 U.S.C. § 1153(b)(5)(B)(ii), (iii); 8 C.F.R. § 204.6(e).  In other words, a rural area must be both outside of a metropolitan statistical area and outside of a city or town having a population of 20,000 or more.

Congress expressly provided for a reduced investment amount in a rural area or an area of high unemployment in order to spur immigrants to invest in new commercial enterprises that are principally doing business in, and creating jobs in, areas of greatest need.  In order for the lower capital investment amount of $500,000 to apply, the new commercial enterprise into which the immigrant invests or the actual job creating entity must be principally doing business in the targeted employment area.

For the purpose of the EB-5 Program, a new commercial enterprise is "principally doing business" in the location where it regularly, systematically, and continuously provides goods or services that support job creation.  If the new commercial enterprise provides such goods or services in more than one location, it will be deemed to be "principally doing business" in the location that is most significantly related to the job creation.  Factors to be considered in making this determination may include, but are not limited to, (1) the location of any jobs directly created by the new commercial enterprise; (2) the location of any expenditure of capital related to the creation of jobs; (3) where the new commercial enterprise conducts its day-to-day operation; and (4) where the new commercial enterprise maintains its assets that are utilized in the creation of jobs.  *Matter of Izummi,* 22 I&N Dec. at 174.

As discussed fully below, investments through the Immigrant Investor Program can be made through regional centers and the new commercial enterprise may seek to establish indirect job creation.  In these cases, the term "principally doing business" will apply to the job-creating

enterprise rather than the new commercial enterprise.  *See* 8 C.F.R. § 204.6(j)(6); *Matter of Izummi,* 22 I&N Dec. at 171-73 (discussing the location of commercial enterprises to which the new commercial enterprise made loans).

The immigrant investor may seek to have a geographic or political subdivision designated as a targeted employment area.  To do so, the immigrant investor must demonstrate that the targeted employment area meets the statutory and regulatory criteria through the submission of:  (1) evidence that the area is outside of a metropolitan statistical area and outside of a city or town having a population of 20,000 or more; (2) unemployment data for the relevant metropolitan statistical area or county; or (3) a letter from the state government designating a geographic or political subdivision located outside a rural area but within its own boundaries as a high unemployment area.  8 C.F.R. § 204.6(j)(6).

### b.       A State's Designation of a Targeted Employment Area

The regulation provides that a state government may designate a geographic or political subdivision within its boundaries as a targeted employment area based on high unemployment. Before the state may make such a designation, an official of the state must notify USCIS of the agency, board, or other appropriate governmental body of the state that will be delegated the authority to certify that the geographic or political subdivision is a high unemployment area.  The state may then send a letter from the authorized body of the state certifying that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area.  8 C.F.R. § 204.6(i).

Consistent with the regulations, USCIS defers to state determinations of the appropriate boundaries of a geographic or political subdivision that constitutes the targeted employment area. However, for all TEA designations, USCIS must still ensure compliance with the statutory requirement that the proposed area designated by the state in fact has an unemployment rate of at least 150 percent of the national average rate.  For this purpose, USCIS will review state determinations of the unemployment rate and, in doing so, USCIS can assess the method or methods by which the state authority obtained the unemployment statistics.  Acceptable data sources for purposes of calculating unemployment include U.S. Census Bureau data (including data from the American Community Survey) and data from the Bureau of Labor Statistics (including data from the Local Area Unemployment Statistics).

There is no provision that allows a state to designate a rural area.

### B.       New Commercial Enterprise

As discussed at the beginning of this PM, the EB-5 Program eligibility requirements are based on the fact that the U.S. economy will benefit from an immigrant investor's investment of capital into a new commercial enterprise that, as a result of the investment, creates at least ten jobs for U.S. workers.  We have discussed above the requirements regarding "capital" and "investment." We now turn to the definition of, and requirements for, a "new commercial enterprise."

### 1.      "Commercial Enterprise" Defined

First, the regulation governing the EB-5 Program defines the term "commercial enterprise" broadly, consistent with the realities of the business world and the many different forms and types of structures that job-creating activities can have.  The regulation defines a "commercial enterprise" as follows:

> [A]ny for-profit activity formed for the ongoing conduct of lawful business.

8 C.F.R. § 204.6(e).

The regulation provides a list of examples of commercial enterprises.  It specifically states that the list is only of examples, and is not a complete list of the many forms a commercial enterprise can have.  The examples listed are:

> [A] sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned.  This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business.

8 C.F.R. § 204.6(e).

Finally, the regulation provides that the commercial enterprise must be one that is designed to make a profit, unlike, for example, some charitable organizations, and it does not include "a noncommercial activity such as owning and operating a personal residence."  8 C.F.R. § 204.6(e).

### 2.      "New" Defined

In its effort to spur job creation through a wide variety of businesses and projects, the EB-5 Program has presented a broad definition of what constitutes a "new" commercial enterprise into which the immigrant investor can invest the required amount of capital and help create jobs.

The EB-5 Program defines "new" as "established after November 29, 1990."  8 C.F.R. § 204.6(e).  The immigrant investor can invest the required amount of capital in a commercial enterprise that was established after November 29, 1990 to qualify for the EB-5 Program, provided the other eligibility criteria are met.

In addition, in the EB-5 Program a "new" commercial enterprise also means a commercial enterprise that was established before November 29, 1990 if the enterprise will be restructured or expanded through the immigrant investor's investment of capital:

### a.       The Purchase of an Existing Business That is Restructured or Reorganized

The immigrant investor can invest in an existing business, regardless of when that business was first created, provided that the existing business is simultaneously or subsequently restructured or reorganized such that a new commercial enterprise results.  8 C.F.R. § 204.6(h)(2).  The facts of *Matter of Soffici*—where an investor purchased a Howard Johnson hotel and continued to run it as a Howard Johnson hotel—were not sufficient to establish a qualifying restructuring or reorganization.  22 I&N Dec. 158, 166 (Assoc. Comm'r 1998) ("A few cosmetic changes to the decor and a new marketing strategy for success do not constitute the kind of restructuring contemplated by the regulations, nor does a simple change in ownership.").  On the other hand, examples that could qualify as restructurings or reorganizations include a plan that converts a restaurant into a nightclub, or a plan that adds substantial crop production to an existing livestock farm.

### b.       The Expansion of An Existing Business

The immigrant investor can invest in an existing business, regardless of when that business was first created, provided that a substantial change in the net worth or number of employees results from the investment of capital.  8 C.F.R. § 204.6(h)(3).

"Substantial change" is defined as follows:

> [A] 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees.

8 C.F.R. § 204.6(h)(3).

Investment in a new commercial enterprise in this manner does not exempt the immigrant investor from meeting the requirements relating to the amount of capital that must be invested and the number of jobs that must be created.  8 C.F.R. § 204.6(h)(3).

### 3.       Pooled Investments in Non-Regional Center Cases

The EB-5 Program provides that a new commercial enterprise can be used as the basis for the petition of more than one immigrant investor.  Each immigrant investor must invest the required amount of capital and each immigrant investor's investment must result in the required number of jobs.  Furthermore, the new commercial enterprise can have owners who are not seeking to enter the EB-5 Program, provided that the source(s) of all capital invested is (or are) identified and all invested capital has been derived by lawful means.  8 C.F.R. § 204.6(g).

### 4.      Evidence of the Establishment of a New Commercial Enterprise

To show that the new commercial enterprise has been established, the immigrant investor must present the following evidence, in addition to any other evidence we deem appropriate:

(1)      as applicable, articles of incorporation, certificate of merger or consolidation, partnership agreement, certificate of limited partnership, joint venture agreement, business trust agreement, or other similar organizational document for the new commercial enterprise; or,

(2)      A certificate evidencing authority to do business in a state or municipality or, if the form of the business does not require any such certificate or the state or municipality does not issue such a certificate, a statement to that effect; or,

(3)      Evidence that, as of a date certain after November 29, 1990, the required amount of capital for the area in which an enterprise is located has been transferred to an existing business, and that the  investment has resulted in a substantial increase in the net worth or number of employees of the business to which the capital was transferred.  This evidence must be in the form of stock purchase agreements, investment agreements, certified financial reports, payroll records, or any similar instruments, agreements, or documents evidencing the investment in the commercial enterprise and the resulting substantial change in the net worth or number of employees.

8 C.F.R. § 204.6(j), (j)(1)(i)-(iii).

### 5.      Evidence of the Investment in a New Commercial Enterprise

In order for the immigrant investor to show that he or she has committed the required amount of capital to the new commercial enterprise, the evidence presented may include, but is not limited to, the following:

(1)      Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

(2)      Evidence of assets which have been purchased for use in the United States enterprise, including invoices, sales receipts, and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(3)      Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading, and transit insurance policies containing

ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

(4)     Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred).  Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

(5)     Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

8 C.F.R. § 204.6(j)(2)(i)-(v).

### 6.     The Requirement that the Immigrant Investor be Engaged in the Management of the New Commercial Enterprise

The EB-5 Program requires the immigrant investor to be engaged in the management of the new commercial enterprise, either through the exercise of day-to-day managerial responsibility or through policy formulation.  It is not enough that the immigrant investor maintain a purely passive role in regard to his or her investment.  8 C.F.R. § 204.6(j)(5).

To show that the immigrant investor is or will be engaged in the exercise of day-to-day managerial control or in the exercise of policy formulation, the immigrant investor must submit:

(1)     A statement of the position title that the immigrant investor has or will have in the new enterprise and a complete description of the position's duties; or,

(2)     Evidence that the immigrant investor is a corporate officer or a member of the corporate board of directors; or,

(3)     If the new enterprise is a partnership, either limited or general, evidence that the immigrant investor is engaged in either direct management or policy making activities.  If the petitioner is a limited partner and the limited partnership agreement provides the immigrant investor with certain rights, powers, and duties normally granted to limited partners under the Uniform Limited Partnership Act, the immigrant investor will be considered sufficiently engaged in the management of the new commercial enterprise.

8 C.F.R. § 204.6(j)(5)(i)-(iii).

### 7. The Location of the New Commercial Enterprise in a Regional Center

As previously mentioned, there is a regional center model within the EB-5 Program that allows for not only "direct job" creation, but "indirect job creation" as demonstrated by reasonable methodologies.  Originally introduced as a "pilot program," and now titled the "Immigrant Investor Program," the program provides investors with expanded opportunities to demonstrate job creation in accordance with a series of job creation rules discussed below. "Regional center" is defined as follows:

> Regional center means any economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

8 C.F.R. § 204.6(e).

A regional center that wants to participate in the Immigrant Investor Program must submit a proposal using Form I-924, that:

(1)    Clearly describes how the regional center focuses on a geographical region of the United States, and how it will promote economic growth through increased export sales, improved regional productivity, job creation, and increased domestic capital investment;

(2)    Provides in verifiable detail how jobs will be created directly or indirectly;

(3)    Provides a detailed statement regarding the amount and source of capital which has been committed to the regional center, as well as a description of the promotional efforts taken and planned by the sponsors of the regional center;

(4)    Contains a detailed prediction regarding the manner in which the regional center will have a positive impact on the regional or national economy in general as reflected by such factors as increased household earnings, greater demand for business services, utilities, maintenance and repair, and construction both within and without the regional center; and,

(5)    Is supported by economically or statistically sound valid forecasting tools, including, but not limited to, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and/or multiplier tables.

8 C.F.R. § 204.6(m)(3)(i)-(v).

USCIS will review the proposed geographic boundaries of a new regional center and will deem them acceptable if the applicant can establish by a preponderance of the evidence that the

proposed economic activity will promote economic growth in the proposed area.  The question is a fact-specific one and the law does not require any particular form of evidentiary showing, such as a county-by-county analysis.  In USCIS's experience, the reasonableness of proposed regional center geographic boundaries may be demonstrated through evidence that the proposed area is contributing significantly to the supply chain, as well as the labor pool, of the proposed projects.

The Immigrant Investor Program was implemented with the goal of spurring greater economic growth in the geographic area in which a regional center is developed.  The regional center model within the Immigrant Investor Program can offer an immigrant investor already-defined investment opportunities, thereby reducing the immigrant investor's responsibility to identify acceptable investment vehicles.  As discussed fully below, if the new commercial enterprise is located within and falls within the economic scope of the defined regional center, different job creation requirements apply.

A regional center can contain one or more new commercial enterprises.

The level of verifiable detail required for a Form I-924 to be approved and provided deference may vary depending on the nature of the Form I-924 filing.  If the Form I-924 projects are "hypothetical" projects,[2] general proposals and general predictions may be sufficient to determine that the proposed regional center will more likely than not promote economic growth, improved regional productivity, job creation, and increased domestic capital investment.  Determinations based on hypothetical projects, however, will not receive deference and the actual projects on which the Form I-526 petitions will be based will receive de novo review during the subsequent filing (e.g., an amended Form I-924 application including the actual project details or the first Form I-526 petition filed by an investor under the regional center project).  Organizational and transactional documents submitted with a Form I-924 hypothetical project will not be reviewed to determine compliance with program requirements since these documents will receive de novo review in subsequent filings.  If an applicant desires review of organizational and transactional documents for program compliance, a Form I-924 application with a Form I-526 exemplar should be submitted.

Form I-924 applications that are based on actual projects may require more details than a hypothetical project in order to conclude that the proposal contains verifiable details and is supported by economically or statistically sound forecasting tools.[3]  Determinations based on

---

[2] An "actual project" refers to a specific project proposal that is supported by a *Matter of Ho* compliant business plan.  A "hypothetical project" refers to a project proposal that is not supported by a *Matter of Ho* compliant business plan.  The term "exemplar" refers to a sample Form I-526 petition, filed with a Form I-924 actual project proposal, that contains copies of the commercial enterprise's organizational and transactional documents, which USCIS will review to determine if they are in compliance with established EB-5 eligibility requirements.

[3] In cases where the Form I-924 is filed based on actual projects that do not contain sufficient verifiable detail, the projects may still be approved as hypothetical projects if they contain the requisite general proposals and predictions.  The projects approved as hypotheticals, however, will not receive deference.  In cases where some projects are approvable as actual projects, and others are not approvable or only approvable as hypothetical projects, the approval notice should contain a statement identifying which projects have been approved as actual projects and will be accorded deference and those projects that have been approved as hypothetical projects but will not be accorded deference.

actual projects, however, will be accorded deference to subsequent filings under the project involving the same material facts and issues.  While an amended Form I-924 application is not required to perfect a hypothetical project once the actual project details are available, some applicants may choose to file an amended Form I-924 application with a Form I-526 exemplar in order to obtain a favorable determination which will be accorded deference in subsequent related filings, absent material change, fraud, willful misrepresentation, or a legally deficient determination (discussed in more detail below).

### C.     The Creation of Jobs

In developing the EB-5 Program, Congress intended to promote the immigration of people who invest capital into our nation's economy and help create jobs for U.S. workers.  Therefore, the creation of jobs for U.S. workers is a critical element of the EB-5 Program.

It is not enough that the immigrant invests funds into the U.S. economy; the investment must result in the creation of jobs for qualifying employees.  As discussed fully below, the EB-5 Program provides that each investment of the required amount of capital in a new commercial enterprise must result in the creation of at least ten jobs.

It is important to recognize that while the immigrant's investment must result in the creation of jobs for qualifying employees, it is the new commercial enterprise that creates the jobs.[4]  This distinction is best illustrated in the non-regional center context by an example:

> Ten immigrant investors seek to establish a hotel as their new commercial enterprise. The establishment of the new hotel requires capital to pay financing costs to unrelated third parties, purchasing the land, developing the plans, obtaining the licenses, building the structure, taking care of the grounds, staffing the hotel, and the many other types of expenses involved in the development and operation of a new hotel.  The immigrant's investments can go to pay part or all of any of these expenses.  Each immigrant's investment of the required amount of capital helps the new commercial enterprise – the new hotel – create ten jobs.  The ten immigrants' investments must result in the new hotel's creation of 100 jobs for qualifying employees (ten jobs resulting per each individual immigrant's capital investment).

*See* 8 C.F.R. §204.6(j) (it is the new commercial enterprise that will create the ten jobs).

Since it is the commercial enterprise that creates the jobs, the developer or the principal of the new commercial enterprise, either directly or through a separate job-creating entity, may utilize interim, temporary or bridge financing – in the form of either debt or equity – prior to receipt of EB-5 capital.  If the project commences based on the interim or bridge financing prior to the receipt of the EB-5 capital and subsequently replaces it with EB-5 capital, the new commercial enterprise may still receive credit for the job creation under the regulations.  Generally, the replacement of bridge financing with EB-5 investor capital should have been contemplated prior

---

[4] 8 C.F.R § 204.6(j)(4)(i).

to acquiring the original non-EB-5 financing.  However, even if the EB-5 financing was not contemplated prior to acquiring the temporary financing, as long as the financing to be replaced was contemplated as short-term temporary financing which would be subsequently replaced, the infusion of EB-5 financing could still result in the creation of, and credit for, new jobs.  For example, the non EB-5 financing originally contemplated to replace the temporary financing may no longer be available to the commercial enterprise as a result of changes in availability of traditional financing.  Developers should not be precluded from using EB-5 capital as an alternative source to replace temporary financing simply because it was not contemplated prior to obtaining the bridge or temporary financing.

It is also important to note that the full amount of the immigrant's investment must be made available to the business(es) most closely responsible for creating the jobs upon which EB-5 eligibility is based.  *Matter of Izummi*, 22 I&N Dec. at 179.  Thus, in the regional center context, if the new commercial enterprise is not the job-creating entity, then the full amount of the capital must be first invested in the new commercial enterprise and then made available to the job-creating entity.  *Id*.

## 1.    Full-Time Positions For Qualifying Employees

The EB-5 Program requires that the immigrant investor invest the required amount of capital in a new commercial enterprise in the United States that "will create full-time positions for not fewer than 10 qualifying employees."  *8 C.F.R. § 204.6(j)*.

An "employee" is defined as follows:

> Employee means an individual who provides services or labor for the new commercial enterprise and who receives wages or other remuneration directly from the new commercial enterprise.

8 C.F.R. § 204.6(e).

The employee must be a "qualifying employee" for the purpose of the EB-5 Program's job creation requirement.  A "qualifying employee" is defined as follows:

> Qualifying employee means a United States citizen, a lawfully admitted permanent resident, or other immigrant lawfully authorized to be employed in the United States including, but not limited to, a conditional resident, a temporary resident, an asylee, a refugee, or an alien remaining in the United States under suspension of deportation.  This definition does not include the alien entrepreneur [immigrant investor], the alien entrepreneur's spouse [immigrant investor's], sons, or daughters, or any nonimmigrant alien.

8 C.F.R. § 204.6(e).

The EB-5 Program's job creation requirement provides that it is "full-time employment" that must be created for the ten or more qualifying employees.  INA § 203(b)(5)(A)(ii), 8 U.S.C. § 1153(b)(5)(A)(ii).  "Full-time employment" is defined as follows:

> Full-time employment means employment of a qualified employee by the new commercial enterprise in a position that requires a minimum of 35 working hours per week.

A full-time employment position can be filled by two or more qualifying employees in a job sharing arrangement as long as the 35-working-hours-per-week requirement is met.  However, a full-time employment position cannot be filled by combinations of part-time positions, even if those positions when combined meet the hourly requirement.  *8 C.F.R. § 204.6(e).*  Direct jobs that are intermittent, temporary, seasonal, or transient in nature do not qualify as full-time jobs for EB-5 purposes.  Consistent with prior USCIS interpretation, however, jobs that are expected to last for at least two years generally are not intermittent, temporary, seasonal, or transient in nature.

Due to the nature of accepted job creation modeling practices, which do not distinguish whether jobs are full- or part-time, USCIS relies upon the reasonable economic models to determine that it is more likely than not that the indirect jobs are created and will not request additional evidence to validate the job creation estimates in the economic models to prove by a greater level of certainty that the indirect jobs created, or to be created, are full-time or permanent.  USCIS may, however, request additional evidence to verify that the direct jobs will be or are full-time and permanent, which may include a review of W-2s or similar evidence at the Form I-829 stage.

## 2.    Job Creation Requirement

As previously discussed, the centerpiece of the EB-5 Program is the creation of jobs.  The immigrant investor seeking to enter the United States through the EB-5 Program must invest the required amount of capital in a new commercial enterprise that will create full-time positions for at least ten qualified employees.

There are three measures of job creation in the EB-5 Program, depending on the new commercial enterprise and where it is located:

### a.    Troubled Business

The EB-5 Program recognizes that in the case of a troubled business, our economy benefits when the immigrant investor helps preserve the troubled business's existing jobs.  Therefore, when the immigrant investor is investing in a new commercial enterprise that is a troubled business or, in the regional center context, is placing capital into a job-creating entity that is a troubled business, the immigrant investor must only show that the number of existing employees in the troubled business is being or will be maintained at no less than the pre-investment level for a period of at least two years.  8 C.F.R. § 204.6(j)(4)(ii).

This regulatory provision, while allowing job preservation in lieu of job creation, does not decrease the statutory numeric requirement; in the case of a troubled business, ten jobs must be preserved, created, or some combination of the two (e.g., an investment in a troubled business that creates four qualifying jobs and preserves all six pre-investment jobs would satisfy the statutory and regulatory requirements).

A troubled business is defined as follows:

> [A] business that has been in existence for at least two years, has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien entrepreneur's [immigrant investor's] Form I-526, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss.  For purposes of determining whether or not the troubled business has been in existence for two years, successors in interest to the troubled business will be deemed to have been in existence for the same period of time as the business they succeeded.

8 C.F.R. § 204.6(e).

### b.  New Commercial Enterprise Not Associated With a Regional Center

For a new commercial enterprise that is not associated with a regional center, the EB-5 Program provides that the full-time positions must be created directly by the new commercial enterprise to be counted.  This means that the new commercial enterprise (or its wholly-owned subsidiaries) must itself be the employer of the qualified employees who fill the new full-time positions.  8 C.F.R. § 204.6(e) (definition of employee).

### c.  New Commercial Enterprise Located Within and Associated With a Regional Center

For a new commercial enterprise that is located within a regional center, the EB-5 Program provides that the full-time positions can be created either directly or indirectly by the new commercial enterprise.  8 C.F.R. § 204.6((j)(4)(iii).  Investors investing in a regional center are subject to all the same program requirements except that they may rely on indirect job creation as demonstrated through reasonable methodologies.  8 C.F.R. §§ 204.6(m)(1), (7).

Indirect jobs are those that are held outside of the new commercial enterprise but are created as a result of the new commercial enterprise.  For indirect jobs, the new full-time employees would not be employed directly by the new commercial enterprise.  For example, indirect jobs can include, but are not limited to, those held by employees of the producers of materials, equipment, or services used by the new commercial enterprise.  Indirect jobs can qualify and be counted as jobs attributable to a regional center, based on reasonable economic methodologies, even if they are located outside of the geographical boundaries of a regional center.

For purposes of demonstrating indirect job creation, petitioners must employ reasonable economic methodologies to establish by a preponderance of the evidence that the required infusion of capital or creation of direct jobs will result in a certain number of indirect jobs.

### 3. Evidence of Job Creation

In order to show that a new commercial enterprise will create not fewer than ten full-time positions for qualifying employees, an immigrant investor must submit the following evidence:

> (A) Documentation consisting of photocopies of relevant tax records, Form I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or,

> (B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

8 C.F.R. § 204.6(j)(4)(i).

For purposes of the Form I-526 adjudication and the job creation requirements, the two-year period described in 8 C.F.R. § 204.6(j)(4)(i)(B) is deemed to commence six months after the adjudication of the Form I-526.  The business plan filed with the Form I-526 should reasonably demonstrate that the requisite number of jobs will be created by the end of this two-year period.

Our AAO precedent decision has articulated the standards by which USCIS will review a business plan:

> The plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise.  The plan should list the required permits and licenses obtained.  If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources.  The plan should detail any contracts executed for the supply of materials and/or the distribution of products.  It should discuss the marketing strategy of the business, including pricing, advertising, and servicing.  The plan should set forth the business's organizational structure and its personnel's experience.  It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions.  It should contain sales, cost, and income projections and detail the bases therefore.  Most importantly, the business plan must be credible.

*Matter of Ho*, 22 I&N Dec. at 213.  USCIS will review the business plan in its totality to determine if it is more likely than not that the business plan is comprehensive and credible.  A

business plan is not required to contain all of the detailed elements described above, but the more details the business plan contains, as described in *Matter of Ho*, the more likely it is that the plan will be considered comprehensive and credible.

In the case of a troubled business, a comprehensive business plan must accompany the other required evidentiary documents.  8 C.F.R. § 204.6(j)(4)(ii).  In the case of a new commercial enterprise within a regional center, the direct or indirect job creation may be demonstrated by the types of documents identified above or by reasonable methodologies.  8 C.F.R. § 204.6(j)(4)(iii).

When there are multiple investors in a new commercial enterprise, the total number of full-time positions created for qualifying employees will be allocated only to those immigrant investors who have used the establishment of the new commercial enterprise as the basis for their entry in the EB-5 Program.  An allocation does not need to be made among persons not seeking classification in the EB-5 Program, nor does an allocation need to be made among non-natural persons (such as among investing corporations).  8 C.F.R. § 204.6(g)(2).

In general, multiple EB-5 investors petitioning through a regional center or on a standalone basis may not claim credit for the same specific new job.  Thus, as a general matter, a petitioner or applicant may not seek credit for the same specifically identified job position that has already been allocated in a previously approved case.

## V.     Procedural Issues

The EB-5 Program provides that the immigrant investor will file an initial petition and supporting documentation to be classified as eligible to apply for an EB-5 visa through USCIS's adjustment of status process within the United States or through the Department of State's visa application process abroad.  Upon adjustment of status or admission to the United States, the immigrant investor is a conditional lawful permanent resident.  INA § 216A(a).  The EB-5 Program further provides that if, two years after obtaining conditional permanent resident status, the immigrant investor has sustained the investment, created or can be expected to create within a reasonable period of time ten full-time jobs to qualifying employees, and is otherwise conforming to the EB-5 Program's requirements, the conditions generally will be removed and the immigrant investor will be an unconditional lawful permanent resident.  INA § 216A(d)(1); 8 C.F.R. § 216.6(c).

### A.     The Sequence of Individual Investor Filings

An immigrant investor seeking admission into the United States as a lawful permanent resident will proceed in the following sequence:

### 1.     The Form I-526 Petition

- For an immigrant investor who is investing in a new commercial enterprise that is not part of a regional center, the immigrant investor will file a Form I-526 that, together with the supporting evidence, demonstrates by a preponderance of the evidence that the immigrant investor has invested, or is actively in the process of investing, lawfully

obtained capital in a new commercial enterprise in the United States that will create full-time positions for not fewer than ten qualifying direct employees.

- For an immigrant investor who is investing in a new commercial enterprise that is part of a regional center:

  o The entity seeking designation as a regional center will file a Form I-924 that, together with the supporting evidence, demonstrates by a preponderance of the evidence that the requirements for a regional center have been met.  The individuals who establish the regional center can be, but need not be, the immigrant investors themselves; and,

  o Once USCIS designates the entity as a regional center, each immigrant investor will file a Form I-526 that, together with the supporting evidence, demonstrates by a preponderance of the evidence that the immigrant investor has invested, or is actively in the process of investing, lawfully obtained capital in a new commercial enterprise in the United States that will create directly or indirectly full-time positions for not fewer than ten qualifying employees.

It is important to note that at this preliminary Form I-526 filing stage, the immigrant investor must demonstrate his or her commitment to invest the capital but need not establish that the required capital already has been invested; it is sufficient if the immigrant investor demonstrates that he or she is actively in the process of investing the required capital.  However, evidence of a mere intent to invest or of prospective investment arrangements entailing no present commitment will not suffice.  8 C.F.R. § 204.6(j)(2); *see Matter of Ho,* 22 I&N Dec. at 210.  Similarly, at this preliminary stage the immigrant investor need not establish that the required jobs already have been created; it is sufficient if the immigrant investor demonstrates in a business plan that it is more likely than not that the required jobs will be created.  8 C.F.R. § 204.6(j); 8 C.F.R. § 204.6(m).

## 2.     The Form I-829 Petition

Within ninety days prior to the two-year anniversary of the date on which the immigrant investor obtained conditional lawful permanent resident status, the immigrant investor will file a Form I-829 to remove the conditions.  The Form I-829 petition to remove conditions must be accompanied by the following evidence:

(1)     Evidence that the immigrant investor invested or was actively in the process of investing the required capital and sustained this action throughout the period of the immigrant investor's residence in the United States.  The immigrant investor can make this showing if he or she has, in good faith, substantially met the capital investment requirement and continuously maintained his or her capital investment over the two years of conditional residence.  At this stage the immigrant investor need not have invested all of the required capital, but must have substantially met that requirement.  The evidence may include, but is not limited to, an

audited financial statement or other probative evidence such as bank statements, invoices, receipts, contracts, business licenses, Federal or State income tax returns, and Federal or State quarterly tax statements; and,

(2)  Evidence that the commercial enterprise created or can be expected to create, within a reasonable time, ten full-time jobs for qualifying employees.  In the case of a troubled business, the immigrant investor must submit evidence that the commercial enterprise maintained the number of existing employees at no less than the pre-investment level for the period following his or her admission as a conditional permanent resident.  At least ten jobs must be preserved or created per immigrant investor.  The evidence may include, but is not limited to, payroll records, relevant tax documents, and Forms I-9.

*See* 8 C.F.R. § 216.6(a)(4)(ii-iv).

It is also important to note that the EB-5 Program allows an immigrant investor to become a lawful permanent resident, without conditions, if the immigrant investor has established a new commercial enterprise, substantially met the capital requirement, and can be expected to create within a reasonable time the required number of jobs.  All of the goals of capital investment and job creation need not have been fully realized before the conditions on the immigrant investor's status have been removed.  Rather, the regulations require the submission of documentary evidence that establishes that it is more likely than not that the investor is in "substantial" compliance with the capital requirements and that the jobs will be created "within a reasonable time."

The "within a reasonable time" requirement permits a degree of flexibility to account for the realities and unpredictability of starting a business venture, but it is not an open-ended allowance.  The regulations require that the business plan submitted with Form I-526 establish a likelihood of job creation "within the next two years," 8 C.F.R. § 204.6(j)(4)(i)(B), demonstrating an expectation that EB-5 projects will generally create jobs within such a timeframe.  Whether a lengthier timeframe for job creation presented in a Form I-829 is "reasonable" is to be decided based on the totality of the circumstances presented, and USCIS has latitude under the law to request additional evidence concerning those circumstances.  Because the law contemplates two years as the baseline expected period in which job creation will take place, jobs that will be created within a year of the two-year anniversary of the alien's admission as a conditional permanent resident or adjustment to conditional permanent resident may generally be considered to be created within a reasonable period of time.  Jobs projected to be created beyond that time horizon usually will not be considered to be created within a reasonable time, unless extreme circumstances, such as *force majeure*, are presented.

## B.  Regional Center Amendments

Because businesses strategies constantly evolve, with new opportunities identified and existing plans improved, the instructions to Form I-924 provide that a regional center may amend a previously-approved designation.  The Form I-924 provides a list of acceptable amendments, to

include changes to organizational structure or administration, capital investment projects (including changes in the economic analysis and underlying business plan used to estimate job creation for previously-approved investment opportunities), and an affiliated commercial enterprise's organizational structure, capital investment instruments or offering memoranda.

Such formal amendments to the regional center designation, however, are not required when a regional center changes its industries of focus, its geographic boundaries, its business plans, or its economic methodologies.  A regional center may elect to pursue an amendment if it seeks certainty in advance that such changes will be permissible to USCIS before they are adjudicated at the I-526 stage, but the regional center is not required to do so.  Of course, all regional centers "must provide updated information to demonstrate the center is continuing to promote economic growth, improved regional productivity, job creation, or increased domestic capital investment in the approved geographic area . . . on an annual basis," 8 C.F.R. § 204.6(m)(6), through the filing of their annual Form I-924A.

### C.        Deference to Previous Agency Determination

Distinct EB-5 eligibility requirements must be met at each stage of the EB-5 immigration process.  Where USCIS has evaluated and approved certain aspects of an EB-5 investment, that favorable determination should generally be given deference at a subsequent stage in the EB-5 process.  This policy of deference is an important part of ensuring predictability for EB-5 investors and commercial enterprises (and the persons they employ), and also conserves scarce agency resources, which should not ordinarily be used to duplicate previous adjudicative efforts.

As a general matter, USCIS will not reexamine determinations made earlier in the EB-5 process, and the earlier determinations will be presumed to have been properly decided.  Where USCIS has previously concluded that an economic methodology satisfies the requirement of being a "reasonable methodology" to project future job creation as applied to the facts of a particular project, USCIS will continue to afford deference to this determination for all related adjudications, so long as the related adjudication is directly linked to the specific project for which the economic methodology was previously approved.  For example, if USCIS approves a Form I-924 or Form I-526 presenting a *Matter of Ho* compliant business plan and a specific economic methodology, USCIS will defer to the finding that the methodology was reasonable in subsequent adjudications of Forms I-526 presenting the same related facts and methodology.  However, USCIS will still conduct a de novo review of each prospective immigrant investor's lawful source of funds and other individualized eligibility criteria.

Conversely, a previously favorable decision may not be relied upon in later proceedings where, for example, the underlying facts upon which a favorable decision was made have materially changed, there is evidence of fraud or misrepresentation in the record of proceeding, or the previously favorable decision is determined to be legally deficient.  A change in fact is material if the changed circumstances would have a natural tendency to influence or are predictably capable of affecting the decision.  *See Kungys v. United States*, 485 U.S. 759, 770-72 (1988) (defining materiality in the context of denaturalization).  Where a new filing involves a different project from a previously-approved filing, or the same project but with material changes to the

project plan, deference will not be afforded to the previous adjudication because the agency is being presented with the given set of facts for the first time.

Since prior determinations will be presumed to have been properly decided, a prior favorable determination will not be considered legally deficient for purposes of according deference unless the prior determination involved an objective mistake of fact or an objective mistake of law evidencing ineligibility for the benefit sought, but excluding those subjective evaluations related to evaluating eligibility.  Unless there is reason to believe that a prior adjudication involved an objective mistake of fact or law, USCIS should not reexamine determinations made earlier in the EB-5 process.  Absent a material change in facts, fraud, or willful misrepresentation, USCIS should not re-adjudicate prior USCIS determinations that are subjective, such as whether the business plan is comprehensive and credible or whether an economic methodology estimating job creation is reasonable.

### D.     Material Change

The process of establishing a new business and creating jobs depends on a wide array of variables over which an investor or the creator of a new business may not have any control.  The very best of business plans may be thrown off, for example, because of a sudden lack of supply in required merchandise, an unexpected hurricane that devastates an area in which the new business was to be built, or a change in the market that the business is intended to serve.

The effect of changed business plans on a regional center or an individual investor's immigration status may differ depending on when the change is made relative to the alien investor's status in the United States.

### 1.     Investors Who Have Not Obtained Conditional Lawful Permanent Resident Status

It is well-established that in visa petition proceedings, a petitioner must establish eligibility at the time of filing and that a petition cannot be approved if, after filing, the petitioner becomes eligible under a new set of facts or circumstances.  *See, e.g.*, *Matter of Izummi*, 22 I. & N. Dec. at 176 ("If counsel had wished to test the validity of the newest plan, which is materially different from the original plan, he should have withdrawn the instant petition and advised the petitioner to file a new Form I-526.").  In addition, the petitioner must continue to be eligible for classification at the time of adjudication of the petition.  8 C.F.R. § 103.2(b)(1).

Thus, consistent with *Matter of Izummi*, if there are material changes to a Form I-526 at any time after filing, the petition cannot be approved.  Under these circumstances, if, at the time of adjudication, the petitioner is asserting eligibility under a materially different set of facts that did not exist when the petition was filed, he or she must file a new Form I-526 petition.  For example, if a petitioner files a Form I-526 petition purporting to be associated with a particular project within the scope of an approved regional center but, subsequent to filing, it is determined that the proceeds of the investment will be directed to a job-creating entity in an entirely different project, the petition may not be approved.

A deficient Form I-526 petition may not be cured by subsequent changes to the business plan or factual changes made to address any other deficiency that materially alter the factual basis on which the petition was filed.  The only way to perfect material changes under these circumstances is for the immigrant investor to file a new Form I-526 petition to correspond to the changed plans.

Similarly, if, after the approval of a Form I-526 petition but before an alien investor has been admitted to the United States or adjusted his or her status pursuant to that petition, there are material changes to the business plan by which the alien intends to comply with the EB-5 requirements, the alien investor would need to file a new Form I-526 petition.  Such material changes would constitute good cause to revoke the approved petition and would result in the denial of admission or an application for adjustment of status.

## 2.      Investors Who Have Obtained Conditional Lawful Permanent Resident Status

Historically, USCIS has required a direct connection between the business plan the investor provides with the Form I-526 and the subsequent removal of conditions.  USCIS would not approve a Form I-829 petition if the investor had made an investment and created jobs in the United States if the jobs were not created according to the plan presented in the Form I-526.  While that position is a permissible construction of the governing statute, USCIS also notes that the statute does not require that direct connection.  In order to provide flexibility to meet the realities of the business world, USCIS will permit an alien who has been admitted to the United States on a conditional basis to remove those conditions when circumstances have changed.  An individual investor can, at the prescribed time, proceed with his or her Form I-829 petition to remove conditions and present documentary evidence demonstrating that, notwithstanding the business plan contained in the Form I-526, the requirements for the removal of conditions have been satisfied.  Pursuant to this policy, USCIS will no longer deny petitions to remove conditions solely based on failure to adhere to the plan contained in the Form I-526 or to pursue business opportunities within an industry category previously approved for the regional center.

It is important to note that a Form I-526 must be filed in good faith and with full intention to follow the plan outlined in that petition.  If the alien investor does not demonstrate that he or she filed the Form I-526 in good faith, USCIS may conclude that the investment in the commercial enterprise was made as a means of evading the immigration laws.  Under these circumstances, USCIS may terminate the alien investor's conditional status as required by 8 U.S.C. § 1186b(b)(1)(A).

Furthermore, nothing in this change in policy relieves an alien investor from the requirements for removal of the conditions as set out in 8 U.S.C. § 1186b(d)(1) and 8 C.F.R. § 216.6(a)(4).  Thus, even in the event of a change in course, a petitioner must always be able to demonstrate (1) that the required funds were placed "at risk" throughout the period of the petitioner's residence in the United States, and (2) that the required amount of capital was made available to the business or businesses most closely responsible for creating the employment; (3) that this "at risk" investment was "sustained throughout" the period of the applicant's residence in the United States; and (4) that the investor created (or maintained, if applicable), or can be expected to

create within a reasonable period of time, the requisite number of jobs.  Accordingly, if an alien investor fails to meet any of these requirements, he or she would not be eligible for removal of conditions.

While changed circumstances after the investor has been admitted in conditional lawful permanent resident status may not require the filing of an amended Form I-526 petition in order for the investor to proceed with and obtain an approval of a Form I-829 petition, changed circumstances which are material may prevent deference from being accorded to the prior determination and a more extensive review will need to be conducted at the Form I-829 stage. For example, in the case of a petition affiliated with a regional center, the petitioner will only receive deference to a prior determination of indirect job creation if the new business plan falls within the scope of the regional center (as defined by either the initial approval or by subsequent amendment to the regional center) with which the petitioner is affiliated.  So if an alien was admitted to the United States based on a petition related to a regional center that was only approved for certain projects related to the food service industry, if the proceeds of the alien's investment were subsequently redirected to an alternate project within the job-creating entity, that project would have to be within the food service industry to continue to receive deference to the prior determination of the indirect job creation of the regional center program.[5]  Similarly, if a change in plan required the liquidation of an investment and reallocation of that investment into either another  job-creating entity or new commercial enterprise, the petition may not comply with the requirements to invest and sustain the investment throughout the period of the alien's residence in the United States.  8 U.S.C. § 1186b(d)(1)(A)(ii); 8 C.F.R. §§ 216.6(a)(4)(iii), (c)(1)(iii).

However, there may be advantages to closely adhering to the business plan described in the Form I-526.  If the alien investor follows the business plan described in the Form I-526, USCIS will not revisit certain aspects of the business plan, including issues related to the economic analysis supporting job creation.  Thus, during review of the Form I-829, USCIS will generally rely on the previous adjudication if the petitioner claims to have fulfilled the business plan that accompanied the Form I-526 petition.  This is consistent with the general policy mandating USCIS deference to previous determinations set forth above in section IV.C.

To improve processing efficiencies and predictability in subsequent filings (i.e. application of deference), many regional centers may choose to amend the Form I-924 approval to reflect job creation in additional industries not previously reviewed at the time of project approval, as well as the resulting change in economic analysis and job creation estimates.  Such amendments, however, are not required in order for individual investors to proceed with filing Forms I-526 or Forms I-829 based on the additional jobs created, or to be created, in additional industries.

---

[5] Industry codes are useful for determining that verifiable detail has been provided and the estimated job creation in the economic methodology is reasonable, however it should be noted that these industry codes are used for informational purposes in estimating job creation and do not limit the economic or job creating activity of an approved regional center or its investors.  Jobs created in industries not previously identified in the economic methodology may still be credited to the investors in subsequent Form I-526 and Form I-829 filings, as long as the evidence in the record establishes that it is probably true that the requisite jobs are estimated to be created, or have been created, in those additional industries.

USCIS will develop a mechanism for the regional center or the immigrant investor to notify USCIS when substantive material changes need to be communicated.  Although USCIS will no longer deny petitions solely as a result of a departure from the business plan described in the Form I-526, the certainty afforded by adherence to a previously approved business plan may be eroded as a regional center project departs from that plan.  Therefore, if the immigrant investor is seeking to have his or her conditions removed based on a business plan not consistent with the approved Form I-526, the alien investor may need to provide evidence to demonstrate the element of job creation or any other requirement for removal of conditions that is called into question by the changed plan.

Similarly, while the adjudication of Form I-829 petitions will be determined by the facts of an individual case, USCIS may need to revisit issues previously adjudicated in the Form I-526, such as the economic analysis underlying the new job creation in cases where the changes could affect the previously decided issues.  For example, if the investment proceeds were diverted from a job-creating entity in one industry to another, and the applicable multipliers changed, USCIS would need to verify that the change did not affect the job creation estimates.  Similarly, if the number of investors on a given project changed dramatically, or if certain assumptions or benchmarks made in the economic assessment were not satisfied, USCIS may need to revisit prior determinations to ensure that the requirements for removal of conditions have been met.

USCIS recognizes the fluidity of the business world and therefore allows for material changes to a petitioner's business plan made after the petitioner has obtained conditional lawful permanent resident status.  However, immigrant investors, and the regional centers with whom they associate, should understand that availing themselves of this flexibility does decrease the degree of predictability they will enjoy if they instead adhere to the initial plan that is presented to and approved by USCIS.

## VI.    Conclusion

Congress created the EB-5 Program to promote immigrants' investment of capital into new commercial enterprises in the United States so that new jobs will be created for U.S. workers. The EB-5 Program provides for flexibility in the types and amounts of capital that can be invested, the types of commercial enterprises into which that capital can be invested, and how the resulting jobs can be created.  This flexibility serves the promotion of investment and job creation and recognizes the dynamics of the business world in which the EB-5 Program exists. We will continue to adjudicate EB-5 cases with vigilance to program integrity and mindful of these important principles.

## VII.   Use

This PM is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications and petitions.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

# TAB 8

# Memorandum



| Subject | Date |
|---|---|
| Alien Entrepreneurs under Section 203(b)(5) of the Immigration and Nationality Act | SEP 1 0 1993 |

To Lawrence J. Weinig
Acting Associate Commissioner
Examinations

    ATTN: Edward H. Skerrett
           Chief, Immigrant Branch

From    Office of the
General Counsel

## Background

You have asked our office to assist you in responding to a letter from Senators Kennedy and Simpson regarding the scope of section 203(b)(5) of the Immigration and Nationality Act, as amended (the "Act"). In their letter, Senators Kennedy and Simpson raise the following legal issues:

## Questions Presented

1. Whether a mutual investment fund constitutes a "commercial enterprise" for purposes of section 203(b)(5) of the Immigration and Nationality Act, as amended (the "Act")?

2. Whether an arrangement for the disposition of an investment after the two-year conditional residence period prescribed under section 216A of the Act, such as by redemption right, third-party purchase or otherwise, satisfies the "at risk" requirement of 8 C.F.R. § 204.6(j)(2)?

3. Whether a capital investment backed by a third party guaranty or other similar promise to reimburse the alien, either in whole or in part, in the event the investment fails or the investment fund is otherwise unable to return the alien's capital, is "at risk" for purposes of 8 C.F.R. § 204.6(j)(2)?

4. Whether an alien who makes a capital investment in the requisite dollar amount in an "ongoing" commercial enterprise which provides full-time permanent employment for at least ten qualifying employees is eligible for classification under section 203(b)(5) of the Act where the capital investment is necessary to sustain current employment or successfully complete an ongoing project, but does not create new full-time jobs?

- 1 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

5. Whether the Immigration and Naturalization Service (the "Service") should "predetermine" any element necessary to establish eligibility under section 203(b)(5) of the Act prior to the time an alien actually submits to the Service a completed visa petition?

## Summary Conclusions

1. Yes. Under 8 C.F.R. § 204.6(e), a mutual investment fund constitutes a "commercial enterprise" for purposes of section 203(b)(5) of the Act. However, in order to qualify for classification under section 203(b)(5) of the Act, an alien investing in such a fund must be "engaged in the management of the new commercial enterprise" as required by 8 C.F.R. § 204.6(j)(5). Moreover, if the investment fund is organized as a partnership, an alien seeking classification under section 203(b)(5) of the Act must show that he or she is engaged in either the direct management or policy-making activities of the partnership.

2. Yes. An arrangement for the disposition of an investment after the two-year conditional residence period, such as by redemption right, third-party purchase or otherwise, may, under certain circumstances, satisfy the "at risk" requirement of 8 C.F.R. § 204.6(j)2). To ensure that the capital the alien has invested remains "at risk" during the entire period of conditional residence, as required by 8 C.F.R. § 204.6(j)(2), the agreement for disposition of the investment must expressly provide, in writing, that the amount the alien will receive therefrom shall not exceed the fair market value of the investment at the time of disposition.

3. In general, yes. A capital investment which is backed by a third-party guaranty or other similar promise to reimburse the alien, either in whole or in part, in the event the investment fails or the investment fund is otherwise unable to return the alien's capital, will generally be "at risk" for purposes of 8 C.F.R. § 204.6(j)(2). However, where the third-party guaranty is backed by an unconditional federal, state or municipal obligation, the capital investment will not be sufficiently "at risk" for purposes of 8 C.F.R. § 204.6.

4. No. An alien who makes a capital investment in the requisite dollar amount in an "ongoing" commercial enterprise which provides full-time permanent employment for at least ten qualifying employees is not eligible for classification under section 203(b)(5) of the Act where the capital investment is necessary to sustain current employment or successfully complete an ongoing project, but does not create new jobs.

- 2 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

5.  No.  As a matter of law and policy, the Service should not rule on requests from investment funds for designation as qualifying investments under section 203(b)(5), or on any other element required by that section of the Act prior to the time an alien actually submits to the Service a completed visa petition.

## Discussion

### I.  Statutory Requirements

Section 203(b)(5) of the Act provides, in pertinent part, that

> [v]isas shall be made available . . . to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise--
>
> > (i) which the alien has established,
> > (ii) in which such alien has invested (after the date of the enactment of the Immigration Act of 1990), or, is actively in the process of investing, capital in an amount specified in subparagraph (C),[1] and
> > (iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

### II.  Legislative History

**A.  Congress intended that an alien immigrating to this country pursuant to section 203(b)(5) of the Act actively participate in the activities of the new commercial enterprise**

Section 203(b)(5) of the Act was enacted in 1990 as part of the Immigration Act of 1990 ("IMMACT 90").  Section 121 of Pub. L. No. 101-649, 104 Stat. 4978 (Nov. 29, 1990).  This section was originally introduced as Senate Bill No. 358 in 1989.  See 136

---

[1]Section 203(b)(5)(C) provides that, except in the case of "targeted areas," the amount of capital required under subparagraph (A) shall be $1,000,000.  Under 8 C.F.R. § 204.6(f), the amount of capital necessary to make a qualifying investment in a targeted employment area within the United States is $500,000.

- 3 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

Cong. Rec. at S7622, 7626 (daily ed. July 11, 1989). As is clear from the floor debate on this bill, the purpose of this provision was to "create[] jobs, growth, and opportunity for Americans," see Remarks of Sen. Gramm, id. at S7770, and not to enable the rich to "buy their way into this country." See Remarks of Sen. Bumpers, id. at S7769. As stated by Senator Kennedy, "[w]e do not say if you just have the million dollars you come in here . . . We say you have to create . . . 10 new jobs." Remarks of Sen. Kennedy, id. at S7771; see also Remarks of Sen. Simpson, id. at S7773. Thus, as explained in the Senate Report accompanying this bill, this provision

> is intended to create new employment for U.S. workers and to infuse new capital into the country, not to provide immigrant visas to wealthy individuals. The committee endorses the present investor requirements as described in 22 C.F.R. § 40.7(a)(14), note 1.3 (except for the investment amount and number of individuals to be employed, and except for note 1.3-6).

S. Rep. 101-55 at 21.[2]

Section 40.7(a)(14) provided that the exclusionary ground for immigrants failing to possess a valid labor certification did not apply if the alien could establish: (a) that the purpose of his or her admission was to engage in an enterprise in which the alien had invested, or was actively in the process of investing, a certain amount of capital; (b) that he or she would be a principal manager of the enterprise; and (c) that he or she would provide employment to at least one U.S. citizen or lawful permanent resident other than a family member. Former 22 C.F.R. § 40.7(a)(14)(iii)(C); see also 9 F.A.M., Note 1.3 to former 22 C.F.R. § 40(a)(14).

Note 1.3-3 to former 22 C.F.R. § 40.7(a)(14) provided, in pertinent part, that

> when assessing the requirement . . . that the alien be a principal manager of the enterprise, the consular officer must examine the position to be held by the applicant as it relates to the entire business organization. It is important to determine the direct effect on the enterprise of the alien's measure of control over the business, the structure of the organization, and the business charter. [T]he regulation requires only that the applicant be "a

---

[2]Subsequent to the publication of S. Rep. 101-55, the Department of State deleted 22 C.F.R. § 40.7(a)(14) and the interpretive notes to this section, which it had published in Volume 9 of the Foreign Affairs Manual.

- 4 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

principal manager" and not "the principal manager." If it can be established that the applicant possesses and will engage in managerial duties which significantly affect the course or direction of the business, then the applicant meets the managerial requirement. _

It is therefore clear from the legislative history that, in enacting current section 203(b)(5), Congress did not intend for an alien simply to "sit down and write out a check for a million dollars [or $500,000 in a targeted area] and get a visa to come into the country," see Remarks of Senator Sarbanes, 136 Cong. Rec. at S7775 (July 12, 1989), but instead, intended that the alien "earn" his or her visa by actively participating in a new commercial enterprise in which the alien invested.

**B. Congress intended that an alien seeking to immigrate to this country pursuant to section 203(b)(5) of the Act place his or her capital "at risk" for the two-year period following admission as a lawful permanent resident**

It is also clear from the legislative history of section 203(b)(5) of the Act that Congress was concerned with the possibility that this visa category could be used by unscrupulous persons to engage in visa fraud. Congress sought to prevent fraudulent investments by requiring that the alien's commitment to the new commercial enterprise be a genuine one. The alien is therefore required to demonstrate the sincerity of his or her capital commitment by sustaining the investment for a two-year period following the alien's admission as a lawful permanent resident. See section 216A of the Act, 8 U.S.C. § 1186b. Moreover,

> the funds invested [must be] the alien's own funds. The concept of investment connotes the placing of funds or other capital assets at risk in the hope of generating a return on the funds risked.

Note 1-1.3 to former 22 C.F.R. § 40.7(a)(14),

## III. Regulatory Requirements

### A. "Commercial Enterprise" Requirement

To qualify for classification under section 203(b)(5) of the Act, an alien must show that he or she has invested in, or is in the process of investing in a new "commercial enterprise." As defined in 8 C.F.R. § 204.6(e), the term "commercial enterprise" means any for-profit activity formed for the ongoing conduct of lawful business, including a joint venture, a holding company and its wholly owned subsidiaries, or any other entity which may be publicly or privately owned. Under this broad definition, it is clear that an investment fund which pools investments into real

- 5 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

estate or other for-profit projects qualifies as a "commercial enterprise." Moreover, as long as the business is "for profit," it is immaterial whether it is co-owned by a government entity or entities.

## B. Active Investor Requirement

In addition to demonstrating the existence of a "commercial enterprise," a petitioner seeking benefits under section 203(b)(5) of the Act must also show that he or she

is or will be engaged in the management of the new commercial enterprise, either through the exercise of day-to-day managerial control or through policy formulation, as opposed to maintaining a purely passive role in regard to the investment . . .

8 C.F.R. § 204.6(j)(5). Where the new commercial enterprise is either a limited or general partnership, the petitioner must present evidence that he or she is engaged in either direct management or policy making activities. 8 C.F.R. §.204.6(j)(5)(iii). If the petitioner is a limited partner and the limited partnership agreement provides the petitioner with certain rights, powers, and duties normally granted to limited partners under the Uniform Limited Partnership Act, the petitioner will be considered sufficiently engaged in the management of the new commercial enterprise. 8 C.F.R. § 204.6(j)(5)(iii).[3] To ensure that a limited partner seeking benefits under section 203(b)(5) of the Act is not maintaining a purely passive role in regard to the investment, but is actually engaged in direct management or policy-making activities, the alien must not only establish that the limited partnership agreement provides him or her with such rights, powers, and duties, but also that he or she: (1) actually has exercised, or is actively in the process of exercising, these rights and powers, and (2) actually has performed, or is actively in the process of performing, these duties.

---

[3]Although 8 C.F.R. § 204.6(j)(5)(iii) makes reference to the ULPA, which was approved by the National Conference of Commissioners on Uniform State Laws in 1916, we note that the National Conference on Uniform State Laws approved the Revised Uniform Limited Partnership Act ("RULPA") in 1976 which superseded the original ULPA. See 6 Uniform Laws Annotated 299 (West 1993). Therefore, the reference to the ULPA in 8 C.F.R. § 204.6(j)(5)(iii) also includes the RULPA.

- 6 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

## C. "At Risk" Requirement

To show that the alien meets the requirement in section 203(b)(5) that he or she have invested, or actively be in the process of investing, the required amount of capital,

> the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital.[4]

8 C.F.R. § 204.6(j)(2).

Moreover, under section 216A(b)(1) of the Act, an alien entrepreneur's permanent resident status is conditioned on the alien's sustaining the requisite capital investment for the two-year period following the date he or she obtained such status. It follows that, during this period, the alien's investment must remain "at risk." Thereafter, provided the alien complies with the requirements of section 216A of the Act, the conditions on his or her permanent resident status will be removed.[5]

## D. Job Creation Requirement

As discussed above, the Act specifically requires that an alien's investment "create" full-time employment for not fewer

---

[4]It is clear from the language of 8 C.F.R. § 204.6(j)(2) that an alien will not be deemed to have "actually committed" the requisite capital, and therefore will not meet the statutory requirement that he or she have invested, or be actively in the process of investing, the requisite capital if he or she conditions the investment on the success of the visa petition and/or application for permanent residence.

[5]To remove the conditional basis of his or her permanent residence, the alien entrepreneur, among other things, must submit to the Attorney General, during the ninety-day period preceding the second anniversary of his or her obtaining permanent residence, a petition containing facts and information demonstrating that a commercial enterprise was established by the alien; the alien invested or was actively in the process of investing the requisite capital; and the alien sustained the above actions throughout the period of the alien's residence in the United States. Section 216A(c) and (d) of the Act, 8 U.S.C. § 1186b(c) and (d).

- 7 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

than 10 United States citizens" and certain other persons.
Section 203(b)(5)(A)(iii) of the Act, 8 U.S.C.
§ 1153(b)(5)(A)(iii). Moreover, as we have noted, the clear
Congressional purpose in enacting section 203(b)(5) was to
promote job creation. Consistent with the language and intent of
the statute, the regulations provide that "[a] petition submitted
for classification as an alien entrepreneur must be accompanied
by evidence that the . . . new commercial enterprise . . . will
create full-time positions for not fewer than 10 qualifying
employees." 8 C.F.R. § 204.6(j). It is therefore clear that an
investment which merely preserves the status quo with respect to
qualifying employees, but does not result in the requisite job
growth will not suffice for purposes of section 203(b)(5),
regardless of any favorable impact such an investment may have on
the economy of the United States or the region.[6]

## IV. Investment Agreements

## A. Redemption and Similar Agreements

Significantly, nothing in either the statute or the relevant
regulations requires the alien to sustain the capital investment
after the conditions of his or her permanent residence have been
removed. Although the statute clearly provides that the
investment be "at risk" for the two-year period following
admission as a permanent resident, there is no requirement that
the capital remain at risk following this period. It is
therefore entirely appropriate for an alien to enter into an
agreement with the investment fund whereby the seller agrees to
repurchase the investor's shares upon, but not before, removal of
the conditional basis of the alien's permanent residence.

It is important to note, however, that a repurchase
agreement may not be used as a vehicle to avoid or reduce the
risk of capital loss to the alien investor during the two-year
period of conditional residency set forth in section 216A of the
Act, 8 U.S.C. § 1186b. To ensure that the capital truly remains
at risk during this two-year period, we believe that the
repurchase agreement should expressly provide that the price of
the shares to be resold at the time of the repurchase shall not
exceed the fair market value of the shares at that time. Any
other repurchase arrangement would impermissibly shift the risk
of loss from the investment from the alien to the party promising
to buy back the alien's interest in the investment.

---

[6]We note that, while the regulations specifically permit an
alien seeking classification under section 203(b)(5) to invest in
a pre-existing business see 8 C.F.R. § 204.6(h)(2) and (3), with
the exception of "troubled businesses," the requirement that the
investment create, as opposed to merely preserve, ten full-time
jobs for qualifying persons is an absolute one.

- 8 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

## B. Guaranty and Similar Agreements

Under C.F.R. § 204.6(j)(2), a petitioner must show that he or she has placed the required amount of capital "at risk" for the purposes of generating a return on the capital placed at risk. Neither the statute nor the regulations require, however, that that risk be an absolute one. We believe that aliens investing the relatively large amount of capital required for immigrant investor classification under section 203(b)(5) of the Act should be able to expect a relatively risk-free, minimum return on their investments. See Rose, The Immigrant Investor Visa, 29 San Diego L. Rev. 615, 630 (1992). Certainly nothing in the statute or the regulations requires an alien investor to engage in unsound or unorthodox business practices in order to obtain benefits under section 203(b)(5) of the Act. Given the wide variety of permissible forms of "for profit" business which will qualify as "commercial enterprises," the critical issue is whether second-stage[7] and other types of investments backed by third-party guaranties[8] and similar agreements can be deemed to be sufficiently "at risk" for purposes of 8 C.F.R. §204.6(j)(2).

It is our opinion that, in general, as long as an investor places his or her capital at commercial risk, the "at risk" requirement of 8 C.F.R. § 204.6(j)(2) will be met. While a third-party guaranty may reduce the investor's risk of loss, it is clear that, in most cases, such a third-party guaranty will not completely eliminate the commercial risk incurred by the alien in making the investment. See id. at 631. The strength

---

[7]One commentator has described a "second-stage investment" as, among other things, an investment "in which the immigrant investor invests in [a] new United States commercial enterprise, which in turn invests into a further venture." See 29 San Diego L. Rev. at 632.

[8]A "guaranty" is defined as "[a]n undertaking or promise that is collateral to [a] primary or principal obligation and that binds [the] guarantor to performance in [the] event of nonperformance by the principal obligor." Black's Law Dictionary 705 (6th ed. 1990). To induce investors to participate in an investment, the sponsor of an investment project may sometimes enter into a guaranty agreement with a third party, such as a bank, whereby the guarantor will agree to reimburse an investor, either in whole or in part, in the event the investment project becomes insolvent or the sponsor otherwise becomes incapable of meeting its obligations to the investor. A "guaranty" does not, of course, refer to property, theft, fire, or other standard forms of business insurance. Neither the statute nor the regulations restricts an investor from purchasing standard business insurance to protect his or her commercial enterprise.

- 9 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

of the third-party guaranty depends on a wide variety of factors, including, but not limited to, the financial solvency of the guarantor, the type of collateral supporting the guarantee, the extent of the guarantor's obligation, the extent the underlying investment fails, and the time for reimbursing the investor. See id. at 630-34. It is therefore clear that, unless the third-party guarantee is supported by collateral unconditionally backed by the full faith and credit of the federal, state or municipal government (e.g., U.S. Treasury obligations or municipal bonds placed in escrow),[9] an alien investor cannot be entirely certain that he will be able to recover his capital investment in the event the guarantor becomes financially insolvent or incapable of meeting its third-party contractual obligation to the investor.[10]

In light of the above, we conclude that requiring alien investors to place large amounts of capital place at absolute risk, without some private third-party guaranty that they will receive a minimum rate of return on their investment, would not only be contrary to current reasonable business practices, but would be violative of Congress's intent to encourage foreign capital investment in this country for the purposes of job creation. On the other hand, we believe that where a third-party guaranty is unconditionally backed by the full faith and credit of a federal, state or municipal authority, there will be insufficient risk of the investor being unable to recover his or

---

[9]In light of the relative rarity of even financially weak state or municipal governments or agencies defaulting on their obligations, we believe that guarantees backed unconditionally by such obligations are not sufficiently "at risk" to qualify an alien investor under 8 C.F.R. § 204.6(j)(2). We are aware, however, that, in certain cases, a governmental obligation may be conditioned on the occurrence of an event or events or the performance of others. See e.g., United States v. Carman, 577 F.2d 556, 563 (9th Cir. 1978) (federally backed student loans at risk because federal guarantee conditioned on certain actions of schools and students). In cases where the third-party guaranty is not backed unconditionally by a governmental agency, we believe the investment will be sufficiently "at risk" for purposes of 8 C.F.R. § 204.6(j)(2).

[10]Of course, even if a guarantee is backed by U.S. Treasury obligations placed in escrow, the investor faces a market risk in the event that the guarantor is forced to sell the obligations at a discounted price in order to reimburse the investor.

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

her capital in the event the investment fails for purposes of 8 C.F.R. § 204.6(j)(2).[11]

## V.   As a matter of law and policy, the Service should not preapprove investment funds as qualifying investments under Section 203(b)(5) of the Act

We are aware that certain investment sponsors seek preapproval of their investment programs as a means of attracting capital from prospective immigrants. Preapproval could serve as a strong inducement to such aliens to invest in commercial enterprises in this country. We nevertheless suggest that, as a matter of law and policy, the Service should not "preapprove" investment funds as qualifying investments under section 203(b)(5) of the Act.

Under 8 C.F.R. § 204.6(c), a petition for classification as an alien entrepreneur may only be filed by an alien on his or her own behalf. As in other visa petition cases, it is the petitioner's burden to establish eligibility for visa classification at the time of filing of the petition. See Matter of Great Wall, 18 I&N Dec. 142, 145 (Acting Reg. Comm'r 1977); Matter of Katigbak, 14 I&N Dec. 45, 49 (BIA 1971). Should the Service determine that an investment qualifies for purposes of section 203(b)(5) of the Act before an alien files his or her petition, however, the petitioner would be relieved from meeting an essential part of this burden. See 8 C.F.R. § 204.6(j). If such preapproval were binding on the Service, an alien would be able to qualify for classification under section 203(b)(5) of the Act even if the investment no longer remained qualifying at the time the petition is filed. Since a binding preapproval policy could result in violations of the statute, it is clear that any preapproval policy could only be advisory in nature. In light of the nonbinding nature of such preapproval, reliance by prospective immigrant investors on any such determination would be inappropriate. Similarly, marketing an investment as "preapproved" by the Service in order to attract foreign investors would also be improper.

We also note that preapproval of an investment as "qualifying" for purposes of section 203(b)(5) of the Act could be construed by certain investors as an endorsement by the Service of the underlying merits of the investment, even if such

---

[11]It is conceivable that some guaranties will be directly backed only partially by federal, state or municipal obligations. In such cases, it will be necessary to conduct a close analysis regarding the extent of protection provided by such governmental sources in order to determine whether the investment meets the "at risk" requirements of 8 C.F.R. § 204.6(j)(2).

- 11 -

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

preapproval were accompanied by an express disclaimer by the Service that preapproval does not constitute such an endorsement. In addition, adopting a policy of nonbinding preapproval would result in a duplication of efforts since the Service would be required to readjudicate the issue of whether an investment is qualifying if and when a petition actually is filed.

Paul W. Virtue
Acting General Counsel

- 12 -

Appendix III

**45206** **Federal Register** / Vol. 60, No. 168 / Wednesday, August 30, 1995 / Notices

**DEPARTMENT OF STATE**

**Office of the Secretary**

[Public Notice 2249]

**Extension of the Restriction on the Use of United States Passports for Travel to, in, or Through Lebanon**

On January 26, 1987, pursuant to the authority of 22 U.S.C. 211a and Executive Order 11295 (31 FR 10603), and in accordance with 22 CFR 51.73(a)(3), all United States passports, with the exception of passports of immediate family members of hostages in Lebanon, were declared invalid for travel to, in, or through Lebanon unless specifically validated for such travel. This action was taken because the situation in Lebanon was such that American citizens there could not be considered safe from terrorist acts.

I have concluded that Lebanon continues to be an area "* * * where there is imminent danger to the public health or the physical safety of United States travelers" within the meaning of 22 U.S.C. 211a and 22 CFR 51.73(a)(3).

Accordingly, all United States passports shall remain invalid for travel to, in, or through Lebanon unless specifically validated for such travel under the authority of the Secretary of State.

This Public Notice shall be effective upon publication in the **Federal Register** and shall expire at the end of six months unless extended or sooner revoked by Public Notice.

Dated: August 22, 1995.

**Warren Christopher,**
*Secretary of State.*
[FR Doc. 95–21443 Filed 8–28–95; 11:32 am]
**BILLING CODE 4710-10-M**

[14] 15 U.S.C. 78s(b)(2).
[15] 17 CFR 200.30–3(a)(12).

AILA InfoNet Doc. No. 93091090. (Posted 09/10/93)

# TAB 9



AMERICAN
IMMIGRATION
LAWYERS
ASSOCIATION

*Celebrating 70 Years*

# INS on EB-5 Investors

*AILA Doc. No. 97102091 | Dated October 20, 1997*

Subject: EB-5 Investors

Date: October 20, 1997

To: All Regional Directors
All District Directors (Including Foreign) (HQADN)
All Officers-In-Charge (Including Foreign)
All Port Directors
All Service Center Directors
Director, Office of Administrative Appeals
Director, ODTF-Glynco, GA and Artesia, NM
All Regional Counsels
The purpose of this memorandum is to provide necessary guidance with respect to adjudicating Form I-526, Petition for Alien Entrepreneur, under section 203(b)(5) of the Immigration and Nationality Act, as amended (the Act), and existing regulations. In addition, this memorandum provides instructions on the proper procedures for handling a number of immigrant investor petitions which were returned recently at the request of certain consulates.

Background

The great majority of immigrant investor petitions are filed by aliens who are seriously committed to investing their capital in United States businesses, often in targeted areas of high unemployment or in struggling businesses, and creating jobs in the United States. These investments involve a genuine commitment on the part of the prospective immigrant investor, as evidenced by, among other things, the placing of the full statutory amount at risk, as is required by current regulations. See 8 CFR 204.6(j)(2). On the other hand, a limited number of petitions appear to involve investment programs designed to eliminate the "at risk" requirement of the current regulations. This memorandum discusses certain kinds of financial agreements underlying immigrant investor (EB-5) petitions that require particular scrutiny to determine compliance with the statutory requirements.

General Guidelines for Adjudicating Immigrant Investor Petitions.

The following general guidelines apply primarily to the adjudication of Form I-526, Petition by Alien Entrepreneur. Service officers are reminded, however, that all approved investments should be scrutinized anew when investor files the Form I-829, Petition to Remove Conditions, to ensure that the full statutory capital amount has remained truly at risk during the entire period of the alien's conditional residence. Should an adjudicator determine at that time that the investor has not, "in good faith, substantially met the capital investment requirement of the statute and maintained his or her capital investment over the two year conditional residence," as well as complied with the other requirements of 8 CFR 216.6(c)(1)(iii), the adjudicator should deny the petition.

1. Proper method for determining whether an investment is "at risk for the purpose of generating a financial return."

All investments must meet the requirement of 8 CFR 204.6(j)(2) that the fully statutory amount be placed at risk for the purpose of generating a financial return on the capital. The Service is aware that not all investments enterprises will generate a return and that, despite every effort, some will continue to operate at a loss for a period of time. However, the essence of an investment is the entrepreneurial use of capital to create more capital.

When the capital ultimately invested and used in, or made fully available to, a company is so minimal as to preclude the possible generation of a financial return, an investment cannot be considered to meet the above requirement. This is apparent, of example, when, after subtracting commissions, fees, and funds placed in a trust to which a particular business purportedly has access, the particular company cannot be reasonably deemed to be in control of enough of the required capita qwl to meet its stated objectives. Similarly, in certain cases, funds which are guaranteed to an investor by a limited partnership may be otherwise unavailable to the business and, therefore, cannot be considered capital placed at risk for the purposes of generating a financial return. Because each new commercial enterprise is unique, the determination of what constitutes too little available capital must be made on a case-by-case basis.

A. Trusts.

Investments must meet the statutory capital requirements provided at 8 CFR 204.6(f). Specifically, while under current regulations a petitioner is not precluded from investing capital in a new commercial enterprise by means of a business trust agreement, the terms of such a trust agreement may not prevent the "actual commitment of the required amount of capital." See 8 CFR 204.6(j)(2). Before a petition involving a trust may be approved, the alien must establish that the trust funds are fully available to the business for its use; there should no attempt by a partnership or trustee to exercise undue control over, otherwise limit access to, or pre-condition normal business use of the funds. If it appears to an adjudicating officer that the use of a particular trust agreement may in fact preclude the use of the full statutory capital amount by the new commercial enterprise, the adjudicating officer should require the alien to revise the trust

agreement to clarify that the capital will be fully available for use by the business upon approval of the petition. Moreover, as previously noted, agreements containing trust accounts must be closely scrutinized at the time a petition on Form I-829 is filed to remove conditions in order to determine whether the funds were actually made available, i.e., distributed from the trust, to the business.

B. Promissory Notes and Balloon Payments with Sell or Buy-Out Options

Current regulations allow investors to use promissory notes to demonstrate that the requisite capital has been place at risk. See 8 CFR 204.6(j)92)(v). For this reason, if all other statutory and regulatory requirements are met, an adjudicating officer may approve a petition involving a small initial down payment (e.g. $125,000) and execution of a promissory note to the new commercial enterprise for the balance of the requisite statutory amount. Further, under current regulations, the mere existence of a balloon payment even after the two year conditional period has lapsed does not by itself mean that a petition should be denied. To ensure that the alien investor has placed the full statutory capital amount at risk as required by the regulations, however, all investment arrangements involving a promissory note which provides for a balloon payment to be made some time after the conditional residency is remove must specifically prove that an investor may not exercise a sell option (and the new commercial enterprise cannot exercise a buy-out option) until the promissory note is paid in full. Moreover, as this office has previously instructed, no portion of the minimum capital investment may be used to make a payment on a promissory note. (See prior field instructions provided by this office in a memorandum dated December 16, 1996.)

Where an agreement specifically provides for redemption of the investment prior to the promissory note having been paid in full, the adjudicating officer should deny the petition. On the other hand, absent evidence to the contrary, where the agreement does not specifically grant the investor the option to sell or the new commercial enterprise to buy out the investment before the balloon payment is due, an adjudicator may not deny the petition based on a finding that the investor will not exercise a sell (or the new commercial enterprise a buy-out) option before the due date on the balloon payment.

2. Business Plans for Troubled Businesses.

Service officers must ensure that all petitions, including those involving investments in a troubled business, demonstrate that the new commercial enterprise will become a productive, successful enterprise that will generate a return on capital for the investor. See 8 CFR 204.6(j)(2). A petitioner must therefore establish that the investment is genuine and not merely designed to provide the alien with temporary repository of capital which the new commercial enterprise has no intent of using. In the case of a troubled business, the comprehensive business plan submitted in support of the petition pursuant to 8 CFR 204.6(j)(4)(ii) should clearly establish that the requisite capital has been, or will in fact be, made available for use by the new commercial enterprise.

3. Proceeds of Certain Lottery Schemes.

Investments must meet the requirement that the requisite capital is "owned by the alien entrepreneur" as provided by the definition of capital in 8 CFR 204.6(e). The current regulations do not specify, however, what constitutes "ownership" for purposes of this provision. Further, with the exception of the requirement that the statutory capital amount must have been obtained by lawful means, the current regulations do not place any restriction on the means by which an alien may have obtained such capital.

The Department of State has informed this office that certain prospective immigrant investors have invested money obtained through various heavily promoted overseas lottery schemes which are advertised to be used exclusively for the purposes of obtaining a green card through the alien entrepreneur classification. Under the current regulations, proceeds from such lotteries, if lawfully obtained, may count toward meeting the requisite capital amount, despite the fact that their use is restricted to investment in a new commercial enterprise.

Under current regulations, where a Department of State consular officer determines the investment program itself is fraudulent, or that the capital invested, or to be invested therein, was unlawfully obtained, then the consular office may appropriately return a petition to the Service for review and revocation pursuant to State Department guidelines.

4. Guaranteed Interest Payment Schemes

This office is aware of certain investment schemes involving promissory notes payable over a multi-year period which promise the investor "guaranteed interest payments" on the capital invested. Under the terms of such agreements, such guaranteed interest payments are applied toward meeting the alien's subsequent annual installment obligations. In some cases, the new commercial enterprise makes the "guaranteed interest payment" with funds received through outside loans or from capital contributed by other investors, and not generated directly from the business itself. This office recognizes that not all new businesses can be expected to become profitable immediately, and that therefore, a contractual provision for such guaranteed payments may, in certain cases, be consistent with a genuine investment. On the other hand, in certain instances, such guaranteed interest payment plans may be evidence that the business is not intended to generate a profit, and therefore, fails to meet the regulatory definition of a "commercial enterprise" set forth in 8 CFR 204.6(e). For this reason, adjudicators should scrutinize with care petitions involving the use of such "guaranteed interest payments" to ensure the legitimacy of the underlying investment scheme.

5. Promissory notes "secured" by property in the People's Republic of China.

Based on discussions with representatives of the State Department and the Department of Justice, Office of the Legal Adviser, it appears that real estate assets in the People's Republic of China

(PRC) owned by an alien entrepreneur may not be used to secure a promissory note since a Untied States promissory note does not appear to be directly enforceable against Chinese real property by a United States Court. It also appears that the PRC and the United States have no judicial agreements providing for full faith and credit of court judgments, and that therefore, a United States enterprise is not enforceable in the PRC. Based on this information, adjudicators should presume that such promissory notes are unsecured and therefore fail to meet the definition of "capital" at 8 CFR 204.6(e) or the "at risk" requirements of 8 CFR 204.6(j)(2)(v). In such cases, since the burden is on the petitioner to establish eligibility for classification under section 203(b)(5) of the Act, and the question of interpretation of foreign law is one of fact, an adjudicator should deny an EB-5 petition which relies on a promissory note secured by real estate in the PRC as "capital" unless the petitioner can overcome this presumption by submitting affidavits from experts in Chinese law, or other authoritative documentation, establishing that such real property is in fact "at risk."

There may be cases, however, in which PRC real property as well as other types of property or assets are used to secure a promissory note applied toward meeting the statutory capital requirement. In such cases, the fact that "unreachable" PRC real property is listed in addition to other assets does not, standing alone, warrant denial of the petition. Service Officers must carefully examine whether the value of the other properties and assets used to secure the note, together with any other invested capital, is sufficient to meet the minimum statutory capital requirement. In addition, Service Officers should determine whether the assets securing the note are truly "at risk," i.e., may be enforced against by the new commercial enterprise. If so, and the alien is otherwise eligible for classification under section 203(b)(5) of the Act, the petition should be approved.

(Courtesy of David Hirson)

*Cite as AILA Doc. No. 97102091.*

**American Immigration Lawyers Association** 1331 G Street NW, Suite 300 Washington, DC 20005

**Copyright © 1993-2016** American Immigration Lawyers Association.

# TAB 10

# USCIS EB-5 Training Materials (through May 2011)
## As released to IIUSA through a FOIA request

## Table of Contents
### (prepared by Karla Creech, Cornell Law School)

| | |
|---|---|
| **I  EB-5 PPT** | **2** |
| **A  Program Overview** | **2** |
| Background | 2 |
| Capital Investment | 3 |
| Job Creation | 5 |
| Obtaining Green Card Status | 10 |
| Statistics | 11 |
| Forms and Fees | 15 |
| Websites for Inquiries and Reporting Fraud | 18 |
| Expediting EB-5 Requests | 22 |
| Public Law 106-273 Case Information | 25 |
| **B  In-depth Capital Investment Issues** | **30** |
| Basics of Capital Investment Issues | 30 |
| Business Plans | 42 |
| Evidence | 46 |
| Escrow Agreements | 50 |
| Bankruptcy and Ceasing Operations | 62 |
| Trusts | 65 |
| **C  Basic Form I-526 Adjudication Issues** | **71** |
| Reviewing Form I-526 | 72 |
| **D  In-Depth Lawful Sources of Capital Issues** | **82** |
| Evidence | 84 |
| The Bank Secrecy Act (1970) | 101 |
| **E  Cases** | **104** |
| Federal EB-5 Cases | 104 |
| R.L. Investment Limited Partners | 105 |
| Golden Rainbow Freedom Fund v. Janet Reno | 107 |
| Golden Rainbow Freedom Fund v. John Ashcroft | 110 |
| Spencer Enterprises, Inc. v. United States | 112 |
| De Jong v. INS | 118 |
| Kenkhuis v. INS | 119 |
| Al-Humaid v. Roark | 122 |
| Chang v. United States | 125 |

**IIUSA DOC#0012012 via FOIA**
**(Pub: 2/24/12) - www.iiusa.org**

    AAO Precedents                                                    128
        Matter of Soffici                                            130
        Matter of Izummi                                             140
        Matter of Hsiung                                             162
        Matter of Ho                                                 168

II  Establishing a New Commercial Enterprise                          177

    A  Definition of a New Commercial Enterprise                      178

    B  The Creation of an Original Business                           180

    C  Purchasing and Restructuring an Existing Business              182

    D  Investing in an Existing Business                              185

III  Preponderance of Evidence Standard/ Burden of Proof and Standard of Proof;
      Involvement in a New Commercial Enterprise                      192

IV  Targeted Employment Areas (TEAs)                                  205

V  Understanding Tax Returns                                          230

VI  Form I-829                                                        251

    A  Regulatory References                                         252

    B  Financial Statements                                          270

VII  Job Creation                                                     287

    A  Job Creation Framework and Definitions                        288

    B  Allocation of Jobs in Pooled Investments                      295

    C  Direct vs. Indirect Jobs                                      297

    D  Seasonal Jobs                                                 299

    E  Maintaining Jobs in a "Troubled Business"                     301

    F  In-Depth Employment Issues; Definitions, Tax Forms, and Filing  307
        Forms                                                        307
            Form I-9                                                 307
            Form W-4                                                 308
            Form W-2                                                 309
            Form 941                                                 310
            Virginia Quarterly Employment Tax Report                 311
            Rhode Island Quarterly Tax Report                        312
            Schedule K-1, Form 1065                                  314

**IIUSA DOC#0012012 via FOIA
(Pub: 2/24/12) - www.iiusa.org**

|  |  |  |
|---|---|---|
| | Form 1120 | 316 |
| | Form 1040 | 320 |
| | Form 1120S | 322 |
| | Schedule C | 326 |
| | Form 1065 | 328 |
| Filing | | 332 |

**VIII Regional Center-Specific Issues** — **357**

  **A  Overview** — **357**

**IX Regional Centers and Immigrant Investor Pilot Program** — **408**

  **A  Overview** — **409**

  **B  Form I-924 Adjudication and Requirements of a Regional Center
Proposal** — **437**

  **C  Economic Analysis and Multipliers** — **451**
| | Direct Jobs Method | 457 |
| | Capital Investment Method | 463 |

**X EB-5 Cases, Public Laws, and Memoranda** — **475**

  **A  Public Law 107-273- Material Misrepresentation and Fraud** — **475**

  **B  INA:  Act 216A-Conditional Permanent Resident Status for Certain Alien Entrepreneurs,
Spouses, and Children** — **476**

  **C  Memorandum:  Handling of N-400s filed by Alien Entrepreneurs
with Pending I-829s** — **482**

  **D  Memorandum:  Adjudication of EB-5 Regional Center Proposals and
Affiliated Form I-526 and Form I-829 Petitions** — **532**

  **E  Matter of Treasure Craft of California LOS-N-14623-In Visa
Petition Proceedings (1972)** — **602**

  **F  In re HO, Petitioner-In Visa Petition Proceedings (1998)** — **608**

  **G  In re HSIUNG, Petitioner in Visa Petition Proceedings (1998)** — **618**

  **H  In re IZUMMI, Petitioner in Visa Petition Proceedings (1998)** — **623**

  **I  In re SOFFICT, Petitioner in Visa Petition Proceedings (1998)** — **655**

**XI Lawful Source Funds:  OFAC Requirements** — **666**

  **A  Overview of OFAC Regulations and Licensing** — **667**

**IIUSA DOC#0012012 via FOIA
(Pub: 2/24/12) - www.iiusa.org**

**XII Forms and Memoranda Concerning Immigrant Petition for Alien
    Entrepreneurship**                                                      **712**

**A  Form I-526:  Immigrant Petition by Alien Entrepreneurs**               **712**

**B  Memorandum:  EB-5 Alien Entrepreneurs-Job Creation and**              **715**
    **Full-Time Positions**

**C  Memorandum:  Delegation of Authority to Service Center Directors to Adjudicate Form I-829,
    Petition by Entrepreneur to Remove Conditions; Adjudication of N-400, Application for
    Naturalization when a Form I-829
    is Still Pending**                                                       **723**

**D  Form I-924:  Application for Regional Center Under Immigrant
    Investor Pilot Program**                                                 **744**

**E  Form I-924A, Supplement to Form I-924**

**F  Form I-829 Petition by Entrepreneur to Remove Conditions**             **766**

**IIUSA DOC#0012012 via FOIA
(Pub: 2/24/12) - www.iiusa.org**



# *Financial Statements*

- *Internally generated*

- *Compiled*

- *Reviewed*

- *Audited*

**IIUSA DOC#0012012 via FOIA**
**(Pub: 2/24/12) - www.iiusa.org**



# *Internally Generated Statements*

- *Created by management*

- *Reflect management's claims pertaining to information presented*

- *No determination of validity by outside individual*

- *Effectively hearsay; at best, the equivalent of an affidavit or self-attestation*

**IIUSA DOC#0012012 via FOIA
(Pub: 2/24/12) - www.iiusa.org**



# Compiled Financial Statements

- *Prepared by "outside" accountant, but no requirement of independence*

- *Based on petitioner's accounting records or representations*

- *CPA is only required to request revisions if statement appears blatantly irregular*

- *Not conclusive for ability to pay*

**IIUSA DOC#0012012 via FOIA
(Pub: 2/24/12) - www.iiusa.org**



# *Reviewed Financial Statements*

- *CPA required to obtain an understanding of petitioner's accounting system, apply standard analysis techniques and question responsible personnel within company*

- *CPA may prepare or may review internally generated statements*

- *Generally acceptable for ability to pay*

**IIUSA DOC#0012012 via FOIA**
**(Pub: 2/24/12) - www.iiusa.org**

282

# *Audits (1)*



- *Examination of financial data, accounting records, supporting evidence within and outside the company*

- *Evidence that sales occurred, goods were shipped, all expenses reported, etc.*

- *Accountant's professional reputation, business, etc. support data presented*

**IIUSA DOC#0012012 via FOIA**
**(Pub: 2/24/12) - www.iiusa.org**

283



# *Audits (2)*

- *Required by SEC for most publicly traded corporations*

- *Required by many banks for commercial loans*

- *Not required by IRS*

- *Seldom used by small business if not required*

**IIUSA DOC#0012012 via FOIA**
**(Pub: 2/24/12) - www.iiusa.org**

# Maintaining Jobs in a "Troubled Business", Cont'd:

The concept of preserving jobs was not a statutory devise but first surfaced in the final rule implementing the IMMACT 90 regulations (56 FR 60897) for employment-based petitions.  Here is the commentary from the preamble to the rule:

The final rule includes a definition of the term troubled business.  In the proposed rule, the Service sought comments relating to the concept of job creation and its relation to job retention within a failing business.  Five commenters felt that job retention should count toward meeting the statutory requirement of employment creation.  Additionally, the Service determined that job retention comports with Congressional intent.  See S. Debate on Conf. Rep. S 358, 136 Cong. Rec. S 17105-18 Oct. 1989).  Therefore, the term "troubled business" has been defined in the final rule, and the term is referenced within the final rule at 8 CFR 204.6(j)(3)(ii) relating evidentiary requirements of employment creation.



U.S. Citizenship
and Immigration
Services

IIUSA DOC#0012012 via FOIA
(Pub: 2/24/12) - www.iiusa.org

# Maintaining Jobs in a "Troubled Business", Cont'd:

It was Congress' intent that the EB-5 investment should be directed to investments that would create permanent year-round employment - INA §203(b)(5) states in pertinent part that EB-5 visas will be made available to alien investors who will benefit the United States economy and create full-time employment for not fewer than 10 [qualifying workers]....

Pooled investments should have an impact on the economy commensurate with the required aggregate level of investment by the group of EB-5 investors...i.e. the required level of capital investments should result in a commensurate amount of jobs, either created or maintained.  Therefore, each investor must prospectively demonstrate that at least 10 jobs will be created (or maintained in the case of a "troubled business").



304

IIUSA DOC#0012012 via FOIA
(Pub: 2/24/12) - www.iiusa.org

# TAB 11



 migrant Investor Program

w – 2013



www.iiusa.org - via FOIA

ASSOCIATION
TO INVEST IN USA

# Troubled Business (cont)

The evidence submitted with the exemplar Form I-526 petition must show that the NCE meets the definition of a troubled business in 8 CFR § 204.6(e).

- A business that:
  - Has been in existence for at least 2 years,
  - Has incurred a net loss* for accounting purposes during the 12 or 24 month period <u>prior</u> to the <u>filing date</u> of the Form I-526.

*Net loss for such period is at least equal to 20% of the troubled business's net worth prior to such loss.

*A troubled business determination is made on the basis of Generally Accepted Accounting Principles (GAAP).



U.S. Citizenship and Immigration Services

10



# Troubled Business (cont)

The evidence submitted with the exemplar Form I-526 petition must show how the NCE will meet the job creation requirement in 8 CFR § 204.6(j)(4)(ii).

According to 8 CFR § 204.6(j)(4)(ii), to show that the NCE meets the statutory employment creation requirement at the I-526 stage, the petition must be accompanied by:

- Evidence that the number of existing employees is being or will be maintained at no less than the pre-investment level for a period of at least two years; and

- Copies of tax records, Forms I-9, or other relevant documents for the qualifying employees and a comprehensive business plan.


U.S. Citizenship and Immigration Services

11

www.iiusa.org - via FOIA

AILA InfoNet Doc. 15111001. (Posted 11/10/15)

IIUSA
ASSOCIATION
TO INVEST IN USA
112

# **TAB 12**



Congressional
Research Service
Informing the legislative debate since 1914

# EB-5 Immigrant Investor Visa

**Carla N. Argueta**
Analyst in Immigration Policy

**Alison Siskin**
Specialist in Immigration Policy

April 22, 2016

**Congressional Research Service**

7-5700

www.crs.gov

R44475

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

The immigrant investor visa was created in 1990 to benefit the U.S. economy through employment creation and an influx of foreign capital into the United States. The visa is also referred to as the EB-5 visa because it is the fifth employment preference immigrant visa category. The EB-5 visa provides lawful permanent residence (i.e., LPR status) to foreign nationals who invest a specified amount of capital in a new commercial enterprise in the United States and create at least 10 jobs. The foreign nationals must invest $1,000,000, or $500,000 if they invest in a rural area or an area with high unemployment (referred to as targeted employment areas or TEAs).

There are approximately 10,000 visas available annually for foreign national investors and their family members (7.1% of the worldwide employment-based visas are allotted to immigrant investors and their derivatives). In FY2015, there were 9,764 EB-5 visas used, with 93% going to investors from Asia. More specifically, 84% were granted to investors from China and 3% were granted to those from Vietnam.

In general, an individual receiving an EB-5 visa is granted conditional residence status. After approximately two years the foreign national must apply to remove the conditionality (i.e., convert to full-LPR status). If the foreign national has met the visa requirements (i.e., invested and sustained the required money and created the required jobs), the foreign national receives full LPR status. If the foreign national has not met the requirements or does not apply to have the conditional status removed, his or her conditional LPR status is terminated, and, generally, the foreign national is required to leave the United States, or will be placed in removal proceedings.

In 1992, Congress established the Regional Center (Pilot) Program, which created an additional pathway to LPR status through the EB-5 visa category. Regional centers are "any economic unit, public or private, which [are] involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment." The program allows foreign national investors to pool their investment in a regional center to fund a broad range of projects within a specific geographic area. The investment requirement for regional center investors is the same as for standard EB-5 investors. As the use of EB-5 visas has grown, so has the use of the Regional Center Program. In FY2014, 97% of all EB-5 visas were issued based on investments in regional centers. Unlike the standard EB-5 visa category, which does not expire, the Regional Center Program is set to expire on September 30, 2016.

Different policy issues surrounding the EB-5 visa have been debated. Proponents of the EB-5 visa contend that providing visas to foreign investors benefits the U.S. economy, in light of the potential economic growth and job creation it can create. Others argue that the EB-5 visa allows wealthy individuals to buy their way into the United States.

In addition, some EB-5 stakeholders have voiced concerns over the delays in processing EB-5 applications and possible effects on investors and time sensitive projects. Furthermore, some have questioned whether U.S. Citizen and Immigration Services (USCIS) has the expertise to administer the EB-5 program, given its embedded business components. The Department of Homeland Security's Office of the Inspector General (DHS OIG) has recommended that USCIS work with other federal agencies that do have such expertise, while USCIS has reported that it has taken steps internally to address this issue. USCIS has also struggled to measure the efficacy of the EB-5 category (e.g., its economic impact). USCIS methodology for reporting investments and jobs created has been called into question by both the DHS OIG and the U.S. Government Accountability Office (GAO).

Furthermore, some have highlighted possible fraud and threats to national security that the visa category presents. In comparison to other immigrant visas, the EB-5 visa faces additional risks of fraud that stem from its investment components. Such risks are associated with the difficulty in verifying that investors' funds are obtained lawfully and the visa's potential for large monetary gains, which could motivate individuals to take advantage of investors and can make the visa susceptible to the appearance of favoritism. USCIS has reported improvements in its fraud detection but also feels certain statutory limitations have restricted what it can do. Additionally, GAO believes that improved data collection by USCIS could assist in detecting fraud and keeping visa holders and regional centers accountable.

Lastly, the authority of states to designate TEAs has raised concerns. Some have pointed to the inconsistency in TEA designation practices across states and how it could allow for possible gerrymandering (i.e., all development occurs in an area that by itself would not be considered a TEA). Others contend that the current regulations allow states to determine what area fits their economic needs and allow for the accommodation of commuting patterns.

In addition to the issues discussed above, Congress may consider whether the Regional Center Program should be allowed to expire, be reauthorized, or made permanent, given its expiration on September 30, 2016. In addition, Congress may consider whether any modifications should be made to the EB-5 visa category or the Regional Center Program. Legislation has been introduced in the 114th Congress that would, among other provisions, amend the program to try to address concerns about fraud, and change the manner in which TEAs are determined. Other bills would create an EB-5-like visa category for foreign national entrepreneurs who do not have their own capital but have received capital from qualified sources, such as venture capitalists.

# Contents

Overview ............................................................................................................................................ 1

EB-5 Classification Requirements ................................................................................................... 2
    Investment of Capital ................................................................................................................. 3
    A New Commercial Enterprise .................................................................................................. 3
    Job Creation ............................................................................................................................... 4

Regional Center Program ................................................................................................................. 4
    What is a Regional Center? ........................................................................................................ 5

The EB-5 Petition Process................................................................................................................ 7

EB-5 Admissions...............................................................................................................................11

Economic Impact............................................................................................................................. 14

Policy Issues.................................................................................................................................... 16
    Application and Petition Processing ........................................................................................ 16
    USCIS Expertise ..................................................................................................................... 16
    Measuring Economic Impacts.................................................................................................. 17
    Fraud and Security Risks ......................................................................................................... 19
    Data Collection........................................................................................................................ 21
    Targeted Employment Area (TEA) Determinations................................................................ 22

Legislation in the 114th Congress .................................................................................................. 23
    Proposed Changes to the Regional Center Program ............................................................... 23
    Proposed General Changes ...................................................................................................... 24
        Target Employment Areas.................................................................................................. 24
    Potential New Programs........................................................................................................... 24

## Figures

Figure 1. Immigrant Investor (EB-5) Visas Issued and Adjustments of Status,
    FY2004-FY2015 ...................................................................................................................... 7

Figure 2. EB-5 Admissions Granted to New Arrivals or through Adjustment of Status,
    FY2004-FY2013 ...................................................................................................................... 9

Figure 3. Form I-526 and Form I-829 Application Denial Rates, FY1994-FY2015.....................11

Figure 4. EB-5 Admissions, FY1994-FY2013 .............................................................................. 12

Figure 5. EB-5 Visas Issued and Adjustments of Status by Country, FY2004-FY2015 ............... 14


Table A-1. EB-5 Visas Issued and Adjustments of Status, FY2004-FY2015 ................................ 26

## Tables

Table 1. Comparison of the Two EB-5 Pathways .......................................................................... 5

Table 2. EB-5 Visas Issued and Adjustments of Status by Country in FY2015 ............................ 13

# Appendixes

Appendix. Additional EB-5 Visa Data ............................................................................................ 26

# Contacts

Author Contact Information ........................................................................................................... 28

# Overview

Congress created several nonimmigrant and immigrant visa categories as a way to increase investment and job creation in the United States.[1] There are two nonimmigrant investor visa categories, the E-1 visa for treaty traders and the E-2 visa for treaty investors.[2] For immigrants, there is one investor visa category, the EB-5 visa, which is the fifth employment preference immigrant visa category.[3] The EB-5 visa was created through the Immigration Act of 1990 (P.L. 101-649). The goal of the EB-5 category is to attract new foreign capital investment to the United States and generate employment.[4] The category provides individual foreign national investors and their derivatives[5] lawful permanent residence (LPR)[6] in the United States when they invest a specified amount of capital in a new commercial enterprise that creates at least 10 jobs.[7]

In general, individuals receiving EB-5 visas are granted a conditional residence status. After approximately two years they must apply to remove the conditionality from their residency status. If they have met the visa requirements (i.e., invested and sustained the required money and created the required jobs), the foreign national receives full LPR status. If the foreign national investor has not met the requirements or does not apply to have the conditional status removed, his or her conditional LPR status is terminated, and, generally, the foreign national is required to leave the United States, or will be placed in removal proceedings.

Some Members of Congress contended during discussions around the creation of the visa that potential immigrants would be "buying their way in" to the United States. Others maintained that the program's requirements would protect its integrity.[8] The Senate Judiciary Committee report on the originating legislation stated that it "is intended to provide new employment for U.S. workers and to infuse new capital into the country, not to provide immigrant visas to wealthy individuals."[9]

In 1992, Congress created the Regional Center Program,[10] an additional pathway for foreign national investors to obtain an EB-5 visa. Unlike the EB-5 visa category, which does not expire, the Regional Center Program is temporary and is scheduled to expire on September 30, 2016. By investing through a regional center, foreign national investors are subject to different requirements pertaining to the measure of job creation, and are unlikely to be involved in the

---

[1] Immigrants are foreign nationals who are admitted to the United States to live and work permanently. Nonimmigrants are foreign nationals who are admitted to the United States for a specific purpose and a specified period of time.

[2] For more information, see CRS Report RL33844, *Foreign Investor Visas: Policies and Issues*.

[3] Immigration and Nationality Act (INA) §203(b)(5). For more on the employment preference immigration system, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*.

[4] INA §203(b)(5); 8 U.S.C. §1153(b)(5).

[5] Spouses and children who accompany or later follow qualifying or principal immigrants are referred to as derivative immigrants. For the purposes of EB-5, a derivative refers to spouses and unmarried children less than 21 years of age.

[6] An LPR is a foreign national who has been admitted to live permanently in the United States and to possibly become a citizen when those requirements are met.

[7] Under certain circumstances, the preservation of existing jobs can count towards the job creation. 8 C.F.R. 204.6(j)(4)(ii).

[8] For debate on this issue, see 136 *Congressional Record* S7768-75 (July 12, 1990).

[9] S.Rept.101-55, p. 21.

[10] As enacted in 1992 (P.L. 102-395 §610), the program was known as the Regional Center Pilot Program. During the most recent reauthorization of the program in 2012 (P.L. 112-176), the name was changed to the Regional Center Program.

management of the commercial enterprise. For each fiscal year, approximately 7.1% (roughly 10,000) of the total employment-based visas (140,000) are available for EB-5 investors and their derivatives, of which 3,000 are reserved for entrepreneurs investing in "targeted employment areas" (TEA),[11] and 3,000 are reserved for those participating in the Regional Center Program.[12]

The upcoming expiration date of the Regional Center Program has renewed congressional focus on the EB-5 visa category. Questions include whether the Regional Center Program should be extended or made permanent, and if so should it be modified, or should it be allowed to expire.

There are additional concerns that Congress may consider with respect to the EB-5 visa category as a whole. For example, the required amounts of capital have not changed since the program was created in 1990. This has raised questions about whether the amounts should be adjusted, and what effect increasing the amounts would have on the number of applicants. Some have also raised concerns about fraud in the program,[13] including possible national security concerns.[14] Thus, Congress may choose to evaluate the oversight of the EB-5 category and the fraud detection mechanisms used during EB-5 adjudications. Other issues that have been raised include the capacity of U.S. Citizenship and Immigration Service (USCIS, part of the Department of Homeland Security (DHS)) to handle the complexity of regional center designations and EB-5 petition adjudications, the need for more data collection, the measurement of the visa's economic impacts, and state determinations of targeted employment areas.

This report begins with a discussion of the EB-5 visa's requirements and an overview of the Regional Center Program. It then provides information on the EB-5 application (petition) process, admissions, and the economic impacts of the visa. Next, the report reviews policy issues surrounding the visa and the Regional Center Program, specifically application processing, USCIS expertise, the measurement of economic impacts, fraud and security risks, data collection, and the determination of targeted employment areas. The report concludes with a summary of current legislation on the EB-5 visa and the Regional Center Program in the 114th Congress. The **Appendix** provides additional data on the visa.

# EB-5 Classification Requirements

The EB-5 visa classification for foreign investors is based on three components: (1) investment of capital, (2) a new commercial enterprise, and (3) job creation. Currently, there are two different pathways for lawful permanent resident (LPR) status through the EB-5 visa category, the standard visa and the Regional Center Program. The overwhelming majority of investors invest through the Regional Center Program.[15] Both pathways have the same requirements with respect to the amount of capital required to be invested and the minimum number of jobs to be created, but they differ in the measure of job creation. In addition, the role of the investor in the enterprise tends to differ between the two pathways.

---

[11] For the definition of a TEA, see "Investment of Capital."

[12] INA §203(b)(5) and §203. Note that a regional center's defined area may be in a TEA, so the set asides are not mutually exclusive.

[13] U.S. Government Accountability Office (GAO), *Immigrant Investor Program: Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefits*, GAO-15-696, August 2015.

[14] Letter from Senator Charles E. Grassley to John Sandweg, Acting Director U.S. Immigration and Customs Enforcement, December 12, 2013.

[15] In FY2014, approximately 97% of investors entered through the Regional Center Program. U.S. Department of State, *Report of the Visa Office,* Table V, Part 3; 2014.

# Investment of Capital

A foreign national must invest at least $1,000,000 in a new commercial enterprise to qualify for the EB-5 visa. If the immigrant decides to invest in a designated "targeted employment area," (TEA) the required minimum is $500,000. For both investment pathways, capital can include non-cash contributions,[16] but the immigrant investor must establish that he/she is the legal owner of the capital and that it was obtained through lawful means. Additionally, the entire investment must be "at risk" for the purpose of generating a return.[17]

---

**What is a targeted employment area (TEA)?**

A TEA is defined under statute as either a rural area (any area outside of a metropolitan statistical area, as designated by the Office of Management and Budget or outside a town or city with 20,000 or more people) or an area experiencing unemployment at 150% of the national average. USCIS defers to state governments in determining if a geographic or political subdivision should be designated as a TEA based on the unemployment rate. Under a May 2013 USCIS policy memorandum, to qualify as a rural area for the purposes of a TEA designation, the area must be outside of a metropolitan statistical area *and* outside of a town or city with 20,000 or more people.

---

# A New Commercial Enterprise

A commercial enterprise is "any for-profit activity formed for the ongoing conduct of lawful business," such as a sole proprietorship, partnership, holding company, joint venture, corporation, business trust, or other publicly or privately owned entity.[18] A *new* commercial enterprise is one established after November 29, 1990. If the commercial enterprise was established before November 29, 1990, the immigrant investor's capital must have been used to expand or restructure/reorganize the enterprise.[19] Applicants are also allowed to invest funds in "troubled businesses."[20] The immigrant investor must be engaged in the management of the commercial enterprise through policy formation, daily managerial responsibilities, or direct management.[21]

---

[16] Capital will be valued at its fair market value in U.S. dollars. 8 C.F.R. §204.6(e).

[17] "At risk" means immigrant investors cannot be guaranteed the return of any part of their investment or a rate of return on their investment. There must be a risk of loss and chance for gain. The investor may receive a return on the investment during or after the conditional residence period, as long as before or during the conditional residence period or before required jobs are created the return is not a portion of the principal investment and was not guaranteed to the investor. U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *EB-5 Adjudications Policy*, Policy Memorandum PM-602-0083, Washington, DC, May 30, 2013.

[18] 8 C.F.R. §204.6(e).

[19] For more information, see 8 C.F.R. §204.6(h).

[20] A troubled business is one that has been in existence for at least two years and has experienced a net loss equal to or at least 20% of its net worth in the 12- or 24-month period prior to the immigrant investor's filing of Form I-526, *Petition by Alien Entrepreneur*. 8 C.F.R. §204.6(e).

[21] "If the foreign national investor is a limited partner and the limited partnership agreement provides the investor with certain rights, powers, and duties normally granted to limited partners under the Uniform Limited Partnership Act, the immigrant investor will be considered sufficiently engaged in the management of the new commercial enterprise." U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *EB-5 Adjudications Policy*, Policy Memorandum PM-602-0083, Washington, DC, May 30, 2013; p. 12.

## Job Creation

In order to meet the requirements for the EB-5 visa, the foreign national's investment capital must create a minimum of 10 jobs in the new commercial enterprise.[22] The EB-5 visa has three different measures of job creation.

1. If an immigrant invests in a troubled business, directly or through a regional center, rather than creating new jobs, he/she can show that they have preserved jobs for at least two years, in lieu of creating new jobs.[23]

2. Investments made in a new commercial enterprise in a non-regional center context must create 10 jobs within the commercial enterprise. (Such jobs are called direct or payroll jobs.)

3. For new commercial enterprises located within a regional center, the 10 new jobs required can be created directly or indirectly (i.e., employees not working directly for the commercial enterprise).[24]

# Regional Center Program

The Regional Center Program was originally authorized in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act in 1992.[25] Since its creation, the program has been reauthorized several times and is set to expire on September 30, 2016.[26] The program was established as a pilot to achieve the economic growth and job creation goals of the immigrant investor statute[27] by encouraging immigrants to invest in commercial enterprises located within economic units known as "regional centers." In order to receive investment from foreign nationals wishing to obtain EB-5 status, a regional center must be designated as such by USCIS. Regional centers are intended to provide a coordinated focus of foreign investment toward specific geographic regions (see section entitled "What is a Regional Center?" for a detailed discussion). In other words, regional centers pool the investments of multiple EB-5 investors.[28]

The Regional Center Program differs from the standard EB-5 visa[29] in three ways (**Table 1**). First, although both pathways require individual investors to create at least 10 jobs, in the regional

---

[22] The position must be full-time, meaning at least 35 hours a week, and be held by a qualifying employee (U.S. citizen, LPR, or other work-authorized migrant), meaning an individual legally able to work in the United States. Jobs are also expected to last two years and cannot be intermittent, temporary, seasonal, or transient in nature. 8 C.F.R. §204.6(j)(4).

[23] 8 C.F.R. §204.6(j)(4)(ii).

[24] Indirect jobs are held outside of the new commercial enterprise but are created as a result of the new commercial enterprise. For example, they can include persons employed by the producers of materials/inputs for the immigrant investor's enterprise. "Reasonable" economic methodologies must be used to demonstrate indirect job creation. 8 C.F.R. §204.6 (m)(l)(7).

[25] P.L. 102-395 §610 (October 6, 1992).

[26] Section 116 of P.L. 105-119 extended the Regional Center Program's reauthorization from 5 years to 7 years, and Section 402 of P.L. 106-396 further extended it to 10 years. Section 548 of P.L. 108-156 extended the program to FY2008, Section 548 of P.L. 111-83 extended it to FY2012, and Section 1 of P.L. 112-176 extended it through FY2015. Section 131 of P.L. 114-53 extended the program to December 11, 2015; P.L. 114-96 extended it to December 16, 2015; and P.L. 114-100 extended it to December 22, 2015. Lastly, Division F, Section 575 of P.L. 114-113 extended the program to September 30, 2016.

[27] 8 U.S.C. §1153(b)(5) and 8 U.S.C. §1153 note.

[28] Pooled investments can also include investments from non EB-5 investors, such as U.S. citizens.

[29] "Standard EB-5 visa" refers to investors that obtain an EB-5 visa through the regular EB-5 visa process rather than (continued...)

center context indirect job creation[30] may be counted instead of or in addition to direct job creation. Second, unlike the standard EB-5 visa, foreign nationals investing in a regional center are unlikely to be involved in the management and daily activities of the commercial enterprise. Third, the EB-5 visa category is permanent, while the Regional Center Program is temporary. As previously mentioned, the program is set to expire on September 30, 2016.

**Table 1. Comparison of the Two EB-5 Pathways**

| Standard EB-5 Visa | Regional Center Program |
|---|---|
| Required capital investment is $1 million, or $500,000 in a targeted employment area. | Same. |
| Foreign national receives conditional LPR status and after approximately two years must apply to have the conditions removed or leave the country. | Same. |
| To have the conditions removed, among other requirements, the immigrant investor must show that he/she created or can be expected to create within a reasonable time 10 full-time jobs for U.S. citizens, LPRs, or other work-authorized aliens. Employment must be *direct* (i.e., employees working for the commercial enterprise).[a] | Same but the employment can be *indirect* (i.e., employees not working for the new commercial enterprise). |
| Investor *tends to be* involved in daily operations of enterprise. | Investor *tends not to be* involved in the daily operation of the enterprise. |
| Visa category is permanent. Does not expire. | Program is temporary; set to expire September 30, 2016. |

**Source:** CRS analysis of Immigration and Nationality Act §203(b)(5) and §610 of P.L. 102-395

a.   These jobs are sometimes referred to as payroll jobs.

Foreign nationals may invest in any of the regional centers that are currently approved to qualify for their conditional LPR status. Also, investments may be both within a regional center and a TEA. Although a regional center does not have to be in a TEA, almost all foreign nationals applying for EB-5 status invest with regional centers whose defined boundaries constitute a TEA.[31] (See **Figure 1**.)

# What is a Regional Center?

Regional centers are defined as "any economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment."[32] More simply, the term "regional

---

(...continued)

by investing in a regional center. Individuals using either pathway, the standard EB-5 visa or the Regional Center Program, can obtain an EB-5 visa. USCIS refers to the standard EB-5 visa as the basic EB-5 program.

[30] Indirect job creation refers to jobs a regional center estimates to create indirectly through revenues generated from increased exports, improved regional productivity, job creation, or increased domestic capital investment.

[31] The Regional Center designation requires that applicants show how their proposed program will focus on a geographic region; promote economic growth through increased export sales, if applicable; promote improved regional productivity; create a minimum of 10 jobs directly or indirectly per investor; increase domestic capital investment; be promoted and publicized to prospective investors; have a positive impact on the regional or national economy through increased household earnings; and generate a greater demand for business services, utilities maintenance and repair, and construction jobs both in and around the center. 8 C.F.R. §204.6(m)(3).

[32] 8 C.F.R. §204.6 (e).

center" refers to an entity (often a limited partnership or a limited liability corporation) where investment from multiple foreign nationals can be pooled to fund a broad range of projects within a specific geographic area.[33] Regional centers can be privately owned, publicly owned (operated by a city, county, state, or economic development agency), or a public-private partnership.[34] There are many different models for regional centers, such as the lending model, where the new commercial enterprise is a lending entity that provides loans to those (e.g., U.S. citizens) seeking funding for business activities, such as new construction or expansions of their operations.[35] Regional centers can also use an equity model, where pooled EB-5 investments are used to purchase equity stakes in a project company (i.e., job-creating entity). In addition, regional centers have been created for direct investment to build a variety of projects, such as hotels, a ski resort, convention centers, arenas, and retail and mixed use developments. Certain state (e.g., Hawaii) and local governments have also established their own regional centers.

Since the inception of the Regional Center Program in 1992, the number of USCIS-approved regional centers has increased substantially. From FY2007 to FY2009, it rose more than three-fold, from 11 to 72.[36] As of January 4, 2016, there were 790 approved regional centers across the United States.[37] However, not all regional centers have received investment from foreign nationals wishing to immigrate under the EB-5 visa category. Additionally, as of January 5, 2016, USCIS had terminated the participation of 39 regional centers from the Regional Center Program.[38]

In the last decade, the use of regional centers among immigrant investors has also grown substantially. **Figure 1** displays the distribution of EB-5 grantees investing through (1) the standard program in a non-TEA, (2) the standard program in a TEA, and (3) through a regional center. The proportion of immigrant investors using regional centers, specifically those in a TEA, has been increasing, especially since FY2007.[39] In FY2006, investments in regional centers in a TEA were responsible for approximately 12% of the visas used; by FY2014 they represented 97% of the visas used.

---

[33] Investment pools can also include funds from non-EB-5 investors (e.g., U.S. citizens). In addition, approximately 20% of those receiving LPR status from an investment under the standard EB-5 category are involved in pooled investments. Personal conversation with staff from USCIS' Immigrant Investor Program Office, April 8, 2016.

[34] For a fuller discussion of regional center public-private partnerships, see Lazaro Zamora and Theresa Cardinal Brown, *EB-5 Program: Success, Challenges, and Opportunities for States and Localities*, Bipartisan Policy Center, Washington, DC, September 2015.

[35] The growth of and preference for the loan model may be driven by the fact that many investors' primary motive is to qualify for LPR status and recover their investment. Jeanne Calderon and Gary Friedland, *EB-5 Capital Project Database: Revisited and Expanded*, NYU Stern School of Business, Center for Real Estate Finance Research, New York, NY, March 29, 2016, p. 9.

[36] U.S. Citizenship and Immigration Services, *Number of Approved EB5 Regional Centers Fiscal Year(s): 2007 – 2012,* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/ Immigration%20Forms%20Data/Employment-based/I526_I924_I829_performancedata_qtr43.pdf.

[37] For a list of approved regional centers, see U.S. Citizenship and Immigration Services, *Immigrant Investor Regional Centers,* http://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/immigrant-investor-regional-centers.

[38] Termination results when a regional center fails to submit Form I-924A to demonstrate continued eligibility or it fails to promote economic growth as required. For a list of terminated regional centers, see U.S. Citizenship and Immigration Services, *Terminated Regional Centers,* http://www.uscis.gov/working-united-states/permanent-workers/ employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-process/terminated-regional-centers.

[39] For exact figures, see the **Appendix**.

**Figure 1. Immigrant Investor (EB-5) Visas Issued and Adjustments of Status, FY2004-FY2015**



**Source:** U.S. Department of State, *Report of the Visa Office*, Table V Immigrant Visas Issued and Adjustments of Status Subject to Numerical Limitations (by Foreign State of Chargeability), Part 3; multiple years.

**Notes: EB-5 Standard** represents those receiving EB-5 visa classification on the basis of investment of at least $1,000,000 in a non-TEA area that is not associated with a regional center. **EB-5 Standard TEA** represents those who have received EB-5 visa classification through investment in a targeted employment area (TEA) that is not associated with a regional center. **Regional Center** represents those who received EB-5 visa classification based on investment in a regional center in both TEAs and non-TEAs. CRS presents those receiving EB-5 visa classifications based on investment in TEA and non-TEA regional centers together because the number of visa numbers issued based on investment in non-TEA regional centers was relatively low, ranging from 0 to 11 from FY2004 to FY2015.

# The EB-5 Petition Process

The EB-5 petition/application process, which is largely administered by USCIS, requires various steps before an individual can obtain his/her full (i.e., unconditional) LPR status.[40] Individuals who are admitted to the United States on the basis of EB-5 visas are granted a conditional resident status.[41] After approximately two years they can apply to remove the conditionality if

---

[40] See U.S. Citizenship and Immigration Services, *EB-5 Immigrant Investor Process*, http://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-process. Accessed by CRS on December 4, 2015.

[41] Conditional resident status is lawful resident status conditional on the immigrant meeting certain requirements. INA §216A.

they have met the visa requirements (i.e., invested and sustained the required investment and created the required jobs).

For a foreign national investor, the first step of the process consists of filing USCIS Form I-526, *Immigrant Petition by Alien Entrepreneur*. At this point, a foreign national has to prove that he/she meets the requirements for EB-5 classification, including that the capital being invested came from a legitimate source, and that he/she has presented a valid business plan or showed that the investment will go to a USCIS-certified regional center. Once the I-526 is approved, the foreign national would need to obtain a visa from the Department of State (DOS) to enter the United States if he/she is not currently in the country, or adjust status[42] with USCIS if he/she is.[43] Individuals not in the United States file Form DS-260 *Application for Immigrant Visa and Alien Registration* with DOS and individuals within the United States file Form I-485 *Application to Register Permanent Residence or Adjust Status* with USCIS. At this stage, DOS and USCIS also check that the foreign national is not inadmissible under the grounds of inadmissibility of the Immigration and Nationality Act (INA).[44] Those who adjust status within the United States receive their conditional residence once the I-485 is approved. Those who receive a visa from DOS receive their conditional residence once they are admitted into the United States.

In FY2004, the number of EB-5 visas granted to new arrivals (60) and the number granted to those who adjusted their status (69) were roughly equal. This ratio has shifted as the growth in visas granted to new arrivals outpaced the number granted to those who adjusted their status, as seen in **Figure 2**. As a result, by FY2014 visas to new arrivals accounted for 86% of EB-5 admissions.

---

[42] "Adjustment of status is the process by which an eligible individual already in the United States can get permanent resident status (a green card) without having to return to their home country to complete visa processing." U.S. Citizenship and Immigration Services, *Adjustment of Status,* https://www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-status.

[43] A visa number must be available for the foreign national to apply for the visa or to adjust status.

[44] The grounds of inadmissibility include criminal, national security, health, and indigence grounds as well as past violations of immigration law. INA §212(a). See also CRS Report R41104, *Immigration Visa Issuances and Grounds for Exclusion: Policy and Trends*.

**Figure 2. EB-5 Admissions Granted to New Arrivals or through Adjustment of Status, FY2004-FY2013**



**Source:** CRS presentation of data from the U.S. Department of Homeland Security, *Yearbook of Immigration Statistics,* multiple years.

**Notes: New Arrivals** refers to individuals who obtained an EB-5 visa from DOS outside the United States. **Adjustment of Status** refers to individuals who applied for an EB-5 visa number from within the United States and adjusted their status with USCIS.

An investor can petition to remove the conditional status after approximately two years by filing Form I-829 *Petition by Entrepreneur to Remove Conditions on Permanent Resident Status*.[45] If the I-829 is approved, the conditionality on the residency of the immigrant investor and his/her derivative family members is removed.[46] If the investor did not meet the requirements to adjust to full LPR status, the investor (and his/her family members who immigrated together) must depart from the United States or adjust to another immigration status. USCIS will issue a notice-to-appear (NTA)[47] to foreign nationals who do not apply to have the conditional status removed or who are denied adjustment to full LPR status.

Petition denial rates have fallen significantly since the early 2000s, as displayed in **Figure 3**. For the I-526, the denial rate fell from 82% in FY2001 to 11% in FY2015. For the I-829, the rate fell

---

[45] The I-829 form instructions state that an investor can petition to remove the conditions within the 90-day period immediately preceding the second anniversary of obtaining his/her conditional permanent resident status.

[46] U.S. Citizenship and Immigration Services, *EB-5 Immigrant Investor Process,* June 25, 2014, http://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-process.

[47] This document starts the removal process.

from 52% in FY2000 to 1% in FY2015. It is likely that the large increase and then decrease in denials is due in part to the altered interpretations by the former Immigration and Naturalization Service (INS) of the EB-5 requirements that took place in late 1997 and 1998. In December 1997, the INS General Counsel's office issued a legal opinion discussing the legality of certain business arrangements for EB-5 purposes. Then during 1998, INS issued four precedential decisions that restricted eligibility for the EB-5 category overall.[48] Among other changes, these decisions barred previously acceptable investment mechanisms (e.g., pooled investment), increased the documentation required to show lawful sources of funds, and changed the rules for determining that investment occurs in a TEA. The INS applied these decisions retroactively. In 2002, the 21st Century Department of Justice Appropriations Act (P.L. 107-273) provided remedies for those affected by INS' 1998 decisions by allowing investors affected by the retroactive changes to apply to re-establish eligibility for an EB-5 visa.

At the end of FY2015, there were 17,367 pending I-526 petitions and 4,049 pending I-829 petitions.[49] As of January 31, 2016, the processing times were 16.3 months for the I-526 and 16.9 months for the I-829.[50]

---

[48] In 1998, the INS Administrative Appeals Office (AAO) issued four precedential decisions on the EB-5 visa category. The decisions were *Matter of Soffici,* (A76 472 614 June 30, 1998)*; Matter of Izumii,* (A76 426 873 July 13, 1998); *Matter of Ho,* (WAC-98-072-50493 July 31, 1998); *and Matter of Hsiung,* (A76 854 232 July 31, 1998). The decisions impacted several program requirements, including what constitutes an "adequate business plan," what can be considered as capital to meet the required investment amount, and what are permissible types of investments and business arrangements to qualify for an EB-5 visa. These decisions came shortly after—and contradicted—a December 1997 opinion issued by the INS General Counsel's office that discussed the legality of certain business arrangements for EB-5 purposes. The contradiction and new rules caused uncertainty among foreign national investors and immigration lawyers. "AAO Designated Two More Immigrant Investor Decisions," *Interpreter Releases,* vol. 75, no. 37 (September 28, 1998), p. 1337.

[49] U.S. Citizenship and Immigration Services, *Performance Analysis System (PAS),* September 2015.

[50] U.S. Citizenship and Immigration Services, *USCIS Processing Time Information for the Immigrant Investor Program Office,* March 14, 2016, https://egov.uscis.gov/cris/processingTimesDisplay.do;jsessionid=abcrm_xl28-KgfTv5_Mpv. Accessed by CRS on April 5, 2016.

**Figure 3. Form I-526 and Form I-829 Application Denial Rates, FY1994-FY2015**



**Source:** CRS analysis of data from the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Performance Analysis System (PAS)*, January 2015.

**Notes:** Immigrant investors file Form I-526 to obtain EB-5 classification. As conditional LPRs, they file Form I-829 to remove the conditionality from the residency status. Denial rates are calculated by dividing the number of denied petitions (applications) in a year by the sum of the approved and denied petitions in the same year.

# EB-5 Admissions

Each year approximately 10,000 EB-5 visas are available for investors and their derivatives.[51] In the program's early years only a small percentage of available EB-5 visas were being utilized,[52] with the exception of a rise in FY1997. Although numerous possible explanations for the overall low admission levels in earlier years exist, the notable drop in admissions in FY1998 and FY1999 is due in part to the altered interpretations by the former INS of the qualifying requirements that took place in 1998. In 2002, in addition to providing remedies for some of those affected by INS'

---

[51] Derivatives are counted against the numerical limit for the category.

[52] A 2005 report from the U.S. Government Accountability Office (GAO) listed a number of contributing factors to the low participation rates, including the rigorous nature of the LPR investor application process and qualifying requirements, the lack of expertise among adjudicators, uncertainty regarding adjudication outcomes, negative media attention on the LPR investor program, lack of clear statutory guidance, and the lack of timely application processing and adjudication. A 2005 law journal article on investor visas suggested that the two-year conditional status of the visa and the alternate (and less expensive) pathways for LPR status often dissuaded potential investors from pursuing LPR investor visas. U.S. Government Accountability Office, *Immigrant Investors: Small Number of Participants Attributed to Pending Regulations and Other Factors*, GAO-05-256, April 2005, pp. 8-11; and Stanley Mailman and Stephen Yale-Loehr, "Immigrant Investor Green Cards: Rise of the Phoenix?" *New York Law Journal*, April 25, 2005.

1998 decisions, P.L. 107-273 provided some clarification of the requirements in order to promote an increase in petitions. Possibly as a result, after FY2003 there were substantial increases in EB-5 visa admissions.[53] From FY2003 to FY2005, the number of EB-5 visas issued grew five-fold (from 64 to 346), and then increased by seven-fold by FY2010 (to 2,480). From FY2010 to FY2013, the number of EB-5 visas issued increased again by nearly three-fold (to 8,543) (**Figure 4**).

As the allotment for EB-5 visas includes derivatives, the total number of immigrants admitted through the investor visa program does not reflect the actual number of investors. On average, individual immigrant investors (principal investors) accounted for approximately one-third of all those granted EB-5 visas.[54] On average, each investor has had approximately two derivatives granted conditional LPR status along with them over the time period examined.

#### Figure 4. EB-5 Admissions, FY1994-FY2013



**Source:** CRS presentation of data from the DHS Office of Immigration Statistics, *Yearbook of Immigration Statistics*; multiple years.

**Notes:** The actual number of available visas for FY2014 was more than 10,000 due to a "roll-down" of unused visas from other employment-based LPR visa categories. For more information on "roll-downs," see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*.

**Table 2** lists the top 10 EB-5 visa receiving countries in FY2014. China ranks at the top of investor visa recipient countries, with its citizens accounting for approximately 84% (8,156) of all

---

[53] In this section, visas issued includes adjustments of status.

[54] CRS calculation using data from the U.S. Department of Homeland Security Office of Immigration Statistics, *Yearbook of Immigration Statistics*; multiple years.

EB-5 visas granted in FY2015.[55] With respect to other EB-5 visa recipient countries in FY2015, Vietnam had the second largest number of EB-5 visas granted, at approximately 3% (280), and Taiwan had the third largest amount of visas at approximately 1% (139).[56]

**Table 2. EB-5 Visas Issued and Adjustments of Status by Country in FY2015**

Top 10 Countries

| Country | Visas | % Total of EB-5 Visas |
|---------|-------|----------------------|
| China | 8,156 | 83.5% |
| Vietnam | 280 | 2.9% |
| Taiwan | 139 | 1.4% |
| South Korea | 116 | 1.2% |
| India | 111 | 1.1% |
| Russia | 88 | 0.9% |
| Great Britain | 80 | 0.8% |
| Mexico | 77 | 0.8% |
| Venezuela | 72 | 0.7% |
| Iran | 62 | 0.6% |
| All Other Countries | 583 | 6.0% |

**Source:** U.S. Department of State, *Report of the Visa Office*, Table V Immigrant Visas Issued and Adjustments of Status Subject to Numerical Limitations (by Foreign State of Chargeability), Part 3; 2015.

**Notes:** Visas issued represents visa granted to individuals outside of the United States. Adjustments of Status represents individuals already in the United States who adjusted their status. This table represents the sum of these two groups. For FY2004 to FY2014 data on EB-5 visas issued and adjustments of status for each of the top 10 countries, see the **Appendix**.

From FY2009 to FY2014, China has experienced the greatest growth in EB-5 visas issued, as illustrated in **Figure 5**. China was granted 1,970 in FY2009 and 9,128 in FY2014 (though the number decreased to 8,156 visas in FY2015).[57] In addition, for FY2014 the maximum number of visas available for Chinese applicants was reached in August 2014.[58] Furthermore, there is a backlog in processing EB-5 visas. As of April 2016, the Department of State was processing visas for Chinese applicants whose petitions had been approved in February 2014.[59]

---

[55] U.S. Department of State, *Report of the Visa Office*, Table V Immigrant Visas Issued and Adjustments of Status Subject to Numerical Limitations (by Foreign State of Chargeability), Part 3; 2015.

[56] Ibid.

[57] The INA establishes that each country can receive no more than 7% of the worldwide level of visas. For more information see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*.

[58] U.S. Department of State: Visa Services, *Effective Immediately Saturday, August 23, 2014 the China Employment Fifth (EB-5) Preference Category Has Become "Unavailable" for the Remainder of FY-2014*, August 23, 2014.

[59] Department of State, *Visa Bulletin for April 2016*, Washington, DC, March 9, 2016, p. 4, http://www.travel.state.gov/content/dam/visas/Bulletins/visabulletin_April2016.pdf.

**Figure 5. EB-5 Visas Issued and Adjustments of Status by Country, FY2004-FY2015**



**Source:** CRS presentation of data from the U.S. Department of State, *Report of the Visa Office*, Table V Immigrant Visas Issued and Adjustments of Status Subject to Numerical Limitations by Foreign State of Chargeability), Part 3; multiple years.

**Notes:** Visas issued represents visa granted to individuals outside of the United States. Adjustments of Status represents individuals already in the United States who adjusted their status. This table represents the sum of these two groups. China was the top EB-5 visa receiving country in FY2015. **Other Top 10** represents the aggregate number of EB-5 visas from the countries with the second to the tenth highest number of visas issued or adjustments of status in FY2015. For data on each of the top 10 EB-5 visa receiving countries, see the **Appendix**.

# Economic Impact

Measurement of the EB-5's economic impact on the U.S. economy has resulted in a wide variety of estimates. The EB-5 visa category was created as a way to increase investment and job creation in the U.S. economy. In 2010, USCIS commissioned ICF International, a private consulting firm, to estimate the impact of EB-5 investments on the U.S. economy.[60] The study used a sample of immigrants whose initial investment occurred between 2001 and 2006.[61] It found that EB-5 investments and the economic activity that resulted from them added $700 million to the U.S. gross domestic product (GDP), with the real estate industry sector experiencing the largest

---

[60] ICF International, *Study of the United States Immigrant Investor Pilot Program (EB-5)*, May 18, 2010, http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/EB-5/EB5-Report-2010.pdf.

[61] Ibid. For this study, USCIS lacked comprehensive data on the entire visa population, preventing the study from determining how representative its sample was for all investors.

impact. This study also found that the visa helped create an estimated 12,000 annual jobs in the United States. The study also estimated that the EB-5 visa classification allowed the federal government to accrue an additional $100 million, and state and local governments, an additional $62 million in tax revenue.[62] Additionally, USCIS commissioned the U.S. Department of Commerce to conduct a new study on the visa's economic impacts.[63]

USCIS has also reported its estimates of the visa's creation of investment and jobs. The agency stated that from FY1990 to FY2014, the EB-5 visa has generated more than $11.2 billion in investments and at least 73,730 jobs.[64] Additionally, USCIS reported in February 2016, that as of October 1, 2012, at least $8.7 billion was invested in the U.S. economy and an estimated 35,140 jobs were created through EB-5 visa investments.[65]

Other non-federal organizations, some of which were commissioned by advocacy organizations, have conducted their own economic analysis of the visa's economic impacts. In 2014, the Brookings Institution estimated that the EB-5 visa created 85,500 full-time jobs and contributed $5 billion in direct investment to the United States since its inception.[66] A 2015 report by U.S. Policy Metrics/Hamilton Place Strategies, commissioned by the EB-5 Investment Coalition (an advocacy organization for EB-5), estimated that from 2005 to 2013 the EB-5 visa generated a minimum of $5.2 billion in investment.[67] The study also noted that in 2013 alone, the visa brought in at least $1.6 billion in investment and, assuming each investment's minimum requirement was met, created 31,000 jobs.[68] Invest in the USA (an EB-5 trade association) commissioned the Alward Institute for Collaborative Science to conduct a peer reviewed study on the impacts of the EB-5 visa. They estimated that EB-5 associated regional center spending contributed $3.58 billion to the U.S. GDP and created over 41,000 jobs in FY2013.[69] These 2013 estimates of EB-5 investments into the economy represent less than 0.1% of the U.S.'s $16.7 trillion GDP.[70]

---

[62] Ibid.

[63] U.S. Citizenship and Immigration Services, staff briefing for CRS, September 9, 2015.

[64] U.S. Congress, House Committee on the Judiciary, *Is the Investor Visa an Under Performing Asset?* testimony of Rebecca Gambler, Director of Homeland Security and Justice at the U.S. Government Accountability Office, 114th Cong., 2nd sess., February 11, 2016.

[65] The estimated amount of money invested in the U.S. economy was based on the number of EB-5 petitions approved and the number of jobs created was based on the number of approvals of Form I-829. U.S. Congress, Senate Committee on the Judiciary, *The Failures and Future of the EB-5 Regional Center Program: Can it be Fixed?* testimony of Nicholas Colucci, Chief of the Office of Immigrant Investor Program, 114th Cong., 2nd sess., February 2, 2016.

[66] Audrey Singer and Camille Glades, *Improving the EB-5 Investor Visa Program: International Financing for U.S. Regional Economic Development*, Brookings-Rockefeller, Project on State and Metropolitan Innovation, February 2014.

[67] Steven McMillin, Michael Solon, and Matt McDonald, *Harnessing Private Capital for Job Creation: An Analysis of the EB-5 Program*, U.S. Policy Metrics & Hamilton Place Strategies, June 2015, http://eb5coalition.org/analysis-of-the-eb-5-program.pdf.

[68] Ibid.

[69] David Kay, *The Economic Impact and Contribution of the EB-5 Immigration Program*, Alward Institute for Collaborative Science, Cornelius, NC, May 2015.

[70] The U.S. GDP in 2015 was $17.9 trillion. GDPs are given in 2016 current dollars. U.S. Department of Commerce Bureau of Economic Analysis, *National Economic Accounts: Current-Dollar and "Real" Gross Domestic Product*, February 26, 2016, http://www.bea.gov/national/index.htm#gdp.

# Policy Issues

In recent years, efforts have been made by USCIS to promote investment by foreigners in the United States economy and to close perceived loopholes for visa exploitation.[71] Some of the issues that have been discussed are the processing of applications, USCIS' expertise and ability to oversee the EB-5 visa, the need for accurate measurement of the visa's economic impact, fraud and security concerns, and TEA determinations. The following sections review these issues and, where applicable, discuss changes USCIS has made to address them.

## Application and Petition Processing

An on-going issue within the EB-5 program is the processing times for EB-5 applications (both for the regional center designation and the petitions for foreign national investors), and the impact of these potential delays on the investors and project developers.[72] As of January 31, 2016, the application adjudication times were 13.6 months to apply for EB-5 status (Form I-526), 16.9 months to remove conditionality from LPR status (Form I-829), and 9 months to apply to become a regional center (Form I-924).[73] Stakeholders have complained that the time period from applying for a regional center designation to actually receiving investment (currently approximately 22.6 months) is too long which can negatively impact investment projects. EB-5 stakeholders have also stated that USCIS needs to adjudicate EB-5 and regional center applications in a more predictable manner, noting that the EB-5 program faces competition from other countries with more predictable and speedy immigrant investor program. The USCIS Ombudsman[74] has made recommendations make the EB-5 adjudication process more transparent, consistent, and timely.[75]

## USCIS Expertise

In drawing attention to some of the issues with the EB-5 visa, some have called into question whether USCIS is the right agency to manage the visa classification or whether USCIS should be

---

[71] In 2013, USCIS released new internal guidance regarding the adjudication of EB-5 petitions. In addition, in the past three years, USCIS has filled new positions (e.g., economist, accountant) to help adjudicate petitions for regional center designations. Department of Homeland Security, U.S. Citizenship and Immigration Services, *EB-5 Adjudications Policy*, Policy Memorandum PM-602-0083, Washington, DC, May 30, 2013.

[72] For example, see Office of the Citizenship and Immigration Services Ombudsman, *EB-5 Immigrant Investor Program Stakeholder Meeting*, Executive Summary, Washington, DC, March 5, 2013. See also Office of the Citizenship and Immigration Services Ombudsman, *Employment Creation Immigrant Visa (EB-5) Program Recommendations*, Department of Homeland Security, Washington, DC, March 18, 2009.

[73] Reportedly, the USCIS Immigrant Investor Program Office (IPO) is continuing to expand its staff and expects to increase staff from 113 to 171 people by the end of FY2016. During a February 2016 stakeholders' meeting, USCIS stated that senior adjudicators are training many junior adjudicators to handle complex cases, and as a result, processing times may decrease in the future. Nicholas Colucci, "February 3, 2016 Stakeholder Engagement," IPO Chief Nicholas Colucci's Remarks, Washington, DC, February 3, 2016. For processing times, see+

U.S. Citizenship and Immigration Services, *USCIS Processing Time Information for the Immigrant Investor Program Office,* March 14, 2016, https://egov.uscis.gov/cris/processingTimesDisplay.do;jsessionid=abcrm_xl28-KgfTv5_Mpv. Accessed by CRS on April 5, 2016.

[74] The office and the position of the USCIS Ombudsman were created in the Homeland Security Act of 2002 (P.L. 107-296, §452). They are independent of USCIS and are tasked with providing individual case assistance, as well as making recommendations to improve USCIS's administration of immigration benefits.

[75] Office of the Citizenship and Immigration Services Ombudsman, *EB-5 Immigrant Investor Program Stakeholder Meeting*, Executive Summary, Washington, DC, March 5, 2013.

required to consult or partner with other agencies regarding its EB-5 responsibilities. In taking on the EB-5 program and the Regional Center Program, the INS mission of providing immigration and naturalization services was extended. Notably, the EB-5 program involves complexities including analysis of business plans and economic forecasting models which require specialized expertise. Some lawmakers were aware while creating the EB-5 program that the INS did not have all the expertise needed to implement the visa category and recommended the agency work with other agencies that have the necessary skills.[76] Even after the creation of USCIS in 2003, there were still concerns about whether that agency had the expertise to adjudicate EB-5 petitions. For example, in 2013, the Department of Homeland Security Office of Inspector General (DHS OIG) suggested that USCIS improve its coordination with the Department of Commerce, the Department of Labor's Bureau of Labor Statistics, and the Securities and Exchange Commission in order to leverage their expertise to its advantage during the adjudication process.[77]

The Government Accountability Office (GAO) reported improvements in USCIS's economic analysis of EB-5 applications that resulted from its hiring of an additional 22 economists to review business plans, economic analysis, and organizational documents for regional center projects.[78] As of February 2016, the Immigrant Investor Program Office (IPO) was staffed with 110 employees, which included 60 adjudication officers, 28 economists, and 22 additional staff responsible for the direct support and management of the program.[79] USCIS also updated and enhanced its employee training curriculum, which currently includes ongoing training, in order to improve consistency in adjudication process and compliance with statutes, regulations, and policies.[80]

## Measuring Economic Impacts

In the past, USCIS has estimated the EB-5's impact through calculating total job creation and foreign investment. This was done by multiplying the number of EB-5 visas granted by the visa category's minimum requirements ($500,000 investment and 10 jobs created).[81] DHS OIG and GAO reported that these estimates of the program's impact could lead to either understatement or overstatement of certain economic benefits. For example, some investors create more than 10 jobs and/or invest over $500,000. Using visa minimums would therefore underestimate their

---

[76] Statement of Senator Alan Simpson, Senate Debate on Conference Report for the Immigration Act of 1990, *Congressional Record*, vol. 136 (October 26, 1990), pp. S17106-01.

[77] U.S. Department of Homeland Security Office of Inspector General, *United States Citizenship and Immigration Services: Employment-Based Fifth Preference (EB-5) Regional Center Program*, OIG-14-19, December 2013.

[78] U.S. Government Accountability Office (GAO), *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit*, GAO-15-696, August 2015.

[79] IPO staffing numbers do not include Fraud Detection and National Security (FDNS) and Office of the Chief Counsel employees. USCIS also stated that they are working to fill vacancies to reach their FY2016 authorized staffing level of 171 employees. U.S. Congress, Senate Committee on the Judiciary, *The Failures and Future of the EB-5 Regional Center Program: Can it be Fixed?* testimony of Nicholas Colucci, Chief of the Office of Immigrant Investor Program,114[th] Cong., 2nd sess., February 2, 2016.

[80] U.S. Government Accountability Office (GAO), *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit*, GAO-15-696, August 2015.

[81] Through its different application forms, USCIS requests information that could be used to make these estimations more accurate. For example, Form I-526 asks investors to report their initial investment, and Form I-829 requires investors to report the number of new jobs created or jobs they expect to be created. Furthermore, USCIS states that it plans to develop a data system that will enable it to track and report data immigrant investors report in FY2017. U.S. Congress, House Committee on the Judiciary, *Is the Investor Visa an Under Performing Asset?* testimony of Rebecca Gambler, Director of Homeland Security and Justice at the U.S. Government Accountability Office, 114th Cong., 2nd sess., February 11, 2016.

impact and would not accurately capture the investors' true contribution to the economy. Additionally, the underlying assumptions in these estimations are that each approved visa was actually used and that all foreign investors fulfilled their capital and job creation requirements. If that assumption does not hold, USCIS could therefore be overestimating the impact of the program. USCIS' lack of comprehensive, longitudinal studies on the economic impact of regional centers could also limit its ability to measure impact over time or any impacts that may manifest later. Though such research would be beneficial to understanding the program's impact, USCIS is not mandated by statute to develop comprehensive assessments of the overall benefits of the investor visa program.[82]

In 2013, a DHS OIG report stated that "USCIS is unable to demonstrate the benefits of foreign investment into the U.S. economy."[83] The report identified how USCIS' limited authority had played a part in the agency's inability to accurately measure the impact of the EB-5 visa. For example, in a regional center context, where foreign funds contribute to an investment pool that also contains funds from non-EB-5 investors (e.g. U.S. citizens), EB-5 investors can take credit for all jobs created, regardless of the proportion of the investment pool that was actually contributed by EB-5 investors or which investment in the pool was primarily responsible for the job creation.[84] In other words, all the jobs created by the project funded by EB-5 and non-EB-5 investors are credited to EB-5 investors, not only the pro-rated portion that represents the amount of EB-5 investment.[85] Therefore, in these situations USCIS does not have the ability to determine if EB-5 investors were responsible for the creation of jobs, making it difficult for the agency to fully capture the economic impact of the program.

Since FY2013, USCIS economists have been provided with data from the Regional Input-Output Modeling System (RIMS II)[86] to estimate job creation. USCIS and Department of Commerce economists and industry and academic experts consider RIMS II to be a valid method to verify job creation estimates.[87] GAO noted that "RIMS II data is a reasonable methodology to verify job creation as permitted in law and program regulation."[88] As of FY2015, Immigrant Investor Program Office (IPO) managers estimate that 95% of EB-5 program petitioners used economic models to estimate job creation and 90% of them used RIMS II in their applications to USCIS.[89]

---

[82] U.S. Government Accountability Office (GAO), *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit,* GAO-15-696, August 2015.

[83] U.S. Department of Homeland Security Office of Inspector General, *United States Citizenship and Immigration Services: Employment-Based Fifth Preference (EB-5) Regional Center Program,* OIG-14-19, December 2013.

[84] 8 C.F.R. §204.6(g)(2).

[85] For example, although only 6% of the total capital raised for a condominium project in Miami, Florida, came from EB-5 investors, 100% of the job creation was allocated to the EB-5 investors. Jeanne Calderon and Gary Friedland, *EB-5 Capital Project Database: Revisited and Expanded*, NYU Stern School of Business, Center for Real Estate Finance Research, New York, NY, March 29, 2016, p. 6.

[86] The RIMS II system was created by the U.S. Department of Commerce's Bureau of Economic Analysis, which is used both in the private and public sectors. By providing detailed geographic and industry information on the project or program, RIMS II can "estimate total impact of the project or program on regional output, earnings, and employment." U.S. Department of Commerce's Bureau of Economic Analysis, *Regional Multipliers from the Regional Input-Output Modeling System (RIMS II): A Brief Description,* February 2015.

[87] U.S. Government Accountability Office, *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit,* GAO-15-696, August 2015.

[88] Ibid.

[89] Ibid.

However, RIMS II cannot determine the location of jobs created, therefore making it difficult to know whether jobs are created in TEAs.[90]

## Fraud and Security Risks

In comparison to other immigration visas, GAO found that EB-5 faces the risk of fraud in three unique respects that stem from its investment components.[91] First, immigrant investors must provide evidence that their investment funds were obtained through lawful means. It can be difficult, however, for USCIS to verify the sources, especially with the use of overseas counterfeit documentation or self-reporting that cannot always be verified with foreign banks.

Second, the potential for large financial gains through the EB-5 visa may motivate regional center operators and intermediaries[92] to take advantage of foreign investors. Some immigrant investors primarily interested in the immigration benefits of EB-5 may accept lower rates of return or may not adequately research an investment decision. U.S. Securities and Exchange Commission (SEC) officials reported over 100 tips, complaints, and referrals on possible security fraud violations concerning the EB-5 visa from January 2013 to January 2015, and just over half were referred for further investigation.[93] Furthermore, from February 2013 to December 2015, SEC filed 19 cases involving EB-5 offerings, of which almost half involved fraud allegations.[94]

Lastly, the EB-5 visa classification is susceptible to the appearance of favoritism and special access. A DHS OIG report identified the risk of internal and external influence on the EB-5 visa, listing USCIS' lack of protocols to document inquiries, decision making, and responses to external parties who inquired about EB-5 activities as a key issue.[95] In March 2015, DHS OIG released a report prompted by USCIS employee complaints on the management of the EB-5 visa.[96] After the report's issuance, the DHS Secretary asked Congress to help increase the security and integrity of the visa. USCIS subsequently issued a new ethics and integrity protocol for EB-5 that addresses application processing and stakeholder communication.[97]

---

[90] U.S. Congress, House Committee on the Judiciary, *Is the Investor Visa an Under Performing Asset?* testimony of Rebecca Gambler, Director of Homeland Security and Justice at the U.S. Government Accountability Office, 114th Cong., 2nd sess., February 11, 2016.

[91] U.S. Government Accountability Office, *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit*, GAO-15-696, August 2015.

[92] Regional center operators and intermediaries can include the individual who created the regional center, the individual who manages or oversees the regional center, or the individual who connected or recruited the foreign investor to invest in a certain regional center.

[93] Ibid.

[94] U.S. Congress, Senate Committee on the Judiciary, *The Failures and Future of the EB-5 Regional Center Program: Can it be Fixed?* testimony of Stephen L. Cohen, Associate Director of U.S. Securities and Exchange Commission's Division of Enforcement, 114th Cong., 2nd sess., February 2, 2016.

[95] U.S. Department of Homeland Security Office of Inspector General, *United States Citizenship and Immigration Services: Employment-Based Fifth Preference (EB-5) Regional Center Program*, OIG-14-19, December 2013.

[96] The report found that then-Director of USCIS and current Deputy Secretary of DHS Alejandro Mayorkas had "communicated with stakeholders on substantive issues, outside of the normal adjudicatory process and intervened with the career USCIS staff in ways that benefited stakeholders." U.S. Department of Homeland Security Office of Inspector General, *Investigation into Employee Complaints about Management of U.S. Citizenship and Immigration Services' EB-5 Program*, March 2015.

[97] U.S. Department of Homeland Security, *Ethics and Integrity: Protocols for Processing EB-5 Immigrant Investor Visa Petitions and EB-5 Regional Center Applications, Including Stakeholder Communications*, April 30, 2015.

With respect to regional centers, when there is a risk to national security or fraud is found, USCIS opines that it lacks explicit statutory authority to deny or terminate centers.[98] For example, USCIS can deny immigration benefits to individual immigrants who are considered to be a national security threat,[99] but the agency has interpreted the Immigration and Nationality Act (INA) as not being applicable to regional centers because they are pooling funds from investors rather than seeking an immigrant benefit or visa.[100] Furthermore, USCIS lacks the authority to deny or terminate a regional center's participation in EB-5 based solely on fraud or national security concerns. Such participation can only be terminated if the regional center fails to submit required information or it is no longer promoting economic growth.[101] USCIS officials have noted that this statutory limitation is a "major challenge and requires a significant amount of time to link findings [of fraud or national security concerns] to the statutory criteria," for terminating a regional center.[102]

USCIS has conducted risk assessments to identify, analyze, and establish solutions for issues surrounding fraud. In 2015, in response to congressional and USCIS requests, the DHS Office of Intelligence and Analysis updated the EB-5 visa's 2012 risk assessment in a classified report.[103] In addition to conducting risk assessments on an "as needed" basis, USCIS reported to GAO that it conducts regular oversight work and collaborates with other enforcement agencies that may uncover fraud, such as the Federal Bureau of Investigation (FBI), Securities and Exchange Commission (SEC), and Immigration and Customs Enforcement's (ICE's) Homeland Security Investigations (HSI). EB-5 fraud risks are always evolving, and more opportunities for fraud exist with increasing numbers of visas being granted. GAO noted that "planned regular or updated future risk assessments could help better position USCIS to identify, evaluate, and address fraud risks given the potential for changing conditions." DHS officials have stated that they plan to complete a risk assessment by September 2016 and to continue to conduct at least one annually.[104]

A 2013 Homeland Security Investigations (HSI) memorandum requested by DHS[105] assessed EB-5's vulnerabilities, specifically "concerns that this particular visa program [EB-5] may be abused by Iranian operatives to infiltrate the United States."[106] The memo, which used data from 2012, identified seven main areas of vulnerability with the visa: export of sensitive technology and economic espionage, use of force by foreign government agents and espionage, use by terrorists, investment fraud by regional centers, investment fraud by investors, fraud conspiracies by

---

[98] U.S. Government Accountability Office, *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit,* GAO-15-696, August 2015; and U.S. Department of Homeland Security Office of Inspector General, *United States Citizenship and Immigration Services: Employment-Based Fifth Preference (EB-5) Regional Center Program*, OIG-14-19, December 2013.

[99] INA §212(a)(3).

[100] U.S. Department of Homeland Security Office of Inspector General, *United States Citizenship and Immigration Services: Employment-Based Fifth Preference (EB-5) Regional Center Program*, OIG-14-19, December 2013.

[101] 8 C.F.R. §204.6(m)(6).

[102] U.S. Government Accountability Office, *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit,* GAO-15-696, August 2015.

[103] Ibid.

[104] U.S. Congress, House Committee on the Judiciary, *Is the Investor Visa an Under Performing Asset?* testimony of Rebecca Gambler, Director of Homeland Security and Justice at the U.S. Government Accountability Office, 114th Cong., 2nd sess., February 11, 2016.

[105] U.S. Department of Homeland Security, *Request for Information Implications of ICE Case Against Procurement Agent,* no. 66820.

[106] U.S. Immigration and Customs Enforcement, Homeland Security Investigations, *EB-5 Program Questions from DHS Secretary,* updated memorandum.

investors and regional centers, and illicit finance and money laundering. The memo noted EB-5 petitioners are not required to "establish significant and verifiable background for program eligibility," creating a national security risk. It found there are "no safeguards that can be put in place that will ensure the integrity of the program."[107] Nonetheless, this memo was written before the creation of the Immigrant Investor Program Office (IPO), and these risks may have been addressed.

GAO noted that USCIS restructured and centralized the EB-5 visa by moving its California operations to Washington, DC, in an effort to increase the agency's fraud detection and response capabilities.[108] This has also allowed USCIS to expand the scope of its background checks and increase the number of databases against which it checks petitioners and applicants. In that same year, USCIS also established a fraud specialist unit within its Fraud Detection and National Security (FDNS) unit specifically for the EB-5 visa. FDNS also reported hiring more fraud specialists with skillsets particularly critical to fraud prevention.[109] FDNS has also begun to provide specialized fraud training for employees and has implemented an "EB-5 University" that provides monthly presentations on different fraud-related topics relevant to the adjudication process. USCIS has improved its communication and collaboration with law enforcement agencies such as the SEC, ICE, HSI, and the FBI, to whom it refers cases of potential fraud, criminal activity, or national security threats.[110] The SEC has also worked to educate EB-5 investors through its Office of Investor Education and Advocacy (OIEA).[111]

## Data Collection

GAO has identified limitations in USCIS' collection of information. Addressing these could assist in its assessment and detection of fraud. For example, USCIS relies heavily on paper-based documentation and does not fully transfer information into their electronic databases or do so in a standardized manner.[112] These practices can make it difficult to search for certain information, especially when attempting to identify fraud through the tracking of irregularities or trends. USCIS expects to implement a new program, the Electronic Immigration System (USCIS ELIS), which aims to improve the collection of applicant information through electronic forms.[113]

---

[107] Ibid.

[108] U.S. Government Accountability Office, *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit*, GAO-15-696, August 2015.

[109] As of January 2016, EB-5's FDNS division included 22 full-time equivalent staff and 18 of those positions were filled. U.S. Congress, House Committee on the Judiciary, *Is the Investor Visa an Under Performing Asset?* testimony of Rebecca Gambler, Director of Homeland Security and Justice at the U.S. Government Accountability Office, 114th Cong., 2nd sess., February 11, 2016.

[110] U.S. Government Accountability Office, *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit*, GAO-15-696, August 2015.

[111] In 2013, OIEA and USCIS issued a joint "Investor Alert" on SEC's website to warn investors of potential investment scams. U.S. Congress, Senate Committee on the Judiciary, *The Failures and Future of the EB-5 Regional Center Program: Can it be Fixed?* testimony of Stephen L. Cohen, Associate Director of U.S. Securities and Exchange Commission's Division of Enforcement, 114th Cong., 2nd sess., February 2, 2016.

[112] For example, databases do not require that all information on paper forms be entered; certain input, such as an applicant's name from the I-924 form, is optional. U.S. Government Accountability Office, *Immigrant Investor Program Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefit*, GAO-15-696, August 2015.

[113] Additionally, USCIS reports that it plans to revise forms I-924, I-924A, I-526, and I-829 in order to capture more information from applicants. U.S. Congress, House Committee on the Judiciary, *Is the Investor Visa an Under Performing Asset?* testimony of Rebecca Gambler, Director of Homeland Security and Justice at the U.S. Government Accountability Office, 114th Cong., 2nd sess., February 11, 2016.

However, as of March 2016, only two of approximately 90 types of immigration forms were available for on-line filing, and it is estimated that the system will be completed in 2019 (over four years later than expected).[114]

Though they are limited in number and scope, FDNS does currently conduct site visits to projects that IPO staff has found to be of material concern. GAO reported that USCIS, SEC, and HSI officials and members of the national industry association representing regional centers agreed that expanding site visits would increase the program's integrity. USCIS reports that they plan on expanding their random site visit program to the EB-5 program in FY2016.[115]

Moreover, USCIS is required by statute to interview immigrant investors within 90 days of submitting Form I-829, but the agency also has the authority to waive that requirement.[116] Interviews can be a method to collect corroborating information on whether investors meet program requirements and whether the project may involve fraud. GAO reported that USCIS believes that interviews at the I-829 stage could provide important information and expects to begin conducting them in the near future.[117] At this time, USCIS has not conducted any interviews with immigrant investors submitting the I-829 petition. However, reportedly USCIS is finalizing its I-829 interview process and plans to begin conducting interviews in the third quarter of FY2016.[118]

## Targeted Employment Area (TEA) Determinations

As noted above, a majority of investments made in the EB-5 program are being directed to targeted employment areas (TEA). The reduced capital investment minimum required for immigrant investors in TEAs was meant to increase investment in areas of greater need.[119] State governments may designate a TEA by identifying a particular geographic or political subdivision as an area of high unemployment (at least 150% of the national average rate).[120] USCIS defers to the state to determine a high unemployment TEA's geographical or political subdivision boundaries but can review the state's methodologies and data.

State designation of TEAs due to high unemployment has been criticized as lenient, without clear direction, and inconsistent across states.[121] For instance, USCIS' deference to states' determinations of the boundaries for high unemployment TEAs has allowed for variation across states in how they designate such an area.[122] Furthermore, TEAs can be created through the

---

[114] DHS Office of Inspector General, *USCIS Automation of Immigration Benefits Processing Remains Ineffective,* OIG-16-48, March 9, 2016.

[115] U.S. Congress, Senate Committee on the Judiciary, *The Failures and Future of the EB-5 Regional Center Program: Can it be Fixed?* testimony of Nicholas Colucci, Chief of the Office of Immigrant Investor Program,114th Cong., 2nd sess., February 2, 2016.

[116] 8 U.S.C. §1186b(c)(1)(B) (INA interview requirement); 8 U.S.C. §1186b(d)(3) (discretionary waiver authority).

[117] U.S. Government Accountability Office, *Immigrant Investor Program: Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefits,* GAO-15-696, August 2015.

[118] Personal Conversation with staff from USCIS' Immigrant Investor Program Office, April 8, 2016.

[119] U.S. Citizenship and Immigration Services, *EB-5 Adjudications Policy,* Policy Memorandum PM-602-0083, Washington, DC, May 30, 2013.

[120] 8 C.F.R. 204.6(i).

[121] See U.S. Congress, House Committee on the Judiciary, *Is the Investor Visa and Underperforming Asset?,* 114th Cong., 2nd sess., February 11, 2016 and U.S. Congress, Senate Committee on the Judiciary, *The Failures and Future of the EB-5 Regional Center Program: Can it be Fixed?,* 114th Cong., 2nd sess., February 2, 2016.

[122] Paul Scheuren, *A Comparison of States' Approaches to Targeted Employment Area Certification,* Regional Center Business Journal, March 2010.

linking of several census tracts, therefore allowing wealthier tracts linked to tracts with high unemployment to form a TEA.[123] Some believe that this practice can accommodate commuting patterns and provide states with the choice as to what area fits their economic needs.[124] Others have contended that this allows for gerrymandering and permits developers to obtain the TEA designation without actually developing and directly investing in the neediest areas.[125]

# Legislation in the 114th Congress

As previously mentioned, in December 2015 the Regional Center Program was reauthorized through September 30, 2016, by the Consolidated Appropriations Act of 2016 (P.L. 114-113). The pending expiration of the program renewed attention on it and legislation has been introduced in the 114th Congress related to the EB-5 visa category. The following bills would modify the Regional Center Program and the EB-5 visa in general: the American Entrepreneurship and Investment Act (H.R. 616), the EB-JOBS Act (H.R. 3370), the EB-5 Integrity Act (H.R. 4530/S. 2415), and American Job Creation and Investment Promotion Reform Act of 2015 (S. 1501). In addition, H.R. 3370 and the Jobs in America Act (H.R. 3987) would create a new visa category, similar to the EB-5 category, for foreign national entrepreneurs. On February 2, 2016, the Senate Judiciary Committee held a hearing on the Regional Center Program and S. 1501; however, none of the other bills have received action.

## Proposed Changes to the Regional Center Program

Several of the bills (H.R. 4530/S. 2415, H.R. 3370, S. 1501) would seek to place more controls and requirements on regional centers, including delineating application requirements, establishing a sanction system, expanding reporting requirements, and prohibiting persons who have been convicted of certain crimes from participating in a regional center. In addition, H.R. 4530/S. 2415 and S. 1501 would create an EB-5 Integrity Fund in the Treasury, from fees on regional centers and those applying for a regional center designation to fund oversight of regional centers. Similarly, H.R. 3370 would create an EB-5 fund to administer and operate the program. H.R. 3370, H.R. 4560/S. 2415, and S. 1501 would also expand DHS's authority to terminate a regional center designation.

H.R. 4530/S. 2415 and S. 1501 would create rules and mandate the establishment of channels through which applicants (or their representatives) for a regional center designation or LPR status could discuss case-specific information.[126] S. 1501 would require USCIS to set fees for the applications at a level so that they would be adjudicated in a statutorily specified period of time, establish premium processing for regional center designation applications, and allow DHS to prioritize petitions filed under the Regional Center Program over all other immigrant petitions.

---

[123] For example, a regional center project that consists of building the Beverly Hills Waldorf Astoria located in Beverly Hills California qualifies as a TEA. Jeanne Calderon and Gary Friedland, *EB-5 Capital Project Database: Revisited and Expanded*, NYU Stern School of Business, Center for Real Estate Finance Research, New York, NY, March 29, 2016, p. 7.

[124] Lazaro Zamora and Theresa Cardinal Brown, *EB-5 Program: Success, Challenges, and Opportunities for States and Localities*, Bipartisan Policy Center, Washington, DC, September 2015.

[125] For examples, see Patrick McGeehan and Kirk Semple, "Rules Stretched as Green Cards Go to Investors," *The New York Times*, December 18, 2011.

[126] These protocols would be similar to ones established by USCIC in 2015. U.S. Department of Homeland Security, *Ethics and Integrity: Protocols for Processing EB-5 Immigrant Investor Visa Petitions and EB-5 Regional Center Applications, Including Stakeholder Communications*, April 30, 2015.

H.R. 616 would set maximum processing times of 180 days for regional center application determinations and immigrant investor petitions. H.R. 3370 would establish premium processing for foreign investors applying for EB-5 status.

H.R. 4530/S. 2415 and S. 1501 would specify how an investor demonstrates that the investment capital was obtained from a "lawful source through lawful means," and set procedures for how foreign national investors are to be treated if the regional center in which they were investing lost its designation. Lastly, H.R. 616, H.R. 3370, H.R. 4560, and S. 2415 would permanently authorize the Regional Center Program, while S. 1501 would extend its authorization to September 30, 2020.

## Proposed General Changes

H.R. 3370 and S. 1501 would increase capital investment minimums and tie the investment minimum amounts to the Consumer Price Index (CPI-U). S. 1501 would allow a foreign national who has invested the requisite capital for at least 24 months before being admitted to the United States to receive full LPR status (i.e., not conditional status). H.R. 616 and H.R. 3370 would allow the Secretary of DHS to delegate some authority for the administration of the EB-5 category to the Department of Commerce. In addition, H.R. 616 would remove derivatives from the numerical limitations imposed on the EB-5 visa and eliminate the visa category's per-country quotas.

### Target Employment Areas

With respect to TEAs, H.R. 3370 would expand the definition of a TEA to include a county that has had at least a 20% decrease in population since 1970, an area established for the purpose of a state or federal economic development incentive program, and an area within the geographic boundaries of any military installation closed pursuant to a base closure law.[127] The bill would also provide an allocation of visas for the different types of TEAs. S. 1501 would change the manner in which a TEA is defined, including providing a methodology for determining high unemployment areas for the purposes of designating a TEA. Like S. 1501, H.R. 616 would increase the number of visas set aside for TEAs from 3,000 to 5,000; but it would specify that TEA designations by the states are to be granted deference by DHS.

## Potential New Programs

H.R. 3370 would create a new visa category (EB-6) similar to the EB-5 category for foreign nationals who (1) wish to start a new commercial enterprise with a specified amount of money from qualified investors or venture capital funds; or (2) have already started and are managing a new commercial enterprise that employs a specified number of persons.[128] H.R. 3987 would create a new visa category (EB-6) for foreign nationals who have received investment to start a new commercial enterprise, and for foreign nationals on H-1B visas[129] who have an advanced degree in science, technology, engineering, or math (STEM) and meet other requirements. Similar

---

[127] 10 U.S.C. §101(a)(17).

[128] H.R. 3370 would also recreate a new LPR visa (EB-7) for nonimmigrant treaty investors holding an E-2 visa who (1) have maintained such status for at least 10 years, and (2) created at least 5 jobs for at least 10 years.

[129] H-1B visas allow for the temporary admission of foreign nationals to work in professional specialty occupations. For more on this visa category, see CRS Report RL30498, *Immigration: Legislative Issues on Nonimmigrant Professional Specialty (H-1B) Workers*.

to the EB-5 category, under H.R. 3370 and H.R. 3987, the entrepreneurs would initially receive conditional LPR status, and after two years they would need to have created a certain number of jobs to be converted to full LPR status. Under H.R. 3370, the EB-5 visa would be exempt from the numerical limits.

# Appendix. Additional EB-5 Visa Data

### Table A-1. EB-5 Visas Issued and Adjustments of Status, FY2004-FY2015

(Number of Visas)

| Fiscal Year | EB-5 Standard | EB-5 TEA | Regional Center | Regional Center TEA | Total EB-5 |
|---|---|---|---|---|---|
| 2004 | 58 | 68 | 0 | 0 | 126 |
| 2005 | 132 | 216 | 0 | 1 | 349 |
| 2006 | 194 | 512 | 0 | 96 | 802 |
| 2007 | 149 | 470 | 1 | 173 | 793 |
| 2008 | 149 | 239 | 0 | 1,055 | 1,443 |
| 2009 | 282 | 410 | 7 | 3,519 | 4,218 |
| 2010 | 324 | 239 | 1 | 1,321 | 1,885 |
| 2011 | 230 | 152 | 5 | 3,076 | 3,463 |
| 2012 | 159 | 164 | 5 | 7,312 | 7,640 |
| 2013 | 243 | 227 | 7 | 8,087 | 8,564 |
| 2014 | 161 | 155 | 1 | 10,375 | 10,692 |
| 2015 | 64 | 92 | 11 | 9,597 | 9,764 |

**Source:** U.S. Department of State, *Report of the Visa Office*, Table V Immigrant Visas Issued and Adjustments of Status Subject to Numerical Limitations (by Foreign State of Chargeability), Part 3; multiple years.

**Notes:** Visas issued represents visa granted to individuals outside of the United States. Adjustments of Status represents individuals already in the United States who adjusted their status. This table represents the sum of these two groups. The actual number of available visas for FY2014 was more than 10,000 due to a "roll-down" of unused visas from other employment-based LPR visa categories. For more information on "roll-downs," see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*. **EB-5 Standard** represents those receiving an EB-5 visa number based in an investment of at least $1,000,000 in a non-TEA area. **EB-5 TEA** represents those receiving an EB-5 visa number based on an investment in a targeted employment area (TEA). **Regional Center** represents those receiving an EB-5 visa classification based on investment in a regional center in a non-TEA area. **Regional Center TEA** represents those who received an EB-5 visa number based on investment in a regional center in a TEA. **EB-5 Total** represents total visas issued and adjustments of status. These numbers differ from the number of EB-5 visa admissions (as seen in Table 4) because some individuals who are issued visas ultimately do not use them to enter the United States.

**Table A-2. Form I-526 and Form I-829 Petition Adjudications, FY1994-FY2015**

| Fiscal Year | I-526 Petitions | | | | I-829 Petitions | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Approved | Denied | Pending | Received | Approved | Denied | Pending |
| 1994 | 513 | 407 | 82 | — | 24 | 15 | 1 | — |
| 1995 | 417 | 291 | 109 | — | 130 | 111 | 10 | — |
| 1996 | 801 | 616 | 122 | — | 287 | 344 | 53 | — |
| 1997 | 1,496 | 1,110 | 141 | — | 877 | 718 | 135 | — |
| 1998 | 1,368 | 358 | 290 | — | 469 | 104 | 13 | — |
| 1999 | 650 | 141 | 1,558 | — | 384 | 86 | 24 | — |
| 2000 | 384 | 167 | 270 | — | 384 | 30 | 33 | — |
| 2001 | 585 | 44 | 207 | — | 143 | 52 | 114 | — |
| 2002 | 255 | 69 | 217 | — | 194 | 198 | 174 | — |
| 2003 | 255 | 132 | 194 | — | 139 | 36 | 66 | — |
| 2004 | 247 | 131 | 159 | — | 123 | 217 | 93 | — |
| 2005 | 332 | 187 | 156 | — | 39 | 206 | 132 | — |
| 2006 | 486 | 344 | 132 | — | 89 | 108 | 108 | — |
| 2007 | 776 | 485 | 149 | — | 194 | 117 | 52 | — |
| 2008 | 1,258 | 644 | 120 | 853 | 391 | 161 | 69 | 454 |
| 2009 | 1,031 | 1,265 | 208 | 514 | 437 | 350 | 57 | 735 |
| 2010 | 1,953 | 1,369 | 165 | 1,125 | 768 | 274 | 56 | 1,167 |
| 2011 | 3,805 | 1,571 | 372 | 3,347 | 2,345 | 1,067 | 46 | 2,395 |
| 2012 | 6,041 | 3,677 | 957 | 5,018 | 712 | 736 | 60 | 1,013 |
| 2013 | 6,346 | 3,699 | 943 | 7,131 | 1,217 | 844 | 44 | 1,345 |
| 2014 | 10,923 | 4,925 | 1,169 | 12,453 | 2,516 | 1,603 | 178 | 2,075 |
| 2015 | 14,373 | 8,756 | 1,051 | 17,367 | 2,767 | 1,067 | 11 | 4,049 |

**Source:** CRS representation of data from the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Service, *Performance Analysis System (PAS)*, multiple years.

**Notes:** Some petitions approved or denied may have been received in previous periods. **Petitions Received** are new petitions received and entered into a case-tracking system during the reporting period. **Petitions Approved** are those approved in that reporting period. **Petitions Denied** are those denied, terminated, or withdrawn during the reporting period. **Petitions Pending** are those awaiting a decision at the end of the reporting period. USCIS did not publicly report petitions pending until FY2008. (—) represents data unavailable.

**Table A-3. EB-5 Issued and Adjustments of Status by Countries, FY2004-FY2015**

Top 10 Countries

| Country | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---------|------|------|------|------|------|------|------|------|------|------|------|------|
| China | 16 | 44 | 96 | 110 | 360 | 1,979 | 772 | 2,408 | 6,124 | 6,895 | 9,128 | 8,156 |
| Vietnam | 0 | 2 | 0 | 0 | 4 | 11 | 15 | 26 | 35 | 46 | 121 | 280 |
| Taiwan | 61 | 75 | 68 | 80 | 47 | 170 | 94 | 122 | 148 | 137 | 126 | 139 |
| South Korea | 14 | 88 | 376 | 385 | 693 | 903 | 295 | 254 | 447 | 364 | 225 | 116 |
| India | 0 | 5 | 20 | 19 | 19 | 72 | 62 | 37 | 76 | 87 | 96 | 111 |
| Russia | 0 | 0 | 0 | 1 | 7 | 60 | 41 | 30 | 42 | 70 | 100 | 88 |
| Britain | 8 | 26 | 44 | 43 | 115 | 324 | 135 | 57 | 67 | 84 | 41 | 80 |
| Mexico | 2 | 5 | 11 | 6 | 15 | 33 | 50 | 53 | 81 | 145 | 129 | 77 |
| Venezuela | 0 | 2 | 4 | 2 | 1 | 30 | 20 | 46 | 109 | 92 | 96 | 72 |
| Iran | 2 | 12 | 0 | 9 | 16 | 12 | 55 | 117 | 81 | 86 | 76 | 62 |

**Source:** U.S. Department of State, *Report of the Visa Office*, Table V Immigrant Visas Issued and Adjustments of Status Subject to Numerical Limitations (by Foreign State of Chargeability), Part 3; multiple years.

**Notes:** Visas issued represents visa granted to individuals outside of the United States. Adjustments of Status represents individuals already in the United States who adjusted their status. This table represents the sum of these two groups. Great Britain includes Northern Ireland.

## Author Contact Information

Carla N. Argueta
Analyst in Immigration Policy
cargueta@crs.loc.gov, 7-1019

Alison Siskin
Specialist in Immigration Policy
asiskin@crs.loc.gov, 7-0260